Brent P. Ray (*pro hac vice* forthcoming)
Andrew J. Chinsky (*pro hac vice* forthcoming)
KING & SPALDING LLP
353 N. Clark Street, 12th Floor
Chicago, Illinois 60654
T: +1 312 995 6333
F: +1 312 995 6330
Email: bray@kslaw.com
        achinsky@kslaw.com

Daniel C. Barr (Bar No. 010149)
Janet M. Howe (Bar No. 034615)
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
T: +1 602 351 8085
F: +1 602 648 7085
Email: dbarr@perkinscoie.com
        jhowe@perkinscoie.com

*Counsel for Plaintiffs and the Class*
(Additional Counsel on Signature Page)

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| D.H., by and through his mother, Janice Hennessy-Waller; and John Doe, by his guardian and next friend, Susan Doe, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>          vs.<br><br>Jami Snyder, Director of the Arizona Health Care Cost Containment System, in her official capacity,<br><br>                    Defendant. | No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Plaintiffs D.H. and John Doe respectfully state and allege as follows

**PRELIMINARY STATEMENT**

1.      D.H. is a seventeen-year-old transgender Arizona resident enrolled in Arizona's Medicaid program, known as the Arizona Health Care Cost Containment System ("AHCCCS"). John Doe is a fifteen-year-old transgender Arizona resident enrolled in AHCCCS. D.H. and John bring this lawsuit on behalf of themselves and

similarly situated individuals to challenge Arizona's categorical prohibition of coverage of medically necessary treatments for gender dysphoria, specifically, male chest reconstruction surgery.

2.     Gender dysphoria refers to the distress that can result from the incongruence between a person's gender identity and their assigned sex at birth. Gender dysphoria is a serious medical condition that, if left untreated, can cause anxiety, depression, and even self-harm or suicidal ideation.

3.     Gender-confirming medical treatments—including male chest reconstruction surgery—are safe, effective, and medically necessary to treat gender dysphoria in many transgender individuals, including adolescents.

4.     A longstanding Arizona regulation, promulgated in 1982 and enforced by AHCCCS, expressly prohibits Medicaid coverage for "gender reassignment surgeries." Ariz. Admin. Code R9-22-205-B.4(a) ("Challenged Exclusion"). Because of the Challenged Exclusion, D.H., John, and similarly situated individuals have been denied or prevented from obtaining Medicaid coverage for medically necessary male chest reconstruction surgery.

5.     Both D.H. and John have been diagnosed with gender dysphoria. Although identified as female at birth, D.H. and John are male and live as male in every aspect of their lives.

6.     D.H. first became aware of his male gender identity around the age of four. Frustrated and angry at his inability to communicate that he was transgender to his mother, D.H. developed significant psychological distress at an early age, including severe anxiety and suicidal ideation. Concerned for his safety and well-being, D.H.'s mother, Janice, placed him in a psychiatric treatment facility on several occasions.

7.     At thirteen, D.H. developed the confidence to tell Janice that he is transgender. Janice then arranged for D.H. to see a mental health provider with experience working with transgender youth. With the recommendation and support of his health care providers, D.H. began to transition to live in accordance with his gender identity. As part

of the treatment for his gender dysphoria, D.H. started taking testosterone to masculinize his body

8.     Just before turning thirteen, D.H. started wearing a binder to flatten his chest, which alleviates his gender dysphoria, but significantly impairs his ability to function. The pain and discomfort caused by wearing the binder interferes with D.H.'s ability to focus on school and homework. The binder also prevents him from engaging in prolonged or intense physical activity, especially dance, which had previously been a source of relief for D.H.

9.     Last year, D.H.'s pediatrician and his therapist recommended that he obtain male chest reconstruction surgery to further alleviate his gender dysphoria. However, prior authorization for this surgery was denied due to the Challenged Exclusion.

10.     John started becoming aware of his male gender identity when he was about eleven years old and his body began showing the first signs of puberty. Worried that his family would reject him for being transgender, John kept everything he was going through to himself and began to experience depression and suicidal ideation.

11.     After about six months, John recognized that he needed help and reached out to his sister, and then eventually told his grandmother, Susan, both of whom were supportive. John started using a male name and pronouns, which helped to alleviate his gender dysphoria to some degree.

12.     In November 2018, John began seeing a specialist at the Gender Support Program at Phoenix Children's Hospital.

13.     Like D.H., John also wears a binder, which is very tight and restrictive. Even with the binder, John feels uncomfortable being outside without layers of clothing. He wears a hooded sweatshirt nearly every day, including in the summer. John's chest also hinders his social interactions. For example, John wears his binder and a t-shirt when at the pool, often having to answer uncomfortable questions about why he insists on wearing a t-shirt in the water.

14.     Around February 2020, John's health care providers recommended that he pursue male chest reconstruction surgery to further alleviate his gender dysphoria. However, due to the Challenged Exclusion, John cannot receive the surgery.

15.     The Challenged Exclusion unlawfully denies medically necessary surgical care to transgender beneficiaries on AHCCCS. Arizona disregards the transition-related health care needs of Medicaid's transgender beneficiaries. In doing so, Arizona exposes transgender people to significant and avoidable harms to their health and well-being, in violation of the U.S. Constitution and federal law.

