Brent P. Ray (*pro hac vice* forthcoming)
Andrew J. Chinsky (*pro hac vice* forthcoming)
KING & SPALDING LLP
353 N. Clark Street, 12th Floor
Chicago, Illinois 60654
T: +1 312 995 6333
F: +1 312 995 6330
Email: bray@kslaw.com
       achinsky@kslaw.com

Daniel C. Barr (Bar No. 010149)
Janet M. Howe (Bar No. 034615)
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ  85012-2788
T: +1 602 351 8085
F: +1 602 648 7085
Email: dbarr@perkinscoie.com
       jhowe@perkinscoie.com

*Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| D.H., by and through his mother, Janice Hennessy-Waller; and John Doe, by his guardian and next friend, Susan Doe, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>vs.<br><br>Jami Snyder, Director of the Arizona Health Care Cost Containment System, in her official capacity,<br><br>Defendant. | No.<br><br>**DECLARATION OF MISCHA COHEN PECK, PHD IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND JOHN DOE'S MOTION TO PROCEED UNDER A PSEUDONYM** |

I, Dr. Mischa Cohen Peck, hereby declare as follows:

1. I am a licensed clinical social worker and psychotherapist based in Phoenix, Arizona, and am currently treating John Doe, a plaintiff in the above-titled action.

2. I make this declaration in support of Plaintiffs' Motion for Preliminary Injunction.

Education and Experience

3. I have more than 25 years of experience teaching and practicing as a clinical therapist.

4. I received a Master of Social Work from the University of Southern California, Los Angeles, in 1993, and obtained a PhD in Social Welfare from the University of Washington, Seattle, in 2003.

5. Since that time, I have served in several academic positions including as an Assistant Professor in the School of Social Work at San José State University in California, and as a Lecturer and Visiting Professor at the School of Social Work at Arizona State University. I currently serve as an Adjunct Assistant Professor for the Smith College for Social Work in Northampton, MA.

6. However, I am primarily a licensed clinical therapist. For the past 11 of my 25 years of practice, I have specialized in work with individuals on issues regarding sexuality, sexual orientation, and gender identity. This includes work with transgender people dealing with gender dysphoria; I provide mental health support through their transition, which is the process of bringing their lives into closer alignment with their gender identity. I treat transgender patients who range in age from 9 years to approximately 75 years of age. Roughly a third of my transgender patients are less than 18 years of age.

7. I also have been a member of the World Professional Association of Transgender Health (WPATH) since 2015.

Assessment of John Doe

8. The assessment and opinions presented herein are based on my work with John Doe as a patient. I first saw John on March 14, 2020, and, since then, have seen John

approximately every other week. During this time, my clinical work and John's progress have been extensive and significant.

9. I understand that John is asking the Court to use this pseudonym to protect his identity and private health information from the public. I fully recommend and support John's request to proceed using a pseudonym. During our sessions, John expressed a desire to keep both his transgender identity and the details of his transition private. John is concerned that being publicly identified with this lawsuit places his physical safety in school and around his community at risk because of the negative attitudes towards transgender people of his classmates and others.

10. The potential of unwanted exposure would also heighten his anxiety, fear, and shame. This could lead to an increase in depressive symptoms, an increased risk of self-harm, and other negative consequences. Given John's history of depression and self-harm, John is particularly vulnerable to psychological harm if his identity is revealed to the public. John's concerns for his physical and mental well-being are justified and reasonable.

11. John started seeing me to help him address the increasing psychological distress he has experienced because of his gender dysphoria. John was diagnosed with gender dysphoria prior to starting treatment with me. I have confirmed that diagnosis and, also, diagnosed him with chronic post-traumatic stress disorder stemming from early-life attachment trauma. Those co-occurring conditions exacerbate one another, making his mental health particularly fragile.

