Logan T. Johnston, #009484
**JOHNSTON LAW OFFICES, P.L.C.**
14040 N. Cave Creek Rd., Suite 309
Phoenix, Arizona 85022
Telephone: (602) 435-0050
ltjohnston@live.com

David T. Barton  #016848
Kathryn Hackett King #024698
**BURNSBARTON PLC**
2201 East Camelback Road, Ste. 360
Phone: (602) 753-4500
david@burnsbarton.com
kate@burnsbarton.com

*Attorneys for Defendant*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| D.H., by and through his mother, Janice Hennessy-Waller; and John Doe, by his guardian and next friend, Susan Doe, on behalf of themselves and all others similarly situated, | Case No. 4:20-cv-00335-SHR |
| Plaintiffs, | |
| v. | **ANSWER TO COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Jami Snyder, Director of the Arizona Health Care Cost Containment System, in her official capacity, | |
| Defendant. | (Assigned to the Honorable Scott H. Rash) |

Defendant Jami Snyder, Director of the Arizona Health Care Cost Containment System, in her official capacity ("Defendant"), for her Answer to Plaintiff's Complaint, hereby admits, denies, and alleges as follows.  Defendant denies all allegations in the Complaint that are not specifically admitted herein.

Gender dysphoria is a sensitive and personal issue that involves individualized assessment and care.  Moreover, medical science is still evaluating the effectiveness, impact and results of gender reassignment surgery – particularly in juvenile populations.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

For these reasons Defendant will deny any allegation in the Complaint that attempts to make broad generalizations about gender dysphoria or the efficacy of specific treatments on groups of individuals.

## PRELIMINARY STATEMENT

1.      D.H. is a seventeen-year-old transgender Arizona resident enrolled in Arizona's Medicaid program, known as the Arizona Health Care Cost Containment System ("AHCCCS").  John Doe is a fifteen-year-old transgender Arizona resident enrolled in AHCCCS.  D.H. and John bring this lawsuit on behalf of themselves and similarly situated individuals to challenge Arizona's categorical prohibition of coverage of medically necessary treatments for gender dysphoria, specifically, male chest reconstruction surgery.

**Answer to Paragraph 1: Defendant lacks sufficient knowledge or information to admit or deny the allegations in Paragraph 1 of the Complaint, and therefore denies them.**

2.      Gender dysphoria refers to the distress that can result from the incongruence between a person's gender identity and their assigned sex at birth.  Gender dysphoria is a serious medical condition that, if left untreated, can cause anxiety, depression, and even self-harm or suicidal ideation.

**Answer to Paragraph 2:  Defendant notes the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-V"), which Plaintiff cites in the Complaint, contains a definition and diagnostic criteria of "gender dysphoria" that differs from that stated in Paragraph 2 of the Complaint. Defendant therefore denies the allegations contained in Paragraph 2 of the Complaint.**

3.      Gender-confirming medical treatments - including male chest reconstruction surgery - are safe, effective, and medically necessary to treat gender dysphoria in many transgender individuals, including adolescents.

**Answer to Paragraph 3:  Plaintiffs have not demonstrated medical necessity for chest reconstruction surgery, but Defendant makes no answer with respect to unknown individuals, and therefore, Defendant denies the allegations contained in Paragraph 3 of the Complaint.**

4.      A longstanding Arizona regulation, promulgated in 1982 and enforced by AHCCCS, expressly prohibits Medicaid coverage for "Gender Reassignment surgeries." Ariz. Admin. Code R9-22-205-B.4(a) ("Challenged Exclusion").  Because of the Challenged Exclusion, D.H., John, and Similarly situated individuals have been denied or prevented from obtaining Medicaid coverage for medically necessary male chest reconstruction surgery.

**Answer to Paragraph 4:  Defendant admits Arizona Administrative Code ("A.A.C.") R-9-22-205(B)(4)(a) provides, "The following services are excluded from AHCCCS coverage: . . . gender reassignment surgeries," and this regulation was promulgated in 1982.  Defendant lacks sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 4 of the Complaint, and therefore denies them.**

5.      Both D.H. and John have been diagnosed with gender dysphoria.  Although identified as female at birth, D.H. and John are male and live as male in every aspect of their lives.

**Answer to Paragraph 5:  Plaintiffs have not provided their medical records to Defendant, who lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 5 of the Complaint, and therefore Defendant denies the allegations in Paragraph 5 of the Complaint.**

6.      D.H. first became aware of his male gender identity around the age of four. Frustrated and angry at his inability to communicate that he was transgender to his mother, D.H. developed significant psychological distress at an early age, including

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

severe anxiety and suicidal ideation.  Concerned for his safety and well-being, D.H.'s mother, Janice, placed him in a psychiatric treatment facility on several occasions.

**Answer to Paragraph 6:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 6 of the Complaint, and therefore denies them.**

7.    At thirteen, D. H. developed the confidence to tell Janice that he is transgender.  Janice then arranged for D.H. to see a mental health provider with experience working with transgender youth.  With the recommendation and support of his health care providers, D.H. began to transition to live in accordance with his gender identity.  As part of the treatment for his gender dysphoria, D.H. started taking testosterone to masculinize his body.

**Answer to Paragraph 7:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 7 of the Complaint, and therefore denies them.**

8.    Just before turning thirteen, D.H. started wearing a binder to flatten his chest, which alleviates his gender dysphoria, but significantly impairs his ability to function.  The pain and discomfort caused by wearing the binder interferes with D.H.'s ability to focus on school and homework.  The binder also prevents him from engaging in prolonged or intense physical activity, especially dance, which had previously been a source of relief for D.H.

**Answer to Paragraph 8:   Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 8 of the Complaint, and therefore denies them.**

9.    Last year, D.H.'s pediatrician and his therapist recommended that he obtain male chest reconstruction surgery to further alleviate his gender dysphoria.  However, prior authorization for this surgery was denied due to the Challenged Exclusion.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Answer to Paragraph 9:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 9 of the Complaint, and therefore denies them.**

10.     John started becoming aware of his male gender identity when he was about eleven years old and his body began showing the first signs of puberty.  Worried that his family would reject him for being transgender, John kept everything he was going through to himself and began to experience depression and suicidal ideation.

**Answer to Paragraph 10:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 10 of the Complaint, and therefore denies them.**

11.     After about six months, John recognized that he needed help and reached out to his sister, and then eventually told his grandmother, Susan, both of whom were supportive.  John started using a male name and pronouns, which helped to alleviate his gender dysphoria to some degree.

**Answer to Paragraph 11:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 11 of the Complaint, and therefore denies them.**

12.     In November 2018, John began seeing a specialist at the Gender Support Program at Phoenix Children's Hospital.

**Answer to Paragraph 12:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 12 of the Complaint, and therefore denies them.**

13.     Like D.H., John also wears a binder, which is very tight and restrictive. Even with the binder, John feels uncomfortable being outside without layers of clothing. He wears a hooded sweatshirt nearly every day, including in the summer.  John's chest also hinders his social interactions.  For example, John wears his binder and a t-shirt when

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

at the pool, often having to answer uncomfortable questions about why he insists on wearing a t-shirt in the water.

**Answer to Paragraph 13:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 13 of the Complaint, and therefore denies them.**

14.     Around February 2020, John's health care providers recommended that he pursue male chest reconstruction surgery to further alleviate his gender dysphoria. However, due to the Challenged Exclusion, John cannot receive the surgery.

**Answer to Paragraph 14:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 14 of the Complaint, and therefore denies them.**

15.     The Challenged Exclusion unlawfully denies medically necessary surgical care to transgender beneficiaries on AHCCCS.  Arizona disregards the transition-related health care needs of Medicaid's transgender beneficiaries.  In doing so, Arizona exposes transgender people to significant and avoidable harms to their health and well-being, in violation of the U.S. Constitution and federal law.

