Logan T. Johnston, #009484
**JOHNSTON LAW OFFICES, P.L.C.**
14040 N. Cave Creek Rd., Suite 309
Phoenix, Arizona 85022
Telephone: (602) 435-0050
ltjohnston@live.com

David T. Barton  #016848
Kathryn Hackett King #024698
**BURNSBARTON PLC**
2201 East Camelback Road, Ste. 360
Phone: (602) 753-4500
david@burnsbarton.com
kate@burnsbarton.com

*Attorneys for Defendant*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| D.H., by and through his mother, Janice Hennessy-Waller; and John Doe, by and through his guardian and next friend, Susan Doe, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>  vs.<br><br>Jami Snyder, Director of the Arizona Health Care Cost Containment System, in her official capacity,<br><br>    Defendant. | Case No. 4:20-cv-00335-SHR<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>(Assigned to the Honorable Scott H. Rash) |

Defendant Jami Snyder, Director of the Arizona Health Care Cost Containment System ("AHCCCS"), submits this Opposition to Plaintiffs' Motion for Preliminary Injunction. (Doc. 3) D.H. and John Doe - minors with gender dysphoria - are demanding that AHCCCS, Arizona's Medicaid program, provide them coverage for gender reassignment surgery – specifically, chest reconstruction surgery. But Plaintiffs have not established this irreversible, expensive surgery is legally required or medically appropriate or effective for children generally or for themselves in particular; nor have they established their own ability to provide informed consent. Also, the relief sought would effectively decide the case at this point, as it would result in all the relief Plaintiffs seek in this case, and this is a highly disfavored result. Plaintiffs fail to meet the exceedingly high standards required for a mandatory injunction. Thus, the Court should deny the motion.

## I.  BACKGROUND

### a. Plaintiffs D.H. and John Doe

Plaintiffs are minors - D.H. is 17 years old, and John Doe is 15 years old. (Doc. 1, ¶¶1, 21-22) Plaintiffs allege they are enrolled in AHCCCS "due to [their] family's limited income." (*Id*.) Plaintiffs have been diagnosed with gender dysphoria; they were identified as female at birth, but have since transitioned to live as male. (*Id*. ¶5) Plaintiffs seek "declaratory and injunctive relief to enjoin Arizona from continuing to deny them medically necessary treatment" – specifically, chest reconstruction surgery (permanent removal of breasts with chest wall reconstruction surgery). (Doc. 1, ¶¶1, 4, 17; Doc. 5-4, ¶35). The motion seeks to "enjoin Defendant from further enforcement of the regulation and order AHCCCS to cover male chest reconstruction surgery for D.H. and John," which they claim is "medically necessary." (Doc. 3, p.2; Doc. 1, ¶¶1, 17)

Plaintiffs' claims are based on Arizona Administrative Code ("A.A.C.") R9-22-205-B.4, which contains several AHCCCS coverage exclusions, including for: "(a) Infertility services, reversal of surgically induced infertility (sterilization), and gender reassignment surgeries; (b) Pregnancy termination counseling services; (c) Pregnancy

terminations, unless required by state or federal law; (d) Services or items furnished solely for cosmetic purposes; and (e) Hysterectomies unless determined medically necessary." While "gender reassignment surgeries" are excluded from coverage, other services for the treatment of gender dysphoria - hormone treatments and behavioral health/counseling - are not excluded. *Id.* D.H. claims prior authorization for chest reconstruction surgery was denied because of the exclusion, but the Complaint does not allege John sought prior authorization. (Doc. 1, ¶9)

Plaintiffs filed nine declarations (five from healthcare providers) in support of the motion. Plaintiffs gave their providers their medical records for review. *See, e.g.,* Declaration of Dr. Andrew Cronyn (Doc. 5-3, ¶5) Expert Declaration of Aron Janssen, M.D. (Doc. 5-4, ¶19); Expert Declaration of Loren Schechter, M.D. (Doc. 5-5, ¶18) And Plaintiffs argue relief should be granted because chest reconstruction surgery is "medically necessary" for them. For this reason, and in order to respond to the motion, Defendant requested Plaintiffs produce the medical records their providers/experts reviewed, explaining (1) the documents are relevant, (2) the prior authorization process requires AHCCCS to review relevant medical records, and (3) AHCCCS would hold the documents confidential. But Plaintiffs have obstinately refused to disclose any of these relevant medical records to Defendant.

**Plaintiff D.H.**: According to the Complaint, D.H. had "significant psychological distress at an early age, including severe anxiety and suicidal ideation" and was placed "in a psychiatric treatment facility on several occasions." (Doc. 1, ¶6) As a young child, D.H. "began exhibiting signs of significant psychological distress including depression, prolonged crying episodes, anxiety, and insomnia." (*Id.*, ¶69) At the age of 11, D.H. had "other stressors D.H. was trying to navigate" (beyond any stress related to gender identity), which caused him to start losing his hair. D.H. was hospitalized, including in intensive psychiatric care, four times beginning at age 11 for depression and suicidal

ideation.[1] (Doc. 5-1, ¶¶5, 12; Doc. 1, ¶¶70, 78, 84) D.H. has a history of pervasive anxiety, chronic suicidal ideations and attempts, and related self-harm issues (including cutting, burning and hair pulling). (Doc. 5-2, ¶6)  In addition, D.H. currently has "anxiety and psychological distress caused by prior trauma."[2]  (Id. ¶13) Also, D.H. has a history of "oppositional disorder" (Id. ¶8), which the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition ("DSM-5") defines as "a frequent and persistent pattern of angry/irritable mood, argumentative/defiant behavior, or vindictiveness."

