# EXHIBIT A

1  Logan T. Johnston, #009484
   **JOHNSTON LAW OFFICES, P.L.C.**
2  14040 N. Cave Creek Rd., Suite 309
   Phoenix, Arizona 85022
3  Telephone: (602) 435-0050
   ltjohnston@live.com
4

5  David T. Barton  #016848
   Kathryn Hackett King #024698
   **BURNSBARTON PLC**
6  2201 East Camelback Road, Ste. 360
   Phone: (602) 753-4500
7  david@burnsbarton.com
   kate@burnsbarton.com
8

9  *Attorneys for Defendant*

   **IN THE UNITED STATES DISTRICT COURT**
10
   **FOR THE DISTRICT OF ARIZONA**
11

12 | D.H., by and through his mother, Janice | Case No. 4:20-cv-00335-SHR |
13 | Hennessy-Waller; and John Doe, by and | |
   | through his guardian and next friend, Susan | **EXPERT DECLARATION OF** |
14 | Doe, on behalf of themselves and all others | **MICHAEL K. LAIDLAW, M.D.** |
   | similarly situated, | |
15 | | |
   | Plaintiffs, | |
16 | | |
   | vs. | |
17 | | (Assigned to the Honorable Scott H. |
   | Jami Snyder, Director of the Arizona Health | Rash) |
18 | Care Cost Containment System, in her | |
   | official capacity, | |
19 | | |
20 | Defendant. | |

21

22     I, Michael K. Laidlaw, M.D., hereby declare as follows:

23     1.     I am over the age of eighteen and submit this expert declaration based on
24 my personal knowledge and experience.

25     2.     I am a board-certified endocrinologist.  I received my medical degree from
26 the University of Southern California in 2001. I completed my residency in internal
27 medicine at Los Angeles County/University of Southern California Medical Center in
28

2004.  I also completed a fellowship in endocrinology, diabetes and metabolism at Los Angeles County/University of Southern California Medical Center in 2006.

3.	I have been board certified by (1) the National Board of Physicians and Surgeons for Endocrinology, Diabetes & Metabolism, (2) the National Board of Physicians and Surgeons for Internal Medicine, (3) the American Board of Internal Medicine for Internal Medicine, and (4) the American Board of Internal Medicine for Endocrinology, Diabetes, and Metabolism.

4.	The information provided regarding my professional background are detailed in my curriculum vitae. A true and correct copy of my curriculum vitae is attached as Exhibit A.

5.	In my clinical practice as an endocrinologist, I evaluate and treat patients with hormonal and/or gland issues.  Hormone and gland disorders can cause or be associated with psychiatric symptoms, such as depression, anxiety, and other psychiatric symptoms.  Therefore, I frequently assess and treat patients demonstrating psychiatric symptoms and determine whether their psychiatric symptoms are being caused by a hormonal issue, gland issue, or something else.

6.	I have been retained by Defendant in the above-captioned lawsuit to provide an expert opinion on (1) the standards of care for treating minors diagnosed with gender dysphoria, including considerations of various proposed treatments, and (2) the appropriateness of D.H. and John Doe receiving bilateral mastectomy surgery at this time.

7.	If called to testify in this matter, I would testify truthfully and based on my expert opinion. The opinions and conclusions I express herein are based on a reasonable degree of scientific certainty.

-2-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

8.      I am being compensated at an hourly rate of $367 per hour plus expenses for my time spent preparing this declaration, and to prepare for and provide testimony in this matter.  My compensation does not depend on the outcome of this litigation, the opinions I express, or the testimony I may provide.

9.      My opinions contained in this report are based on: (1) my clinical experience as an endocrinologist; (2) my clinical experience evaluating individuals who have or have had gender incongruence and/or gender dysphoria; (3) my knowledge of research and studies regarding the treatment of gender dysphoria, including for minors; and (4) my review of the various declarations submitted by Plaintiffs D.H. and John Doe in the present lawsuit, *D.H. and John Doe v. Snyder*, Case No. 4:20-cv-00335-SHR (pending in the U.S. District Court for the District of Arizona).

