1  Brent P. Ray (Admitted *pro hac vice*)
   Andrew J. Chinsky (Admitted *pro hac vice*)
2  KING & SPALDING LLP
   353 N. Clark Street, 12th Floor
3  Chicago, Illinois 60654
   T: +1 312 995 6333
4  F: +1 312 995 6330
   Email: bray@kslaw.com
5         achinsky@kslaw.com

6  Daniel C. Barr (Bar No. 010149)
   Janet M. Howe (Bar No. 034615)
7  PERKINS COIE LLP
   2901 N. Central Avenue, Suite 2000
8  Phoenix, AZ 85012-2788
   T: +1 602 351 8085
9  F: +1 602 648 7085
   Email: dbarr@perkinscoie.com
10        jhowe@perkinscoie.com

11 *Counsel for Plaintiffs and the Class*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| D.H., by and through his mother, Janice Hennessy-Waller; and John Doe, by his guardian and next friend, Susan Doe, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> Jami Snyder, Director of the Arizona Health Care Cost Containment System, in her official capacity, <br><br> Defendant. | No. 4:20-cv-335-SHR <br><br> **REPLY EXPERT DECLARATION OF ARON JANSSEN, M.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Aron Janssen, M.D., hereby declare as follows:

1. I submit this expert declaration based on my personal knowledge.

2. If called to testify in this matter, I would testify truthfully and based on my expert opinion.

3. In preparing this declaration, I was provided with and reviewed the following additional case-specific materials: (1) Expert Declaration of Michael Laidlaw, MD, and accompanying exhibits; and (2) Expert Declaration of Stephen Levine, MD, and accompanying exhibits.

4. The opinions contained in this declaration are based solely on the information I have been provided by Plaintiffs' counsel as well as my extensive experience studying and treating patients with gender dysphoria.

## Discussion

### *Drs. Laidlaw and Levine Lack the Necessary Expertise*

5. According to his CV, Dr. Laidlaw is an endocrinologist with no specific training or board certification in working with pediatric or transgender patient populations. Expert Declaration of Dr. Michael Laidlaw, Dkt. 18-1, at 17-19 ("Laidlaw Decl."). Yet, his declaration provides extensive—and, as discussed below, unsupported—opinions about the mental health dimensions of gender dysphoria and appropriate protocols for assessing a patient's preparedness for male chest reconstruction surgery, an assessment he would never perform as an endocrinologist and one that he does not have the formal training or qualifications necessary to perform.

6. Although Dr. Laidlaw claims to have experience working with patients with gender dysphoria, he provides no indication of whether that experience includes treatment of adolescents, the subject of this case, or the depth of that experience. Laidlaw Decl. ¶ 9. His claims of expertise are also belied by his lack of familiarity with the subject matter. For example, Dr. Laidlaw critiques a peer-reviewed journal article on chest dysphoria because, in part, the term "chest dysphoria" is not a clinical diagnosis or mentioned in the DSM-5. Laidlaw Decl. ¶ 34. That term, however, was not coined by the author, but is a commonly

used term of art to refer to the unique psychological distress people with gender dysphoria experience associated with their chest. Dr. Laidlaw also suggests that D.H.'s and John's increased chest dysphoria sometime after starting testosterone is because of their co-occurring conditions. Laidlaw Decl. ¶ 21. But, increased chest dysphoria is a common response to starting testosterone among transgender males. A provider who regularly works with transgender young people would not attribute that response to a patient's co-occurring conditions. Transgender young people experience an improvement in their mental health upon starting hormone-replacement therapy because that medication helps bring their body into closer alignment with their gender identity. As those hormones take effect, however, some transgender young people experience increased distress regarding the parts of their body the hormones cannot change. This is particularly true for transgender males whose voice will drop and will start growing facial hair—two visible markers of masculinity—but will still have a female-appearing chest.

