1 | Brent P. Ray (Admitted *pro hac vice*)
2 | Andrew J. Chinsky (Admitted *pro hac vice*)
  | KING & SPALDING LLP
3 | 353 N. Clark Street, 12th Floor
  | Chicago, Illinois 60654
  | T: +1 312 995 6333
4 | F: +1 312 995 6330
  | Email: bray@kslaw.com
5 |        achinsky@kslaw.com

6 | Daniel C. Barr (Bar No. 010149)
  | Janet M. Howe (Bar No. 034615)
7 | PERKINS COIE LLP
  | 2901 N. Central Avenue, Suite 2000
  | Phoenix, AZ 85012-2788
8 | T: +1 602 351 8085
  | F: +1 602 648 7085
9 | Email: dbarr@perkinscoie.com
  |        jhowe@perkinscoie.com

*Counsel for Plaintiffs and the Class*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

D.H., by and through his mother, Janice Hennessy-Waller; and John Doe, by his guardian and next friend, Susan Doe, on behalf of themselves and all others similarly situated,

Plaintiffs,

vs.

Jami Snyder, Director of the Arizona Health Care Cost Containment System, in her official capacity,

Defendant.

No. 4:20-cv-335-SHR

**REPLY EXPERT DECLARATION OF LOREN S. SCHECHTER, M.D. IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

I, Loren S. Schechter, M.D., declare as follows:

1.      I have been retained by counsel for the Plaintiffs as an expert in the above-captioned lawsuit. I submitted an expert witness declaration ("Schechter Decl."), Dkt. 5-6, in connection with Plaintiffs' motion for a preliminary injunction in this case. I submit this declaration to respond to points raised in the declarations of Michael K. Laidlaw, M.D. ("Laidlaw Decl."), Dkt. 18-1] and Stephen B. Levine, M.D. ("Levine Decl."), Dkt. 18-2, which Defendants submitted in connection with their response to Plaintiffs' motion for a preliminary injunction.

2.      My background, qualifications, and compensation for my services in this case, and the bases for my opinions in this case are described in my original declaration. In preparing this declaration, I was provided with and reviewed the following additional case-specific materials: (1) Expert Declaration of Michael Laidlaw, MD, and accompanying exhibits; and (2) Expert Declaration of Stephen Levine, MD, and accompanying exhibits.

3.      I have personal knowledge of the matters stated in this supplemental declaration.

4.      Both Dr. Laidlaw and Dr. Levine claim that male chest reconstruction surgery is not a safe and effective treatment for gender dysphoria.[1] That claim is flatly inconsistent with mainstream medical standards. It is my professional opinion – supported by the prevailing consensus of the medical community – that male chest reconstruction is a safe, effective, and medically accepted treatment for individuals with gender dysphoria, including adolescents.

---

[1] Based on my review of Dr. Laidlaw's declaration and CV, it appears that he has no clinical experience treating individuals with gender dysphoria. The language Dr. Laidlaw used in his declaration reflects his lack of familiarity with this area of medicine. For example, he claims that treatments for individuals with gender dysphoria "must be optimal, efficacious, and safe." *Id.* ¶ 11. His use of the term "optimal" implies that there is one way to treat or care for a particular condition, and that is simply not true. There are only "optimal" treatments for a particular patient. As is the case with many medical conditions, there are various treatments available for gender dysphoria, including surgery. As part of a surgical consultation, surgeons discuss the risks, benefits, and options of available procedures with their patients.  This discussion includes a consideration of the patients' medical history as well as other factors. What is "optimal" for one person with gender dysphoria might not be "optimal" for another person with the same medical condition.

