1   Daniel C. Barr (#010149)
    Janet M. Howe (#034615)
2   **PERKINS COIE LLP**
    2901 North Central Avenue, Suite 2000
3   Phoenix, Arizona  85012-2788
    Telephone:  602.351.8000
4   Facsimile:  602.648.7000
    Email:        DBarr@perkinscoie.com
5                 JHowe@perkinscoie.com

6   Brent P. Ray (*admitted pro hac vice*)
    Andrew J. Chinsky (*admitted pro hac vice*)
7   **KING & SPALDING LLP**
    353 N. Clark Street, 12th Floor
8   Chicago, Illinois 60654
    T: +1 312 995 6333
9   F: +1 312 995 6330
    Email:        bray@kslaw.com
10                achinsky@kslaw.com

11  *Attorneys for Plaintiffs and the Class*

12

13                  UNITED STATES DISTRICT COURT

14                       DISTRICT OF ARIZONA

15

16  D.H., by and through his mother, Janice        No. CV-20-00335-TUC-SHR
    Hennessy-Waller, and John Doe, by his
17  guardian and next friend, Susan Doe, on behalf
    of themselves and all others similarly situated,
                                                    **SUPPLEMENTAL**
18                                                  **DECLARATION OF ANDREW**
                      Plaintiffs,                   **CRONYN, MD, IN SUPPORT OF**
19                                                  **D.H. AND JOHN DOE'S MOTION**
            v.                                      **FOR PRELIMINARY**
20                                                  **INJUNCTION**
    Jami Snyder, Director of the Arizona Health
21  Care Cost Containment System, in her official
    capacity,
22
                      Defendant.
23

24

25

26

27

28

I, Dr. Andrew Cronyn, hereby declare as follows:

1.     I provide this supplemental declaration in further support of Plaintiff D.H.'s request that AHCCCS cover D.H.'s male chest reconstruction surgery as a medically necessary procedure to treat his gender dysphoria.

2.     I submit this declaration based on my experience treating D.H., specifically my evaluation of D.H. on November 9, 2020.

3.     In early October 2020, D.H. started working at a local car wash. His job requires him to interact with customers as well as assist in washing and drying cars.

4.     D.H. reported that soon after starting this job he was regularly referred to as female by co-workers and customers based on the appearance of his chest.  His co-workers would stare at his chest while making these comments.  He also reported receiving similar comments from customers. D.H. recounted that one customer loudly called out, "hey, tranny," a derogatory word used to refer to transgender people, when D.H. didn't respond to being called "ma'am."

5.     This exacerbated D.H.'s gender dysphoria to the point that he began "double binding," a practice of wearing a smaller binder over a slightly larger binder.  I had heard of this practice before, but had not previously seen it in my teen patients.  This practice is used to further flatten the chest, which serves the dual purposes of alleviating gender dysphoria (because wearing a single binder is perceived as insufficient) and increasing the likelihood that a transgender male will be treated as male.  Given the size of D.H.'s chest and the physical nature of his work, this is a dangerous practice because it greatly reduces his ability to breathe properly, especially during exercise or exertion.  Research shows that use of chest binders is associated with abnormal lung function testing with lower lung volumes which can cause other problems including shortness of breath, light-headedness, and fainting.  In fact, D.H. reported already being sent home early from work more than once due to difficulty breathing.  The constriction caused by "double binding," especially when done for long periods of time, has the potential to bruise ribs. Double binding is highly discouraged due to the potential of ill effects, but some transgender men will use this

-1-                     **SUPPLEMENTAL DECLARATION OF ANDREW CRONYN, MD**

1    technique to help with their gender dysphoria in times of increased stress.

2         6.      On November 2, 2020, D.H. reported being misgendered by several

3    customers in a short time span, causing him to start panicking and struggling to control his

4    breathing.

5         7.      Although he was able to keep working and maintain his composure until his

6    lunch break, he immediately decompensated on his way to buy lunch at a local restaurant.

7    D.H. started having difficulty breathing, which caused him to hyperventilate and feel weak.

8    He also had difficulty speaking and found himself stuttering (a problem he had not had

9    previously).  D.H. called emergency services and was evaluated by EMTs.  The EMTs did

10   not find any evidence of a life-threatening physical condition, like a heart arrythmia,

11   diabetes or an infection, that would have caused the symptoms D.H. reported. They

12   recommended that D.H. go to the emergency room for further evaluation and observation

13   but felt he would be safe in a private car rather than an ambulance.  He was transported to

14   a nearby hospital by his mother.

15        8.      At the emergency room, D. H. was given one liter of intravenous fluids for

16   concern of dehydration.  An EKG showed a normal heart rhythm, and lab work (blood

17   sugar, thyroid studies, complete blood count) were all normal as was a chest x-ray.  He also

18   had a CT scan of his head/brain that showed no acute findings.  The doctor who evaluated

19   D.H. at the hospital discharged him with a recommendation to follow up with his primary

20   care provider and obtain an EEG to rule out the possibility that he had a seizure.

21        9.      I saw D.H. on November 9, 2020 to provide follow-up care.  I conducted a

22   full evaluation of D.H.'s physical and mental health.  Based on the events that preceded

23   D.H.'s symptoms, it is my opinion that D.H. had a severe panic attack.  But, out of an

24   abundance of caution and based on the recommendation of the doctor who evaluated D.H.

25   in the emergency room, I also ordered an EEG for D.H., the results of which should be

26   available in a few weeks.  Lastly, I ensured that D.H. was continuing to have regular

27   appointments with Tamar Reed, his mental health provider.

28        10.     The fact that D.H. was "double binding," coupled with his asthma, further

-2-                    **SUPPLEMENTAL DECLARATION OF**
                       **ANDREW CRONYN, MD**

1   contributed to the severity of the panic attack and the symptoms that D.H. experienced.

2   Typically during a panic attack, a person will start to breathe deeper and faster. Because

3   the binders restricted D.H.'s chest, he could not breathe deeper, only faster. As he began to

4   hyperventilate, the sensation of shortness of breath would worsen and it would continue in

5   a worsening feedback loop. As a result, I advised D.H. to stop double binding, but I am not

6   confident that D.H. will be able to comply with that advice because of his increasing gender

7   dysphoria.

8        11.     D.H.'s self-treatment using "double binding" and the severe panic attack he

9   experienced both indicate that D.H.'s mental health is becoming more fragile and his

10  healthier coping mechanisms are beginning to fail. For example, now that a single binder

11  is no longer sufficient to temporarily calm D.H.'s gender dysphoria so that he can function

12  throughout the day, I am concerned that he could turn to more destructive coping

13  mechanisms to deal with his psychological distress, including self-harming behaviors.

14  Given D.H.'s prior serious suicidal ideation, his mental health could deteriorate quickly and

15  unpredictably.

16       12.     This change in D.H.'s overall health and well-being make his need for male

17  chest reconstruction even more urgent.

18

19  I declare under penalty of perjury pursuant to the laws of the State of Arizona that

    the foregoing is true and correct.

20       Executed this $\underset{\underline{\quad}}{18}$ th day of November, 2020 at Tucson, Arizona.

21

22  

23

    Andrew Cronyn, M.D.

24

25

26

27

28

                                                          SUPPLEMENTAL DECLARATION OF
                             -3-                          ANDREW CRONYN, MD