16.     The Challenged Exclusion violates Plaintiffs' civil rights under Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557"); the Early and Periodic Screening, Diagnostic and Treatment requirements of the federal Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r); the comparability requirement of the Medicaid Act, *id*. § 1396a(a)(10)(B); and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

17.     D.H. and John further seek immediate declaratory and injunctive relief to enjoin Arizona from continuing to deny them medically necessary treatment in violation of federal law. Without the injunctive relief sought in this lawsuit, the Challenged Exclusion will prevent effective treatment of D.H.'s and John's gender dysphoria, causing them irreparable physical and psychological harm.

## JURISDICTION AND VENUE

18.     The Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

19.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 1983.

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiffs reside within this judicial district and D.H resides within the Tucson division, the events giving rise to this action occurred in this judicial district, and the Defendant is subject to personal jurisdiction in this judicial district.

**THE PARTIES**

21.     Plaintiff D.H. is a seventeen-year-old boy who has been diagnosed with gender dysphoria. D.H. resides in Pima County, Arizona and brings this action though his mother, Janice Hennessy-Waller. Due to his family's limited income, D.H. is eligible for Arizona's Medicaid program. D.H. has been enrolled in Arizona's Medicaid program at all relevant times.

22.     Plaintiff John Doe is a fifteen-year-old boy who has been diagnosed with gender dysphoria. John resides in Maricopa County, Arizona and brings this action though his grandmother and legal guardian, Susan Doe. Due to his family's limited income, John is eligible for Arizona's Medicaid program. John has been enrolled in Arizona's Medicaid program at all relevant times.

23.     Defendant Jami Snyder is the Director of AHCCCS, the single-state agency that administers Arizona's Medicaid program. As such, she has a duty to ensure that the AHCCCS program is administered in accordance with federal Medicaid law. Defendant Snyder is sued in her official capacity.

**STATEMENT OF FACTS**

***Gender Identity and Gender Dysphoria***

24.     Gender identity is an innate, internal sense of one's sex—*i.e.*, being male or female—and is a core, hard-wired aspect of a person's identity. Everyone has a gender identity. Most people's gender identity is consistent with the sex they were assigned at birth ("assigned sex"). Transgender people, however, have a gender identity that differs from their assigned sex. A transgender man is a man who was assigned female at birth but has a male gender identity. A transgender woman is a woman who was assigned male at birth but has a female gender identity.

25.     Gender identity and transgender status are inextricably linked to one's sex and are sex-related characteristics.

26.     Around the onset of puberty, many transgender youth experience a level of psychological distress that significantly interferes with their overall wellbeing and ability

to function. For some transgender youth, that distress becomes debilitating and can lead to a severe decline in mental health.

27.     That distress stems, in part, from the visible physical changes that accompany puberty. Those physical changes undermine a transgender young person's ability to live in a manner consistent with their gender identity, exacerbating their psychological distress. Even basic daily tasks, such as bathing and getting dressed, can become emotionally paralyzing because those tasks are painful reminders of the disconnect between a transgender young person's body and their gender identity. In addition, a transgender boy who has begun to develop breasts is more likely to be mistaken for female, a probability that serves as a constant source of anxiety. The psychological distress transgender youth experience is further heightened by the reality that some of those physical changes may be irreversible, permanently constricting their future treatment options and negatively affecting their quality of life. Consequently, timely treatment is critical.

28.     This significant increase in distress causes many transgender youth who had previously delayed disclosing that they are transgender to set aside their fears of rejection and ask for help from family. With the permission of their parents or legal guardians, a transgender young person can begin accessing the health care services needed to alleviate their psychological distress. That distress is commonly referred to as gender dysphoria.

29.     Gender dysphoria is a serious medical condition recognized by the American Psychiatric Association. Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5").[1] Gender dysphoria refers to the

---

[1] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder." The DSM-5 noted that Gender Dysphoria "is more descriptive than the previous DSM-IV term *gender identity disorder* and focuses on dysphoria as the clinical problem, not identity *per se*." Being diagnosed with gender dysphoria "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." Am. Psychiatric Ass'n, *Position Statement on Discrimination Against Transgender & Gender Variant Individuals* (2012), at https://goo.gl/iXBM0S.

distress that can result from the incongruence between a person's gender identity and their assigned sex. If left untreated, gender dysphoria can cause anxiety, depression, and even self-harm or suicidal ideation. Gender dysphoria is often heightened "when physical interventions by means of hormones and/or surgery are not available." *Id.* at 451. Access to appropriate, individualized medical care can mitigate and often prevent all of those symptoms.

30.     Gender dysphoria is highly treatable. As with other medical conditions, health care providers follow a well-established standard of care when working with patients with gender dysphoria. The World Professional Association for Transgender Health ("WPATH"), and its predecessors, has set those standards for over four decades.

31.     WPATH is an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria. WPATH published the seventh and most recent edition of the Standards of Care in 2011.

32.     Building on those standards and incorporating the most current research and clinical experience, the Endocrine Society released the Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline in September 2017. Those guidelines reaffirm the WPATH Standards of Care and offer medical providers practical guidance on providing transition-related care to patients with gender dysphoria, including young people.

33.     The WPATH and the Endocrine Society standards have been adopted by many major associations of healthcare professionals, including the American Medical Association, American Psychiatric Association, and American Psychological Association, as well as associations of healthcare professionals focused on youth and adolescents, such as the American Academy of Pediatrics, American Association of Child and Adolescent Psychiatrists, and the Pediatric Endocrine Society. Federal courts across the country have

1    also recognized the standards of these medical societies as setting the prevailing standard

2    of care for the treatment of gender dysphoria.