12. Regarding John's gender dysphoria, he reports a long history of feeling distress related to his body, and that distress increased significantly with puberty, specifically when he began developing feminine-appearing breasts. This distress became so intense that during the 6th grade he recalls many times crying himself to sleep due to gender-related distress. He describes the experience of puberty as being detached from his body, as if his body was betraying him while developing feminine-appearing secondary sex characteristics.

13. Those feelings of distress, and those of shame, transformed into self-harming behaviors, including cutting, burning, and food restriction. John also describes himself as having

difficulty sleeping, low motivation, anxiety, and fear. His distress, including periodic desire for self-harm, and his risk of depression, remains present today. He still cries himself to sleep 2-3 times a week. He finds it impossible to ignore his chest and to feel comfortable with his chest. John also continues to experience suicidal ideation but denies any current plan and intent. These are all very common manifestations of gender dysphoria in transgender males.

14. Approximately three years ago, John began his transition and living consistent with his gender identity. For John, that has included using a male name—which is now his legal name—and corresponding pronouns, as well as starting a regimen of hormone-replacement therapy to further masculinize his appearance, including growing facial hair and deepening his voice. Like most transgender males, John started binding his chest, typically using compressive fabric, to flatten the appearance of his chest. In addition to binding, John wears baggy clothing and curves his shoulders forward to further hide the contour of his chest.

15. Such changes helped to reduce some symptoms of John's gender dysphoria, making it more manageable, but dysphoria continues to affect his ability to function in significant ways. For example, binding provides important, but limited, relief from his chest dysphoria, while also impeding physical movement and causing potential physical discomfort and irritation. Wearing the binder makes it possible for him to leave the house, but John continues to experience chronic distress at school and in social situations because of the fear that those around him will see or notice the binder under his clothing. At night, when he removes the binder, the benefits that John experiences from using a binder disappear as he, once again, must confront the appearance of his chest, thereby aggravating his hatred of his body.

16. John has achieved the maximum mental health benefit from hormone-replacement therapy and binding. Without further treatment for his gender dysphoria—specifically surgical treatment—he will not be able to progress further in his mental health treatment.

17. Based on my professional experience working with transgender young people and my assessment of John, he meets the criteria for a referral for male chest reconstruction surgery under WPATH standards. He is fully adjusted to living as male and exhibits the psychological

maturity and thoughtfulness necessary to provide independent and informed consent to the procedure.

18. The mental health benefits of male chest reconstruction surgery are transformative. Prior to the surgery, my transgender male patients experience shame, self-hate, and self-doubt—the same emotions John struggles with. Those emotions significantly decrease—and for some patients entirely disappear—within days of the surgery.

19. Male chest reconstruction surgery will remove the major source of John's gender dysphoria, alleviating the shame, dysphoria, and other negative emotions associated with his chest. The reduction or elimination of those negative emotions will also create emotional space for positive emotions, including pride and self-acceptance, and give him greater capacity to develop healthy coping mechanisms.

20. Male chest reconstruction surgery is also likely to have a positive impact on John's PTSD. The confidence he will gain from the surgery will help him develop the close friendships and intimate relationships that his early-attachment trauma hindered. Without the distress caused by the gender dysphoria, John also will have greater emotional capacity to progress in his treatment of the trauma underlying his PTSD.

21. John's need for surgery is immediate. If John is unable to get male chest reconstruction surgery, or even experiences any significant delay in getting the surgery, he will be at significant risk of physical and emotional harm. John's prolonged anxiety, depression, and self-hate will continue, making his gender dysphoria and PTSD more intractable and harder to treat. It will also be increasingly harder for John to resist the perceived psychological rewards of self-harm, which can quickly become very dangerous when coupled with his suicidal ideation.

//
//
//
//
//

I declare under penalty of perjury pursuant to the laws of the State of Arizona that the foregoing is true and correct.

Executed this 4th day of August, 2020 in Phoenix, Arizona.

_____
Dr. Mischa Cohen Peck

DECLARATION OF MISCHA COHEN PECK, PHD IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND JOHN DOE'S MOTION TO PROCEED UNDER A PSEUDONYM
-5-