**Answer to Paragraph 15:  Defendant denies the allegations contained in Paragraph 15 of the Complaint.**

16.     The Challenged Exclusion violates Plaintiffs' civil rights under Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557"); the Early and Periodic Screening, Diagnostic and Treatment requirements of the federal Medicaid Act, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r); the comparability requirement of the Medicaid Act, *id.* § 1396a(a)(10)(B); and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

**Answer to Paragraph 16:  Defendant denies the allegations contained in Paragraph 16 of the Complaint.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

17.     D.H. and John further seek immediate declaratory and injunctive relief to enjoin Arizona from continuing to deny them medically necessary treatment in violation of federal law.  Without the injunctive relief sought in this lawsuit, the Challenged Exclusion will prevent effective treatment of D.H.'s and John's gender dysphoria, causing them irreparable physical and psychological harm.

**Answer to Paragraph 17:  Defendant admits D.H. and John are seeking declaratory and injunctive relief, but denies that D.H. and John are entitled to a declaratory judgment, injunction, or any other relief whatsoever.**

## JURISDICTION AND VENUE

18.     The Court has jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331, 1343(a)(3)-(4).

**Answer to Paragraph 18:  Defendant admits jurisdiction is proper in this Court.**

19.     Plaintiffs' claims for declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201, 2202 and 42 U.S.C. § 1983.

**Answer to Paragraph 19:  Defendant admits Plaintiffs are seeking declaratory and injunctive relief, but denies that Plaintiffs are entitled to a declaratory judgment, injunction, or any other relief whatsoever.**

20.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Plaintiffs reside within this judicial district and D.H. resides within the Tucson division, the events giving rise to this action occurred in this judicial district, and the Defendant is subject to personal jurisdiction in this judicial district.

**Answer to Paragraph 20:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 20 of the Complaint, and therefore denies them.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## THE PARTIES

21.     Plaintiff D.H. is a seventeen-year-old boy who has been diagnosed with gender dysphoria.  D.H. resides in Pima County, Arizona and brings this action though his mother, Janice Hennessy-Waller.  Due to his family's limited income, D.H. is eligible for Arizona's Medicaid program.  D.H. has been enrolled in Arizona's Medicaid program at relevant times.

**Answer to Paragraph 21:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 21 of the Complaint, and therefore denies them.**

22.     Plaintiff John Doe is a fifteen-year-old boy who has been diagnosed with gender dysphoria.  John resides in Maricopa County, Arizona and brings this action though his grandmother and legal guardian, Susan Doe.  Due to his family's limited income, John is eligible for Arizona's Medicaid program.  John has been enrolled in Arizona's Medicaid program at all relevant times.

**Answer to Paragraph 22:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 22 of the Complaint, and therefore denies them.**

23.     Defendant Jami Snyder is the Director of AHCCCS, the single-state agency that administers Arizona's Medicaid program.  As such, she has a duty to ensure that the AHCCCS program is administered in accordance with federal Medicaid law.  Defendant Snyder is sued in her official capacity.

**Answer to Paragraph 23:  Defendant admits Defendant Snyder is the Director of AHCCCS, the state agency that administers Arizona's Medicaid program, and her job duties include, among other things, ensuring the AHCCCS program is administered in accordance with federal Medicaid law.  Upon information and belief, Defendant admits Plaintiffs have filed this lawsuit against Defendant in her official capacity.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## STATEMENT OF FACTS

### *Gender Identity and Gender Dysphoria*

24.     Gender identity is an innate, internal sense of one's sex-*i.e.,* being male or female-and is a core, hard-wired aspect of a person's identity.  Everyone has a gender identity.  Most people's gender identity is consistent with the sex they were assigned at birth ("assigned sex").  Transgender people, however, have a gender identity that differs from their assigned sex.  A transgender man is a man who was assigned female at birth but has a male gender identity.  A transgender woman is a woman who was assigned male at birth but has a female gender identity.

**Answer to Paragraph 24:  Defendant notes the DSM-V, which Plaintiffs cite in the Complaint, contains definitions of "gender identity" and "transgender" that differ from those stated in Paragraph 24 of the Complaint.  Defendant therefore denies the allegations contained in Paragraph 24 of the Complaint.**

25.     Gender identity and transgender status are inextricably linked to one's sex and are sex-related characteristics.

**Answer to Paragraph 25:  Defendant denies the allegations contained in Paragraph 25 of the Complaint.**

26.     Around the onset of puberty, many transgender youth experience a level of psychological distress that significantly interferes with their overall wellbeing and ability to function.  For some transgender youth, that distress becomes debilitating and can lead to a severe decline in mental health.

**Answer to Paragraph 26:  Defendant denies the allegations contained in Paragraph 26 of the Complaint.**

27.     That distress stems, in part, from the visible physical changes that accompany puberty.  Those physical changes undermine a transgender young person's ability to live in a manner consistent with their gender identity, exacerbating their psychological distress.  Even basic daily tasks, such as bathing and getting dressed, can

become emotionally paralyzing because those tasks are painful reminders of the disconnect between a transgender young person's body and their gender identity.  In addition, a transgender boy who has begun to develop breasts is more likely to be mistaken for female, a probability that serves as a constant source of anxiety.  The psychological distress transgender youth experience is further heightened by the reality that some of those physical changes may be irreversible, permanently constricting their future treatment options and negatively affecting their quality of life.  Consequently, timely treatment is critical.

**Answer to Paragraph 27:   Defendant lacks sufficient knowledge or information to admit or deny the allegations relating to the "psychological distress" and "physical changes" of "many transgender youth" and "some transgender youth" contained in Paragraph 27 of the Complaint, and therefore Defendant denies all allegations in Paragraph 27 of the Complaint.**

28.     This significant increase in distress causes many transgender youth who had previously delayed disclosing that they are transgender to set aside their fears of rejection and ask for help from family.  With the permission of their parents or legal guardians, a transgender young person can begin accessing the health care services needed to alleviate their psychological distress.  That distress is commonly referred to as gender dysphoria.

**Answer to Paragraph 28:   Defendant denies the allegations contained in Paragraph 28 of the Complaint.**

29.     Gender dysphoria is a serious medical condition recognized by the American Psychiatric Association.  Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM-5").[1]  Gender dysphoria refers to the

---

[1] Earlier editions of the DSM included a diagnosis referred to as "Gender Identity Disorder."  The DSM-5 noted that Gender Dysphoria "is more descriptive than the previous DSM-IV term gender identity disorder and focuses on dysphoria as the clinical problem, not identity per se." Being diagnosed with gender dysphoria "implies no impairment in judgment, stability, reliability, or general social or vocational capabilities." Am. Psychiatric Ass'n, Position Statement on Discrimination Against Transgender &

distress that can result from the incongruence between a person's gender identity and their assigned sex.  If left untreated, gender dysphoria can cause anxiety, depression, and even self-harm or suicidal ideation.  Gender dysphoria is often heightened "when physical interventions by means of hormones and/or surgery are not available." *Id.* at 451.  Access to appropriate, individualized medical care can mitigate and often prevent all of those symptoms.

**Answer to Paragraph 29: Defendant states the DSM-V manual speaks for itself. Defendant further states the DSM-V manual (p. 451) defines "gender dysphoria" as follows: "*Gender dysphoria* refers to the distress that may accompany the incongruence between one's experienced or expressed gender and one's assigned gender.  Although not all individuals will experience distress as a result of such incongruence, many are distressed if the desired physical interventions by means of hormones and/or surgery are not available." Defendant denies the remaining allegations contained in Paragraph 29 of the Complaint.**

30.     Gender dysphoria is highly treatable.  As with other medical conditions, health care providers follow a well-established standard of care when working with patients with gender dysphoria.  The World Professional Association for Transgender Health ("WPATH"), and its predecessors, has set those standards for over four decades.

**Answer to Paragraph 30:  Defendant states the World Professional Association for Transgender Health ("WPATH") has issued a "Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People," and that this document speaks for itself.  Defendant further states WPATH has issued several versions of the "Standards of Care" over the years. Defendant denies the remaining allegations contained in Paragraph 30 of the Complaint.**

31.     WPATH is an international, multidisciplinary, professional association of medical providers, mental health providers, researchers, and others, with a mission of

Gender Variant Individuals (2012), at https://goo.gl/iXBM0S.

promoting evidence-based care and research for transgender health, including the treatment of gender dysphoria.  WPATH published the seventh and most recent edition of the Standards of Care in 2011.