At 13, D.H. informed his mother he is transgender and began seeing a therapist, Tamar Reed, who "recommended that D.H. begin to transition to living as male;" D.H. then began to socially transition to male and started hormone-replacement therapy (testosterone) that D.H. alleges "masculinize[d] his body." (Doc. 1, ¶¶7, 75, 79, 80)

**Plaintiff John Doe**: In his early years, "John's biological parents were unable to care for him and provide a stable home environment." (Doc. 4-1, ¶5) John's guardian is his grandmother. (Doc. 1, ¶89) John has been diagnosed with PTSD: "chronic post-traumatic stress disorder stemming from early-life attachment trauma." (Doc. 4-2, ¶11). The term "early-life attachment trauma" means John suffered abuse or neglect at a young age.  Laidlaw Decl. at ¶16. John has been depressed, suffered from anxiety, engaged in self-harm through cutting and burning,[3] distanced from friends and family, lost interest in activities, and lost significant weight in a short period of time because of limited food intake. John also contemplated suicide. (Doc. 4, ¶5) According to John's clinical therapist, Mischa Cohen-Peck, John continues to suffer from PTSD.  She notes he is currently

---

[1] D.H. was in intensive in-patient psychiatric care for severe anxiety and suicidal ideation beginning in 2014.  There is no indication gender dysphoria was being evaluated, discussed, or addressed at this time. It was not until two years later (in 2016) that D.H. disclosed to another person that he was transgender. (Doc. 5-1, ¶¶5,7); Expert Declaration of Dr. Michael Laidlaw, M.D., Exhibit A ("Laidlaw Decl.") at ¶15.
[2] The Declaration of Tamar Reed does not specify the nature of the "prior trauma."
[3] Both D.H. and John have engaged in non-suicidal self-injury, which is associated with multiple types of psychiatric disorders (e.g., PTSD, depression, anxiety, and obsessive-compulsive, borderline personality, and eating disorders). Laidlaw Decl. at ¶19.

involved in "treatment of the trauma underlying his PTSD." (Doc. 4-2, ¶20) Thus, John has not been successfully treated for the trauma underlying his PTSD.[4]

At about age 11, John began to socially transition to male. (Doc. 1, ¶¶10-11) At 13, John began visiting a gender support program and then began hormone-replacement therapy (testosterone) and medicine to stop John's menstrual cycle. (*Id*. ¶¶96-97)

**b. Treatment Standards**

There are no laboratory, imaging, or other objective tests to predict whether children with gender dysphoria will outgrow the condition; a large majority of children with gender dysphoria outgrow the condition by adulthood. Expert Declaration of Dr. Stephen B. Levine, M.D. (Exhibit B) ("Levine Decl."), at ¶¶28, 56, 58-60; Laidlaw Decl. at ¶¶22, 40. Treatment interventions on behalf of children diagnosed with gender dysphoria must be held to the same scientific standards as other medical treatments; they must be optimal, efficacious, and safe, and any treatment that alters biological development in children should be used with extreme caution.[5] Laidlaw Decl. at ¶ 12.

A high percentage of children diagnosed with gender dysphoria have depression, anxiety, or other mental health disorders, and many had their first contact with psychiatric services for reasons other than gender identity issues. Laidlaw Decl. at ¶¶13, 23; Levine Decl. at ¶55 and n.7.[6]  Both D.H. and John have a significant and lengthy history of significant psychiatric issues separate and apart from gender dysphoria. Laidlaw Decl. at ¶¶13-19. In addition, they have both been prescribed hormone-replacement therapy (i.e., testosterone). A typical dose of hormone-replacement therapy is very high (6 to 100 times

---

[4] In addition, John describes "being detached" from his body. (Doc. 4-2, ¶12) One psychiatric disorder, dissociative identity disorder (often associated with traumatic events and/or physical or sexual abuse in childhood) causes people's bodies to feel different (like the opposite gender); also, suicide attempts and self-injurious behavior are common among people with this disorder. Laidlaw Decl. at ¶18.
[5] Indeed, Dr. Levine explains the "affirmation therapy" model for treating gender dysphoria disregards the principles of child development and family dynamics, and is not supported by science.  Levine Decl. at ¶¶36-42, 61-67.
[6] Certain groups of children have an increased prevalence and incidence of trans identities, including children who are minorities, have mental developmental disabilities, are in foster homes or adopted, have a prior history of psychiatric illness, and adolescent girls. Levine Decl. at ¶19.

higher than the typical natal female body); significantly, high doses of testosterone predispose individuals towards mood disorders, psychosis, and psychiatric disorders, and thus hormone treatments can exacerbate a patient's underlying psychiatric problems. Laidlaw Decl. at ¶20. Plaintiffs claim they first felt better after the hormones, but later felt worse. It is likely they originally felt better because of the side effect of euphoria from high doses of testosterone; it is likely they later felt worse because (1) the high dose ultimately exacerbated their mental health issues, or (2) their underlying psychiatric issues were never actually resolved (or both). Laidlaw Decl. at ¶21.