10.      I was provided with and reviewed the following case-specific materials: (1) the declarations of D.H. and John Doe, and their respective guardians Janice Hennessy-Waller and Susan Doe; (2) the declarations of D.H.'s and John Doe's respective treating providers, Tamar Reed, LPC, Dr. Andrew Cronyn, M.D., and Dr. Mischa Cohen Peck, PhD; and (3) the expert declarations of Dr. Aron Janssen, M.D. and Dr. Loren S. Schechter, M.D.

11.      In my professional opinion, treatment interventions on behalf of children diagnosed with gender dysphoria must be held to the same scientific standards as other medical treatments. These interventions must be optimal, efficacious, and safe. Any treatment which alters biological development in children should be used with extreme caution.

12.      Based on the materials I have reviewed and in my professional opinion, there is an insufficient clinical basis to conclude that either D.H. or John Doe will suffer imminent, irreparable harm if they do not receive bilateral mastectomy with chest wall

recontouring surgery prior to the conclusion of this case.  To the contrary, in my professional opinion, this irreversible surgery should not be performed on minors D.H. and John Doe.  I reach this opinion for the following reasons.

13.     A high percentage of children diagnosed with gender dysphoria have depression, anxiety, or other mental health disorders separate and apart from gender dysphoria.  *See infra* ¶23.  According to the declarations I reviewed, both D.H. and John Doe have a significant and lengthy history of psychiatric issues separate and apart from gender dysphoria.

14.     According to the declarations of Janice Hennessy-Waller and Tamar Reed, D.H. has been hospitalized, including in intensive psychiatric care, four times since age 11 for treatment of significant psychological distress, including severe anxiety and suicidal ideation.  D.H. has a history of pervasive anxiety, chronic suicidal ideations and attempts, and related self-harm issues (including cutting, burning and hair pulling).  D.H. also has oppositional defiant disorder, which the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition ("DSM-5") defines as "a frequent and persistent pattern of angry/irritable mood, argumentative/defiant behavior, or vindictiveness."  In addition, the declaration of Tamar Reed states that D.H. currently has "anxiety and psychological distress caused by prior trauma."

15.     According to the declaration of Janice Hennessy-Waller, D.H. was in intensive in-patient psychiatric care for severe anxiety and suicidal ideation beginning in 2014.  There is no indication gender dysphoria was being evaluated, discussed, or addressed at this time.  It was not until two years later (in 2016) that D.H. identified as transgender to another person (D.H.'s mom).

16.     According to the declaration of Susan Doe, John Doe's biological parents were unable to care for John Doe and provide John Doe with a stable home environment. According to the declaration of Mischa Cohen Peck, John Doe was diagnosed with post-

traumatic stress disorder ("PTSD") stemming from early-life attachment trauma. Although not defined in the declarations, the term "early-life attachment trauma" indicates that John Doe likely suffered abuse or neglect at a young age.

17.     According to John Doe's declaration, John Doe has been depressed, suffered from anxiety, engaged in self-harm through cutting and burning, distanced from friends and family, lost interest in activities, and lost a significant amount of weight in a very short period of time because of limited food intake.  John Doe also contemplated suicide.

18.     According to the declaration of Mischa Cohen Peck, John Doe has <u>not</u> been successfully treated for the trauma underlying John Doe's PTSD.  In addition, John Doe describes "being detached" from John Doe's own body.[1]

19.     According to several of the declarations that I reviewed, both D.H. and John Doe have engaged in non-suicidal self-injury ("NSSI"), which is associated with multiple types of psychiatric disorders.  As one article has noted, "[t]he age onset of NSSI most often occurs in early adolescence, between 12 and 14 years (Nock et al., 2006; Muehlenkamp and Gutierrez, 2007; Cerutti et al., 2011), but findings have also reported NSSI behavior in children under the age of 12 (Barrocas et al., 2012). The most common method was self-cutting (over 70%) followed by head banging, scratching, hitting and