7. Likewise, when Dr. Laidlaw discussed dosing of testosterone, one of the rare occasions Dr. Laidlaw opined on matters within the purview of an endocrinologist, he made errors that would not have been made by a medical provider that regularly treats transgender patients. Although a testosterone level of 300-1000 ng/dL would be concerning for a nontransgender female, *see* Laidlaw Decl. ¶ 20, that is a typical range of testosterone in males during puberty. And, likening doses of testosterone for transgender males to abusing steroids, is misleading and inaccurate. *Id.* The highest dose recommended for adolescents under the Endocrine Society Guidelines ranges from 100-125 mg every two weeks, which is, at most, one fifth of the levels studied in the article Dr. Laidlaw cites on steroid abuse.[1] Not surprisingly, induction of male puberty in transgender males has the same effects as those typically seen in nontransgender males (*e.g.* increased libido, potential for changes in mood, and increased body hair growth). It does not cause the complications and side effects that accompany steroid abuse.

---

[1] Many, if not all, of the studies contained in the meta-analysis cited by Dr Laidlaw involved nontransgender male participants whose starting levels of testosterone are much higher than those of transgender men.

8. Even though Dr. Levine is a psychiatrist, he is also unqualified to make the opinions asserted in his declaration. According to his CV, Dr. Levine is not board certified in child and adolescent psychiatry, which requires specialized training in child development that is essential for working with transgender young people and their families. Expert Declaration of Stephen Levine, Dkt. 18-2, at 49 ("Levine Decl."). His declaration and CV indicate that he does not have significant clinical experience working with adolescents experiencing gender dysphoria, the patient population at the heart of this case, and suggests that any such experience occurred decades ago. Levine Decl. ¶ 5.

9. He too used language throughout his declaration that laid bare his lack of expertise in treating adolescents with gender dysphoria. For example, on a number of occasions, Dr. Levine referred to transgender people as "transgendered." *See, e.g.*, Levine Decl. ¶¶ 47, 78, 104. That word has long been abandoned by practitioners and researchers in the field of transgender health care because it is offensive to transgender people and unnecessarily confusing. Similarly, Dr. Levine's declaration contains numerous claims that are false or misleading. For example, he claims that it is inaccurate to "assert that doctors 'assign' the sex of a child at birth." Levine Decl. ¶ 11. Yet, approximately 1 in 1,000 babies are born with intersex conditions, some of which cannot be diagnosed based on an inspection of a newborn's genitalia and others that result in a "mosaic" of sex chromosomes in their cells. Doctors routinely assign these children to one gender or another at birth. Nor is gender dysphoria "the only psychiatric condition to be treated by surgery." Levine Decl. ¶ 22. For example, deep brain stimulation (DBS) is a procedure that can be used to treat Obsessive Compulsive Disorder and Major Depression. DBS requires a surgical procedure to place a device called a neurostimulator in the brain; the neurostimulator, sometimes called a "brain pacemaker," then sends electrical impulses, through implanted electrodes, to specific targets in the brain.

### *Diagnosis and Treatment of Gender Dysphoria in Adolescents*

10. Despite Drs. Laidlaw and Levine's assertions to the contrary, scientific research and clinical experience has foreclosed any credible debate about the diagnosis and

1  benefits of treatment for gender dysphoria in childhood. But, because male chest
2  reconstruction surgery is not medically appropriate until adolescence, this declaration will
3  focus primarily on their statements that apply to adolescents with gender dysphoria. As
4  such, any studies or statements not directly addressed in this declaration, such as the
5  significant misrepresentations Drs. Laidlaw and Levine make regarding the research
6  regarding "persistence" and "desistence," should not be construed as agreement. *See*
7  Laidlaw Decl. ¶ 22; Levine Decl. ¶¶ 28, 35, 56, 58-67, 99-103.