*WPATH is a Professional Medical Association*

5.     Both Dr. Laidlaw and Dr. Levine attempt to discount the broad medical consensus that gender confirming surgeries are medically necessary by claiming that WPATH is an "advocacy organization" and not a "purely" professional one. *See* Laidlaw Decl. ¶ 33; Levine Decl. ¶ 46. First, most medical associations and societies engage in advocacy on behalf of health care professionals, their patients, and their medical specialty generally. For example, the Endocrine Society – of which Dr. Laidlaw is a member – describes itself as devoted to "advocating on behalf of the global endocrinology community," including patients with endocrine conditions. Endocrine Soc'y, Who We Are, https://www.endocrine.org/about-us; *see also* Endocrine Soc'y, Advocacy, https://www.endocrine.org/advocacy, Endocrine Soc'y, Shaping Healthcare and Research Policy, https://www.endocrine.org/our-community/shaping-healthcare-and-research-policy. Similarly, the American Society of Plastic Surgeons uses advocacy "to support its members in the provision of excellent patient care." Am. Soc'y of Plastic Surgeons, About ASPS, https://www.plasticsurgery.org/about-asps. Far from being unique, engaging in advocacy is the norm among professional medical associations. *See, e.g.*, Am. Medical Ass'n, Health Care Advocacy, https://www.ama-assn.org/health-care-advocacy; Am. Psychiatric Ass'n, Make a Difference Through APA Advocacy, https://www.psychiatry.org/psychiatrists/advocacy; Am, Acad. of Pediatrics, Advocacy, https://services.aap.org/en/advocacy/.

6.     Second, WPATH has transgender members who are licensed professionals in the wide range of specialties associated with transgender health as well as transgender members who bring the voice of the community into the organization. The presence and participation of transgender people in WPATH in no way restricts "honest and scientific debate" among professionals. *Cf.* Levine Decl. ¶ 45. To the contrary, it enriches the discussion of important topics, just as the participation of patients and patient support groups does during discussions at conferences for other professional societies to which I belong. Having transgender members is vital to WPATH and the development of the

Standards of Care, but notably, voting privileges are limited to members who are professionals. Thus, the implication that the participation of transgender members degrades WPATH's scientific integrity or impartiality has no merit.[2] Moreover, in conjunction with WPATH's biennial conference, it hosts a meeting that is limited to surgeons and healthcare professionals directly involved in surgical care (a meeting that I started at the 2007 WPATH Biennial meeting in Chicago, and continue to organize and participate in at each of the subsequent meetings). During the meeting, surgeons openly discuss a wide range of issues, including surgical techniques and ethical questions.

7.     Finally, Dr. Laidlaw and Dr. Levine ignore that many other professional medical associations agree that gender-confirming surgery is a medically necessary treatment for individuals with gender dysphoria. *See, e.g.*, Schechter Decl. ¶ 32 (noting that the American Medical Association, American College of Obstetricians and Gynecologists, and American Academy of Pediatrics have all issued policy statements and guidelines that are in accordance with the WPATH Standards of Care); *see also* Am. Psychological Ass'n, Guidelines for Psychological Practice With Transgender and Gender Nonconforming People (2015), https://www.apa.org/practice/guidelines/transgender.pdf; Am. Psychiatric Ass'n, *A Guide for Working With Transgender and Gender Nonconforming Patients* (2017), https://www.psychiatry.org/psychiatrists/cultural-competency/education/transgender-and-gender-nonconforming-patients.

### Male Chest Reconstruction Surgery is Safe and Effective for
### Individuals who Meet the Prevailing Standards of Care

8.     The WPATH Standards of Care set forth the following general criteria for individuals seeking male chest reconstruction to treat their gender dysphoria: (1) The patient has a referral from at least one mental health professional documenting the patient's necessity and preparedness for the surgery; (2) If the patient has other significant medical

---

[2] Dr. Laidlaw's complaint that WPATH's Standards of Care are developed through a consensus process among its members is curious, at best. WPATH members have dedicated a significant portion of, if not their entire professional careers, to advancing the health and wellbeing of transgender people. That level of expertise is essential in creating a standard-setting document.

or mental health concerns, they are reasonably well-controlled prior to surgery; and (3) The patient has the capacity to make fully informed decisions and to consent for treatment. WPATH, *Standards of Care for the Health of Transsexual, Transgender, and Gender-Nonconforming People*, 59 (hereafter, "WPATH SOC"). With respect to individuals under age 18, the Standards of Care indicate that it is preferable to perform male chest reconstruction after the patient has had "ample time of living in the desired gender role and after one year of testosterone treatment," but that a different approach could be more suitable depending on the individual needs of the patient. WPATH SOC at 21.