3        34.    A key component of treating gender dysphoria is a "social transition," in

4    which the individual lives in accordance with their gender identity in all aspects of life.

5    Though specific to each person, a social transition typically includes adopting a new first

6    name, using and asking others to use pronouns reflecting the individual's true gender,

7    wearing clothing typically associated with that gender, and using sex-specific facilities

8    corresponding to that gender.

9        35.    Studies and anecdotal evidence demonstrate the tremendous mental health

10   benefits transgender youth experience following a social transition. One study found that

11   the mental health profile of transgender children who underwent a social transition was

12   nearly identical to that of their nontransgender peers. Kristina Olson et al., *Mental Health*

13   *of Transgender Children Who Are Supported in Their Identities*, 137 Pediatrics 1 (2016).

14   Another study found that transgender young people who were referred to by the correct

15   name and pronoun throughout their daily lives demonstrated a seventy-seven percent

16   decrease in severe depressive symptoms. Stephen Russell et al., *Chosen Name Use is*

17   *Linked to Reduced Depressive Symptoms, Suicidal Ideation and Behavior among*

18   *Transgender Youth*, 63 J. of Adolescent Health 503 (2018). The success of a social

19   transition hinges on parents, extended family, peers, and others in the community treating

20   the individual consistently with their gender identity.

21       36.    Consistent with the standard of care, many transgender individuals also need

22   health care services that alter their physical characteristics to bring their outer appearance

23   into alignment with their gender identity. The purpose of the services is to enable a

24   transgender person to live consistently with their gender identity in every aspect of their

25   life. This alleviates a transgender individual's gender dysphoria by reducing the

26   incongruence between their assigned sex and gender identity. Those treatments also ensure

27   that they are seen by others in a way that reflects their true gender, addressing a significant

28   source of distress.

37.     For transgender youth who have entered puberty, these health care services may include hormone-replacement therapy and surgery. Hormone-replacement therapy ensures that transgender people develop physical sex characteristics typical of their gender identity—not their assigned sex—such as facial and body hair in boys and breasts in girls.

38.     The prevailing standards of care for the treatment of gender dysphoria recognize that transgender males may need male chest reconstruction surgery before turning eighteen. A prerequisite for male chest reconstruction surgery is a referral letter from the young person's treating mental health provider. That letter provides the surgeon with a psychological assessment of the patient and the clinical rationale(s) for the referral and confirms that the patient is capable of consenting to the procedure.

39.     The purpose of the surgery is functional. Following the surgery, a transgender male is more readily seen as male, improving the effectiveness of their social transition because they are less likely to be mistaken for female, which can significantly reduce the anxiety and dysphoria they experience. The surgery also improves their self-image because they no longer have to see or wear a binder to hide a part of their body that causes so much physical pain and psychological distress. As a result, transgender males who have had male chest reconstruction surgery experience fewer barriers to engaging in physical activity, among other physical and mental health benefits.

40.     As with other treatments for gender dysphoria, both scientific research and clinical evidence highlight the importance of male chest reconstruction surgery in the treatment of gender dysphoria in transgender males.

### The Federal Medicaid Act

41.     Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-5, creates the Medicaid program—a cooperative federal-state program that provides health care services to specified categories of individuals meeting income and other criteria. The objective of Medicaid is to enable states to "furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the cost of necessary medical

services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396-1.

42.     States are not required to participate in the Medicaid program. States that choose to participate must comply with the federal Medicaid Act and its implementing regulations.

43.     In return, the federal government reimburses each participating state for a substantial portion of the cost of providing medical assistance. *See id.* §§ 1396b(a), 1396d(b), 1396(c).

44.     The Medicaid Act requires each participating state to establish or designate a single state agency that is responsible for administering or supervising the administration of the state's Medicaid program. *Id.* § 1396a(a)(5); 42 C.F.R. § 431.10.

45.     In addition, each participating state must maintain a comprehensive plan for medical assistance approved by the Secretary of the U.S. Department of Health and Human Services. *Id.* § 1396a. The plan must describe the state's program and affirm its commitment to comply with the Medicaid Act and its implementing regulations.

46.     While a state is entitled to delegate certain of its responsibilities to other entities, such as local agencies or Medicaid managed care plans, the single state agency is ultimately responsible for ensuring compliance with all aspects of federal Medicaid law. *See, e.g.*, 42 C.F.R. §§ 438.100(a)(2), 438.100(d).

47.     Under the Medicaid Act, a participating state must provide medical assistance to certain eligibility groups. *Id.* § 1396a(a)(10)(A)(i). One mandatory eligibility category is children and adolescents under age 18 whose household income is below 133% of the federal poverty level. *Id.* §§ 1396a(a)(10)(A)(i)(VI)-(VII), 1396a(l).

### *The Medicaid Early and Periodic Screening, Diagnostic and Treatment Requirements*

48.     The Medicaid Act requires states to cover certain services and gives them the option to cover other services. *Id.* §§ 1396a(a)(10)(A), 1396d.

49.     Each participating state must cover Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") for individuals under age 21. *Id*. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r).

50.     EPSDT's fundamental purpose is to "[a]ssure that health problems are diagnosed and treated early, before they become more complex and their treatment more costly." Ctrs. for Medicare & Medicaid Servs., *State Medicaid Manual* § 5010.B.