**Answer to Paragraph 31:  Defendant states WPATH's website (https://www.wpath.org/about/mission-and-vision) (last visited Sept. 13, 2020) indicates its "Mission" is "[t]o promote evidence based care, education, research, public policy, and respect in transgender health," and its "Goals and Tasks" are described as follows: "As an international interdisciplinary, professional organization, [WPATH] will work to further the understanding and treatment of gender dysphoria by professionals in medicine, psychology, law, social work, counseling, psychotherapy, family studies, sociology, anthropology, sexology, speech and voice therapy, and other related fields."  Upon information and belief, Defendant admits WPATH published the seventh and most recent addition of the "Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People" in or around 2011. Defendant lacks sufficient knowledge or information to admit or deny the remaining allegations in Paragraph 31 of the Complaint, and therefore denies them.**

32.     Building on those standards and incorporating the most current research and clinical experience, the Endocrine Society released the Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline in September 2017.  Those guidelines reaffirm the WPATH Standards of Care and offer medical providers practical guidance on providing transition-related care to patients with gender dysphoria, including young people.

**Answer to Paragraph 32:  Defendant admits the "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline" was released in or around 2017. Defendant states the "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine**

1
2
3
4
5
6

**Society Clinical Practice Guideline" document speaks for itself.  Defendant further states WPATH's "Standards of Care" document speaks for itself, WPATH has issued several versions of "Standards of Care," and it is unknown which version Plaintiffs are referencing in Paragraph 32 of the Complaint. Defendant lacks sufficient knowledge or information to admit or deny the remaining allegations identified in Paragraph 32 of the Complaint, and therefore deny them.**

7
8
9
10
11
12
13
14

33.     The WPATH and the Endocrine Society standards have been adopted by many major associations of healthcare professionals, including the American Medical Association, American Psychiatric Association, and American psychological Association, as well as associations of healthcare professionals focused on youth and adolescents, such as the American Academy of Pediatrics, American Association of Child and Adolescent Psychiatrists, and the Pediatric Endocrine Society.  Federal courts across the country have also recognized the standards of these medical societies as setting the prevailing standard of care for the treatment of gender dysphoria.

15
16
17
18
19
20

**Answer to Paragraph 33:  Defendant lacks sufficient knowledge or information to admit or deny the allegations relating to unspecified standards of WPATH and the Endocrine Society that have been "adopted" by associations and unspecified "federal courts across the country" "recogniz[ing]" standards of WPATH and the Endocrine Society identified in Paragraph 33 of the Complaint, and therefore Defendant denies all allegations in Paragraph 33 of the Complaint.**

21
22
23
24
25
26

34.     A key component of treating gender dysphoria is a "social transition," in which the individual lives in accordance with their gender identity in all aspects of life. Though specific to each person, a social transition typically includes adopting a new first name, using and asking others to use pronouns reflecting the individual's true gender, wearing clothing typically associated with that gender, and using sex-specific facilities corresponding to that gender.

27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Answer to Paragraph 34:** **Defendant admits a social transition is specific to each person.  Defendant denies the remaining allegations contained in Paragraph 34 of the Complaint.**

35.     Studies and anecdotal evidence demonstrate the tremendous mental health benefits transgender youth experience following a social transition.  One study found that the mental health profile of transgender children who underwent a social transition was nearly identical to that of their nontransgender peers.  Kristina Olson et al., *Mental Health of Transgender Children Who Are Supported in Their Identities,* 137 Pediatrics 1 (2016).  Another study found that transgender young people who were referred to by the correct name and pronoun throughout their daily lives demonstrated a seventy-seven percent decrease in severe depressive symptoms.  Stephen Russell et al., *Chosen Name Use is Linked to Reduced Depressive Symptoms, Suicidal Ideation and Behavior among Transgender Youth,* 63 J. of Adolescent Health 503 (2018).  The success of a social transition hinges on parents, extended family, peers, and others in the community treating the individual consistently with their gender identity.

**Answer to Paragraph 35:**  **Defendant states the articles Plaintiffs cite in Paragraph 35 speak for themselves.  Defendant denies the remaining allegations contained in Paragraph 35 of the Complaint.**

36.     Consistent with the standard of care, many transgender individuals also need health care services that alter their physical characteristics to bring their outer appearance into alignment with their gender identity.  The purpose of the services is to enable a transgender person to live consistently with their gender identity in every aspect of their life.  This alleviates a transgender individual's gender dysphoria by reducing the incongruence between their assigned sex and gender identity.  Those treatments also ensure that they are seen by others in a way that reflects their true gender, addressing a significant source of distress.

1

2

**Answer to Paragraph 36**:  **Defendant denies the allegations contained in Paragraph 36 of the Complaint.**

3

4

5

6

37.     For transgender youth who have entered puberty, these health care services may include hormone-replacement therapy and surgery.  Hormone-replacement therapy ensures that transgender people develop physical sex characteristics typical of their gender identity - not their assigned sex - such as facial and body hair in boys and breasts in girls.

7

8

**Answer to Paragraph 37**: **Defendant denies the allegations contained in Paragraph 37 of the Complaint.**

9

10

11

12

13

14

38.     The prevailing standards of care for the treatment of gender dysphoria recognize that transgender males may need male chest reconstruction surgery before turning eighteen.  A prerequisite for male chest reconstruction surgery is a referral letter from the young person's treating mental health provider.  That letter provides the surgeon with a psychological assessment of the patient and the clinical rationale(s) for the referral and confirms that the patient is capable of consenting to the procedure.

15

16

**Answer to Paragraph 38**:  **Defendant denies the allegations contained in Paragraph 38 of the Complaint.**

17

18

19

20

21

22

23

24

39.     The purpose of the surgery is functional.  Following the surgery, a transgender male is more readily seen as male, improving the effectiveness of their social transition because they are less likely to be mistaken for female, which can significantly reduce the anxiety and dysphoria they experience.  The surgery also improves their self-image because they no longer have to see or wear a binder to hide a part of their body that causes so much physical pain and psychological distress.  As a result, transgender males who have had male chest reconstruction surgery experience fewer barriers to engaging in physical activity, among other physical and mental health benefits.

25

26

**Answer to Paragraph 39:**  **Defendant denies the allegations contained in Paragraph 39 of the Complaint.**

27

28

40.    As with other treatments for gender dysphoria, both scientific research and clinical evidence highlight the importance of male chest reconstruction surgery in the treatment of gender dysphoria in transgender males.

**Answer to Paragraph 40:  Defendant denies the allegations contained in Paragraph 40 of the Complaint.**

***The Federal Medicaid Act***

41.    Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396w-5, creates the Medicaid program-a cooperative federal-state program that provides health care services to specified categories of individuals meeting income and other criteria.  The objective of Medicaid is to enable states to "furnish [] medical assistance" to individuals "whose income and resources are insufficient to meet the cost of the necessary medical services" and to provide "rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care." 42 U.S.C. § 1396-1.

**Answer to Paragraph 41:  Defendant admits that the statutes speak for themselves as to Medicaid's services and objective.**

42.    States are not required to participate in the Medicaid program.  States that choose to participate must comply with the federal Medicaid Act and its implementing regulations.

**Answer to Paragraph 42: Defendant admits the allegations in Paragraph 42 of the Complaint.**

43.    In return, the federal government reimburses each participating state for a substantial portion of the cost of providing medical assistance.  *See id.* §§ 1396b(a), 1396d(b), 1396(c).

**Answer to Paragraph 43: Defendant admits the allegations in Paragraph 43 of the Complaint.**

44.     The Medicaid Act requires each participating state to establish or designate a single state agency that is responsible for administering or supervising the administration of the state's Medicaid program.  *Id.* § 1396a(a)(5); 42 C.F.R. § 431.10.

**Answer to Paragraph 44:  Defendant admits the allegations in Paragraph 44 of the Complaint.**

45.     In addition, each participating state must maintain a comprehensive plan for medical assistance approved by the Secretary of the U.S. Department of Health and Human Services.  *Id.* § 1396a.  The plan must describe the state's program and affirm its commitment to comply with the Medicaid Act and its implementing regulations.