A child's psychological disorders should be thoroughly treated before considering gender reassignment surgery, but there is insufficient evidence D.H. and John's psychiatric issues have been thoroughly evaluated and treated by a qualified psychiatrist/psychologist. Laidlaw Decl. at ¶23; Levine Decl. at ¶¶23, 27-35. In addition, there is nothing in the record to establish Plaintiffs (1) have been adequately treated or received medication to treat their psychological issues; (2) have had a thorough psychiatric evaluation; and (3) do not have a history of substance use/abuse (as is common in individuals with these types of disorders). Laidlaw Decl. at ¶¶23-25. This is all relevant as to whether two minors can provide informed consent for an irreversible surgery. Laidlaw Decl. at ¶¶25, 29; Levine Decl. at ¶¶105-118. If a patient later regrets the decision and decides to resume living as their natal sex (female), the patient will not be able to breastfeed a child. And like any surgery, it can result in damage to the nerves, trouble healing, scarring, and infections. Laidlaw Decl. at ¶¶26, 28; Levine Decl. at ¶90. Also, a final assessment (in-person exam) has not even been conducted on Plaintiffs to determine suitability for surgery.[7] Laidlaw Decl. at ¶27; Doc. 5-5, ¶45.

Gender dysphoria is the only psychiatric condition to be treated by surgery. Levine Decl. at ¶¶21-22. But quality studies showing that chest reconstruction surgery is safe, effective, and optimal for treating minors with gender dysphoria do not exist; also, there is

---

[7] Hennessy-Waller's declaration claims a plastic surgeon indicated D.H. was "a good candidate" for surgery, but there are no records or evidence of an in-person exam.

evidence that questions the long-term effectiveness of gender reassignment surgery.[8] Laidlaw Decl. at ¶¶30-38; Levine Decl. at ¶¶69-82, 96-98, 113-114. Indeed, the Centers for Medicare and Medicaid Services has found "inconclusive" clinical evidence regarding gender reassignment surgery. Laidlaw Decl. at ¶36. There are no tests to predict whether a young person will outgrow the gender dysphoria; and the under 21 age group is still undergoing brain development and are immature with respect to intellect, emotion, judgment, and self-control. Thus, there is a significant chance a young person may later regret removing an organ that cannot be replaced. Laidlaw Decl., at ¶40; Levine Decl., at ¶¶99-104. Plaintiffs have not established that an irreversible chest reconstruction surgery is safe, medically necessary, or effective to treat their gender dysphoria, or that they have the ability to provide informed consent for an irreversible surgery of this nature. Laidlaw Decl. at ¶¶12, 39-40; Levine Decl. at ¶¶14, 18, 69-82, 96-98, 113-114.

## II.    LEGAL ARGUMENT

### a.  Requirements to obtain a preliminary injunction

A preliminary injunction is extraordinary and drastic relief that a court may grant only in limited circumstances and after the moving party meets exacting requirements. "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the

---

[8] Plaintiffs cite the World Professional Association for Transgender Health's (WPATH) "Standards of Care for the Health of Transsexual, Transgender, and Gender Non-Conforming People" (7th ed., 2011) ("SOC"). But as Drs. Laidlaw and Levine note, (1) WPATH's SOC were prepared within an organization whose mission includes advocacy, (2) there are limitations on the SOC that have been caused by a lack of rigorous research in the field, (3) the SOC does not capture the clinical experiences of many in the medical profession, (4) because the latest SOC deleted the requirement for therapy, facilities are allowing patients to be counseled to transition by individuals with masters rather than medical or PhD clinical psychology degrees, and (5) there are serious questions about WPATH's scientific process; for example, unlike other organization's guidelines, WPATH does not have a grading system for the strength of their recommendations or quality of evidence. Levine Decl., at ¶¶43-51; Laidlaw Decl., at ¶33. Nonetheless, even under the SOC (p.59), the criteria for chest surgery are (1) the patient has "[c]apacity to make a fully informed decision and to give consent for treatment;" and (2) "If significant medical or mental health concerns are present, they must be reasonably well-controlled." Plaintiffs have <u>not</u> established they have capacity to provide informed consent or their other conditions have been reasonably well-controlled.  Laidlaw Decl., at ¶¶14-21, 23-25, 29. For example, D.H. has ongoing anxiety and psychological distress from prior trauma; John is currently in treatment for trauma underlying his PTSD. (Doc. 4-2, ¶20; Doc. 5-2, ¶13)

merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Monarch Content Mgmt. v. Ariz. Dep't of Gaming,* 971 F.3d 1021, 1027 (9th Cir. 2020) (citing *Winter v. Nat. Res. Def. Council,* 555 U.S. 7, 20 (2008)). The Supreme Court has emphasized a moving party must clearly prove each of these elements: "It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quoting 11A *C. Wright, A. Miller, & M. Kane, Federal Prac. & Proc.* § 2948, pp. 129–130 (2d ed.1995) (emphasis in *Mazurek*; footnotes omitted)). This is particularly true in cases, like this one, where the moving party seeks a "mandatory" rather than a "prohibitory" injunction. Mandatory injunctions require a party to "take action"[9] and are "particularly disfavored" by courts. *Marlyn Nutraceuticals v. Mucos Pharm.,* 571 F.3d 873, 878–79 (9th Cir. 2009). Mandatory injunctions are "subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharm,* 7 F.3d 1399, 1403 (9th Cir.1993); *Marlyn,* 571 F.3d at 878–79.  In *Anderson v. United States,* 612 F.2d 1112, 1115 (9th Cir. 1979) the Ninth Circuit described this "heightened scrutiny" as follows:

> Courts are more reluctant to grant a mandatory injunction than a prohibitory one and . . . generally an injunction will not lie except in prohibitory form. Such mandatory injunctions, however, are not granted unless extreme or very serious damage will result and **are not issued in doubtful cases** or where the injury complained of is capable of compensation in damages.

(Emphasis added.) This language was repeated in *Marlyn* (vacating a mandatory injunction). Plaintiffs' motion should be denied because there is more than a little doubt that Plaintiffs in this case are likely to succeed on the merits or suffer irreparable harm in the absence of a preliminary injunction.

---

[9] Among other things, Plaintiffs would have this Court enter an order that AHCCCS "shall provide coverage for Plaintiffs' male chest reconstruction surgeries, consistent with all other requirements of federal law." (Doc. 3-1 at p. 1)

1

2

### b. Plaintiffs have not established irreparable harm

Plaintiffs argue if the Court does not grant a preliminary injunction, they will suffer

3

medical harm.  The principal source of this harm is the binding that each Plaintiff wears to

4

disguise their breasts.  But a careful review of the facts presented demonstrates why there

5

is no medical emergency that warrants immediate relief. The DSM-5 (p. 451) defines

6

gender dysphoria as "distress that may accompany the incongruence between one's

7

experienced or expressed gender and one's assigned gender." In the context of a

8

preliminary injunction, the Court must consider whether this "distress" amounts to

9

irreparable harm. Another important aspect of gender dysphoria in the context of this case

10

is that, more often than not, gender dysphoria in children does not persist into adulthood.

11

The DSM-5 (p. 455) says: "Rates of persistence of gender dysphoria from childhood into

12

adolescence or adulthood vary. In natal males, persistence has ranged from 2.2% to 30%.

13

In natal females, persistence has ranged from 12% to 50%." Dr. Laidlaw agrees, noting

14

"[t]here are no laboratory, imaging, or other objective tests to predict whether children

15

with gender dysphoria will outgrow the condition." Laidlaw Decl. at ¶22. Thus, the

16

distress Plaintiffs currently experience may very well dissipate over time, which argues in

17

favor of the Court adopting a deliberate rather than emergency pace here.

18

Dr. Laidlaw points to another concern related to the Plaintiffs in this case. Both

19

suffer from other significant psychological disorders which pre-date their gender

20

dysphoria. As Dr. Laidlaw notes, this history of psychiatric disorders calls into question

21

the ability of these minors to provide true informed consent: "I have significant concerns

22

about the ability of two minors with histories of significant underlying psychiatric issues,

23

separate and apart from gender dysphoria, to provide informed consent to undergo an

24

irreversible sex reassignment surgery." Laidlaw Decl. at ¶29. Our country does not allow

25

children under 18 to vote.  In Arizona, children under 16 cannot drive.  Yet Plaintiffs

26

would require the state to approve irreversible surgery for even younger children.

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**D.H.**: D.H., who is 17 years, first came out as transgender in about 2016. (Doc. 5-2, ¶¶5-6) According to Dr. Cronyn, he has been binding for five years now. (Doc. 5-3, ¶26) Despite this lengthy period of binding, D.H. has not reported any of the skin conditions Plaintiffs argue could develop into more serious medical issues. (*Id*. ¶26) Similarly, the back pain that DH complains of is relieved by stretching and removing the binder. (*Id*. ¶¶19-20) And although Dr. Cronyn opines that continued use of the binder "will exacerbate the symptoms of his asthma" that exacerbation has apparently not occurred to date. (*Id*. ¶23).

**John Doe**: John is 15 years old. John has suffered from "chronic post-traumatic stress disorder from early life attachment disorder." (Doc. 4-2, ¶11) Long-standing and pre-existent conditions should be addressed *before* irreversible surgical procedures are employed. Laidlaw Decl. at ¶¶11-29; Levine Decl. at ¶¶30-35, 75, 111-112. The Court should also note John's therapist is the only medical professional to provide a declaration in support of his need for surgery. Plaintiffs provide no declaration from a medical doctor who has actually treated John to support immediate and irreversible surgery for John.