---

[1] Although I did not review or have access to John Doe's medical records, I note there is one psychiatric disorder, dissociative identity disorder, which the American Psychiatric Association describes as follows: "People with dissociative identity disorder may feel that they have suddenly become observers of their own speech and actions, or their bodies may feel different (e.g., like a small child, like the opposite gender, huge and muscular)." Further, (1) "Dissociative identity disorder is associated with overwhelming experiences, traumatic events and/or abuse that occurred in childhood"; (2) "People who have experienced physical and sexual abuse in childhood are at increased risk of dissociative identity disorder. The vast majority of people who develop dissociative disorders have experienced repetitive, overwhelming trauma in childhood. Among people with dissociative identity disorder in the United States, Canada and Europe, about 90 percent had been the victims of childhood abuse and neglect"; and (3) "Suicide attempts and other self-injurious behavior are common among people with dissociative identity disorder. More than 70 percent of outpatients with dissociative identity disorder have attempted suicide." *See* American Psychiatric Association, "What Are Dissociative Disorders?" (Aug. 2018), at https://www.psychiatry.org/patients-families/dissociative-disorders/what-are-dissociative-disorders (last visited Sept. 22, 2020). This issue should be fully explored by a psychiatrist for John Doe.

burning (Briere and Gil, 1998; Laye-Gindhu and Schonert-Reichl, 2005; Gratz, 2006; Whitlock et al., 2006)." Further, "[s]elf injury has long been linked to other disorders as well, including post-traumatic stress disorder (Briere and Gil, 1998; Bolognini et al., 2003), depressive disorders (Darche, 1990), obsessive-compulsive disorder (Bolognini et al., 2003), anxiety disorder (Darche, 1990; Simeon and Favazza, 2001), borderline personality disorder (BPD) (Klonsky et al., 2003; Nock et al., 2006), and eating disorder (Iannaccone et al., 2013)." Cipriano, Cella, & Cotrufo, "Nonsuicidal Self-injury: A Systematic Review," *Front Psychol.* 2017; 8: 1946 (Nov. 8, 2017). The link between self-injury and these psychiatric disorders warrant a full evaluation by a clinical psychiatrist and psychologist for John Doe and D.H.

20.    According to several of the declarations, D.H. and John Doe have both been prescribed hormone-replacement therapy (i.e., testosterone) to develop a more masculine appearance. A typical dose of hormone-replacement for female-to-male transition is a high dose. Normal female testosterone levels are 10-50 ng/dL. The Endocrine Society Clinical Guidelines advise bringing these to 300-1000 ng/dL, which are values typically found with androgen-secreting tumors. *See* Laidlaw, Van Meter, Hruz, Van Mol, & Malone, "Letter to the Editor: Endocrine Treatment of Gender-Dsyphoria/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," *J Clin Endocrinol Metab*, 104(3) (March 2019). This is 6 to 100 times higher than the natal female body typically contains. According to research, high doses of testosterone have been shown to predispose individuals towards mood disorders, psychosis, and psychiatric disorders. The "most prominent psychiatric features associated with AAS [anabolic-androgenic steroids, i.e. testosterone] abuse are manic-like presentations defined by irritability, aggressiveness, euphoria, grandiose beliefs, hyperactivity, and reckless or dangerous behavior. Other psychiatric presentations include the development of acute psychoses, exacerbation of tics and depression, and the development of acute confusional/delirious states." Moreover, "[s]tudies . . . of medium steroid use (between

300 and 1000 mg/week of any AAS) and high use (more than 1000 mg/week of any AAS) have demonstrated that 23% of subjects using these doses of steroids met the DSM-III-R criteria for a major mood syndrome (mania, hypomania, and major depression) and that 3.4%–12% developed psychotic symptoms." Hall, Hall & Chapman, "Psychiatric Complications of Anabolic Steroid Abuse," *Psychosomatics* 46:4 (July-August 2005). Thus, hormone treatments can exacerbate any underlying psychiatric problems of a child, including D.H. and John Doe.