8        11.    Contrary to the portrayal in Drs. Laidlaw's and Levine's declarations, the
9  gender affirmative model of treatment requires a careful and thorough assessment of a
10 patient's mental health, including co-occurring conditions, history of trauma, substance use,
11 among many other factors. Laidlaw Decl. ¶¶ 23-26; Levine Decl. ¶¶ 51, 57. That assessment
12 requires an exploration of the patient's psychological distress surrounding their gender
13 identity, including its sources and manifestations. Without that detailed history and
14 assessment, a provider could not accurately diagnose a patient with gender dysphoria. The
15 number of sessions that assessment requires will vary greatly depending on the patient's
16 presentation and the complexity of the issues the patient is navigating. Further, in
17 conducting that assessment, the mental health provider is drawing from their professional
18 training and experience in working with transgender young people, exercising professional
19 judgment, and tailoring the assessment to each individual patient.

20       12.    That comprehensive assessment is also needed to inform possible future care,
21 specifically referrals for surgical treatment. The referral process involves an assessment of
22 the patient's gender dysphoria, co-occurring conditions, and the surgical procedure's likely
23 affect on the patient's overall mental health and functioning. As part of that process, mental
24 health providers also discuss the risks, benefits, and alternatives to surgery with transgender
25 young people and their parents. This gives the mental health provider an opportunity to
26 assess whether the transgender young person's co-occurring conditions are interfering with
27 their ability to fully assent to the procedure and whether those conditions would impede
28 their ability to comply with necessary post-surgical care.

13. Where the gender-affirmative model differs from other approaches is that it does not presume that being transgender is incompatible with a young person's short- and long-term health and wellbeing. That is consistent with DSM-5 diagnostic criteria which is "focus[ed] on dysphoria as the clinical problem, not identity per se." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders (DSM-5)*, 451 (2013). And, despite Drs. Laidlaw and Levine's characterization to the contrary, the gender-affirmative model is not synonymous with a rubber-stamp recommendation that all patients undergo a gender transition. *See* Laidlaw Decl. ¶¶ 23-25; Levine Decl. ¶¶ 51, 57. Instead, the focus of the gender-affirmative model is supporting overall health and wellbeing, regardless of whether the young person continues to identify as transgender. As a result, I have had patients who presented with some symptoms of gender dysphoria, but who ultimately did not meet the diagnostic criteria for a variety of reasons and therefore I recommended treatments other than transition to alleviate their psychological distress.

14. The other treatment modalities outlined in Dr. Levine's declaration are inconsistent with the prevailing standards of care because those modalities withhold treatments known to ameliorate the patient's gender dysphoria, which is unethical and contrary to a provider's oath to "first, do no harm." Levine Decl. ¶¶ 28-42. Although Dr. Levine refers to his preferred modality as the "psychotherapy model," this approach is more appropriately characterized as "gender identity conversion efforts" because its goal is to bring the patient's gender identity into alignment with their assigned sex and forecloses gender transition as a treatment for gender dysphoria. Levine Decl. ¶¶ 30-35. A recent study found that experiencing those conversion efforts was associated with greater odds of attempting suicide, especially for those had those experiences in childhood. Jack Turban, et al., *Association between recalled exposure to gender identity conversion efforts and psychological distress and suicide attempts among transgender adults*, 77 JAMA Psychiatry 68 (2020). That conclusion is further supported by the extensive evidence that rejection of a young person's gender identity from family and peers are the strongest predictors for adverse mental health outcomes. This is not an appropriate therapeutic

REPLY EXPERT DECLARATION OF ARON JANSSEN, M.D. IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
- 5 -

modality and every leading medical and mental health organization has issued clear statements that those practices are discredited, harmful, and ineffective, including the American Medical Association,[2] the American Academy of Pediatrics,[3] and the American Academy of Child & Adolescent Psychiatry.[4]

### *Treatment for Gender Dysphoria is Evidence Based*

15. Many well-established treatment protocols in psychiatry—and likely in every discipline of medicine—do not have the level of evidentiary support that Drs. Laidlaw and Levine seek to impose on treatment for gender dysphoria. Laidlaw Decl. ¶¶ 31-34, 36-37; Levine Decl. ¶ 71-77, 114. The evidentiary basis for those treatment protocols are developed, and regularly updated, using a combination of peer-reviewed research and the extensive clinical experience of providers who regularly treat patients with that condition. Those treatment protocols are considered the standard of care and are safe and effective for the conditions they are intended to treat. For example, in children, Zoloft is FDA approved to treat Obsessive-Compulsive Disorder, but is also regularly used to treat depression and anxiety, such that the use of Zoloft is considered the standard of care for children who require medication to treat those conditions.