9.     Dr. Laidlaw and Dr. Levine appear to misunderstand these guidelines. Both declarations include an extensive discussion of treatment for gender dysphoria in children (*i.e.* prior to puberty), but the SOC does not recommend surgical interventions for pre-pubescent children, and in any event, the issue of what interventions are appropriate for children before puberty is irrelevant to the question of whether male  chest reconstruction surgeries are clinically appropriate for D.H. and John Doe, both of whom have already commenced puberty.

10.     Dr. Laidlaw asserts that "any treatment which alters biological development in children should be used with extreme caution." Laidlaw Decl. ¶ 11. While any surgical intervention should be approached with care, the SOC outline the clinical factors medical and mental health professionals should assess when determining whether surgery is medically necessary to treat a transgender young person's gender dysphoria. Nor do the SOC go beyond clinical practice in other areas for youth. Many nontransgender women have breast reduction surgery before the age of 18 in order to alleviate back pain, neck pain, shoulder grooving from bras straps, and/or skin irritation. Likewise, it is common for nontransgender men as young as 14 to have surgery to treat gynecomastia. Accordingly, the SOC recognize that male chest reconstruction is medically necessary for many adolescents with gender dysphoria who are under age 18. WPATH SOC at 21; *see also* Wylie C. Hembree et al., *Endocrine Treatment of Gender-Dysphoric/Gender-Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, 102 J. Clin. Endocrinology &

Metabolism 3869, 3872 (2017) ("We suggest that clinicians determine the timing of breast surgery for transgender men based upon the physical and mental health status of the individual. There is insufficient evidence to recommend a specific age requirement.").

11.    Dr. Laidlaw claims that any co-occurring mental health conditions, "should be thoroughly treated first before considering hormone therapy or gender reassignment surgery." Laidlaw Decl. ¶¶ 23, 26. That position is not supported by any evidence. Co-occurring mental health conditions are not uncommon in patients who need surgery, including patients with gender dysphoria. The WPATH SOC recognize that. They specifically indicate the importance of mental health assessments prior to surgery, as well as the importance of a multi-disciplinary and collaborative approach between surgeons, mental health professionals, and primary care providers. *See* WPATH SOC at 56-57. Working in this interdisciplinary way, surgeons determine if a patient has any medical or mental health conditions that could affect their suitability for surgery or complicate their recovery after surgery. *See* WPATH SOC at 59.

12.    In addition, it is wrong to assume that gender-affirming surgeries, like male chest reconstruction surgery, cannot have a positive effect on co-occurring mental health conditions. The overwhelming majority of my patients improve across multiple domains after surgery. For example, before surgery, some patients are unable to exercise because doing so causes intense gender dysphoria, and the size of their chest/breasts makes exercise physically uncomfortable, not unlike nontransgender women seeking breast reduction surgery. After surgery, they are able to exercise more comfortably and, as such, they are able to improve their physical health. Research confirms that male chest reconstruction does improve psychosocial and physical well-being.[3]

13.    Dr. Laidlaw goes on to say that the presence of certain co-occurring mental health conditions could make individuals unable to consent to gender affirming surgery.

---

[3] Agarwal, C, et al, Quality of life improvement after chest wall masculinization in female-to-male transgender patients:  A prospective study using the BREAST-Q and Body Uneasiness Test, J Plast Reconstr Aesthet Surg. 2018 May; 71(5), 651-657. *See also* Tim C. van de Grift et al., Body image in transmen:  multidimensional measurement and the effects of mastectomy, journal of sexual medicine 2016; 13, 1778-1786.

Laidlaw Decl. ¶¶ 25, 29. Dr. Laidlaw fails to recognize that when individuals under age 18 seek surgery, it is their parent or guardian that must provide informed consent. Of course, adolescents must also assent to gender confirming surgery. Patients with co-occurring mental health conditions, such as depression, anxiety, substance use disorder, and post-traumatic stress disorder, regularly and appropriately assent to surgical care. Generally, these conditions do not prevent patients from understanding the procedure, the risks and complications of the procedure, and the benefits that they can reasonably expect to achieve from surgery. *See* Schechter Decl. ¶ 38.