51.     As part of providing EPSDT, states must:

      a.  Inform all persons in the state who are under the age of 21 and who are eligible for Medicaid of the availability of EPSDT as described in 42 U.S.C. § 1396d(r);

      b.  Provide or arrange for screening services in all cases where they are requested as required by § 1396d(r)(5); and

      c.  Arrange for (directly or through referral) corrective treatment for any conditions identified by the screening services as required by § 1396a(a)(43)(C).

52.     Pursuant to the EPSDT requirements, states must cover four specific, separate categories of screening services: medical, vision, dental, and hearing. 42 U.S.C. § 1396d(r)(1)-(4).

53.     States also must cover "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in [§ 1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." *Id*. § 1396d(r)(5). In other words, the EPSDT mandate requires states to cover all necessary Medicaid services for individuals under age 21.

54.     EPSDT services must be initiated in a timely manner, as the individual needs of the child require, and must be consistent with accepted medical standards, no later than six months from the date of request. 42 C.F.R. § 441.56(e).

55.     Surgery to treat gender dysphoria, including male chest reconstruction surgery, is an EPSDT service under § 1396d(r)(5).

### The Medicaid Comparability Requirement

56.     Under the Medicaid Act, "the medical assistance made available to any individual . . . shall not be less in amount, duration or scope than the medical assistance made available to any other such individual." *Id*. § 1396a(a)(10)(B)(i). *See also* 42 C.F.R. § 440.240(b).

57.     A state "Medicaid agency may not arbitrarily deny or reduce the amount or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).

58.     States must also ensure that "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose." 42 C.F.R. § 440.230(b).

### The Arizona Medicaid Program

59.     Arizona participates in Medicaid, calling its program the Arizona Health Care Cost Containment System ("AHCCCS"). Ariz. Rev. Stat. §§ 36-2901 to 2972.

60.     AHCCCS is also the name of the single-state Medicaid agency that is responsible for administering and implementing Arizona's Medicaid program consistent with the requirements of federal law. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10.

61.     AHCCCS contracts with private managed care plans to provide health care services to Medicaid enrollees. *See* AHCCCS, Available Health Plans, https://www.azahcccs.gov/Members/ProgramsAndCoveredServices/availablehealthplans.html (listing the eight Medicaid managed care plans operating in the State).

62.     The federal government reimburses Arizona for approximately seventy percent of its expenditures on health care services. U.S. Dep't of Health & Human Servs., Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Persons for October 1, 2020 Through September 30, 2021, 84 Fed. Reg. 66204, 66204 (Dec. 3, 2019).

***Arizona's Exclusion on Surgical Care for Transgender Medicaid Beneficiaries***

63.    Since 1982, an Arizona regulation (the "Challenged Exclusion") has prohibited AHCCCS coverage for "gender reassignment surgeries." Ariz. Admin. Code R9-22-205-B.4(a). The Challenged Exclusion has been applied since that time to deny coverage to transgender AHCCCS beneficiaries seeking male chest reconstruction surgery.

64.    Arizona has singled out transition-related surgical care for an express exclusion even though AHCCCS covers the same surgical services to treat other health conditions. *See, e.g.,* Ariz. Admin. Code R9-22-2004(A)(4), AHCCCS Medical Policy Manual, § 310-C Breast Reconstruction After Mastectomy (2018), https://www.azahcccs.gov/shared/Downloads/MedicalPolicyManual/300/310C.pdf.

65.    The Challenged Exclusion has no medical or scientific basis. To the contrary, for many transgender people, including adolescents, surgical care is medically necessary to treat gender dysphoria.

66.    Contrary to the prevailing standard of care for the treatment of gender dysphoria, Defendant continues to enforce the Challenged Exclusion against transgender Medicaid recipients, even those covered under EPSDT, including D.H. and John.

67.    On information and belief, many transgender AHCCCS recipients have been deterred from seeking prior authorization for transition-related surgeries because of their knowledge, or the knowledge of their medical providers, that the Challenged Exclusion would make such requests futile.

***D.H.'s Gender Dysphoria and Need for Surgical Treatment***

68.    D.H. was identified as female at birth but has known that he is male since age four.

69.    As a young child, D.H. struggled to express to his mother that he is male. Nothing he said or did got the result he had hoped for; Janice, D.H.'s mother, continued to treat him as a girl. As a result, D.H. began exhibiting signs of significant psychological

distress including depression, prolonged crying episodes, anxiety, and insomnia. The severity of D.H.'s distress led his mother to seek the advice of mental health professionals.

70.     When he was about eleven years old, the stress related to his gender identity—combined with the other stressors D.H. was trying to navigate—was so overwhelming that D.H. started losing his hair. He was eventually hospitalized for intensive psychiatric treatment.

71.     Following his hospitalization, Janice enrolled D.H. in dance class, hoping it would provide D.H. a healthy way to cope with his distress. The movements were like therapy to him. Dance also became a social outlet; he made friends and felt a sense of belonging. It was the only thing in his life that could make him feel better. By the following year, D.H. was enrolled in three different dance classes: ballet, modern, and jazz.

72.     That euphoria ended later that year once puberty began. Because of D.H.'s increasing chest size, dance no longer provided the same psychological release it once had. D.H. hated his body and everything that came with it. His thoughts and fears about experiencing puberty—with its associated physical changes that would take his body even further out of alignment with his gender identity—became all-consuming and significantly affected his ability to function. D.H. hid his changing body under baggy clothes and hated being perceived as a girl at school.