**Answer to Paragraph 45:  Defendant admits the allegations in Paragraph 45 of the Complaint.**

46.     While a state is entitled to delegate certain of its responsibilities to other entities, such as local agencies or Medicaid managed care plans, the single state agency is ultimately responsible for ensuring compliance with all aspects of federal Medicaid law. *See, e.g.,* 42 C.F.R. §§ 438.100(a)(2), 438.100(d).

**Answer to Paragraph 46:  Defendant admits the allegations of Paragraph 46 are generally correct but states the cited rules speak for themselves.**

47.     Under the Medicaid Act, a participating state must provide medical assistance to certain eligibility groups.  *Id.* § 1396a(a)(10)(A)(i).  One mandatory eligibility category is children and adolescents under age 18 whose household income is below 133% of the federal poverty level.  *Id.* §§ 1396a(a)(10)(A)(i)(VI)-(VII), 1396a(l).

**Answer to Paragraph 47: Defendant admits the allegations in Paragraph 47 of the Complaint.**

***The Medicaid Early and Periodic Screening, Diagnostic and Treatment Requirements***

48.     The Medicaid Act requires state to cover certain services and gives them the option to cover other services.  *Id.* §§ 1396a(a)(10)(A), 1396d.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Answer to Paragraph 48:  Defendant admits the allegations in Paragraph 48 of the Complaint.**

49.     Each participating state must cover Early and Periodic Screening, Diagnostic and Treatment ("EPSDT") for individuals under age 21.  *Id.* §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r).

**Answer to Paragraph 49:  Defendant admits the allegations in Paragraph 49 of the Complaint.**

50.     EPSDT's fundamental purpose is to "[a]ssure that health problems are diagnosed and treated early, before they become more complex and their treatment more costly." Ctrs. For Medicare & Medicaid Servs., *State Medicaid Manual* § 5010.B.

**Answer to Paragraph 50: Defendant admits only that the State Medicaid Manual speaks for itself as to the purposes of EPSDT.**

51.     As part of providing EPSDT, states must:

    a. Inform all persons in the state who are under the age of 21 and who are eligible for Medicaid of the availability of EPSDT as described in 42 U.S.C. § 1396d(r);

    b. Provide or arrange for screening services in all cases where they are requested as required by § 1396d(r)(5); and

    c. Arrange for (directly or through referral) corrective treatment for any conditions identified by the screening services as required by § 1396a(a)(43)(C).

**Answer to Paragraph 51:  Defendant admits that the statutes speak for themselves as to Medicaid's requirements.**

52.     Pursuant to the EPSDT requirements, states must cover four specific, separate categories of screening services: medical, vision, dental, and hearing.  42 U.S.C. § 1396d(r)(1)-(4).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Answer to Paragraph 52:  Defendant alleges that the cited statute speaks for itself but admits medical, vision, dental and hearing services can be covered under the EPSDT program.**

53.     States also must cover "[s]uch other necessary health care, diagnostic services, treatment, and other measures described in [§ 1396d(a)] to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." *Id.* § 1396d(r)(5).  In other words, the EPSDT mandate requires states to cover all necessary Medicaid services for individuals under age 21.

**Answer to Paragraph 53:  Defendant admits the first sentence in Paragraph 53 of the Complaint, but denies the allegations of the second sentence in Paragraph 53 of the Complaint.**

54.     EPSDT services must be initiated in a timely manner, as the individual needs of the child require, and must be consistent with accepted medical standards, no later than six months from the date of request.  42 C.F.R. § 441.56e.

**Answer to Paragraph 54:  Defendant alleges that the cited rule speaks for itself and denies the remaining allegations of Paragraph 54 of the Complaint.**

55.     Surgery to treat gender dysphoria, including male chest reconstruction surgery, is an EPDST service under § 1396d(r)(5).

**Answer to Paragraph 55:  Paragraph 55 contains a legal conclusion to which no response is necessary. To the extent a response is deemed necessary, Defendant denies the allegations in Paragraph 55 of the Complaint.**

*The Medicaid Comparability Requirement*

56.     Under the Medicaid Act, "the medical assistance made available to any individual . . . shall not be less in amount, duration or scope than the medical assistance made available to any other such individual." *Id.* § 1396a(a)(10)(B)(i).  *See also* 42 C.F.R. § 440.240(b).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Answer to Paragraph 56**: **Defendant admits the allegations in Paragraph 56 of the Complaint.**

57.     A state "Medicaid agency may not arbitrarily deny or reduce the amount or scope of a required service . . . to an otherwise eligible recipient solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c).

**Answer to Paragraph 57:**  **Defendant admits the allegations in Paragraph 57 of the Complaint.**

58.     States must also ensure that "[e]ach service must be sufficient in amount, duration, and scope to reasonably achieve its purpose."  42 C.F.R. § 440.230(b).

**Answer to Paragraph 58**:  **Defendant alleges that the full rule cited speaks for itself.**

*The Arizona Medicaid Program*

59.     Arizona participates in Medicaid, calling its program the Arizona Health Care Cost Containment System ("AHCCCS"). Ariz. Rev. Stat. §§ 36-2901 to 2972.

**Answer to Paragraph 59:**  **Defendant admits the allegations in Paragraph 59 of the Complaint.**

60.     AHCCCS is also the name of the single-state Medicaid agency that is responsible for administering and implementing Arizona's Medicaid program consistent with the requirements of federal law.  *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10.

**Answer to Paragraph 60:**  **Defendant admits the allegations in Paragraph 60 of the Complaint.**

61.     AHCCCS contracts with private managed care plans to provide health care services to Medicaid enrollees.  *See* AHCCCS, Available Health Plans, https://www.azahcccs.gov/Members/ProgramsAndCoveredServices/availablehealthplans.html (listing the eight Medicaid managed care plans operating in the State).

**Answer to Paragraph 61: Defendant admits it contracts with managed care plans to provide services to some, but far from all, Medicaid enrollees.**

62.     The federal government reimburses Arizona for approximately seventy percent of its expenditures on health care services.  U.S. Dep't of Health & Human Servs., Federal Financial Participation in State Assistance Expenditures; Federal Matching Shares for Medicaid, the Children's Health Insurance Program, and Aid to Needy Aged, Blind, or Disabled Person for October 1, 2020 Through September 30, 2021, 84 Fed. Reg. 66204, 66204 (Dec. 3, 2019).

**Answer to Paragraph 62: Defendant admits the allegations in Paragraph 62 of the Complaint.**

***Arizona's Exclusion on Surgical Care for Transgender Medicaid Beneficiaries***

63.     Since 1982, an Arizona regulation (the "Challenged Exclusion") has prohibited AHCCCS coverage for "gender reassignment surgeries." Ariz. Admin. Code R9-22-205-B.4(a).  The Challenged exclusion has been applied since that time to deny coverage to transgender AHCCCS beneficiaries seeking male chest reconstruction surgery.

**Answer to Paragraph 63: Defendant admits Arizona Administrative Code ("A.A.C.") R-9-22-205(B)(4) excludes several services from AHCCCS coverage. Defendant further admits A.A.C. R-9-22-205(B)(4)(a) provides, "The following services are excluded from AHCCCS coverage: . . . gender reassignment surgeries," and this regulation was promulgated in 1982. Defendant lacks sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 63 of the Complaint, and therefore denies them.**

64.     Arizona has singled out transition-related surgical care for an express exclusion even though AHCCCS covers the same surgical services to treat other health conditions. *See, e.g.,* Ariz. Admin. Code R9-22-2004(A)(4), AHCCCS Medical Policy Manual, § 310-C Breast Reconstruction After Mastectomy (2018), https://www.azahcccs.gov/shared/Downloads/MedicalPolicyManual/300/310C.pdf.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Answer to Paragraph 64:** **Defendant denies the allegations contained in Paragraph 64 of the Complaint.**

65.     The Challenged Exclusion has no medical or scientific basis.  To the contrary, for many transgender people, including adolescents, surgical care is medically necessary to treat gender dysphoria.