In light of these facts, the cases Plaintiffs cite provide little support for a preliminary injunction. *Bowen v. City of New York*, 476 U.S. 467, 484 (1986) was a lawsuit brought by New York and eight disabled individuals who alleged the Social Security Administration was denying benefits based upon an unwritten policy that was contrary to published regulations. *Id.* at 473–74. The injunction at issue was not a preliminary injunction (the court's decision followed a seven-day trial) but rather the court entered an order requiring the agency to "reopen the decisions denying or terminating benefits, and to redetermine eligibility." *Id.* at 476. Nor were the *Bowen* plaintiffs seeking a mandatory injunction. As the court noted, the plaintiffs "neither sought nor were awarded benefits in the District Court, but rather challenged the Secretary's failure to follow the applicable regulations." *Id.* at 483. And finally, it should be noted the district court's finding of irreparable harm was not challenged on appeal. *Id.* at 484. Further,

1    *Edmo v. Corizon,* 935 F.3d 757 (9th Cir. 2019) was an 8th Amendment claim brought by a

2    prisoner. The court's decision was issued only after the court allowed the parties four

3    months of factual and expert discovery followed by a three-day evidentiary hearing. *Id.* at

4    775. This process allowed the court to make an evidentiary finding of irreparable harm

5    based upon "Edmo's severe, ongoing psychological distress and the high risk of self-

6    castration and suicide she faces absent surgery." *Id.* at 797. The importance of an

7    evidentiary hearing was emphasized in *Thomas v. Cty. of Los Angeles*, 978 F.2d 504 (9th

8    Cir. 1992), <u>as amended</u> (Feb. 12, 1993). *Thomas* was a Section 1983 class action by

9    Black and Hispanic residents who alleged deputy sheriffs were utilizing terrorist-type

10   tactics to cause them irreparable physical and emotional injuries. *Id.* at 511. Importantly,

11   the 9th Circuit vacated the preliminary injunction entered by the District Court because

12   "[b]efore issuing its preliminary injunction, the district court did not conduct evidentiary

13   proceedings to resolve any of the disputed matters." *Id.* at 509.

14          Plaintiffs' remaining cases are also not dispositive. In *Chalk v. U.S. Dist. Court*

15   *Cent. Dist. of Cal.*, 840 F.2d 701 (9th Cir. 1988), a teacher diagnosed with AIDS brought

16   a claim under the Rehabilitation Act. The 9th Circuit found irreparable harm because the

17   Rehabilitation Act allows the recovery of emotional distress damages (*Id.* at 710) and

18   because, given the lethality of AIDS at the time, Chalk did not have time to wait for trial:

19   "Presently Chalk is fully qualified and able to return to work; but his ability to do so will

20   surely be affected in time. A delay, even if only a few months, pending trial represents

21   precious, productive time irretrievably lost to him." *Id*. Neither factor is present in this

22   case. And finally, Plaintiffs' reliance on *Whitaker v. Kenosha,* 858 F.3d 1034 (7th Cir.

23   2017) is misplaced for the simple reason that in *Whitaker*, the requested remedy was not

24   an expensive, irreversible surgery of questionable value for two minors who have not

25   established the ability to provide informed consent, but simply the ability to use a school

26   restroom of the transgender student's choosing. *Id*. at 1042.

27

28

Plaintiffs contend the deprivation of constitutional rights constitutes irreparable injury. But they first have to prove a deprivation of their constitutional rights; as demonstrated in section II(c)(4) there is significant doubt whether Plaintiffs have a constitutional right to have AHCCCS pay for this surgery. This case is not like *Melendres v. Arpaio*, 695 F.3d 990 (9th Cir. 2012) in which Latino drivers were stopped just because of their race. Nor is it similar to *Edmo,* in which discovery and a lengthy evidentiary hearing demonstrated that a prisoner's 8th Amendment rights had been violated. Here, the Court must grapple with the difficult question of whether AHCCCS should be required to provide medically questionable, irreversible surgeries to children. That complex and difficult question cannot be resolved on the record before this Court. Laidlaw Decl. at ¶12.

### c. Likelihood of success on the merits

#### 1. *Plaintiffs fail to demonstrate the challenged rule violates EPSDT*

AHCCCS does not discriminate against its transgender members or exclude gender dysphoria treatment - for example, AHCCCS covers medically necessary hormone treatments and mental health counseling. The challenged rule merely draws the line at gender reconstruction surgery. As set forth above and in the declarations of Drs. Laidlaw and Levine, there is legitimate debate about whether such surgery should be covered, particularly for children. The question is: Does such surgery correct or ameliorate the underlying conditions of persons, particularly children, who seek such surgeries?

We do not know Plaintiffs' circumstances beyond what they allege in their Complaint, motion, and attached declarations. EPSDT covers treatment of defects, illnesses, or conditions that are "discovered by the [EPSDT] screening services," not simply asserted in expert declarations. 42 U.S.C. § 1396d(r)(5). Plaintiffs have been unwilling to produce the medical records upon which their expert declarations rely, and even their own declarations disclose Plaintiffs have not been finally assessed for suitability for surgery by the surgeon who would perform the procedures. (Doc. 5-5, ¶45)

D.H. alleges he sought chest reconstruction surgery from AHCCCS in 2019, and appealed the denial to his health plan but no further. (Doc. 5-1, ¶¶14-15) Apparently, D.H.'s next step was to seek not the review afforded by state law, but this Court's intervention instead. John does not allege he ever sought AHCCCS coverage of chest reconstruction surgery. Even interpreting the Complaint as a "request" for such authorizations, neither has yet demonstrated medical necessity for the service.