21.    According to several of the declarations, D.H. and John Doe originally felt better after receiving the hormones, but then subsequently felt worse. In my professional opinion, it is likely D.H. and John Doe originally felt better because of the side effect of euphoria elicited by high doses of testosterone, as noted above. It is also likely D.H. and John Doe may have later started feeling worse because either (1) the high dose of testosterone ultimately exacerbated their mental health issues, or (2) their underlying psychiatric issues, separate from the gender dysphoria, were never actually resolved (or a combination of the two).

22.    There are no laboratory, imaging, or other objective tests to predict whether children with gender dysphoria will outgrow the condition. "Children with [gender dysphoria] will outgrow this condition in 61% to 98% of cases by adulthood. There is currently no way to predict who will desist and who will remain dysphoric." Laidlaw, Van Meter, Hruz, Van Mol, & Malone, "Letter to the Editor: Endocrine Treatment of Gender-Dsyphoria/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," *J Clin Endocrinol Metab*, 104(3) (March 2019).

23.    A key study from Finland indicated that 68% of children with gender dysphoria had already been to psychiatric care for reasons other than gender identity issues. Kaltiala-Heino, Sumia, Työläjärvi, & Lindberg, "Two years of gender identity service for minors: overrepresentation of natal girls with severe problems in adolescent

development," *Child & Adolescent Psychiatry & Mental Health* (2015) 9:9 ("Of the applicants, 68% (32/47) had had their first contact with psychiatric services due to other reasons than gender identity issues"; in addition, "[s]eventy-five per cent of the applicants (35/47) had been or were currently undergoing child and adolescent psychiatric treatment for reasons other than gender dysphoria when they sought referral to [sex reassignment] assessment"). Therefore, in my professional opinion, a child's psychological disorders should be thoroughly treated first before considering hormone therapy or gender reassignment surgery.  Based on the declarations I reviewed, there is insufficient evidence to establish that D.H.'s and John Doe's psychiatric issues have been thoroughly evaluated and adequately treated by a qualified psychiatrist or clinical psychologist.

24.     In addition to the information identified above, the declarations do not contain pertinent historical information regarding whether or not D.H. or John Doe are (or have been) on any psychiatric or other medication or have been provided other adequate treatments to treat any of their significant psychological issues.

25.     The declarations are also missing pertinent history as to whether or not D.H. or John Doe have had any history of substance use or abuse.  Many individuals with the disorders identified above may also have a history of substance abuse.  The National Institutes of Health recommends that "people entering treatment either for a substance use disorder or for another mental disorder should be assessed for the co-occurrence of the other condition." Additionally, "as many as 6 in 10 people with an illicit substance use disorder also suffer from another mental illness." National Institute on Drug Abuse, "Principles of Drug Addiction Treatment: A Research-Based Guide" (3rd ed.) (Jan. 2018), located at https://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/frequently-asked-questions/how-do-other-mental-disorders-coexisting-drug-addiction (last accessed Sept. 25, 2020). A history of substance use or abuse would be important to clarify as substance use or abuse could impair

judgment with respect to informed consent for a procedure.  Thus, it should be thoroughly examined and ruled out before any irreversible surgery is performed.

26.     Depression, if not properly treated before surgery, may result in an increase in morbidity and mortality post-surgery: "Several studies reported increased rate of postoperative infections in patients suffering from depression."  With respect to depression treatment for patients before major surgery, where it is "[n]on-alleviated, it may predict increased morbidity and mortality after the operation. It may be associated with greater postoperative pain, higher incidence of postoperative infections, progression of malignant tumors, poor health-related quality of life as well as other complications." Ghoneim & O'Hara, "Depression and Postoperative complications: an overview," *BMC Surg.* 2016; 16:5 (Feb. 2, 2016).