16. Although there are still no imaging or laboratory tests that assist clinicians in the diagnosis and treatment of gender dysphoria, there are measurable and objective criteria mental health providers use to diagnose and treat gender dysphoria, including the DSM-5 diagnostic criteria and the ever-growing body of research on gender dysphoria. For example, studies repeatedly point to the strength of a young person's cross-gender identification as an important factor in the diagnostic process. A recent study found cross-

---

[2] American Medical Association, *Health care needs of lesbian, gay, bisexual and transgender populations,* H-160.991. 2017, https://policysearch.ama-assn.org/policyfinder/detail/H-160.991%20?uri=%2FAMADoc%2FHOD.xml-0-805.xml (lasted visited Oct. 23, 2020).
[3] Jason Rafferty, et al., Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents, 142 Pediatrics (2018), *available at*, https://pediatrics.aappublications.org/content/pediatrics/142/4/e20182162.full.pdf (last visited Oct. 23, 2020).
[4] The American Academy of Child & Adolescent Psychiatry, *Conversion Therapy* (2018), https://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx (last visited Oct. 23, 2020).

gender identification of transgender children who had not yet undergone any transition to be indistinguishable from that of nontransgender study participants and transgender participants who had already undergone a social transition. Rae, J., et al., *Predicting early-childhood gender transitions*, 30 Psychological Science 669 (2019); *see also* Selin Gülgöz, et al., *Similarity in Transgender and Cisgender Children's Gender Development*, 116 *Proceedings of the Nat'l Acad. Of Sci. of the U.S.* 24480 (2019).[5] Research also shows that social transition significantly improves the mental health of transgender young people, bringing their mental health profiles into alignment with their nontransgender peers. Kristina Olson, et al., *Mental health of transgender children who are supported in their identities*, 137 Pediatrics 1 (2016);[6] *see also* Jack Turban, et al., *Pubertal suppression for transgender youth and risk of suicidal ideation*, 145 Pediatrics 1 (2020) (transgender people who accessed puberty suppression treatment were 70% less likely to contemplate suicide). Those guideposts, among others, assist clinicians to differentiate a young person who shows some symptoms consistent with gender dysphoria but for whom a gender transition would not be recommended, and a young person who has the type of persistent gender dysphoria seen in transgender people.

17.     Another related measure is whether a young person's gender dysphoria continues into or intensifies at the onset of puberty. That further confirms the accuracy of a young person's gender dysphoria diagnosis. Even researchers who oppose treatment of gender dysphoria in childhood adhere to the gender-affirmative model for transgender adolescents and recognize the importance of medical and surgical treatments for gender dysphoria in adolescence. Jack Turban, Annelou DeVries & Kenneth Zucker, *Gender Incongruence & Gender Dysphoria*, in *Lewis's Child and Adolescent Psychiatry: A Comprehensive Textbook*, (A Martin, et al., eds., 5th ed., 2018). A longitudinal study

---

[5] These studies also demonstrate there is no support for Dr. Levine's suggestion that social transition in childhood causes transgender young people to continue identifying as transgender into adolescence and beyond.
[6] Anxiety was the only area where transgender young people differed from the nontransgender controls. On that measure, transgender young people showed slightly elevated levels of anxiety, but were still in the pre-clinical range.