14.    Dr. Laidlaw and Dr. Levine also suggest that the possible complications of male chest reconstruction mean that it is not safe. *See* Laidlaw Decl. ¶ 28; Levine Decl. ¶ 90. Gender confirming surgeries do not have a particularly high complication rate when compared with analogous procedures for other conditions. For example, a study of 7,905 transgender individuals, of whom 1,047 underwent gender affirming surgery between 2009-2015, revealed an overall complication rate for all surgical procedures of only 5.8%.[4] Looking specifically at male chest reconstruction surgery, two recent studies reveal a complication rate of between 11%-12%.[5] In comparison, a 2005 study of cisgender women undergoing breast reduction found a complication rate of 43%.[6] Likewise, a systematic review of cisgender women undergoing nipple-sparing mastectomy and immediate breast reconstruction using breast implants and acellular dermal matrix, found the following complication rates: 11% skin necrosis, 5% nipple necrosis, 12% infection, 1% hematoma, 5% seroma, 4% explantation, and 9% unplanned return to the operating room.[7] In short, the

---

[4] Lane, M., et al. Trends in gender-affirming surgery in insured patients in the United States. Plastic and Reconstructive Surgery – Global Open. 2018; 6(4), e1738. doi:10.1097/GOX.0000000000001738.
[5] Berry, M., et al. Female-to-male transgender chest reconstruction: A large consecutive, single surgeon experience. J Plast Reconstr Aesthet Surg. 2012 Jun; 65(6):711-9. doi: 10.1016; Agarwal, C. et al. Quality of life improvement after chest wall masculinization in female-to-male transgender patients: A prospective study using the BREAST-Q and Body Uneasiness Test. J Plast Reconstr Aesthet Surg. 2018 May; 71(5):651-657. doi: 10.1016.
[6] Cunningham, B., et al., Analysis of breast reduction complications derived from the BRAVO study. Plast Reconstr Surg. 2005 May; 115(6):1597-604.
[7] Heidemann, L., et al. Complications following nipple-sparing mastectomy and immediate acellular dermal matrix implant-based breast reconstruction-A systematic review and meta-analysis. Plast Reconstr Surg Glob Open. 2018 Jan 12; 6(1):e1625. doi: 10.1097.

complication rates for gender affirming surgeries are lower than or in the same range as the rates for the same surgeries performed to treat other conditions.

15.     Moreover, Dr. Laidlaw and Dr. Levine ignore the health risks and complications that can arise from withholding surgical care, including worsening gender dysphoria; anxiety; depression; and self-harm, suicide attempts, and suicide.

16.     Dr. Levine also opines that male chest reconstruction is not effective because the surgery does not fully align a patient's body and gender identity, and thus, cannot possibly cure their gender dysphoria. *See* Levine Decl. ¶ 82. First, Dr. Levine misconstrues the purpose of male chest reconstruction. The goal of the procedure is to reduce gender dysphoria. That a surgery might only alleviate – and not cure – the condition being treated, does not mean that it is not medically necessary. For example, a mastectomy performed on a patient who has a genetic predisposition to cancer (BRCA mutation carriers), does not completely eliminate the risk that the patient will develop cancer. And, chest/breast reconstruction following mastectomy does not result in anatomical structures that perfectly restore those that were removed. For example, breast reconstruction surgery for cancer does not restore the ability to breastfeed. Yet, there is no question that when performed in accordance with the standards of care, a risk-reduction mastectomy and chest/breast reconstruction is highly effective and medically necessary in a patient with one of the BRCA genes. Second, many of my patients who have undergone male chest reconstruction have in fact described total relief from their gender dysphoria.