73.     D.H. began using a variety of methods to flatten his chest, from multiple sports bras and Ace bandages to duct tape, so that his appearance better aligned with his gender identity. Those initial attempts were extremely uncomfortable and irritated his skin. Needing a better and safer solution, D.H. secretly bought his first binder, an article of clothing that compresses a person's chest, giving the appearance of a flat chest. Putting on the binder gave D.H. a sense of relief that no amount of therapy or medication had ever given him. It also eventually helped him gain the confidence to tell his mother what he struggled to express as a child: "I am a boy."

74.    Janice was supportive but sought out the advice of health care providers with experience working with transgender youth before making any decisions regarding next steps.

75.    Soon after disclosing to his mother that he is transgender at age thirteen, D.H. started seeing Tamar Reed, a therapist who specializes in treating gender dysphoria in children and adolescents. After carefully assessing D.H.'s mental health, Ms. Reed recommended that D.H. begin to transition to living as male. D.H. started using a male name and asked that others refer to him using that name and masculine pronouns. He also changed his hairstyle and started wearing boys' clothing.

76.    D.H.'s social transition provided him with much-needed psychological relief. He was regularly being referred to by a male name and pronouns and treated as male by those around him.

77.    Nevertheless, D.H.'s distress continued to build.

78.    A few months before his fourteenth birthday, the depression and suicidal ideation became overwhelming. Janice noticed a change in D.H.'s personality and that he had started distancing himself from his peers and activities that had previously brought him joy. Then, following a dance competition in January 2017, D.H.'s mental health decompensated significantly. Out of concern for his safety and wellbeing, D.H. was admitted to a ten-day intensive psychiatric treatment program.

79.    Following that treatment program, his health care providers recommended that he start hormone-replacement therapy to further his social transition—that treatment would both halt the effects of estrogen and make his appearance more typically masculine. D.H.'s pediatrician referred him to a pediatric endocrinologist for this treatment and related specialty care. D.H. received his first shot of testosterone in November 2017.

80.    The testosterone has caused D.H.'s voice to deepen, he has grown facial hair, and he has developed a more masculine musculature. The testosterone, however, cannot reverse the physical changes that had already occurred prior to D.H.'s transition, particularly chest development.

81.     Because of the prominent appearance of his chest, D.H.'s binder continues to be one of his most important pieces of clothing. Although binders are not supposed to be worn for more than seven to eight hours a day, D.H. regularly wears his binder for ten hours a day, and at least twice per week D.H. wears it for longer than ten hours. On occasion, D.H. has worn his binder for multiple consecutive days. He even struggles to take the binder off at home, where feels the most comfortable being himself.

82.     Keeping the binder on that long is uncomfortable and painful. The effort it takes to ignore the pain interferes with D.H.'s ability to focus on school, particularly homework, as D.H.'s discomfort compounds throughout the day. The compression from the binder also prevents him from breathing too deeply. In fact, D.H.'s current pediatrician, Dr. Andrew Cronyn, remarked that D.H.'s binder contributed to him developing asthma in adolescence and needing an inhaler to engage in extended physical activity.

83.     While taking testosterone and using the binder have improved D.H.'s mental health, D.H. continues to experience significant gender dysphoria because of his chest. The benefits of using a binder were—and continue to be—temporary and imperfect. The binder dampens the distress D.H. feels during the day, but once he removes the binder at night, D.H.'s distress intensifies. And, even with the binder, D.H. continues to be mistaken for female, exacerbating his anxiety around interacting with unfamiliar people.

84.     D.H.'s distress began compounding again and, in September 2018, D.H. was placed in an intensive psychiatric treatment program for a third time due to suicidal ideation. D.H. was fifteen-years old at that time.

85.     The mental health treatment D.H. received following that hospitalization helped him develop more effective strategies for coping with the distress caused by gender dysphoria and the appearance of his chest. Even with those strategies, D.H.'s distress still has a significant effect on his mental health, daily life, and ability to function. D.H. still struggles with an ever-present anxiety that the appearance of his chest will cause others to treat him as female. This prevents him from participating in social activities with his

friends and caused him to quit dance over a year ago because he gets winded too easily to dance with a binder, but the dysphoria is too great for him to dance without one. His dysphoria also makes him extremely uncomfortable revealing his body even when he is by himself or in a doctor's office.

86.     In 2019, D.H.'s pediatrician referred D.H. to a surgeon, Dr. Ethan Larson, who could perform male chest reconstruction surgery. D.H.'s health care providers determined that the surgery was medically necessary to alleviate D.H.'s gender dysphoria. Dr. Larson evaluated D.H. and agreed he would be a good candidate for the surgery.

87.     Dr. Larson requested prior authorization for the surgery from UnitedHealthcare, D.H.'s Medicaid managed care plan. UnitedHealthcare denied prior authorization for the surgery. D.H. appealed the denial of the surgery, and on July 5, 2019, UnitedHealthcare upheld its denial of coverage pursuant to the Challenged Exclusion.

88.     Due to her income, Janice cannot afford to pay for John to undergo male chest reconstruction surgery without AHCCCS covering the procedure.

### John's Gender Dysphoria and Need for Surgical Treatment

89.     John was identified as female at birth. His grandmother, Susan, has cared for him since he was two years old and continues to be his legal guardian.