**Answer to Paragraph 65:** **Defendant denies the allegations contained in Paragraph 65 of the Complaint.**

66.     Contrary to the prevailing standard of care for the treatment of gender dysphoria, Defendant continues to enforce the Challenged Exclusion against transgender Medicaid recipients, even those covered under EPSDT, including D.H. and John.

**Answer to Paragraph 66:**  **Defendant denies the allegations contained in Paragraph 66 of the Complaint.**

67.     On information and belief, many transgender AHCCCS recipients have been deterred from seeking prior authorization for transition-related surgeries because of their knowledge, or the knowledge of their medical providers, that the Challenged Exclusion would make such requests futile.

**Answer to Paragraph 67:** **Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 67 of the Complaint, and therefore denies them.**

*D.H.'s Gender Dysphoria and Need for Surgical Treatment*

68.     D.H. was identified as female at birth but has known that he is male since age four.

**Answer to Paragraph 68:** **Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 68 of the Complaint, and therefore denies them.**

69.     As a young child, D.H. struggled to express to his mother that he is male. Nothing he said or did got the result he had hoped for; Janice, D.H.'s mother, continued to

treat him as a girl.  As a result, D.H. began exhibiting signs of significant psychological distress including, depression, prolonged crying episodes, anxiety, and insomnia.  The severity of D.H.'s distress led his mother to seek the advice of mental health professionals.

**Answer to Paragraph 69:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 69 of the Complaint, and therefore denies them.**

70.     When he was about eleven years old, the stress related to his gender identity-combined with the other stressors D.H. was trying to navigate-was so overwhelming that D.H. started losing his hair.  He was eventually hospitalized for intensive psychiatric treatment.

**Answer to Paragraph 70: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 70 of the Complaint, and therefore denies them.**

71.     Following his hospitalization, Janice enrolled D.H. in dance class, hoping it would provide D.H. a healthy way to cope with his distress.  The movements were like therapy to him.  Dance also became a social outlet; he made friends and felt a sense of belonging.  It was the only thing in his life that could make him b=feel better.  By the following year, D.H. was enrolled in three different dance classes: ballet, modern, and jazz.

**Answer to Paragraph 71:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 71 of the Complaint, and therefore denies them.**

72.     That euphoria ended later that year once puberty began.  Because of D.H.'s increasing chest size, dance no longer provided the same psychological release it once had. D.H. hated his body and everything that came with it.  His thoughts and fears about experiencing puberty-with its associated physical changes that would take his body even

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

further out of alignment with his gender identity-became all-consuming and significantly affected his ability to function.  D.H. hid his changing body under baggy clothes and hated being perceived as a girl at school.

**Answer to Paragraph 72: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 72 of the Complaint, and therefore denies them.**

73.     D.H. began using a variety of methods to flatten his chest, from multiple sports bras and Ace bandages to duct tape, so that his appearance better aligned with his gender identity.  Those initial attempts were extremely uncomfortable and irritated his skin.  Needing a better and safer solution, D.H. secretly bought his first binder, an article of clothing that compresses a person's chest, giving the appearance of a flat chest.  Putting on the binder gave D.H. a sense of relief that no amount of therapy or medication had ever given him.  It also eventually helped him gain the confidence to tell his mother what he struggled to express as a child: "I am a boy."

**Answer to Paragraph 73: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 73 of the Complaint, and therefore denies them.**

74.     Janice was supportive but sought out the advice of health care providers with experience working with transgender youth before making any decisions regarding next steps.

**Answer to Paragraph 74: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 74 of the Complaint, and therefore denies them.**

75.     Soon after disclosing to his mother that he is transgender at age thirteen, D.H. started seeing Tamar Reed, a therapist who specializes in treating gender dysphoria in children and adolescents.  After carefully assessing D.H.'s mental health, Ms. Reed recommended that D.H. begin to transition to living as male.  D.H. started using a male

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

name and asked that others refer to him using that name and masculine pronouns.  He also changed his hairstyle and started wearing boys' clothing.

**Answer to Paragraph 75: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 75 of the Complaint, and therefore denies them.**

76.     D.H.'s social transition provided him with much-needed psychological relief.  He was regularly being referred to by a male name and pronouns and treated as male by those around him.

**Answer to Paragraph 76: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 76 of the Complaint, and therefore denies them.**

77.     Nevertheless, D.H.'s distress continued to build.

**Answer to Paragraph 77:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 77 of the Complaint, and therefore denies them.**

78.     A few months before his fourteenth birthday, the depression and suicidal ideation became overwhelming.  Janice noticed a change in D.H.'s personality and that he had started distancing himself from his peers and activities that had previously brought him joy.  Then, following a dance competition in January 2017, D.H.'s mental health decompensated significantly.  Out of concern for his safety and wellbeing, D.H. was admitted to a ten-day intensive psychiatric treatment program.

**Answer to Paragraph 78: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 78 of the Complaint, and therefore denies them.**

79.     Following that treatment program, his health care providers recommended that he start hormone-replacement therapy to further his social transition-that treatment would both halt the effects of estrogen and make his appearance more typically masculine.

D.H.'s pediatrician referred him to a pediatric endocrinologist for this treatment and related specialty care.  D.H. received his first shot of testosterone in November 2017.

**Answer to Paragraph 79: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 79 of the Complaint, and therefore denies them.**

80.    The testosterone has caused D.H.'s voice to deepen, he has grown facial hair, and he has developed a more masculine musculature.  The testosterone, however, cannot reverse the physical changes that had already occurred prior to D.H.'s transition, particularly chest development.

**Answer to Paragraph 80: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 80 of the Complaint, and therefore denies them.**

81.    Because of the prominent appearance of his chest, D.H.'s binder continues to be one of his most important pieces of clothing.  Although binders are not supposed to be worn for more than seven to eight hours a day, D.H. regularly wears his binder for ten hours a day, and at least twice per week D.H. wears it for longer than ten hours.  On occasion, D.H. has worn his binder for multiple consecutive days.  He even struggles to take the binder off at home, where he feels the most comfortable being himself.

**Answer to Paragraph 81: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 81 of the Complaint, and therefore denies them.**

82.    Keeping the binder on that long is uncomfortable and painful.  The effort is takes to ignore the pain interferes with D.H.'s ability to focus on school, particularly homework, as D.H.'s discomfort compounds throughout the day.  The compression from the binder also prevents him from breathing too deeply.  In fact, D.H.'s current pediatrician, Dr. Andrew Cronyn, remarked that D.H.'s binder contributed to him

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

developing asthma in adolescence and needing an inhaler to engage in extended physical activity.

**Answer to Paragraph 82: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 82 of the Complaint, and therefore denies them.**

83.     While taking testosterone and using the binder have improved D.H.'s mental health, D.H. continues to experience significant gender dysphoria because of his chest. The benefits of using a binder were - and continue to be - temporary and imperfect.  The binder dampens the distress D.H. feels during the day, but once he removes the binder at night, D.H.'s distress intensifies.  And, even with the binder, D.H. continues to be mistaken for female, exacerbating his anxiety around interacting with unfamiliar people.

**Answer to Paragraph 83: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 83 of the Complaint, and therefore denies them.**

84.     D.H.'s distress began compounding again and, in September 2018, D.H. was placed in an intensive psychiatric treatment program for a third time sue to suicidal ideation.  D.H. was fifteen-years old at that time.

**Answer to Paragraph 84: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 84 of the Complaint, and therefore denies them.**

85.     The mental health treatment D.H. received following that hospitalization helped him develop more effective strategies for coping with the distress caused by gender dysphoria and the appearance of his chest.  Even with those strategies, D.H.'s distress still has a significant effect on his mental health, daily life, and ability to function. D.H. still struggles with an ever-present anxiety that the appearance of his chest will cause others to treat him as female.  This prevents him from participating in social activities with his friends and caused him to quit dance over a year ago because he gets winded too

easily to dance with a binder, but the dysphoria is too great for him to dance without one. His dysphoria also makes him extremely uncomfortable revealing his body even when he is by himself or in a doctor's office.