Although EPSDT coverage is broad, it is not unlimited. The 9th Circuit has stated, "[u]nder § 1396d(r)(5), states must cover every type of health care or service necessary for EPSDT corrective or ameliorative purposes that is allowable under § 1396d(a)", but the court immediately noted, "[t]his is subject to certain limits; for example, a state need not pay for experimental medical procedures." *Katie A., ex rel. Ludin v. Los Angeles Cty*., 481 F.3d 1150, 1154, n.10 (9th Cir. 2007)*.* Medicaid does not require states to cover every service, especially services that have yet to be demonstrated to be safe and effective. States may limit the amount, duration, and scope of the services they cover. 42 U.S.C. § 1396d(a). States are required to limit utilization of services. 42 U.S.C. § 1396a(a)(30)(A) (state plans must "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan ... as may be necessary to safeguard against unnecessary utilization of such care and services"); *Rush v. Parham,* 625 F.2d 1150, 1156 (5th Cir. 1980) ("Georgia's definition of medically necessary services can reasonably exclude experimental treatment" when confronted with plaintiff's complaint that Georgia refused to pay for "transsexual surgery" prescribed by doctor); *Miller v. Whitburn,* 10 F.3d 1315, 1321 (7th Cir. 1993).  As noted above and in the attached declarations, there is reason to question the "broad consensus" Plaintiffs allege as to its safety and efficacy. (Doc. 3, at 8) "Medicaid was not designed to fund risky, unproven procedures, but to provide the largest number of necessary medical services to the greatest number of needy people." *Ellis v. Patterson*, 859 F.2d 52, 55 (8th Cir. 1988). "It may be that, pursuant to a generally applicable funding restriction or utilization control

procedure, a participating state could deny coverage for a service deemed medically necessary in a particular case." *Hern v. Beye*, 57 F.3d 906, 911 (10th Cir. 1995).

Further, while EPSDT is a mandatory set of services under Medicaid that is covered by AHCCCS, the services that correct or ameliorate a child's condition are not specifically listed. Defendant has not located any decision, nor have Plaintiffs cited one, that has found gender reassignment surgery to be recognized as an EPSDT requirement. Thus, it is not improper to exclude coverage for a service that continues to be the subject of legitimate debate as to its safety and efficacy.

### 2. *Plaintiffs fail to demonstrate violation of comparability requirement*

42 U.S.C. § 1396a(a)(10)(B)(i) provides "the medical assistance made available to any individual described in subparagraph (A)--(i) shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." The exclusion does not violate this requirement. First, the exclusion applies to all transgender persons alike. Second, the rule requires comparable services for individuals with comparable needs. "[N]eed is the only basis upon which distinctions between recipients can be made without violating the comparability requirement." *V.L. v. Wagner*, 669 F. Supp. 2d 1106, 1117 (N.D.Cal. 2009). As noted in the declarations of Drs. Laidlaw and Levine, the needs for relief from gender dysphoria are unique – they are not the same as the needs of a person who seeks reconstruction after a mastectomy. This is particularly true as to children.  Nor does AHCCCS "arbitrarily deny or reduce the amount, duration, or scope of a required service . . . to an otherwise eligible beneficiary solely because of the diagnosis, type of illness, or condition." 42 C.F.R. § 440.230(c). Plaintiffs argue AHCCCS is denying "comparable services for individuals with comparable needs," but this begs the question whether reconstruction following a mastectomy is based on the same needs as chest reconstruction to treat a child's gender dysphoria.

### 3. *Plaintiffs fail to demonstrate a violation of §1557 of the ACA*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The exclusion does not violate the Affordable Care Act ("ACA"), which prohibits discrimination "on the basis of sex." 42 U.S.C. §18116(a) (incorporating 20 U.S.C. §1681(a)). The federal rules implementing §1557 were amended effective Aug. 18, 2020 with the intent that "each State may balance for itself the various sensitive considerations relating to medical judgment and gender identity, within the limits of applicable Federal statutes (which are to be read according to their plain meaning)." *Fed. Reg.,* Vol. 85, No. 119 at 37162 (June 24, 2020). Further, "[t]he Department does not and need not take a definitive view on any of the medical questions raised in these comments about treatments for gender dysphoria. The question is whether Title IX and Section 1557 require healthcare professionals, *as a matter of nondiscrimination*, to perform such procedures or provide such treatments. The answer is they do not." *Id*. at 37188 (emphasis in original). Also, a "medical provider may rightly judge a hysterectomy due to the presence of malignant tumors to be different in kind from the removal of properly functioning and healthy reproductive tissue for psychological reasons, even if the instruments used are identical." *Id.* at 37187.[10] The new rule supports the ability of a state to exclude chest reconstruction for gender dysphoria while covering it to treat a mastectomy.