27.     As Dr. Loren Schechter (plastic surgeon) confirms in her declaration (p. 16, ¶ 45) "[t]o make a final assessment of D.H.'s and John Doe's suitability for surgery, I would need to perform an in-person exam." Dr. Schechter acknowledges that before any individual can be determined suitable for surgery, a final assessment which requires an in-person exam, is required.  But Dr. Schechter confirms he has not conducted a final assessment of John Doe and D.H.'s suitability for surgery.  None of the other declarations indicate a final assessment or physical examination has been conducted on either D.H. or John Doe.  As Dr. Schecther notes, a final assessment is necessary to assess skin elasticity and also to rule out any pathology, such as breast masses, lumps, and nipple retraction.  A full work up for John Doe and D.H. has not been completed.

28.     A mastectomy surgery is irreversible.  If a patient later regrets the decision and decides to resume living as their natal sex (female), she will not be able to ever breastfeed a child, because her functional organs have been removed and can never be replaced.  Possible complications of this procedure (bilateral mastectomy with chest wall

contouring) include loss of normal sensation of the nipples, problems with wound healing, pain, adverse scarring, and infections.

29.     I have significant concerns about the ability of two minors with histories of significant underlying psychiatric issues, separate and apart from gender dysphoria, to provide informed consent to undergo an irreversible sex reassignment surgery.

30.     While the Endocrine Society has issued "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," these are only "guidelines."  The Endocrine Society's guidelines specifically note the "guidelines cannot guarantee any specific outcome, nor do they establish a standard of care." Wylie C. Hembree, et al., "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline," *The Journal of Clinical Endocrinology & Metabolism*, Volume 102, Issue 11 (Nov. 1, 2017).[2]

31.     In the Endocrine Society's guidelines, the quality of evidence for the treatment of adolescents is rated "very low-quality evidence" and "low quality evidence." (p. 3871-72).

32.     "The Endocrine Society has published revised clinical guidelines in 2017 on the treatment of gender dysphoric persons including adolescents (Hembree et al. 2017). The quality of evidence for [puberty blocking agents] is noted to be low. In fact, all of the evidence in the guidelines with regard to treating children/adolescents by [gender affirmative therapy] is low to very low because of the absence of proper studies."

---

[2] The Endocrine Society guidelines (p.3380) note "in some forms of [gender dysphoria]/gender incongruence, psychological interventions may be useful and sufficient," before ever needing to proceed with medicalized treatments.  Further, the guidelines (p. 3894) note "some transgender male adolescents" may "consider mastectomy 2 years after they begin androgen [testosterone] therapy."  But according to John Doe's declaration, John Doe began hormone replacement therapy in June 2019; thus, John Doe has not been on hormone therapy for two years.

Laidlaw, Cretella & Donovan, "The Right to Best Care for Children Does Not Include the Right to Medical Transition," *The American Journal of Bioethics*, 19:2, 75-77 (Feb. 20, 2019).  Unlike other recommendations for adolescent transition, the Endocrine Society's guidelines do not include any grading of the quality of evidence specifically for adolescent mastectomy.

33.    The declarations of Dr. Aron Janssen and Dr. Loren Schechter cite to the World Professional Association for Transgender Health's ("WPATH") "Standards of Care for the Health of Transsexual, Transgender, and Gender Non-Conforming People." According to their declarations, Dr. Janssen is a member of WPATH, Dr. Schechter is on the Board of Directors of WPATH, and both have been contributing authors to WPATH's "Standards of Care."  WPATH's "Standards of Care" were prepared within their advocacy organization and are purported to be a "professional consensus about the psychiatric, psychological, medical, and surgical management of gender dysphoria."  However, the "professional consensus" exists only within the confines of its organization.  Furthermore, their "Standards of Care," unlike the Endocrine Society's guidelines, do not have a grading system for either the strength of their recommendations or the quality of the evidence presented.