REPLY EXPERT DECLARATION OF ARON JANSSEN, M.D. IN SUPPORT OF
PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
- 7 -

following a cohort of transgender young people in the Netherlands from puberty suppression through surgical treatment found that the cohort had global functioning that was equivalent to the Dutch population. Annelou De Vries, et al., *Young adult psychological outcome after puberty suppression and gender reassignment*, 134 *Pediatrics* 696 (2014). And, in fact, the cohort of transgender participants were nearly twice as likely to pursue higher education (58% v. 31%). *Id.*

18. Drs. Laidlaw and Levine criticize the extensive body of research supporting the current standard of care for the treatment of gender dysphoria based on purported concerns that generally lack a sound scientific basis; at the same time, they rely heavily on articles and other sources that lack peer review or other indicia of reliability to support their own views. For example, in response to the brain-imaging studies identifying biological sources of gender identity, Dr. Levine claims "there is no evidence that these patients have any defining abnormality in brain structure that precedes the onset of gender dysphoria." Levine Decl. ¶ 24. This critique fails to account for the fact that medical providers would have no basis for conducting a brain imaging study on transgender people prior to the onset of gender dysphoria. Equally concerning, however, is Dr. Levine's reliance on the Littman study for his claim that gender dysphoria is driven by cultural influences. *Id.* Although purporting to provide a basis for Dr. Levine's speculations, the study was based on an anonymous survey, allegedly of parents, about the etiology of their child's gender dysphoria. Participants were recruited from websites promoting this social-contagion theory, and the children were not surveyed or assessed by a clinician. Those serious methodological flaws render the study meaningless. The only conclusion that can be drawn from that study is that a self-selected sample of anonymous people recruited through websites that predisposed participants to believe that transgender identity can be influenced by social factors believe those social factors influence children to identify as transgender.

19. Further, a significant proportion of the sources cited by Drs. Laidlaw and Levine were published in nonscientific journals, including *Public Discourse*, a general-interest opinion journal edited by Ryan Anderson, an outspoken opponent of treatment for

gender dysphoria who has no medical training. *See* Laidlaw Decl. at 8; Masthead – Public Discourse, https://www.thepublicdiscourse.com/masthead/ (last visited Oct. 23, 2020).

### *Assessing Co-Occurring Conditions & Referrals for Surgery*

20. Both Drs. Laidlaw and Levine include extensive discussions of co-occurring conditions—even suggesting diagnoses for D.H. and John without examining them. Laidlaw Decl. ¶¶ 13-26; Levine Decl. ¶¶ 19, 55. Each suggests that transgender people have an underlying psychopathology by virtue of being transgender. *See* Laidlaw Decl. ¶ 23; Levine Decl. ¶¶ 21-25, 50-51, 83. The American Psychiatric Association unequivocally repudiated that outdated view in the DSM-5, revising the diagnostic criteria (and name) to recognize the clinical distress as the focus of the treatment, not the patient's transgender status. *See* DSM-5 at 451. As in other aspects of their declarations, Drs. Laidlaw and Levine's reliance on scientific research is selective, cannot support their conclusions, and is inconsistent with the prevailing standards of care.

21. Studies on transgender young people have long reported data on co-occurring conditions. Johanna Olson, et al., *Baseline Physiologic and Psychosocial Characteristics of Transgender Youth Seeking Care for Gender Dysphoria*, 57 J. of Adol. Health 374 (2015) (finding 35% of participants with clinical levels depression and prevalence of moderate and severe depression among participants was 9% and 11%, respectively); Sari L. Reisner, et al., *Mental health of transgender youth in care at an adolescent urban community health center: A matched retrospective cohort study*, 56 J. of Adol. Health 274 (2015) (finding approximately 51% of participants had a diagnosis of depression and 27% were diagnosed with anxiety); Norman Spack, et al., *Children and Adolescents With Gender Identity Disorder Referred to a Pediatric Medical Center*, 129 Pediatrics 419 (2012) (finding 40% had mental health diagnoses prior to contact with the clinic, including, among others, depression (58%), general anxiety disorder (7%), bipolar (7%), PDD-NOS (9%), and ADHD/ADD (5%)); Brian S. Mustanski, et al., *Mental Health Disorders, Psychological Distress, and Suicidality in a Diverse Sample of Lesbian, Gay, Bisexual, and Transgender Youths*, 100 Am. J. of Pub. Health 2426 (2010) (One third of participants met criteria for