17.     Finally, both Dr. Laidlaw and Dr. Levine suggest that gender confirming surgery is not safe and effective because some patients could later regret their transition and the procedure. Dr. Laidlaw offers no support for his opinion. *See* Laidlaw Decl. ¶ 40. Dr. Levine points to his own experience working with "multiple individuals who have abandoned trans female identity after living in that identity for years," Levine Decl. ¶ 100, and vague references to stories on the internet. That Dr. Levine has seen this happen several times in almost 40 years does not mean that it is a common occurrence among transgender individuals generally or among those who have received gender confirming surgery. All

available research—as well as my own clinical experience—indicates that very few patients experience regret when gender confirming surgery is provided in accordance with the WPATH SOC and by a qualified surgeon. Regret of any kind is rare (0.6% in transgender women and 0.3% in transgender men),[8] but "true regrets," as opposed to regrets due to lack of social or familial acceptance, comprise an even smaller percentage (approximately half this group, roughly 0.3% in transgender women and 0.15% in transgender men).[9] Having performed gender confirming surgeries for over 20 years, I have never had a patient request a reversal of male chest reconstruction.

18.    The Djordjevic study cited by Dr. Levine does nothing to undermine the necessity or effectiveness of surgical care for gender dysphoria. That article discusses the experiences of seven patients whose treatment leading up to surgery did not follow the WPATH SOC.[10] Contrary to Dr. Levine's implication, that study reaffirms that the prevailing standards of care are effective at assessing medical necessity for surgical care, ensuring that surgery is not performed on patients that would not benefit from those procedures. Having reviewed the declarations of Dr. Peck and Ms. Reed, and having evaluated D.H. and John via tele-health (which is how I conducted all of my consultations at that time and, given the ongoing concerns regarding COVID-19, tele-health consultations remain routine), both D.H. and John meet each of the criteria for male chest reconstruction surgery under the WPATH SOC and that procedure is medically necessary to treat their gender dysphoria.  If I were performing male chest reconstruction surgery on D.H. and John, this is the point at which I would seek prior authorization for the procedure. Although, like

---

[8] Wiepjes, et. al. The Amsterdam Cohort of Gender Dysphoria Study 1972-2015: Trends in Prevalence, Treatment, And Regrets. J Sex Med. 2018 Apr; 15(4):582-590. doi: 10.1016.

[9] *Id*. at 585, 587 (researchers classified "social regrets" as those experienced by individuals who still identified as transwomen, but reported feeling "ignored by surroundings" or regretted loss of relatives," and classified "true regrets" as those experienced by individuals who "thought gender affirming treatment would be a 'solution' for, for example, homosexuality or [lack of] personal acceptance, but, in retrospect, regretted the diagnosis and treatment").

[10] *See* Djordjevic, M., et al. Reversal Surgery in Regretful Male-to-Female Transsexuals After Sex Reassignment Surgery. J Sex Med. 2016 Jun; 13(6):1000-7. doi: 10.1016. Moreover, the study did not even involve individuals who had undergone male chest reconstruction, but only considered the experience of seven transgender women who underwent genital reconstruction surgeries. *See id.*

1  any surgeon, I would need to examine D.H. and John in person prior to proceeding with

2  surgery, it is highly unlikely, given their age and medical history, that the examination

3  would uncover an issue requiring a delay or cancellation of the surgery.

4      19.    Dr. Laidlaw also makes much of the fact that if a patient does regret

5  undergoing male chest reconstruction, they will be unable to breastfeed. Laidlaw Decl. ¶ 28.

6  But, individuals are unable to breastfeed for a variety of reasons, such as insufficient

7  glandular tissue or certain medical conditions. Moreover, breast reduction surgery, which

8  as I noted above, is often performed on adolescents, can also leave patients unable to

9  breastfeed.

10  ***The Peer-Reviewed Research Indicates that Male Chest Reconstruction is Safe and***

11  ***Effective for Individuals Who Meet the Prevailing Standards of Care***

12      20.    Dr. Laidlaw and Dr. Levine suggest that there is no "good quality" literature

13  showing that male chest reconstruction surgery is a safe and effective treatment for

14  individuals with gender dysphoria. Laidlaw Decl. ¶¶ 34, 40; Levine Decl. ¶¶ 69-73.

15  Notably, critical review of the scientific literature is one component as to how surgeons

16  evaluate whether a particular procedure is generally safe and effective and whether it is

17  appropriate or recommended for an individual patient. Not only de we consider the literature

18  *en masse*, but we must also account for our own clinical experience and that of our

19  colleagues, as well as our patients' experiences and input. Here, the existing literature

20  indicates that male chest reconstruction is a safe and effective treatment for individuals with

21  gender dysphoria, including adolescents. My own experience, and the documented

22  experience of clinicians across the globe, is consistent with that literature.