90.     As a child, John did not like dresses or typical girl toys, but was never able to pinpoint a reason.

91.     Approximately three years ago, just before John turned twelve, he started experiencing the first signs of puberty. Those signs were coupled with an almost immediate and significant decline in his mental health. He experienced symptoms of severe depression, such as a constant and overwhelming sadness, distancing himself from his friends, and suicidal ideation. Unable to describe his feelings and uncertain about how Susan would respond even if he could, John kept those emotions bottled up.

92.     Worried about how Susan and others in his family might react, especially given their strong religious faith, John waited nearly six months before telling his older sister that he is transgender. He eventually told Susan as well.

93.     Over the course of the following year, John's 7th grade year, Susan and John had many extensive conversations to help her better understand what he was experiencing and how she could help him.

94.     John continued to experience significant gender dysphoria throughout his 7th grade year. Although John continued to wear the boys' clothes he always had and started using a male name, his peers, teachers, and family did not consistently refer to him by that name and male pronouns. Not being consistently treated as male caused John to be stressed the entire school year.

95.     Wanting to prevent a repeat of the prior year, in the summer prior to starting 8th grade, John e-mailed each of his teachers to inform them that he is transgender and ask that they refer to him as John and by male pronouns. This helped set the tone; in 8th grade, John was more regularly referred to by the correct name and pronouns—both in school and out.

96.     Around that same time, at thirteen years old, John's pediatrician referred him to the Gender Support Program at Phoenix Children's Hospital, a clinic specializing in healthcare services for transgender young people.

97.     John had his first appointment at Phoenix Children's Hospital in November 2018, where he began to see Dr. Veenod Chulani, an adolescent-medicine specialist. Dr. Chulani referred John to a mental health provider, who formally diagnosed John with gender dysphoria. Soon thereafter John started taking medication to stop his menstrual cycle, which helped relieve some of the gender dysphoria he was experiencing at the time. In May 2019, Dr. Chulani and John's therapist determined that it was medically necessary for him to start taking testosterone, which he started the following month. John is pleased with how the testosterone therapy has changed his voice and other aspects of his body. Transitioning has also boosted his confidence, and now far fewer people mistake him for female.

98.     His transition and testosterone treatment, however, have not lessened the intense dysphoria he experiences regarding the appearance of his chest. Starting in 2018,

John began binding his chest using a variety of methods, such as multiple sports bras and constrictive undergarments. He bought his first binder in December 2019.

99.    Every morning, the first thing John does is to put on a binder, which he often wears for longer than the recommended eight-hour maximum. Even with the binder, John still feels uncomfortable being outside without multiple layers of clothing, including a hooded sweatshirt that he wears nearly every day. The binder constricts his breathing, which in combination with his asthma, requires him to take far more breaks than his peers when engaging in physical activity.

100.    Although the binder sometimes allows him to forget about his chest—a sense of relief he treasures—the hardest part of John's daily routine is removing his binder. The dysphoria John experiences regarding his chest comes flooding back, a difficult reminder that his body still does not match who he is. John's chest-related dysphoria keeps him awake at night at least once a week; putting on his binder temporarily is the only way he can calm his distress, a task he often tries to do without opening his eyes or turning on the lights so that he does not have to see his bare chest.

101.    Having top surgery would have a significant positive impact on John's life. John would finally be able to look at himself in the mirror and be in public without having to wear so many layers of clothing on top of his binder, which would benefit both his mental and physical health. John would gain confidence that will help improve his social functioning and broaden his horizons, challenging himself to try to new things.

102.    Around February 2020, Dr. Chulani recommended that John undergo male chest reconstruction surgery to alleviate the dysphoria caused by the shape and appearance of his chest. At that time, Dr. Chulani also referred John to another mental health provider to assist John with the increased psychological distress he was experiencing and to evaluate John for male chest reconstruction surgery as required by the prevailing standards of care.

103.    On July 2, 2020, John received a referral letter from his mental health provider for the surgery, as required by the standards of care.

104.    Due to her income, Susan cannot afford to pay for John to undergo male chest reconstruction surgery without AHCCCS covering the procedure.

## CLASS ACTION ALLEGATIONS

105.    Plaintiffs, on behalf of themselves and all similarly situated individuals, bring their claims for declaratory and injunctive relief as a class action under Fed. R. Civ. P. 23(a) and 23(b)(2).

106.    Plaintiffs request that the Court certify the following class ("Class") under Fed. R. Civ. P. 23(b)(2):

> All transgender individuals under age 21 who are or will be enrolled in AHCCCS, have or will have a diagnosis of gender dysphoria, and are seeking or will seek coverage for male chest reconstruction surgery following a determination by their respective health care providers that the procedure is necessary to treat their gender dysphoria.

107.    Plaintiffs are adequate representatives of the Class. Plaintiffs are transgender individuals under age 21 who are enrolled in AHCCCS, have been diagnosed with gender dysphoria, and are seeking coverage for male chest reconstruction surgery to treat their gender dysphoria.

108.    The Class satisfies the requirements of Fed. R. Civ. P. 23(a)(1) because the class is so numerous that joinder of all members is impracticable. There are at least one hundred transgender males under age 21 who are enrolled in AHCCCS and who require male chest reconstruction surgery to treat their gender dysphoria. In addition, because of the transient nature of the AHCCCS population, in part because individuals' income may make them eligible or ineligible for Medicaid at various points in their lives, it is impractical to join all transgender individuals under age 21 (who may live in various parts of Arizona) with gender dysphoria who may be denied AHCCCS coverage by the Challenged Exclusion at some point.