**Answer to Paragraph 85: Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 85 of the Complaint, and therefore denies them.**

86.    In 2019, D.H.'s pediatrician referred D.H. to a surgeon, Dr. Ethan Larson, who could perform male chest reconstruction surgery.  D.H.'s health care providers determined that the surgery was medically necessary to alleviate D.H.'s gender dysphoria. Dr. Larson evaluated D.H. and agreed he would be a good candidate for the surgery.

**Answer to Paragraph 86:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 86 of the Complaint, and therefore denies them.**

87.    Dr. Larson requested prior authorization for the surgery from UnitedHealthcare, D.H.'s Medicaid managed care plan.  UnitedHealthcare denied prior authorization for the surgery.  D.H. appealed the denial of the surgery, and on July 5, 2019, UnitedHealthcare upheld its denial of coverage pursuant to the Challenged Exclusion.

**Answer to Paragraph 87:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 87 of the Complaint, and therefore denies them.**

88.    Due to her income, Janice cannot afford to pay for John to undergo male chest reconstruction surgery without AHCCCS covering the procedure.

**Answer to Paragraph 88:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 88 of the Complaint, and therefore denies them.**

*John's Gender Dysphoria and Need for Surgical Treatment*

89.     John was identified as female at birth.  His grandmother, Susan, has cared for him since he was two years old and continues to be his legal guardian.

**Answer to Paragraph 89:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 89 of the Complaint, and therefore denies them.**

90.     As a child, John did not like dresses or typical girl toys, but was never able to pinpoint a reason.

**Answer to Paragraph 90:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 90 of the Complaint, and therefore denies them.**

91.     Approximately three years ago, just before John turned twelve, he started experiencing the first signs of puberty.  Those signs were coupled with an almost immediate and significant decline in his mental health.  He experienced symptoms of severe depression, such as a constant and overwhelming sadness, distancing himself from his friends, and suicidal ideation.  Unable to describe his feelings and uncertain about how Susan would respond even if he could, John kept those emotions bottled up.

**Answer to Paragraph 91:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 91 of the Complaint, and therefore denies them.**

92.     Worried about how Susan and others in his family might react, especially given their strong religious faith, John waited nearly six months before telling his older sister that he is transgender.  He eventually told Susan as well.

**Answer to Paragraph 92:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 92 of the Complaint, and therefore denies them.**

93.    Over the course of the following year, John's 7th grade year, Susan and John had many extensive conversations to help her better understand what he was experiencing and how she could help him.

**Answer to Paragraph 93:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 93 of the Complaint, and therefore denies them.**

94.    John continued to experience significant gender dysphoria throughout his 7th grade year.  Although John continued to wear the boys' clothes he always had and started using a male name, his peers, teachers, and family did not consistently refer to him by that name and male pronouns.  Not being consistently treated as male caused Joh to be stressed the entire school year.

**Answer to Paragraph 94:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 94 of the Complaint, and therefore denies them.**

95.    Wanting to prevent a repeat of the prior year, in the summer prior to starting 8th grade, John e-mailed each of his teachers to inform them that he is transgender and ask that they refer to him as John and by male pronouns.  This helped set the tone; in 8th grade, John was more regularly referred to by the correct name and pronouns-both in school and out.

**Answer to Paragraph 95:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 95 of the Complaint, and therefore denies them.**

96.    Around that same time, at thirteen years old, John's pediatrician referred him to the Gender Support Program at Phoenix Children's Hospital, a clinic specializing in healthcare services for transgender young people.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Answer to Paragraph 96:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 96 of the Complaint, and therefore denies them.**

97.     John had his first appointment at Phoenix Children's Hospital in November 2018, where he began to see Dr. Veenod Chulani, an adolescent-medicine specialist.  Dr. Chulani referred John to a mental health provider, who formally diagnosed John with gender dysphoria.  Soon thereafter John started taking medication to stop his menstrual cycle, which helped relieve some of the gender dysphoria he was experiencing at the time. In May 2019, Dr. Chulani and John's therapist determined that it was medically necessary for him to start taking testosterone, which he started the following month.  John is pleased with how the testosterone therapy has changed his voice and other aspects of his body. Transitioning has also boosted his confidence, and now far fewer people mistake him for female.

**Answer to Paragraph 97:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 97 of the Complaint, and therefore denies them.**

98.     His transition and testosterone treatment, however, have not lessened the intense dysphoria he experiences regarding the appearance of his chest.  Starting in 2018, John began binding his chest using a variety of methods, such multiple sports bras and constrictive undergarments.  He bought his first binder in December 2019.

**Answer to Paragraph 98:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 98 of the Complaint, and therefore denies them.**

99.     Every morning, the first thing John does is to put on a binder, which he often wears for longer than the recommended eight-hour maximum.  Even with the binder, John still feels uncomfortable being outside without multiple layers of clothing, including a hooded sweatshirt that he wears nearly every day.  The binder constricts his

breathing, which in combination with his asthma, requires him to take far more breaks than his peers when engaging in physical activity.

**Answer to Paragraph 99:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 99 of the Complaint, and therefore denies them.**

100.    Although the binder sometimes allows him to forget about his chest-a sense of relief he treasures-the hardest part of John's daily routine is removing his binder.  The dysphoria John experiences regarding his chest domes flooding back, a difficult reminder that his body still does not match who he is.  John's chest-related dysphoria keeps him awake at night at least once a week; putting on his binder temporarily is the only way he can calm his distress, a task he often tries to do without opening his eyes or turning on the lights so that he does not have to see his bare chest.

**Answer to Paragraph 100:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 100 of the Complaint, and therefore denies them.**

101.    Having top surgery would have a significant positive impact on John's life. John would finally be able to look at himself in the mirror and be in public without having to wear so many layers of clothing on top of his binder, which would benefit both is mental and physical health.  John would gain confidence that will help improve his social functioning and broaden his horizons, challenging himself to try to (do) new things.

**Answer to Paragraph 101:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 101 of the Complaint, and therefore denies them.**

102.    Around February 2020, Dr. Chulani recommended that John undergo male chest reconstruction surgery to alleviate the dysphoria caused by the shape and appearance of his chest.  At that time, Dr. Chulani Also referred John to another mental health provider to assist John with the increased psychological distress he was experiencing and

to evaluate John for male chest reconstruction surgery as required by the prevailing standards of care.

**Answer to Paragraph 102:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 102 of the Complaint, and therefore denies them.**

103.    On July 2, 2020, John received a referral letter from his mental health provider for the surgery, as required by the standards of care.

**Answer to Paragraph 103:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 103 of the Complaint, and therefore denies them.**

104.    Due to her income, Susan cannot afford to pay for John to undergo male chest reconstruction surgery without AHCCCS covering the procedure.

**Answer to Paragraph 104:  Defendant lacks sufficient knowledge or information to admit or deny the allegations contained in Paragraph 104 of the Complaint, and therefore denies them.**

## CLASS ACTION ALLEGATIONS

105.    Plaintiffs, on behalf of themselves and all similarly situated individuals, bring their claims for declaratory and injunctive relief as a class action under Fed. R. Civ. P. 23(a) and 23(b)(2).

**Answer to Paragraph 105:  Defendant admits Plaintiffs are attempting to bring this action on behalf of themselves and a proposed class, but denies that class certification is appropriate or permissible. Defendant denies the remaining allegations in Paragraph 105 of the Complaint.**

106.    Plaintiffs request that the Court certify the following class ("Class") under Fed. R. Civ. P. 23(b)(2).

All transgender individuals under age 21 who are or will be enrolled in AHCCCS, have or will have a diagnosis of gender dysphoria, and are seeking or will seek coverage for male chest reconstruction surgery following a determination by their

respective health care providers that the procedure is necessary to treat their gender dysphoria.

**Answer to Paragraph 106:  Defendant admits Plaintiffs have defined a proposed class as set forth in Paragraph 106, but denies that class certification for this proposed class is appropriate.  Defendant denies the remaining allegations in Paragraph 106 of the Complaint.**

107.    Plaintiffs are adequate representatives of the Class. Plaintiffs are transgender individuals under the age 21 who are enrolled in AHCCCS, have been diagnosed with gender dysphoria, and are seeking coverage for male chest reconstruction surgery to treat their dysphoria.