Plaintiffs allege the exclusion discriminates against them because they are transgender, relying on *Bostock v. Clayton Cty., Georgia*, 140 S. Ct. 1731 (2020). But *Bostock* is not dispositive. In *Bostock*, the Court held "[a]n employer who fires an employee for being … transgender" has violated Title VII, relying on the traditional meaning of "sex" as "biological distinctions between male and female." *Id*. at 1737, 1739. *Bostock* restated the long-standing principle that Title VII protects employees from discrimination if they are treated differently because of their sex. *Id*. at 1741-42. As Justices Alito and Thomas explained in their dissent there are still unsettled areas of law:

---

[10] The new rules were challenged, and the E.D.N.Y issued a preliminary injunction against the Department's repeal of its prior rules (*Walker v. Azar*, 2020 WL 4749859, at *10 (E.D.N.Y. Aug. 17, 2020)), but there is not any current affirmative requirement for coverage of gender reassignment surgery.

After *Bostock*, "healthcare benefits may emerge as an intense battleground under the Court's ruling." *Id*. at 1781 (Alito, J.). *Bostock* did not mandate anything with respect to coverage for transgender individuals under the ACA, and no court has determined *Bostock's* impact on health coverage. AHCCCS's exclusion for "gender reassignment surgeries" applies to all members, regardless of sex (it applies to males transitioning to female, and vice versa). Thus, it is not discrimination "on the basis of sex."

Plaintiffs also rely on the denial of a motion to dismiss in *Toomey v. Arizona*, 2019 WL 7172144 (D.Ariz. 2019). But a motion to dismiss evaluates whether a plaintiff has stated a claim "that is plausible on its face," accepting all allegations and reasonable inferences as true, *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This stands in sharp contrast to a motion for preliminary injunction, which evaluates, under exacting standards, whether a claim is *clearly* likely to succeed on the merits based on the evidence presented.

Plaintiffs' other cases are from outside this jurisdiction (not precedent for this Court), and they are inapposite. None required a plan to provide coverage of gender reassignment surgeries for children or addressed a facially neutral policy regarding one specific category of services. *Prescott v. Rady*, 265 F.Supp.3d 1090, 1099 (S.D.Cal. 2017) (staff "continuously referr[ed] to him with female pronouns, despite knowing that he was a transgender boy" and "refused to treat Kyler as a boy"); *Flack v. Wisc. Dep't of Health,* 395 F.Supp.3d 1001 (W.D. Wis. 2019) (involved adult plaintiffs, and the plan contained a broad exclusion for transition coverage - not just surgery); *Boyden v. Conlin,* 341 F.Supp.3d 979 (W.D. Wis. 2018) (involved adult plaintiffs, and coverage excluded all services associated with gender reassignment); *Glenn v. Brumby,* 663 F.3d 1312 (11th Cir. 2011) (employment termination of plaintiff). Here, coverage is provided for hormone treatments and mental health counseling; thus, there is no discrimination against transgender persons or the elimination of coverage for all gender transition treatment. Plaintiffs have failed to establish their high burden.

*4.  Plaintiffs fail to establish an equal protection violation*

-16-

1

2       The Equal Protection Clause (U.S. Const. Amend. XIV, §1) states, "[n]o State

3  shall . . . deny to any person within its jurisdiction the equal protection of the laws." This

4  provision "does not forbid classifications. It simply keeps governmental decisionmakers

5  from treating differently persons who are in all relevant respects alike." *Nordlinger v.*

6  *Hahn*, 505 U.S. 1, 10 (1992). A "classification neither involving fundamental rights nor

7  proceeding along suspect lines is accorded a strong presumption of validity"; such a

8  provision is subject to rational basis review. *Heller v. Doe*, 509 U.S. 312, 319-21 (1993);

9  *McGowan v. State of Md.*, 366 U.S. 420, 425-26 (1961) ("State legislatures are presumed

10 to have acted within their constitutional power despite the fact that, in practice, their laws

11 result in some inequality. A statutory discrimination will not be set aside if any state of

12 facts reasonably may be conceived to justify it."). Multiple courts have applied rational

13 basis to classifications based on transgender status. *Druley v. Patton*, 601 F.App'x 632,

14 635 (10th Cir. 2015); *Murillo v. Parkinson*, 2015 WL 3791450, *12 (C.D. Cal. 2015);

15 *Kaeo–Tomaselli v. Butts*, 2013 WL 399184, *5 (D. Haw. 2013); *Jamison v. Davue*, 2012

16 WL 996383, *4 (E.D.Cal. 2012); *Brainburg v. Coalinga State Hosp*., 2012 WL 3911910,

17 *8 (E.D. Cal. 2012); *Stevens v. Williams*, 2008 WL 916991, *13 (D. Or. 2008); *Johnston*

18 *v. Univ. of Pittsburgh*, 97 F. Supp. 3d 657, 668 (W.D. Pa. 2015).