34.    Good quality studies specifically showing that mastectomy surgery is safe, effective, and optimal for treating minors with gender dysphoria do not exist.  The declaration of Dr. Loren Schechter refers to the article *Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults Comparisons of Nonsurgical and Postsurgical Cohorts*, 172 JAMA Pediatrics 431, 434 (2018), and quotes the conclusion that "Chest dysphoria was high among presurgical transmasculine youth, and surgical intervention positively affected both minors and young adults." However, there are a number of problems with this study. First, the term "chest dysphoria" is a creation of the study authors and is not found as a diagnosis or even referenced in the DSM-5. Second the "chest dysphoria scale" is a measuring tool created by the authors, but which the authors

state "is not yet validated." (p. 435)  Third, the mastectomies were performed on girls as young as 13 and 14 years old and who thereby lacked the maturity and capacity of good judgement for truly informed consent for this life altering procedure. For this reason, in my professional opinion, the research and surgeries performed were flawed and unethical.

35.     There is also evidence that questions the long-term effectiveness of gender reassignment surgery.  A Swedish study in 2011 (Dhejne, et al., "Long-Term Follow-Up of Transsexual Persons Undergoing Sex Reassignment Surgery: Cohort Study in Sweden*," PLoS One,* vol. 6, issue 2 (Feb. 22, 2011)) examined data over a 30-year period. The Dhejne team made extensive use of numerous Swedish registries and examined data from 324 patients in Sweden over 30 years who underwent sex reassignment surgery. They used population controls matched by birth year, birth sex, and reassigned sex. When followed out beyond ten years, the sex-reassigned group had nineteen times the rate of completed suicides and nearly three times the rate of all-cause mortality and inpatient psychiatric care compared to the general population.

36.     The Centers for Medicare and Medicaid Services ("CMS") has found "inconclusive" clinical evidence regarding gender reassignment surgery.  Specifically, the CMS Decision Memo for Gender Dysphoria and Gender Reassignment Surgery (CAG-00446N) (June 19, 2019) states: "The Centers for Medicare & Medicaid Services (CMS) is not issuing a National Coverage Determination (NCD) at this time on gender reassignment surgery for Medicare beneficiaries with gender dysphoria because the clinical evidence is inconclusive for the Medicare population."

37.     Hayes Directories, Inc. is an internationally recognized research and consulting firm dedicated to promoting better health outcomes by assessing quality evidence. In 2014, the Hayes Directory conducted a comprehensive review and evaluation of the scientific literature regarding the treatment of gender dysphoria in adults and children. It concluded the practice of using hormones and sex reassignment surgery to

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

treat gender dysphoria is based on "very low" quality of evidence.  For sex reassignment surgery ("SRS") to treat gender dysphoria in adolescents, it received a Hayes Rating of D2 (which is "insufficient evidence"): "This rating reflects the paucity of data of SRS in adolescents." "Sex Reassignment Surgery for the Treatment of Gender Dysphoria," *Hayes Medical Technology Directory*, p. 3-4 (May 15, 2014).

38.     Recently, a major correction was issued by the American Journal of Psychiatry.  The editors of an October 2019 study, titled "Reduction in mental health treatment utilization among transgender individuals after gender-affirming surgeries: a total population study" (Bränström study) retracted their original primary conclusion.  The Bränström team reanalyzed the data and the results demonstrated "no advantage to [gender reassignment] surgery" for their three endpoints in the subject population (prescriptions for antidepressants and anti-anxiety medications, healthcare visits for mood or anxiety disorders, and post-suicide attempt hospitalizations).  Specifically, the correction stated, "the results demonstrated no advantage of surgery in relation to subsequent mood or anxiety disorder-related health care visits or prescriptions or hospitalizations following suicide attempts in that comparison. Given that the study used neither a prospective cohort design nor a randomized controlled trial design, the conclusion that 'the longitudinal association between gender-affirming surgery and lower use of mental health treatment lends support to the decision to provide gender-affirming surgeries to transgender individuals who seek them' is too strong." "Correction to Bränström and Pachankis," *Am J Psychiatry*, 177:8 (Aug. 2020).

39.     For these reasons, in my professional opinion, an irreversible chest reconstruction surgery should not be performed on minors D.H. and John Doe.