any mental disorder, 17% for conduct disorder, 15% for major depression, and 9% for posttraumatic stress disorder.). The existence—and prevalence—of co-occurring conditions among transgender young people is unsurprising. Transgender young people must cope with many stressors from the fear of rejection from family and peers to pervasive societal discrimination. Not to mention, their underlying gender dysphoria can cause significant psychological distress, which, if left untreated, can result in the co-occurring conditions identified in studies on transgender young people. And, given that transgender young people typically delay disclosing their transgender status or initially experience family rejection following disclosure, it is not uncommon for transgender young people to engage with psychological or psychiatric care for other reasons prior to being diagnosed with gender dysphoria.

22.     Transgender young people, however, are not outliers in this regard. Research and clinical experience show that most psychiatric conditions are highly correlated with other co-occurring psychiatric conditions. For example, young people with depression are very likely to have at least one other diagnosable condition, most often anxiety. *See, e.g.*, E. Jane Costello, et al., *Prevalence and development of psychiatric disorders in childhood and adolescence*, 60 Archives of Gen. Psychiatry 837 (2003) ("There was strong heterotypic continuity from depression to anxiety" and finding approximately 30% of participants diagnosed with a depressive disorder were also diagnosed with an anxiety disorder). Likewise, a study on children diagnosed with Attention-Deficit/Hyperactivity Disorder found between 74-79% participants had additional co-occurring psychiatric conditions. Timothy Wilens, et al., *Psychiatric Comorbidity and Functioning in Clinically Referred Preschool Children and School-Age Youths With ADHD*, 41 J. of Am. Academy of Child & Adol. Psychiatry 262 (2002).

23.     Thus, Dr. Laidlaw's reliance on the prevalence data in the study by Kaltiala-Heino is misleading. Laidlaw Decl. ¶ 23. First and foremost, the prevalence rates reported in that study are significantly higher than other data on co-occurring conditions in transgender young people. His reliance on a single outlier study is particularly troubling

because the prevalence data in those other studies are largely consistent with one another, suggesting a high level of reliability. Second, the small size of the study and its design prevented its authors from drawing any causal connections between the co-occurring conditions and the medical necessity or mental health benefits of surgical care to treat the participant's gender dysphoria. Instead, the study was focused on developing categories that describe the various clinical presentations of young people with gender dysphoria in that clinic. Yet, Dr. Laidlaw cites this study as a basis for his belief that transgender young people must demonstrate their co-occurring conditions have been "thoroughly treated" prior to obtaining male chest reconstruction surgery, a conclusion that is contrary to the standards of care and the study's own conclusions. *Id.*

24. In suggesting D.H. and John need further assessment for co-occurring conditions, Dr. Laidlaw also implies that mental health providers who follow the gender-affirmative model of therapy do not conduct a thorough assessment of their patients. Laidlaw Decl. ¶ 23. As noted above, conducting a detailed assessment is a central feature of the gender-affirmative model, and such an assessment would have explored the categories of potential co-occurring conditions identified by Dr. Laidlaw. Based on the declarations of Dr. Peck and Ms. Reed, both have extensive experience working with transgender young people and have an extended therapist-patient relationship with John and D.H., respectively. Declaration of Dr. Mischa Cohen Peck, Dkt. 4-2, ¶¶ 6, 8 ("Peck Decl."); Declaration of Tamar Reed, Dkt. 5-2, ¶¶ 4-5. There is nothing in their declarations that suggest either conducted anything short of a comprehensive assessment of their patient's mental health.

25. Equally concerning is Dr. Laidlaw's assertion that John may have dissociative identity disorder (previously known as multiple personality disorder), a complex psychiatric condition, without having assessed John—an assessment he would not be qualified to conduct. Laidlaw Decl. ¶ 18 n.1. That opinion is based on John's description of his experience of puberty as "being detached" from his body. *Id.*; Peck Decl. ¶ 12. Young people commonly describe distressing or traumatic experiences as an out-of-body

experience; it is a coping mechanism that allows them to separate and protect themselves from that experience. Given the distress the onset of puberty causes for transgender young people, it is not surprising that John recounted his experience in those terms; it is an experience I have heard from many of my patients, including transgender patients, both around the onset of puberty and during times of stress or trauma.