23      21.    Moreover, the quality of the evidence supporting gender affirming surgeries

24  is comparable to that supporting many surgeries and clinical procedures. While prospective,

25  randomized, double-blind, placebo-controlled studies are the gold standard, they cannot be

26  used to evaluate many clinical procedures. There are simply inherent limitations to our

27  ability to conduct such studies in clinical medicine. First, it is unethical to withhold

28  medically necessary care. As such, in many situations, clinicians cannot conduct a study

that uses a control group who is deprived of the treatment being studied. For this reason, and the fact that we do not perform gender-affirming surgery on children, it is particularly unsurprising that "[n]o studies show that affirmation of children (or anyone else) reduces suicide, prevents suicidal ideation, or improves long-term outcomes, as compared to either a 'watchful waiting' or a psychotherapeutic model of response." Levine Decl. ¶ 75. No institutional review board would approve such a study for adults or adolescents since "watchful waiting" amounts to withholding beneficial treatment (and is not an approach taken with adults), and the "psychotherapeutic model" amounts to gender identity conversion efforts, an approach that has been debunked as unsound and harmful. Second, it is not possible to perform a double-blind study of surgeries that modify body parts, nor is there a placebo that can mimic such a surgery – unlike studies that use placebo drug regimens, for example, people will know if they have had an operation or not. Third, for relatively uncommon conditions like gender dysphoria, sample sizes of individuals with the condition who are available to participate in a clinical study tend to be small. This is especially true where treatment for a condition has not been covered by insurance programs and plans, and where additional barriers (such as ongoing stigmatization) prevent patients from accessing care. That very lack of access to the procedure results in there being fewer people who have received treatment and who can participate in a prospective study of that treatment's effect.

22.     Dr. Laidlaw and Dr. Levine cite a study by Dhejne *et al.* to imply that because individuals who received gender confirming surgeries had higher morbidity and mortality rates compared to the general population, the surgeries are not effective. Laidlaw Decl. ¶ 35; Levine Decl. ¶ 74. They appear to misunderstand that study. First, the study itself clearly states that it is not intended to evaluate whether gender affirming surgeries are effective treatments. Dhejne *et al*. at e16885.[11] Second, the study includes patients who had surgery

---

[11] *See Science AMA Series: I'm Cecilia Dhejne a fellow of the European Committee of Sexual Medicine, from the Karolinska University Hospital in Sweden. I'm here to talk about transgender health, suicide rates, and my often misinterpreted study. Ask me anything!,* Reddit.com, July 27, 2017 05:14 ("Despite the paper clearly stating that the study was not designed to evaluate whether or not gender-affirming is beneficial, it has been interpreted

prior to the development of the current standards of care. Third, the fact that gender confirming surgeries do not entirely resolve all possible causes of morbidity and mortality among transgender individuals is completely unsurprising. While surgery can treat gender dysphoria by aligning transgender people's bodies with their gender identity, surgery alone cannot fully eliminate the stigma and discrimination that transgender people face.

23.     Moreover, it is rare for any surgery to eliminate morbidity and mortality. For example, people who have surgery to remove a cancerous tumor may still experience higher rates of morbidity and mortality than the general population, but that does not mean that they should not undergo the surgery. And, those who receive such surgery generally have reduced morbidity and mortality compared to those with the same condition who do not, even if morbidity and mortality for both groups is higher than average. For instance, one study cited by Dr. Levine concluded that gender-affirming surgeries "may reduce psychological morbidity for some individuals while increasing it for others."[12] The fact that surgery does not always reduce morbidity for everyone who receives it does not mean that the surgery is not safe or effective, particularly given the number of potential confounding factors that can impact morbidity. Similarly, the continued existence of elevated morbidity and mortality rates, compared to the population at large, say nothing about whether a treatment is a safe and effective way to treat a particular condition.