109.    The Class satisfies the commonality requirements of Fed. R. Civ. P. 23(a)(2) because there are questions of law and fact common to the Class. Pursuant to the Challenged Exclusion, Defendant has acted or refused to act on grounds generally

applicable to the Class. This action raises questions of law common to all members of the Class, including: (a) whether the Challenged Exclusion, facially and as applied to members of the Class, violates the EPSDT and comparability provisions of the federal Medicaid Act; (b) whether the Challenged Exclusion, facially and as applied to members of the Class, violates the prohibition on sex discrimination under Section 1557 of the Patient Protection and Affordable Care Act; and (c) whether the Challenged Exclusion, facially and as applied to members of the Class, violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution. All members of the Class share a common question of fact: Would their male chest reconstruction surgery be covered by AHCCCS but for Defendant's continuing enforcement of the Challenged Exclusion?

110.   The Class satisfies the typicality requirements of Fed. R. Civ. P. 23(a)(3) because the named Plaintiffs' claims are typical of the claims of the Class. Plaintiffs are members of the Class, are individuals who have been unable and will be unable to obtain AHCCCS coverage for medically necessary male chest reconstruction surgery because of the Challenged Exclusion, and as a result, have faced or will face delayed or denied access to these medically necessary treatments. Plaintiffs and members of the Class share the same legal claims under Section 1557, the Medicaid Act, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

111.   The Class satisfies the adequacy requirements of Fed. R. Civ. P. 23(a)(4) because the class representatives will fairly and adequately represent the interests of the Class. The named Plaintiffs seek the same declaratory and injunctive relief as the other members of the Class: a declaratory judgment that the Challenged Exclusion violates the Medicaid Act, Section 1557, and the Equal Protection Clause, and preliminary and permanent injunctions enjoining Defendant from enforcing the Challenged Exclusion. The named Plaintiffs seek this relief to benefit themselves and to protect other low-income transgender Arizona residents who are or will be enrolled in AHCCCS. In asserting their own rights, the named Plaintiffs will vindicate the rights of all members of the Class fairly

1    and adequately. The class representatives have no interests that are antagonistic to the

2    interests of other members of the Class.

3    112.   The Class further satisfies the requirements of Fed. R. Civ. P. 23(a)(4)

4    because counsel for the Class will fairly and adequately represent the interests of the Class.

5    The Class is represented by counsel from King & Spalding LLP and Perkins Coie LLP,

6    two of the largest law firms in the country; the National Center for Lesbian Rights

7    ("NCLR"), a legal organization dedicated to advancing the civil and human rights of the

8    LGBTQ community; and the National Health Law Program ("NHeLP"), a non-profit law

9    firm dedicated to protecting and advancing the health rights of low-income and

10   underserved individuals and families. Collectively, counsel has significant experience

11   litigating civil rights cases, including transgender rights cases, Medicaid EPSDT cases,

12   and complex class actions in federal court.

13   113.   The Class also satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because

14   Defendant has acted or refused to act on grounds that apply generally to the Class, so that

15   final injunctive or corresponding declaratory relief is appropriate respecting the class as a

16   whole. The Class exhibits sufficient cohesiveness because its members have suffered

17   group, as opposed to individual, injuries, namely, the Challenged Exclusion's categorical

18   denial of male chest reconstruction surgery. Members of the Class are bound together by

19   the significant common traits that they are all transgender, they have gender dysphoria,

20   and they need male chest reconstruction surgery to treat their gender dysphoria.

21   114.   Further, by definition, members of the Class are low-income individuals

22   who would otherwise have difficulty affording counsel to individually challenge the

23   Challenged Exclusion. Therefore, a class action is the ideal—and the only—method by

24   which the Class may vindicate the denial of their civil rights.

25

26

27

28

1

2

3

## COUNT I

**(Violation of the Medicaid Act's EPSDT Requirements,
42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(A)-(C), 1396d(a)(4)(B), and 1396d(r)(5))**

4      115.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 114 of this

5  Complaint.

6      116.    The Challenged Exclusion, Arizona Administrative Code R9-22-205-

7  B.4(a), and Defendant's refusal, based on the Challenged Exclusion, to provide coverage

8  for surgical treatments and services for gender dysphoria to Plaintiffs and members of the

9  Class, violate the Medicaid Act's EPSDT requirements, 42 U.S.C. §§ 1396a(a)(10)(A),

10  1396a(a)(43)(A)-(C), 1396d(a)(4)(B), and 1396d(r)(5), which are enforceable by

11  Plaintiffs under 42 U.S.C. § 1983.

12

## COUNT II

**(Violation of the Medicaid Act's Comparability Requirement,
42 U.S.C. § 1396a(a)(10)(B))**

13

14

15      117.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 114 of this

16  Complaint.

17      118.    The Challenged Exclusion, Arizona Administrative Code R9-22-205-

18  B.4(a), and Defendant's refusal, based on the Challenged Exclusion, to provide coverage

19  for surgical treatments and services for gender dysphoria to Plaintiffs and members of the

20  Class, while covering the same services for other AHCCCS beneficiaries with different

21  diagnoses, violate the Medicaid Act's comparability requirement, 42 U.S.C.