**Answer to Paragraph 107:  Defendant denies that Plaintiffs are adequate representatives of the proposed class set forth in Paragraph 106 of the Complaint. Defendant lacks sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 107 of the Complaint, and therefore denies them.**

108.    The Class satisfies the requirements of Fed. R. Civ. P. 23(a)(1) because the class is so numerous that joinder of all members is impracticable.  There are at least one hundred transgender males under age 21 who are enrolled in AHCCCS and who require male chest reconstruction surgery to treat their gender dysphoria.  In addition, because of the transient nature of the AHCCCS population, in part because individuals' income may make them eligible or ineligible for Medicaid at various points in their lives, it is impractical to join all transgender individuals under age 21 (who may live in various parts of Arizona) with gender dysphoria who may be denied AHCCCS coverage by the Challenged Exclusion at some point.

**Answer to Paragraph 108:  Defendant denies the allegations in Paragraph 108 of the Complaint.**

109.    The Class satisfies the commonality requirements of Fed R. Civ. P. 23(a)(2) because there are questions of law and fact common to the Class.  Pursuant to the Challenged Exclusion, Defendant has acted or refused to act on grounds generally

applicable to the Class.  This action raises questions of law common to all members of the Class, including: (a) whether the Challenged Exclusion, facially and as applied to members of the Class, violates the EPSDT and comparability provisions of the federal Medicaid Act; (b) whether the Challenged Exclusion, facially and as applied to members of the Class, violates the prohibition on sex discrimination under Section 1557 of the Patient Protection and Affordable Care Act; and (c) whether the Challenged Exclusion, facially and as applied to members of the Class, violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.  All members of the Class share a common question of fact: Would their male chest reconstruction surgery be covered by AHCCCS but for Defendant's continuing enforcement of the Challenged Exclusion?

**Answer to Paragraph 109:  Defendant denies the allegations in Paragraph 109 of the Complaint.**

110.    The Class satisfies the typically requirements of Fed. R. Civ. P. 23(a)(3) because the named Plaintiffs' claims are typical of the claims of the Class.  Plaintiffs are members of the Class, are individuals who have been unable and will be unable to obtain AHCCCS coverage for medically necessary male chest reconstruction surgery because of the Challenged Exclusion, and as a result, have faced or will face delayed or denied access to these medically necessary treatments.  Plaintiffs and members of the Class share the same legal claims under Section 1557, the Medicaid Act, and the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

**Answer to Paragraph 110:  Defendant denies the allegations in Paragraph 110 of the Complaint.**

111.    The Class satisfies the adequacy requirements of Fed. R. Civ. P. 23(a)(4) because the class representatives will fairly and adequately represent the interests of the Class.  The named Plaintiffs seek the same declaratory and injunctive relief as the other members of the Class: a declaratory judgment that the Challenged Exclusion violates the Medicaid Act, Section 1557, and the Equal Protection Clause, and preliminary and

permanent injunctions enjoining Defendant from enforcing the Challenged Exclusion. The named Plaintiffs seek this relief to benefit themselves and to protect other low-income transgender Arizona residents who are or will be enrolled in AHCCCS.  In asserting their own rights, the named Plaintiffs will vindicate the rights of all members of the Class fairly and adequately.  The class representatives have no interests that are antagonistic to the interests of other members of the Class.

**Answer to Paragraph 111:  Defendant denies the allegations in Paragraph 111 of the Complaint.**

112.    The Class further satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because counsel for the Class will fairly and adequately represent the interests of the Class.  The Class is represented by counsel from King & Spalding LLP and Perkins Coie LLP, two of the largest law firms in the country; the National Center for Lesbian Rights ("NCLR"), a legal organization dedicated to advancing the civil and human rights of the LGBTQ community; and the National Health Law Program ("NHeLP"), a non-profit law firm dedicated to protecting and advancing the health rights of low-income and underserved individuals and families.  Collectively, counsel has significant experience litigating civil rights cases, including transgender rights cases, Medicaid EPSDT cases, and complex class actions in federal court.

**Answer to Paragraph 112:  Defendant admits Plaintiffs are represented by counsel from King & Spalding, LLP, Perkins Coie, LLP, the National Center for Lesbian Rights, and the National Health Law Program.  Defendant lacks sufficient knowledge or information to admit or deny the remaining allegations contained in Paragraph 112 of the Complaint, and therefore denies them.**

113.    The Class also satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive or corresponding declaratory relief is appropriate respecting the class as a whole.  The Class exhibits sufficient cohesiveness because its members have suffered

group, as opposed to individual, injuries, namely, the Challenged Exclusion's categorical denial of male chest reconstructive surgery.  Members of the Class are bound together by the significant common traits that they are all transgender, they have gender dysphoria, and they need male chest reconstruction surgery to treat their gender dysphoria.

**Answer to Paragraph 113:  Defendant denies the allegations in Paragraph 113 of the Complaint.**

114.    Further, by definition, members of the Class are low-income individuals who would otherwise have difficulty affording counsel to individually challenge the Challenged Exclusion.  Therefore, a class action is the ideal - and the only - method by which the Class may vindicate the denial of their civil rights.

**Answer to Paragraph 114:  Defendant denies the allegations contained in Paragraph 114 of the Complaint.**

## COUNT I

**(Violation of the Medicaid Act's EPSDT Requirements, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(A)-(C), 1396d(a)(4)(B), and 1396d(r)(5))**

115.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 144 of this Complaint.

**Answer to Paragraph 115:  Defendant incorporates her responses to each and every allegation in the Complaint as if fully set forth herein.**

116.    The Challenged Exclusion, Arizona Administrative Code R9-22-205-B.4(a), and Defendant's refusal, based on the Challenged Exclusion, to provide coverage for surgical treatments and services for gender dysphoria to Plaintiffs and members of the Class, violate the Medicaid Act's EPSDT requirements, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(A)-(C), 1396d(a)(4)(B), and 1396d(r)(5), which are enforceable by Plaintiffs under 42 U.S.C. § 1983.

**Answer to Paragraph 116:  Defendant denies the allegations in Paragraph 116 of the Complaint.**

## COUNT II

### (Violation of the Medicaid Act's Comparability Requirement, 42 U.S.C. § 1396a(a)(10)(B))

117.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 114 of this Complaint.

**Answer to Paragraph 117:  Defendant incorporates her responses to each and every allegation in the Complaint as if fully set forth herein.**

118.    The Challenged Exclusion, Arizona Administrative Code R9-22-205-B.4(a), and Defendant's refusal, based on the Challenged Exclusion, to provide coverage for surgical treatments and services for gender dysphoria to Plaintiffs and members of the Class, while covering the same services for other AHCCCS beneficiaries with different diagnoses, violate the Medicaid Act's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B), which is enforceable by Plaintiffs under 42 U.S.C. § 1983.

**Answer to Paragraph 118:  Defendant denies the allegations in Paragraph 118 of the Complaint.**

## COUNT III

### (Unlawful Discrimination on the Basis of Sex in Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116)

119.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 114 of this Complaint.

**Answer to Paragraph 119:  Defendant incorporates her responses to each and every allegation in the Complaint as if fully set forth herein.**

120.    Under Section 1557 of the Affordable Care Act, "an individual shall not…be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, and part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by and Executive Agency or any entity established under this title (or amendments)" on the basis of sex. 42 U.S.C. § 18116.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Answer to Paragraph 120: Defendant admits that 42 U.S.C. § 18116(a) states, in its entirety, "Except as otherwise provided for in this title (or an amendment made by this title), an individual shall not, on the ground prohibited under title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.), title IX of the Education Amendments of 1972 (20 U.S.C. 1681 et seq.), the Age Discrimination Act of 1975 (42 U.S.C. 6101 et seq.), or section 794 of Title 29, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under this title (or amendments). The enforcement mechanisms provided for and available under such title VI, title IX, section 794, or such Age Discrimination Act shall apply for purposes of violations of this subsection."**

121.    Section 1557's prohibitions on sex discrimination are enforceable by Plaintiffs in a judicial action under 20 U.S.C. § 1683, which Section 1557 incorporates by reference.  42 U.S.C. § 18116(a).  The Challenged Exclusion, Arizona Administrative Code R9-22-205-B.4(a), on its face and as applied to Plaintiffs and members of the Class, violates Section 1557's prohibition against discrimination on the basis of sex in a health program or activity receiving federal financial assistance.