19      Plaintiffs have not cited any U.S. Supreme Court case that changes the rational

20 basis standard for claims brought by transgender individuals. While Plaintiffs cite

21 *Bostock*, that case involved statutory interpretation of Title VII – it did not (i) involve an

22 equal protection claim, (ii) hold transgender persons constitute a suspect or quasi-suspect

23 class for equal protection claims, or (iii) create a new protected class for transgender

24 persons. *See Bollfrass v. City of Phoenix*, 2020 WL 4284370, at *1 (D. Ariz. 2020)

25 (declining to reconsider equal protection claim after *Bostock* which "involved a matter of

26 statutory interpretation"). *Bostock* does not support heightened review here. In addition,

27 Plaintiffs' cases from other jurisdictions (i) are not precedent for this Court, (ii) are

28 inapposite, (iii) did not mandate coverage of gender reassignment surgery for children,

and (iv) did not address a facially neutral policy regarding one specific category of services. *F.V. v. Barron*, 286 F.Supp.3d 1131 (D.Id. 2018) (policy categorically denied transgender people from changing sex on birth certificates); *Norsworthy v. Beard*, 87 F. Supp. 3d 1104 (N.D.Cal. 2015) (denying motion to dismiss on claims involving 8th Amendment and deliberate indifference to medical needs of prison inmate); *Whitaker*, 858 F.3d 1034 (plaintiff had to complete surgical transition to access boys restroom); *Glenn* (*supra*); *Smith v. City of Salem,* 378 F.3d 566 (6th Cir. 2004) (employee suspension).[11]

Under rational basis review, Plaintiffs simply cannot overcome the "strong presumption of validity" of the exclusion. Here, there are "plausible reasons for [the state] action," and thus the "inquiry is at an end." *U.S. Railroad Retirement Bd. v. Fritz*, 449 U.S. 166, 179 (1980). The government has a legitimate interest in not providing an expensive, irreversible surgery of questionable value for minors, including Plaintiffs who have a history of underlying unresolved psychiatric conditions and have not established the ability to provide informed consent.[12] In addition, there is no evidence the exclusion was motivated by animosity towards a protected class. The Court should apply the presumption of validity because there is a "plausible reason" supporting the classification and it is rationally related to a legitimate government interest.

### d. Balance of equities

Based on the record, Plaintiffs have failed to establish that chest reconstruction surgery is safe, effective, and urgent for them. Balanced against this is the well-established caution courts exercise in granting mandatory injunctive relief, particularly relief that involves an irreversible surgery for children. In addition, AHCCCS has a significant interest in not providing expensive services that have not been shown to be

---

[11] Plaintiffs again rely on the denial of a motion to dismiss in *Toomey*. That order not only involved a completely different standard (motion to dismiss), but *Toomey* also does not involve minor plaintiffs with the medical history and background of Plaintiffs in this case.
[12] Rational basis review applies, *supra*. But even if intermediate scrutiny applies, Plaintiffs still cannot obtain a preliminary injunction because the classification is substantially related to this important government interest. *See U.S. v. Virginia*, 518 U.S. 515 (1996).

1
2
3
4

medically necessary, particularly irreversible surgeries on minors that carry significant risks, and for which there is questionable scientific evidence about its effectiveness and long-term benefits for children. Plaintiffs have failed to demonstrate that the balance of equities is in their favor.

5

### III.    CONCLUSION

6
7

Plaintiffs cannot meet the exceedingly high standards required for a mandatory injunction. Thus, Defendant requests the Court deny Plaintiffs' motion.

8

RESPECTFULLY SUBMITTED this 28th day of September, 2020.

9
10

**BURNSBARTON PLC**

11
12

By____*/s/ Kathryn Hackett King*____

13

David T. Barton
Kathryn Hackett King

14
15

**JOHNSTON LAW OFFICES, P.L.C.**
Logan T. Johnston
14040 N. Cave Creek Rd., Suite 309
Phoenix, Arizona 85022

16
17
18

*Attorneys for Defendant*

19
20
21
22
23
24
25
26
27
28

1

## <u>CERTIFICATE OF SERVICE</u>

2

3

4

    I hereby certifies that on September 28, 2020, I electronically transmitted the foregoing document, using the ECF System for filing and transmittal of a Notice of Electronic Filing and to ECF registrants and e-mailed a copy of the foregoing to the following:

5

6

7

8

9

Brent P. Ray
Andrew J. Chinsky
KING & SPALDING LLP
353 N. Clark Street, 12th Floor
Chicago, Illinois 60654
T: +1 312 995 6333
F: +1 312 995 6330
Email:bray@kslaw.com
achinsky@kslaw.com

10

11

12

13

14

Daniel C. Barr
Janet M. Howe
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
T: +1 602 351 8085
F: +1 602 648 7085
Email:dbarr@perkinscoie.com
jhowe@perkinscoie.com

15

16

17

18

19

Asaf Orr
NATIONAL CENTER FOR LESBIAN RIGHTS
870 Market Street, Suite 370
San Francisco, CA 94102
T: +1 415 392 6257
F: +1 415 392 8442
Email:aorr@nclrights.org

20

21

22

23

Abigail K. Coursolle
Catherine McKee
NATIONAL HEALTH LAW PROGRAM
3701 Wilshire Boulevard, Suite 750
Los Angeles, CA 90010
T: +1 310 204 6010
Email:coursolle@healthlaw.org
mckee@healthlaw.org

24

25

*Attorneys for Plaintiffs and the Class*

26

*s/Tonya Denler*

27

28