40.     Based on the studies and research cited above, in my professional opinion there is insufficient quality of evidence at this time demonstrating the benefit of bilateral mastectomy with chest wall recontouring surgery on individuals diagnosed with gender

dysphoria in any age group. For those under 21, there is an additional reason to avoid irreversible procedures: there are no laboratory, imaging, or other objective tests to predict whether a young person with gender dysphoria will outgrow this condition. Because this age group is still undergoing brain development and as such they are immature with respect to intellect, emotion, judgment, and self-control, in my professional opinion this means there is a significant chance that a young person may later regret removing an organ that cannot be replaced. Thus, in my professional opinion, it is never appropriate to provide bilateral mastectomy with chest wall recontouring surgery on individuals diagnosed with gender dysphoria - particularly those under the age of 21.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Executed this 27th day of September, 2020 at Rocklin, California.

Michael K. Laidlaw, M.D.

-14-

# EXHIBIT A

# Michael K. Laidlaw, M.D.

4770 Rocklin Rd, Suite #1
Rocklin, CA 95677
Office: (916) 315-9100
Fax: (916) 315-0141
docdrlaidlaw@gmail.com

## EMPLOYMENT

2006-Present     Michael K Laidlaw, MD Inc. Private Practice – Endocrinology, Diabetes, and Metabolism. Rocklin, CA

## EDUCATION

2004-2006     Endocrinology and Metabolism Fellowship - Los Angeles County/University of Southern California Keck School of Medicine

2001-2004     Internal Medicine Residency - Los Angeles County/University of Southern California Keck School of Medicine

1997-2001     University of Southern California Keck School of Medicine
Doctor of Medicine Degree May 2001

1990-1997     San Jose State University
Bachelor of Science Degree in Biology with a concentration in Molecular Biology, Cum Laude

## LICENSURE

National Board of Physicians and Surgeons - Endocrinology, Diabetes, & Metabolism 2018-2022
National Board of Physicians and Surgeons - Internal Medicine 2018-2022
Diplomate in Endocrinology, Diabetes, and Metabolism – American Board of Internal Medicine - Certified 2006
Diplomate in Internal Medicine - American Board of Internal Medicine - Certified 2005
California Medical License – Physician and Surgeon: # A81060: Nov 6, 2002. Exp 5/31/2022.
Certification in Diagnostic Thyroid Ultrasound and Biopsy – AACE 2005

## PROFESSIONAL AFFILIATIONS

Endocrine Society 2006-2020

**HONORS AND RECOGNITION**

| | |
|---|---|
| 2010 | Endocrine Society Harold Vigersky Practicing Physician Travel Award |
| 2004-2005 | Vice President - Joint Council of Interns and Residents |
| 2002-2004 | Council Member – Joint Council of Interns and Residents |
| 1996, 1997 | Dean's Scholar, San Jose State University |
| 1995 | Golden Key National Honor Society |