26. Like any patient, transgender young people will develop a variety of ways to cope with the psychological distress they experience, especially when untreated, to regain control of their lives. Some strategies can be healthy and promote psychological and overall health, like exercise and drawing, while other strategies can cause further damage, such as self-harm or restricted eating. Dr. Laidlaw attempts to draw a connection between D.H.'s and John's history of engaging in self-harming behaviors[7] to a litany of psychological conditions. Laidlaw Decl. ¶ 19. The suggestion that the mere presence self-harming behaviors requires further assessment for the co-occurring conditions listed in his declaration is inconsistent with the research on those behaviors and the prevailing standard of care. Self-harming behaviors are considered a non-specific maladaptive coping mechanism, meaning those behaviors are used by patients in response to a wide range of psychological conditions and stressors. Because those behaviors are not associated with a specific condition, the standard of care is to explore the triggers for the self-harming behaviors and to help redirect patients towards positive—or, at least, less harmful—coping mechanisms, while treating the underlying condition so that the triggering events are less frequent.

27. For transgender males, the presence and appearance of their chest repeatedly triggers their gender dysphoria throughout the day, from seeing their body while getting dressed in the morning to being misperceived as female by others. Although therapy can greatly assist transgender males in developing more positive coping mechanisms, it cannot completely resolve the underlying psychological distress, thereby impairing their ability to achieve sustained relief from gender dysphoria. Male chest reconstruction surgery removes

---

[7] These behaviors are also referred to by the term non-suicidal self-injury or NSSI.

this significant source of dysphoria, reducing the transgender person's overall level of distress and improving their psychological functioning.

28. Both Drs. Laidlaw and Levine, however, suggest that the existence of co-occurring conditions, history of self-harming behaviors, or history of suicidal ideation or attempts should disqualify D.H. and John from consideration for male chest reconstruction surgery. Laidlaw Decl. ¶¶ 23-26; Levine Decl ¶¶ 31–32. The scientific research and clinical experience working with transgender young people demonstrates that the opposite is true. *See, e.g.*, Richard Bränström & John E. Pachankis, *Toward Rigorous Methodologies for Strengthening Causal Inference in the Association Between Gender-Affirming Care and Transgender Individuals' Mental Health: Response to Letters*, 177 Am. J. Psychiatry 769 (2020);[8] Johanna Olson-Kennedy, et al., *Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults Comparisons of Nonsurgical and Postsurgical Cohorts*, 172 JAMA Pediatrics 431, 434 (2018); Annelou De Vries, et al., *Young adult psychological outcome after puberty suppression and gender reassignment*, 134 *Pediatrics* 696 (2014). In fact, transgender males who are experiencing severe chest dysphoria manifesting in suicidal ideation, suicide attempts, or psychiatric hospitalizations are among the most in need of male chest reconstruction surgery. For those patients, therapy and medication have proved to be a temporary band aid and continuing that treatment protocol would cause the patient's mental health to deteriorate further with very dangerous consequences.

---

[8] In his declaration, Dr. Laidlaw misrepresented the differences between the original Bränström study and its subsequent correction. Although the correction concurred that "the [study] design is incapable of establishing a causal effect of gender-affirming [surgical] care on mental health treatment utilization," *id.* at 772, a re-analysis of the data supported an expectation of "a reduction in mental health treatment as a function of time since completing such treatment," *id.* Dr. Laidlaw's discussion of the study's conclusion, however, makes the same analytical misstep he claimed the authors made; just as the data could not prove a causal connection between surgery and the subsequent improvement to the participant's mental health, it also cannot support a finding that the surgery had no effect. *See* Laidlaw, et al., *Letter to the Editor: Gender-Affirmation Surgery Conclusion Lacks Evidence*, 177 *Am. J. Psychiatry* 765-766 (2020). In doing so, Dr. Laidlaw glosses over the study's conclusion that there is a positive correlation between access to surgical treatment for gender dysphoria and improved mental health over time.