24.     Dr. Laidlaw also points to a 2016 decision of the Department of Health & Human Services' Centers for Medicare and Medicaid Services to support his claim that gender confirming surgeries are not effective. Laidlaw Decl. ¶ 36.  But, Laidlaw takes that decision out of context and misrepresents it conclusions.  In 2014, an impartial adjudicative board in the Department of Health & Human Services concluded, based on decades of studies, that surgical care to treat gender dysphoria is safe, effective, and medically

---

as such."),   https://www.reddit.com/r/science/comments/6q3e8v/science_ama_series_im_cecilia_dhejne_a_fellow_of/.

[12] R. K. Simonsen et al. (2016), *Long-Term Follow Up of Individuals Undergoing Sex Reassignment Surgery: Psychiatric Morbidity & Mortality,* Nordic J. of Psychiatry 70(4).

necessary.[13]  Dep't of Health & Human Servs., Departmental Appeals Bd., Appellate Div., Decision No. 2676 (May 30, 2014), hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2014/dab2576.pdf.  As a result, CMS started covering surgical care for gender dysphoria and continues to provide that coverage, including for patients in my practice.  The decision Laidlaw cites was focused on whether to issue national standards for determining the medical necessity of surgical treatment for gender dysphoria in Medicare recipients.  CMS declined to create those standards based on concerns that are specific to the Medicare population, typically people over 65 years old, because "older adults may respond to health care treatments differently than younger adults." Ctrs. for Medicare & Medicaid Servs., Decision Memo for Gender Dysphoria and Gender Reassignment Surgery, 57 (Aug. 30, 2016).  "These differences can be due to, for example, multiple health conditions or co-morbidities, longer duration needed for healing, metabolic variances, and impact of reduced mobility." *Id*.  Thus, the CMS memorandum concluded that the appropriateness of surgical care for this population should be determined on an individualized basis.

25.    Notably, I have performed gender confirming surgeries on a number of Medicare beneficiaries in recent years. Indeed, most medical and surgical care provided to patients should be individualized, taking into account each patient's unique clinical circumstances. In contrast, the exclusion challenged in this case does not evaluate the medical necessity of surgical care for gender dysphoria on an individualized basis. It categorically excludes all coverage regardless of an individualized showing of medical necessity.

///

///

///

---

[13] That decision also discussed the quality of data demonstrating the efficacy of surgical care to treat gender dysphoria, noting regardless of whether the studies were randomized double-blind trials, there was sufficient evidence to prove "a consensus among researchers and mainstream medical organizations that transsexual surgery is an effective, safe and medically necessary treatment for [gender dysphoria]." Dep't of Health & Human Servs., Departmental Appeals Bd., Appellate Div., Decision No. 2676, at 20 (May 30, 2014), hhs.gov/sites/default/files/static/dab/decisions/board-decisions/2014/dab2576.pdf.

1

*D.H. and John Doe Meet the Requirements for Male Chest Reconstruction*

2       26.    Based on review of the declarations and materials provided by their treating
3  providers and my clinical assessment of D.H. and John Doe, it is my professional opinion
4  that male chest reconstruction surgery is a safe, effective, and medically necessary treatment
5  for each of them. While I would need to perform an in-person exam prior to surgery, it
6  would be highly unusual for that exam to reveal any contraindication in an adolescent
7  patient.

8       27.    Dr. Laidlaw baldly concludes that D.H. and John were not sufficiently
9  evaluated and treated prior to being recommended for surgery. There is nothing in the
10  declarations of Dr. Cronyn, Tamar Reed, and Dr. Peck, nor in the medical records from the
11  office of Dr. Veenod Chulani, to support that assertion. Those documents indicate that D.H.
12  and John have been evaluated and treated by medical doctors and mental health
13  professionals who have significant experience working with transgender adolescents.

14       28.    In addition, as I indicated in my previous declaration, I see no evidence that
15  D.H. or John has a co-occurring mental health condition that would contraindicate surgery.
16  *See* Schechter Decl. ¶¶ 43-44. Nor do I have any reason to suspect that these conditions
17  render them unable to assent to male chest reconstruction surgery. *See id.*

18       I declare under penalty of perjury under the laws of the United States that the
19  foregoing is true and correct.

20       Executed this 27 th day of October, 2020 at Chicago, Illinois.

21

22

23                           Loren S. Schechter, M.D.

24

25

26

27

28