22  § 1396a(a)(10)(B), which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

23

24

25

26

27

28

1

**COUNT III**

2

**(Unlawful Discrimination on the Basis of Sex in Violation of
Section 1557 of the Patient Protection and Affordable Care Act,
42 U.S.C. § 18116)**

3

4       119.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 114 of this

5   Complaint.

6       120.    Under Section 1557 of the Affordable Care Act, "an individual shall

7   not . . . be excluded from participation in, be denied the benefits of, or be subjected to

8   discrimination under, any health program or activity, any part of which is receiving

9   Federal financial assistance, including credits, subsidies, or contracts of insurance, or

10  under any program or activity that is administered by an Executive Agency or any entity

11  established under this title (or amendments)" on the basis of sex. 42 U.S.C. § 18116.

12      121.    Section 1557's prohibitions on sex discrimination are enforceable by

13  Plaintiffs in a judicial action under 20 U.S.C. § 1683, which Section 1557 incorporates by

14  reference. 42 U.S.C. § 18116(a). The Challenged Exclusion, Arizona Administrative Code

15  R9-22-205-B.4(a), on its face and as applied to Plaintiffs and members of the Class,

16  violates Section 1557's prohibition against discrimination on the basis of sex in a health

17  program or activity receiving federal financial assistance.

18      122.    Plaintiffs and the Class have been and are continuing to be injured by

19  Defendants' application of the Challenged Exclusion to deny them AHCCCS coverage

20  for surgical treatments for gender dysphoria.

21

**COUNT IV**

22

**(Violation of the Equal Protection Clause of the
Fourteenth Amendment of the United States Constitution)**

23

24      123.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 114 of this

25  Complaint.

26      124.    First, the Challenged Exclusion, Arizona Administrative Code R9-22-205-

27  B.4(a), on its face and as applied to Plaintiffs and members of the Class, impermissibly

28  discriminates against Plaintiffs and members of the Class on the basis of sex and violates

1  their right to equal protection of the laws under the Equal Protection Clause of the
2  Fourteenth Amendment to the United States Constitution.

3      125.   Second, the Challenged Exclusion, Arizona Administrative Code R9-22-
4  205-B.4(a), on its face and as applied to Plaintiffs, impermissibly discriminates against
5  Plaintiffs and members of the Class for being transgender and violates their right to equal
6  protection of the laws under the Fourteenth Amendment to the United States Constitution.

7      126.   Defendant's promulgation and continued enforcement of the Challenged
8  Exclusion did not, and does not, serve any rational, legitimate, important, or compelling
9  state interest. Rather, the Challenged Exclusion serves only to prevent Plaintiffs and
10 members of the Class from obtaining medically necessary surgical care and services to
11 treat their gender dysphoria, complete their gender transitions, and live as their authentic
12 selves.

13                      **PRAYER FOR RELIEF**

14      WHEREFORE, Plaintiffs respectfully request that this Court:

15      A.     Certify a Class consisting of: All transgender individuals under age 21 who
16 are or will be enrolled in AHCCCS, have or will have a diagnosis of gender dysphoria,
17 and are seeking or will seek male chest reconstruction surgery following a determination
18 by their respective health care providers that the procedure is necessary to treat their
19 gender dysphoria.

20      B.     Name D.H. and John as representatives of the Class, and appoint Plaintiffs'
21 counsel as King & Spalding LLP, Perkins Coie LLP, the NCLR, and NHeLP;

22      C.     On behalf of Plaintiffs and all similarly situated individuals, issue
23 preliminary and permanent injunctions prohibiting Defendant from any further
24 enforcement or application of the Challenged Exclusion, Arizona Administrative Code
25 R9-22-205-B.4(a), and directing Defendant and their agents to provide Medicaid coverage
26 for medically necessary male chest reconstruction surgery;

27      D.     On behalf of Plaintiffs and all similarly situated individuals, enter a
28 declaratory judgment that the denial of coverage for male chest reconstruction surgery:

1.     Violates the Medicaid Act's EPSDT requirements, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(A), (C), 1396d(a)(4)(B), and 1396d(r)(5);

2.     Violates the Medicaid Act's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B);

3.     Violates Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex; and

4.     Violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex (including sex stereotyping, gender identity, being transgender, and undergoing a gender transition), and for being transgender;

E.     Waive the requirement for the posting of a bond of security for the entry of temporary and preliminary relief;

F.     Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under 42 U.S.C. § 1988 or other applicable statutes; and

G.     Award such other and further relief as the Court may deem just and proper.

Respectfully submitted,

DATED:  AUGUST 6, 2020          **PERKINS COIE LLP**

    /s/ Daniel C. Barr
Daniel C. Barr (Bar No. 010149)
Janet M. Howe (Bar No. 034615)
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
T: +1 602 351 8085
F: +1 602 648 7085
Email: dbarr@perkinscoie.com
      jhowe@perkinscoie.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Brent P. Ray*
Andrew J. Chinsky*
KING & SPALDING LLP
353 N. Clark Street, 12th Floor
Chicago, Illinois 60654
T: +1 312 995 6333
F: +1 312 995 6330
Email: bray@kslaw.com
       achinsky@kslaw.com

Asaf Orr*
NATIONAL CENTER FOR LESBIAN
RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
T: +1 415 392 6257
F: +1 415 392 8442
Email: aorr@nclrights.org

Abigail K. Coursolle*
Catherine McKee*
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Boulevard, Suite 750
Los Angeles, CA 90010
T: +1 310 204 6010
Email: coursolle@healthlaw.org
       mckee@healthlaw.org

*Attorneys for Plaintiffs and the Class*

* *Pro hac vice* forthcoming