**Answer to Paragraph 121:  Defendant denies the allegations in Paragraph 121 of the Complaint.**

122.    Plaintiffs and the Class have been and are continuing to be injured by Defendants' application of the Challenged Exclusion to deny them AHCCCS coverage for surgical treatments for gender dysphoria.

**Answer to Paragraph 122:  Defendant denies the allegations in Paragraph 122 of the Complaint.**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

<u>COUNT IV</u>
**(Violation of the Equal Protection Clause of the
Fourteenth Amendment of the United States Constitution)**

123.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 114 of this Complaint.

**<u>Answer to Paragraph 123:</u>  Defendant incorporates her responses to each and every allegation in the Complaint as if fully set forth herein.**

124.    First, the Challenged Exclusion, Arizona Administrative Code R9-22-205-B.4(a), on its face and as applied to Plaintiffs and members of the Class, impermissibly discriminates against Plaintiffs and members of the Class on the basis of sex and violates their right to equal protection of the laws under the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

**<u>Answer to Paragraph 124:</u>  Defendant denies the allegations in Paragraph 124 of the Complaint.**

125.    Second, the Challenged Exclusion, Arizona Administrative Code R9-22-205-B.4(a), on its face and as applied to Plaintiffs, impermissibly discriminates against Plaintiffs and members of the Class for being transgender and violates their right to equal protection of the laws under the Fourteenth Amendment to the United States Constitution.

**<u>Answer to Paragraph 125:</u>  Defendant denies the allegations in Paragraph 125 of the Complaint.**

126.    Defendant's promulgation and continued enforcement of the Challenged Exclusion did not, and does not, serve any rational, legitimate, important, or compelling state interest.  Rather, the Challenged Exclusion serves only to prevent Plaintiffs and members of the Class from obtaining medically necessary surgical care and services to treat their gender dysphoria, complete their gender transitions, and live as their authentic selves.

**<u>Answer to Paragraph 126:</u>  Defendant denies the allegations in Paragraph 126 of the Complaint.**

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

A.      Certify a Class consisting of: All transgender individuals under age 21 who are or will be enrolled in AHCCCS, have or will have a diagnosis of gender dysphoria, and are seeking or will seek male chest reconstruction surgery following a determination by their respective health care providers that the procedure is necessary to treat their gender dysphoria.

B.      Name D.H. and John as representatives of the Class, and appoint Plaintiffs' counsel as King & Spalding LLP, Perkins Coie LLP, the NCLR, and NHeLP;

C.      On behalf of Plaintiffs and all similarly situated individuals, issue preliminary and permanent injunctions prohibiting Defendant from any further enforcement or application of the Challenged Exclusion, Arizona Administrative Code R9-22-2-5-B.4(a), and directing Defendant and their agents to provide Medicaid coverage for medically necessary male chest reconstruction surgery;

D.      On behalf of Plaintiffs and all similarly situated individuals, enter a declaratory judgment that the denial of coverage for male chest reconstruction surgery:

1.  Violates the Medicaid Act's EPSDT requirements, 42 U.S.C. §§ 1396a(a)(10)(B);

2.  Violates the Medicaid Act's comparability requirement, 42 U.S.C. § 1396a(a)(10)(B);

3.  Violates Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116, by discriminating against Plaintiffs and all similarly situated individuals on the basis of sex; and

4.  Violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution by discrimination against Plaintiffs and all similarly situated individuals on the basis of sex (including sex stereotyping, gender identity,

being transgender, and undergoing a gender transition), and for being
transgender;

    E.    Waive the requirement for the posting of a bond of security for the entry of
temporary and preliminary relief;

    F.    Award Plaintiffs their reasonable attorneys' fees, costs, and expenses under
42 U.S.C. § 1988 or other applicable statutes; and

    G.    Award such other and further relief as the Court may deem just and proper.

**Answer to Prayer for Relief: Defendant denies the allegations in the Prayer for
Relief and denies that Plaintiff is entitled to any relief whatsoever.**

### AFFIRMATIVE DEFENSES

A.    Plaintiffs' Complaint fails to state a claim upon which relief may be granted.

B.    The Complaint should be dismissed for failure to exhaust administrative
remedies, including by D.H. failing to timely appeal from the alleged health
plan denial.

C.    Plaintiffs' claims may be barred by applicable statutes of limitations.

D.    Plaintiffs' claims may be barred by the doctrines of waiver, laches, and/or
estoppel.

E.    Defendant has fulfilled all obligations imposed on her by law.

F.    Plaintiffs' claims are barred because the decision about which they complain
was made on the basis of reasonable factors other than Plaintiffs' sex.

G.    Defendant's actions were not designed, intended, or used to discriminate
because of sex.

H.    Any action taken by Defendant was rationally related to a legitimate
government interest.

I.    Any action taken by Defendant was reasonable and necessary to serve, and
substantially related to, an important government purpose.

J.    Any action taken by Defendant was narrowly tailored to serve a compelling government interest.

K.    Plaintiffs' claims may be barred for lack of standing.

L.    Plaintiffs cannot satisfy the prerequisites for class certification and, therefore, lack standing and cannot represent the interests of others.

M.    Class certification may be inappropriate due to conflicts of interest between Plaintiffs and purported class members, or between and among purported class members.

N.    Plaintiffs cannot satisfy the prerequisites under Federal Rule of Civil Procedure 23 to certify this action as a class action.

O.    Plaintiffs have failed to provide their medical records to support their allegations regarding chest reconstruction surgery for Plaintiffs.

P.    Plaintiff John Doe does not appear to have requested chest reconstruction surgery from AHCCCS or any health plan and John Doe's allegations are therefore premature.

Defendant has not knowingly or intentionally waived any applicable affirmative defenses.  Defendant reserves the right to amend her Answer to add such affirmative defenses as may become available or apparent during this proceeding and discovery.

**WHEREFORE**, Defendant demands judgment against Plaintiffs as follows:

A.    Dismissing the Complaint with prejudice;

B.    For costs, disbursements and attorney fees; and

C.    For such other relief as the Court deems just and equitable.

1

2
RESPECTFULLY SUBMITTED this 28th day of September, 2020.

3
**BURNSBARTON PLC**

4

5
By     */s/ Kathryn Hackett King*

6
David T. Barton
Kathryn Hackett King

7

8
**JOHNSTON LAW OFFICES, P.L.C.**
Logan T. Johnston

9
14040 N. Cave Creek Rd., Suite 309
Phoenix, Arizona 85022

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**CERTIFICATE OF SERVICE**

2

3

4

     I hereby certify that on September 28, 2020 I electronically transmitted the foregoing document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants.

5

Brent P. Ray
Andrew J. Chinsky

6

KING & SPALDING LLP
353 N. Clark Street, 12th Floor

7

Chicago, Illinois 60654
T: +1 312 995 6333

8

F: +1 312 995 6330
Email:bray@kslaw.com

9

achinsky@kslaw.com

10

Daniel C. Barr
Janet M. Howe

11

PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000

12

Phoenix, AZ 85012-2788
T: +1 602 351 8085

13

F: +1 602 648 7085
Email:dbarr@perkinscoie.com

14

jhowe@perkinscoie.com

15

Asaf Orr
NATIONAL CENTER FOR LESBIAN RIGHTS

16

870 Market Street, Suite 370
San Francisco, CA 94102

17

T: +1 415 392 6257
F: +1 415 392 8442

18

Email:aorr@nclrights.org

19

Abigail K. Coursolle
Catherine McKee

20

NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Boulevard, Suite 750

21

Los Angeles, CA 90010
T: +1 310 204 6010

22

Email:coursolle@healthlaw.org
mckee@healthlaw.org

23

24

*Attorneys for Plaintiffs and the Class*

25

*s/Carolyn Galbreath*

26

27

28