**RESEARCH & PUBLICATIONS**

| | |
|---|---|
| 2020 | <u>Publication</u> – Van Mol A, Laidlaw MK, Grossman M,  McHugh P. "Correction: Transgender Surgery Provides No Mental Health Benefit." Public Discourse, 13 Sep 2020. https://www.thepublicdiscourse.com/2020/09/71296/ |
| 2020 | <u>Publication</u> –  VanMol A, Laidlaw MK, Grossman M, McHugh P.. "Gender-affirmation surgery conclusion lacks evidence (letter)". Am J Psychiatry 2020; 177:765–766. |
| 2020 | <u>Publication</u> –  Laidlaw MK. "The Pediatric Endocrine Society's Statement on Puberty Blockers Isn't Just Deceptive. It's Dangerous." Public Discourse. 13 Jan 2020. https://www.thepublicdiscourse.com/2020/01/59422/ |
| 2019 | <u>Expert Witness Affidavit</u> –  Laidlaw MK. Court of Appeal File No. CA45940, Vancouver Registry. B.C. Supreme Court File No. E190334, between A.B. Respondent/Claimant, and C.D. Appellant/Respondent, and E.F. Respondent/Respondent. 24 Jun 2019. |
| 2019 | <u>Publication</u> –  Laidlaw MK, Cretella M, Donovan K. "The Right to Best Care for Children Does Not Include the Right to Medical Transition". The American Journal of Bioethics. Volume 19. Published online 20 Feb 2019. 75-77. https://doi.org/10.1080/15265161.2018.1557288 |
| 2018 | <u>Brief of Amicus Curiae</u> –  Alliance Defending Freedom, Campbell, James A., Grossman, Miriam, Laidlaw, Michael K., McCaleb, Gary S., Van Meter, Quentin L., Van Mol, Andre.  Brief of Amicus Curiae.  United States Court of Appeals for the Eleventh Circuit. Drew Adams, Plaintiff-Appellee, v. School Board of St. Johns County, Florida, Defendant-Appellant. 12/27/2018. |
| 2018 | <u>Publication</u> –  Laidlaw MK, Van Meter QL, Hruz PW, Van Mol A, Malone WJ. Letter to the Editor: "Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline." The Journal of Clinical Endocrinology & Metabolism, Volume 104, Issue 3, 1 March 2019, Pages 686–687, https://doi.org/10.1210/jc.2018-01925 (first published on-line 11/2018) |
| 2018 | <u>Publication</u> –  Laidlaw MK. "The Gender Identity Phantom". gdworkinggroup.org, 24 Oct 2018. http://gdworkinggroup.org/2018/10/24/the-gender-identity-phantom/ |
| 2018 | <u>Publication</u> –  Laidlaw MK. "Gender Dysphoria and Children: An Endocrinologist's Evaluation of 'I am Jazz'". Public Discourse, 5 Apr 2018. https://www.thepublicdiscourse.com/2018/04/21220/ |
| 2013 | <u>Abstract</u> –  Poster presentation Jun 2013. Endocrine Society Annual Meeting. A 12 Step Program for the Treatment of Type 2 Diabetes and Obesity. |
| 2011 | <u>Abstract</u> –  Poster presentation Nov 2011. Journal of Diabetes Science and |

|            | Technology. A Video Game Teaching Tool for the Prevention of Type 2 Diabetes and Obesity in Children and Young Adults. |
|------------|--------------------------------------------------------------------------------------------------------------------------|
| 2011       | <u>Abstract</u> – Journal of Diabetes Science and Technology. A Web-Based Clinical Software Tool to Assist in Meeting Diabetes Guidelines and Documenting Patient Encounters. |
| 2008       | <u>Abstract</u> - Accepted to Endocrine Society Annual Meeting 2008. Hypercalcemia with an elevated 1,25 dihydroxy-Vitamin D level and low PTH due to granulomatous disease. |
| 2005-2006  | <u>Clinical Research</u> - University of Southern California – Utility of Thyroid Ultrasound in the Detection of Thyroid Cancer. Study involving the use of color flow/power doppler ultrasound and ultrasound guided biopsy to detect the recurrence of thyroid cancer in patients with total thyroidectomies. |
| 2002-2005  | <u>Clinical Research</u> - University of Southern California - Determining the Role of Magnesium in Osteoporosis. Study involved collecting and analyzing patient data related to patient characteristics, laboratory results, bone mineral density exams, nutrition analysis, and genetic analysis in order to determine a link between magnesium deficiency and osteoporosis. |
| 1996       | <u>Research Assistant</u> - San Jose State University - Role of the suprachiasmatic nucleus pacemaker in antelope ground squirrels. |
| 1995-1996  | <u>Research Assistant</u> - San Jose State University/NASA. Acoustic tolerance test and paste diet study for space shuttle rats. |

## PERSONAL

Languages: Conversational Spanish, French
Tutor: Biochemistry, computer science, High School mentor
Computers: Ruby, Rails, Javascript, C++, C, Java, and HTML programming