29. The prevailing standards of care account for the reality that transgender individuals may be diagnosed with co-occurring conditions. Among the criteria for assessing a transgender patient for male chest reconstruction surgery is determining whether the patient's "significant medical or mental health concerns are . . . reasonably well controlled." WPATH, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, 59 (hereafter, "WPATH SOC").

30. That criteria is focused on serious conditions that would interfere with one, or more, of the following: (1) the ability of the provider to accurately diagnose the patient with gender dysphoria; (2) the ability of the patient to provide informed assent (for people under eighteen) or consent (for parents and adults) to the surgery; or (3) the ability of the patient to recover from the surgery, including compliance with post-operative care.

31. The conditions that typically trigger closer assessment under that criteria include schizophrenia, schizoaffective disorder, dissociative identity disorder, and Down Syndrome. Having those conditions—or similar ones—does not automatically preclude a transgender person from undergoing treatment for gender dysphoria. Instead, assessing that person requires providers who are highly specialized in working with transgender people to determine whether the person's co-occurring condition does, in fact, raise any of the concerns noted above. This also means that the assessment process may take longer.

32. Requiring that a transgender patient resolve all co-occurring conditions prior to undergoing surgical care—as suggested by Defendant's experts—is not possible, nor is it ethical. Laidlaw Decl. ¶¶ 23-26; Levine Decl. ¶¶ 29, 31, 34, 55. Nor is resolving all co-occurring conditions before surgical treatment a requirement for other procedures, such as surgeries for Grave's disease or Hyperthyroidism. Gender dysphoria, by definition, is accompanied by clinically significant psychological distress. That distress can take on many different forms (*e.g.*, anxiety, mood disorders, and depression) and vary greatly in severity, resulting in co-occurring conditions. Because psychological distress is not easily compartmentalized, the distress associated with gender dysphoria can also amplify co-occurring conditions that developed independently of the gender dysphoria. In either

situation, gender dysphoria limits the effectiveness of treatment of any co-occurring mental health conditions. Thus, treating the underlying gender dysphoria is essential to alleviating the psychological distress associated with co-occurring conditions.

33. Even assuming that it was possible to cure a patient's co-occurring conditions, Drs. Laidlaw and Levine fail to consider the very real harms caused by delaying treatment. Therapy and medications alone are often inadequate to treat gender dysphoria in transgender males. Without male chest reconstruction surgery, their gender dysphoria would continue to worsen. At a minimum, that increased distress would interfere with the treatment for the person's co-occurring conditions, subjecting them unnecessarily to a longer course of treatment. It is far more likely that the gender dysphoria would eclipse the person's co-occurring conditions, not only entirely impeding treatment of those co-occurring conditions, but also resulting in an overall deterioration of their mental health. The increased distress from their gender dysphoria would translate to resorting to negative coping mechanisms (*i.e.* self-harm), suicidal ideation, and suicide attempts—just as it could if that increased distress was attributable to a co-occurring condition.

34. Based on my review of the declarations submitted by D.H.'s and John's healthcare providers, there is no basis to suggest that either of them has co-occurring conditions that are not "reasonably well controlled" as required under WPATH Standards of Care to be eligible for male chest reconstruction. WPATH SOC at 21, 59. To the contrary, the professional opinions of those providers are that not only are their co-occurring conditions well controlled, but that having male chest reconstruction surgery will help alleviate the symptoms of those co-occurring conditions.

35. Thus, undergoing male chest reconstruction surgery may allow D.H. and John, a transgender patient to "thoroughly treat[]" their co-occurring conditions as Dr. Laidlaw envisions. Laidlaw Decl. ¶ 23. As a result, withholding or denying treatment in the manner suggested by Drs. Laidlaw and Levine is irresponsible and unethical.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 26th th day of October, 2020 at Chicago, Illinois.

_____
Aron Janssen, M.D.