# EXHIBIT 1



Neutral Citation Number: [2020] EWHC 3274 (Admin)

Case No: CO/60/2020

**IN THE HIGH COURT OF JUSTICE**
**ADMINISTRATIVE COURT**
**DIVISIONAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 01/12/2020

**Before** :

**THE PRESIDENT OF THE QUEEN'S BENCH DIVISION**
**LORD JUSTICE LEWIS**
**MRS JUSTICE LIEVEN**
- - - - - - - - - - - - - - - - - - - - -
**Between :**

**(1) QUINCY BELL**
**(2) MRS A**

**Claimants**

**and**

**THE TAVISTOCK AND PORTMAN NHS FOUNDATION TRUST**

**Defendant**

**NATIONAL HEALTH SERVICE COMMISSIONING BOARD (NHS**
**ENGLAND)**

**Interested Party**

**(1) UNIVERSITY COLLEGE LONDON HOSPITALS NHS**
**FOUNDATION TRUST**
**(2) LEEDS TEACHING HOSPITALS NHS TRUST**
**(3) TRANSGENDER TREND LTD**

**Interveners**

**Mr Jeremy Hyam QC and Mr Alasdair Henderson** (instructed by **Sinclairslaw**) for the
**Claimants**
**Ms Fenella Morris QC and Ms Nicola Kohn** (instructed by **DAC Beachcroft**) for the
**Defendant**
**The Interested Party** did not appear and was not represented
**Mr John McKendrick QC** (instructed by **Hempsons**) for the **First and Second Interveners**
**Mr Paul Skinner and Mr Aidan Wills** (instructed by **Ai Law**) for the **Third Intervener**
Hearing dates: **7 and 8 October 2020**

----------------------

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

.............................

THE PRESIDENT OF THE QUEEN'S BENCH DIVISION
LORD JUSTICE LEWIS
MRS JUSTICE LIEVEN

**Dame Victoria Sharp P., Lord Justice Lewis, Lieven J**.

*SECTION A: INTRODUCTION AND BACKGROUND*

1.      This is the judgment of the court.

2.      This is a claim for judicial review of the practice of the defendant, the Tavistock and
        Portman NHS Foundation Trust, through its Gender Identity Development Service
        (GIDS) and the first and second Interveners (the Trusts) of prescribing puberty-
        suppressing drugs to persons under the age of 18 who experience gender dysphoria.

3.      Gender dysphoria or GD is a condition where persons experience distress because of a
        mismatch between their perceived identity and their natal sex, that is, their sex at birth.
        Such persons have a strong desire to live according to their perceived identity rather
        than their natal sex.

4.      Those with gender dysphoria may be referred to GIDS. GIDS may, in turn, refer them
        to one of two NHS Trusts (the first and second Interveners) whose clinicians may be
        prepared to undertake medical interventions in relation to those with gender dysphoria.
        We are concerned in this case with the administration of gonadotropin-releasing
        hormone agonists (GnRHa) which are hormone or puberty blocking drugs (also called
        PBs) to suppress the physical developments that would otherwise occur during puberty.

5.      Puberty blocking drugs can in theory be, and have in practice been, prescribed for
        gender dysphoria through the services provided by the defendant to children as young
        as 10. It is the practice of the defendant, through GIDS, to require the informed consent
        of those children and young persons to whom such drugs are prescribed.

6.      The issue at the heart of this claim is whether informed consent in the legal sense can
        be given by such children and young persons.

7.      The claimants' case is that children and young persons under 18 are not competent to
        give consent to the administration of puberty blocking drugs. Further, they contend that
        the information given to those under 18 by the defendant is misleading and insufficient
        to ensure such children or young persons are able to give informed consent. They
        further contend that the absence of procedural safeguards, and the inadequacy of the
        information provided, results in an infringement of the rights of such children and
        young persons under Article 8 of the European Convention for the Protection of Human
        Rights and Fundamental Freedoms (the Convention).

8.      In our view, it is appropriate to consider first, whether a child under 16, or a young
        person between 16 and 18, can give the requisite consent; and secondly, if, in principle,
        they can do so, whether the information provided by the defendant and the Trusts is
        adequate for achieving informed consent.

9.      The court in this case is concerned with the legal requirements of the process of
        obtaining consent for the carrying out of medical treatment. In considering this issue
        the court has had to consider evidence on the use of PBs, their impact on the patients,
        both in the short and long term, and the evidence of the efficacy of their use. The court
        is not deciding on the benefits or disbenefits of treating children with GD with PBs,
        whether in the long or short term. The court has been given a great deal of evidence

about the nature of GD and the treatments that may or may not be appropriate. That is not a matter for us. The sole legal issue in the case is the circumstances in which a child or young person may be competent to give valid consent to treatment in law and the process by which consent to the treatment is obtained.

10.    We have had placed before us written evidence from a wide variety of those engaged in issues surrounding GD and a number of individuals who have been treated or are still being treated with PBs.

11.    On behalf of the defendant and the Trusts there are statements from Dr Polly Carmichael, Director of GIDS, Professor Gary Butler, Consultant in Paediatric Endocrinology at University College Hospital London, and Dr Nurus-Sabah Alvi, Consultant in Paediatric Endocrinology at Leeds General Infirmary and Clinical Lead for Endocrine Liaison Clinics of the GIDS, Leeds. These witnesses describe the process that the children and young people go through at GIDS and at the Trusts. The court has also had a wide range of evidence from a variety of people concerned with the treatment of those under 18 with PBs. We will refer to that evidence and its sources as appropriate below. Our references to a child or children will be to those under the age of 16, and to young person(s) to anyone under the age of 18, save where it is clear from the context that we are referring to anyone under the age of 18.

*Gender Dysphoria*

12.    Gender dysphoria is defined in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) which provides for one overarching diagnosis of gender dysphoria with separate specific criteria for children and for adolescents and adults:

> "In adolescents and adults gender dysphoria diagnosis involves a difference between one's experienced gender and assigned gender, and significant distress or problems functioning. It lasts at least six months and is shown by at least two of the following:

> 1. A marked incongruence between one's experienced / expressed gender and primary and / or secondary sex characteristics

> 2. A strong desire to be rid of one's primary and / or secondary sex characteristics

> 3. A strong desire for the primary and / or secondary sex characteristics of the other gender

> 4. A strong desire to be of the other gender

> 5. A strong desire to be treated as the other gender

> 6. A strong conviction that one has the typical feelings and reactions of the other gender.

> In children, gender dysphoria diagnosis involves at least six of the following and an associated significant distress or impairment in function, lasting at least six months:

1. A strong desire to be of the other gender or an insistence that one is the other gender

2. A strong preference for wearing clothes typical of the other gender

3. A strong preference for cross-gender roles in make-believe play or fantasy play

4. A strong preference for toys, games or activities stereotypically used or engaged in by the other gender

5. A strong preference for playmates of the other gender

6. A strong rejection of toys, games and activities typical of one's assigned gender

7. A strong dislike of one's sexual anatomy

8. A strong desire for the physical sex characteristics that match one's experienced gender."

*Gender Identity Development Service (GIDS)*

13. The defendant is an NHS Foundation Trust employing specialist staff including child psychologists, psychotherapists, psychiatrists, social workers, family therapists and nurses. Since 1989 it has provided a gender identity development service, a specialised service providing care to patients up to the age of 18 suffering from GD. GIDS is commissioned by the National Health Service Commissioning Board. The statutory mechanism is that under section 3B of the NHS Act 2006, the Secretary of State has the power to require NHS England to arrange services or facilities as may be prescribed by regulations. The Secretary of State has exercised that power (pursuant to Regulation 11 of the National Health Service Commissioning Board and Clinical Commissioning Groups (Responsibilities and Standing Rules) Regulations 2012/2296, which concerns specified services for rare and very rare conditions) that NHS England must arrange for the provision of services including, pursuant to para 56 of Schedule 4, a gender identity development service specifically for children and adolescents in addition to gender dysphoria services more generally (para 57).

14. Schedule 2, Part A of the NHS Standard Contract, pursuant to which GIDS is provided, sets out the Service Specification which establishes the context of the service, its aims and objectives and the manner in which it will be delivered. As set out in the Service Specification, the service is commissioned to provide specialist assessment, consultation and care including psychological support and physical treatments. The purpose of the treatment is *"to help reduce the distressing feelings of a mismatch between their natal (assigned) sex and their gender identity."* The service also provides support to family and carers of children and young persons so affected.

15. GIDS recognises three stages of physical intervention that may be appropriate in cases of GD. Stage 1 is the administration of GnRHa (one form of puberty blocker). This is clinically appropriate for children and young people who have reached Tanner Stage 2

of puberty and above. Tanner Stage 2 marks the beginning of the physical development of puberty. In natal girls this is the start of development of the breasts, and in boys the testicles and scrotum begin to get larger. Stage 2 of the treatment is the administration of cross-sex hormones (CSH) which can only be prescribed from around the age of 16. Stage 3 is gender reassignment surgery which is only available via adult services to people aged over 18.

16.     GIDS takes referrals from across England and Wales and from a wide range of professionals in the health, social services and education sectors, and the voluntary sectors. When a referral is made, the case will be discussed with the relevant regional team. If the intake is successful, then the child will then progress to the GIDS waiting list.

17.     As at November 2019 the waiting time for a first assessment at GIDS was between 22-26 months. When a young person reaches the top of the waiting list, they will be invited to the first of a number of assessment appointments at GIDS. The assessment process laid out in the Service Specification anticipates that the assessment process will typically span three to six sessions over 6 months or longer. Most young people will have more sessions than this, and the younger the age the more sessions are likely.

18.     Dr Carmichael said that during assessments young persons will be asked, for example, about: the onset of their gender dysphoria; the consistency of their feelings about their gender; how they identify (cross-gender, non-binary, etc); their relationships with peers and family members; their social functioning in general, thoughts about or experience of puberty; their relationship to their bodies; their attractions or romantic relationships as appropriate based on their age and maturity; and their hopes and expectations for the future.

19.     As this case is brought by way of judicial review of the GIDS policy and practice, rather than a challenge to an individual treatment decision, it is not possible to give a detailed analysis of the facts of an individual case and the degree to which all the matters referred to by Dr Carmichael were explored in the particular case. We refer at paras 78 to 89 below to the evidence of the experience of the first claimant and some of the other patients of the GIDS service.

20.     Dr Carmichael sets out the broad range of professionals who work within GIDS, their specialism in working with young people with GD and the care that is taken when discussing the young person's expression of their gender identity.

21.     At the end of the assessment period the clinicians will agree a care plan with the young person and their family. Where the young person fulfils the criteria in the Service Specification and has reached at least Tanner Stage 2 of puberty, they will be referred by GIDS to the first and second Interveners for consultation and/or physical assessment with endocrinologists with a view to being prescribed PBs. Dr Carmichael explains that before any referral to the Trusts, GIDS clinicians discuss the treatment with the young person, including explaining side effects.

*The Age and Patient Group for Puberty Blockers*

22.     Until 2011 PBs were only available at GIDS for those aged 16 or older. In 2011 PBs started to be prescribed for those aged 12-15 and in mid-puberty. This was first done between 2011-14 at University College London Hospital (UCLH) under an approved research study known as the Early Intervention Study. The Study took an uncontrolled treatment cohort of 12-15 year olds with established and persistent GD in England. The Study recruited children for 3 years, but there was then a period until February 2019 when the last cohort member began the next stage of therapy (cross-sex hormones).

23.     One of the issues raised in these proceedings is the non-existent or poor evidence base, as it is said to be, for the efficacy of such treatment for children and young persons with GD.

24.     In that context, we note that though this research study was commenced some 9 years ago, at the time of the hearing before us the results of this research had yet to be published. Dr Carmichael says in her witness statement dated 2 February 2020 that a paper is now being finalised for publication. At the hearing we were told that that this paper had been submitted for peer-review but that Professor Viner, one of the authors of it, had yet to respond to issues raised by the reviewers, as he has been otherwise engaged in working on issues relating to the coronavirus pandemic.

25.     The court was however provided with a paper entitled *"The Early Intervention Study. An evaluation of early pubertal suppression in a carefully selected group of adolescents with "Gender Identity Disorder". A statement and update on the Early Intervention Study (dated 2020)".* We refer further to this paper at para 73 below.

26.     There are now two types of endocrine clinic: a clinic for under 15s, referred to as the early intervention clinic, and a clinic for over 15s. The Service Specification states that the early intervention clinic will continue to follow the 2011 Protocol, save that PBs will now be considered for any children *under the age of 12* if they are in established puberty.

27.     The age distribution of those treated with PBs in each year between 2011 and 2020 was not provided to the court. Although the defendant and the Trusts said that such data was available, in the sense that the ages of the children are known, the data has not been collated for each year. However, Ms Ailsa Swarbrick, the Divisional Director of Gender Services at the Trust, has presented evidence in relation to patients referred to endocrinology services in 2019-20 and those treated in earlier years but who were discharged from GIDS in 2019-2020. This work was done in response to recommendations in the GIDS Review Action Plan 2019 (a Review commissioned by the Trust following a report by Dr David Bell) that data would help to inform clinical and service developments and a process of continuous improvement.

28.     We note here that we find it surprising that such data was not collated in previous years given the young age of the patient group, the experimental nature of the treatment and the profound impact that it has.

29.   As it is, for the year 2019/2020, 161 children were referred by GIDS for puberty blockers (a further 10 were referred for other reasons). Of those 161, the age profile is as follows:

> 3 were 10 or 11 years old at the time of referral;
>
> 13 were 12 years old;
>
> 10 were 13 years old;
>
> 24 were 14 years old;
>
> 45 were 15 years old;
>
> 51 were 16 years old;
>
> 15 were 17 or 18 years old.

For the year 2019/20, therefore, 26 of the 161 children referred were 13 or younger; and 95 of the 161 (well over 50%) were under the age of 16.

30.   It follows from the information that the court does have on age distribution that some young people could be on PBs for a number of years, in the most extreme case for 5 years between the age of 10 and when they start CSH at 16.

31.   Apart from the age distribution, there are other aspects of the patient group which are relevant to this case. The number of referrals to GIDS has increased very significantly in recent years. In 2009, 97 children and young people were referred. In 2018 that number was 2519.

32.   Further, in 2011 the gender split was roughly 50/50 between natal girls and boys. However, in 2019 the split had changed so that 76 per cent of referrals were natal females. That change in the proportion of natal girls to boys is reflected in the statistics from the Netherlands (Brik et al "*Trajectories of Adolescents Treated with Gonadotropin-Releasing Hormone Analogues for Gender Dysphoria*" 2018). The defendant did not put forward any clinical explanation as to why there had been this significant change in the patient group over a relatively short time.

33.   It is recorded in the GIDS Service Specification and the wider literature that a significant proportion of those presenting with GD have a diagnosis of Autistic Spectrum Disorder (ASD). The Service Specification says:

> "There seems to be a higher prevalence of autistic spectrum disorder (ASD) conditions in clinically referred, gender dysphoric adolescents than in the general adolescent population. Holt, Skagerberg & Dunsford (2014) found that 13.3% of referrals to the service in 2012 mentioned comorbid ASD (although this is likely to be an underestimate). This compares with 9.4% in the Dutch service; whereas in the Finnish service, 26% of adolescents were diagnosed to be on the autism spectrum (Kaltiala-Heino et al. 2015)."

34.     The court asked for statistics on the number or proportion of young people referred by GIDS for PBs who had a diagnosis of ASD. Ms Morris said that such data was not available, although it would have been recorded on individual patient records. We therefore do not know the proportion of those who were found by GIDS to be *Gillick* competent who had ASD, or indeed a mental health diagnosis.

35.     Again, we have found this lack of data analysis – and the apparent lack of investigation of this issue - surprising.

*The process of taking consent*

36.     The position taken by GIDS is that they will only refer a young person for PBs if they determine that person is competent to give consent, i.e. is *Gillick* competent within the meaning of competence identified in the decision of the House of Lords in *Gillick v West Norfolk and Wisbech Health Authority* [1986] AC 112.

37.     Dr Carmichael explained that GIDS takes consent from the young person to their case being referred to the Trusts for treatment; however the consent for the actual prescription of the PBs is taken separately by the clinicians working for the Trusts. She set out the careful process by which GIDS gives information to the young persons and to their parents in order to seek to ensure that the young person is in a position to give valid consent. The court was taken through the statements of Dr Carmichael and Professor Butler and various documents to show the level of information and dialogue that was involved in achieving lawful consent to the treatment. The Service Specification includes Section 3.2 on "Informed Consent". This states *"The consequences of treatment decisions can be significant and life-changing"* and states:

> "All efforts will be made to ensure that clients are aware of the longer term consequences of the endocrine treatments, including implications for fertility, and the decision of the competence of the client will be jointly made by the endocrine and psychological members of the Service's integrated team.

> The current context of treatment decisions about cross sex hormones in adolescence is that there is limited scientific evidence for the long-term benefits versus the potential harms of the intervention. There are also concerns that it is uncertain whether or not a young person will continue to identify as transgender in the future, given that some subsequently identify in a different way."

38.     The defendant has recently adopted a Standard Operating Procedure for the taking of consent in GIDS. This has taken 2 years to develop and is dated 31 January 2020. Dr Carmichael says at para 33 of her first statement:

> "In advance of any referral by the Trust of a young person for consideration by an endocrinologist for GnRHa treatment, GIDS clinicians discuss treatment with the young person. This includes, checking that the young person's hopes for treatment are realistic, explaining what the treatment can and cannot do, discussing any potential

side-effects, discussing fertility and potential impact on genital development for birth registered males. We have developed visual aids to support this process.

UCLH and LTH have collated extensive written information to help young people and their parents further understand the nature of the drugs, their limitations and the possible side effects. These written documents are given to young people at their first endocrine clinic visit. The written documents act as a reference point for patients with questions whilst they contemplate whether they would like to go ahead with the referral, and subsequently with treatment. In particular, informational slides titled "Have you thought about having children in the future?" explains the impact GnRHa treatment can have on fertility in explicit terms. Young people and their families are encouraged to raise any questions with their GIDS clinicians or at their next endocrine clinic visit."

39.   Ms Morris emphasised that the process of ensuring that consent could validly be given was a discursive and iterative one that involved multiple discussions and answering any questions the young people or their parents might raise. Dr Carmichael said at para 35: "*The GIDS clinicians make it very clear to children and young people that there are both known and unknown risks associated with GnRHa treatment.*" Further, she said at para 41: "*In my experience, those young people we see who are recommended for GnRHa treatment understand the implications and limitations of treatment with GnRHa treatment and are able to consent to this stage of treatment.*"

40.   Professor Butler described the approach to consent at the Trusts as follows:

"For those under 15 years of age all the pre-assessment consultations are individual and occur with a consultant or senior clinical fellow on at least two visits. Parental support (or that of their guardian or social services where appropriate) is a pre-requisite for the under 15 year stream. On occasions, a young person is not deemed, on clinical examination, to be at an appropriate stage of puberty so further follow-up visits are arranged thereafter at 6-12 monthly intervals until a person is deemed at an appropriate physical stage for intervention and taking of consent. This also gives the opportunity to judge the level of emotional cognitive and psychosocial maturity, and capacity.

The decisions at UCLH and Leeds do not automatically follow on from those made at the GIDS Tavistock. They are a reassessment of physical maturity and cognitive capacity in their own right. They may be at odds with the Tavistock formulation (an infrequent event) and thus would be returned to the Tavistock MDT for reconsideration."

41.   Professor Butler said that in his clinic they are careful to ensure that the force behind the decision to seek treatment comes from the young person themselves and is not a consequence of pressure upon them from others around them. The Trusts work closely

with parents to reach a solution that is satisfactory to all and meets the best interests of the child. His clinic has never sought to apply to the Court under its inherent jurisdiction "against" parental opinions because he is concerned that would cause familial frictions. Equally, he suggested UCLH would not wish to have to apply to the court for consent on behalf of the child because it would delay treatment and put an additional burden on GIDS and the Trusts; and because "*it would also increase the distress suffered by the young people themselves, finding that their right to autonomous decision making had been removed from them.*"

42.    Professor Butler said a full written information package is provided to older adolescents. For those under 15 there is an initial individual consultation because of the need for "*individualising the approach for very young people, taking special care to assess their level of knowledge and understanding and they are given the written information package then.*" In relation to impacts on fertility and sexual functioning he says:

> "It is also relevant for the consultation purposes that matters of fertility are discussed and counselling by the team takes place, and the option of meeting a fertility specialist is offered, and often taken up. The options of fertility preservation are discussed with all the young people and it is a requirement of the consent process that they fully understand this at an age appropriate level. This understanding must include that they are unable to have the typical sexual relationship of their identified gender with another person on account of their biological sex organ development, and that other surgical procedures may be necessary later on to achieve this possibility."

43.    He then said: "*it is an absolute requirement before starting any treatment that a young person can fully understand this effect on fertility and sexual functioning according to their age and level of maturation.*"

44.    The court asked for statistical material on the number, if any, of young people who had been assessed to be suitable for PBs but who were *not* prescribed them because the young person was considered not to be *Gillick* competent to make the decision, whether at GIDS or the Trusts. Ms Morris could not produce any statistics on whether this situation had ever arisen. She suggested that in the main, GIDS would work with the young person to give them further information, discuss the matter further and in some cases wait until they had achieved further maturity. The court gained the strong impression from the evidence and from those submissions that it was extremely unusual for either GIDS or the Trusts to refuse to give PBs on the ground that the young person was not competent to give consent. The approach adopted appears to be to continue giving the child more information and to have more discussions until s/he is considered *Gillick* competent or is discharged.

45.    Relevant to the evidence of consent is the evidence of Professor Scott (Director of University College London's Institute of Cognitive Neuroscience). She "*seeks to explain, from a neuroscientific point of view, why I have significant doubts about the ability of young people under the age of 18 years old to adequately weigh and*

> *appreciate the significant consequences that will result from the decision to accept hormonal treatment for gender dysphoria."*

46.     She explained the neurological development of adolescents' brains that leads to teenagers making different, more risky decisions than adults. She said further that this is backed up by behavioural studies showing that when decision making is "hot" (i.e. more emotional), under 18 year olds make less rational decisions than when the responses are made in a colder, less emotional context. Her conclusion was that:

> "11. … given the risk of puberty blocking treatment, and the fact that these will have irreversible effects, that have life-long consequences, it is my view that even if the risks are well explained, that in the light of the scientific literature, that it is very possible for an adolescent to be unable to fully grasp the implications of puberty-blocking treatment. All the evidence we have suggests that the complex, emotionally charged decisions required to engage with this treatment are not yet acquired as a skill at this age, both in terms of brain maturation and in terms of behaviour."

### *Parental consent*

47.     If a child cannot give consent for treatment because they are not *Gillick* competent then the normal position in law would be that someone with parental responsibility could consent on their behalf. Mr Hyam sought at one point to argue that a decision as to giving PBs would fall outside the scope of parental responsibility because of the nature of the treatment concerned. However, the GIDS practice in relation to acting on parental consent alone is quite clear. In the response to the pre-action protocol letter the defendant said:

> "36. There is a fundamental misunderstanding in your letter, which states that parents can consent to pubertal suspension on behalf of a child who is not capable of doing so. This is not the case for this service, as is clear from the above. Although the general law would permit parent(s) to consent on behalf of their child, GIDS has never administered, nor can it conceive of any situation where it would be appropriate to administer blockers on a patient without their consent. The Service Specification confirms that this is the case."

It follows that is not necessary for us to consider whether parents could consent to the treatment if the child cannot lawfully do so because this is not the policy or practice of the defendant and such a case could not currently arise on the facts.

### *The effect of Puberty Blockers*

48.     PBs have been used for many years to stop precocious puberty. This is a condition experienced largely by children aged 7 or under when puberty commences at a very early age. This condition is seen more often in natal girls but sometimes in natal boys. PBs are used to stop this early onset of puberty and the use of them ceases when the child reaches an appropriate age for puberty. As can be seen from the evidence this use of PBs does not interfere with the onset of puberty at a normal biological age and, as such, will not interfere with normal development of puberty through adolescence.

49.     The use of PBs in cases of GD is quite different. We have some evidence of the history
        of this treatment and the meaning of puberty from Professor Hruz (Associate Professor
        of Paediatrics, Endocrinology and Diabetes at Washington University, St Louis, USA)
        on behalf of the claimants.

50.     In summary, PBs were first used for such treatment at a Dutch gender clinic in the late
        1990s. That clinic developed a protocol, often referred to as the Dutch protocol. The
        Dutch protocol was published in the European Journal of Endocrinology in 2006 and
        called for puberty suppression to begin at the age of 12 after a diagnosis of GD. Puberty
        is understood in medicine or biology as a process of physiological change involving the
        process of maturation of the gonads. Hormones in a part of the brain secrete a
        gonadotropin-releasing hormone which, in turn, stimulates the pituitary gland to secrete
        other hormones. These stimulate the growth of the gonads, that is ovaries in females
        and testes in males. Further hormones are secreted which contribute to the further
        development of the primary sex characteristics, the uterus in females and the penis and
        scrotum in males. The hormones contribute to the development of secondary sex
        characteristics including breasts and wider hips in girls and wider shoulders, deeper
        voices and increased muscle mass in boys. Further growth hormones are released,
        which stimulate growth.  With regular injection of the PBs there is no progression of
        puberty and some regression of the first stages of already developed sexual
        characteristics. This means that in girls *"breast tissue will become weak and may
        disappear completely"* and in boys *"testicular volume will regress to a lower volume."*

51.     Under the Dutch protocol, the introduction of CSH starts at age 16. As Professor Hruz
        explained:

                "29. Then, starting at age 16, cross-sex hormones are administered while
                GnRH analogue treatment continues, in order to induce something like the
                process of puberty that would normally occur for members of the opposite
                sex. In female-to-male patients, testosterone administration leads to the
                development of "a low voice, facial and body hair growth, and a more
                masculine body shape" as well as to clitoral engagement and further
                atrophying of breast tissue. In patients seeking a male-to-female transition,
                the administration of estrogens will result in "breast development and a
                female-appearing body shape." Cross-sex hormone administration for
                these patients will be prescribed for the rest of their lives."

52.     There is some dispute as to the purpose of prescribing PBs. According to Dr
        Carmichael, the primary purpose of PBs is to give the young person time to think about
        their gender identity. This is a phrase which is repeated on a number of the GIDS and
        Trust information documents. The Health Research Authority carried out an
        investigation into the Early Intervention Study in 2019. Its report was somewhat critical
        of the description of the purpose and said:

                "The research team described the purpose of pubertal suppression as 'to
                induce a sex hormone-neutral environment to provide young people with
                space to decide whether to progress further with gender reassignment
                treatment as an adult.' This phrase appears to have caused confusion as it
                has been interpreted by some that the puberty suppression was for use in

any children presenting to the clinic, that there would be no change in the course of any gender identity dysphoria during this time, and that the child could then choose to progress to cross-sex hormone treatment or to stop treatment with subsequent onset of puberty in the birth gender. It has been noted that the participants in this study and other research involving early puberty suppression have progressed to cross-sex hormones. This has raised concerns that the treatment might be responsible for generating persistence, rather than 'creating space to decide'.

It would have reduced confusion if the purpose of the treatment had been described as being offered specifically to children demonstrating a strong and persistent gender identity dysphoria at an early stage in puberty, such that the suppression of puberty would allow subsequent cross-sex hormone treatment without the need to surgically reverse or otherwise mask the unwanted physical effects of puberty in the birth gender. The present study was not designed to investigate the implications on persistence or desistence of offering puberty suppression to a wider range of patients, it was limited to a group that had already demonstrated persistence and were actively requesting puberty blockers."

53.    Professor Butler said that PBs:

"may have some help or advantage in the support of transgender adolescents in some aspects of mental health functioning, in particular with reducing the risk of reduction of suicidal ideation and actual suicidal actions themselves."

54.    See further the reference at para 73 below to the paper presented by Dr Carmichael and Professor Viner in 2014, referring to the Early Intervention Study and the limited evidence of psychological benefit.

55.    As is clear from the literature and referred to by the HRA, the other purpose of giving PBs is stopping the development of the physical effects of puberty (something that obviously varies depending on at what age and stage in pubertal development the PBs are commenced) because slowing or preventing the early development of secondary sex characteristics during puberty can make a later transition (both medical and social) to living as the opposite sex easier.

*The relationship between Puberty Blockers and Cross-Sex Hormones (CSH)*

56.    GIDS and the Trust place reliance on the fact that Stage 1 treatment with PBs and Stage 2 treatment (CSH) are separate. Thus, so it is said, it is possible for a young person to come off the PBs at any point and not proceed to taking CSH. On one view, this is correct. However, the evidence that we have on this issue clearly shows that practically all children / young people who start PBs progress on to CSH.

57.     No precise numbers are available from GIDS (as to the percentage of patients who
        proceed from PBs to CSH). There was some evidence based on a random sample of
        those who in 2019-2020 had been discharged or had what is described as a closing
        summary from GIDS. However the court did have the evidence of Dr de Vries. Dr de
        Vries is a founding board member of EPATH (European Professional Association for
        Transgender Health) and a member of the WPATH (World Professional Association
        for Transgender Health) Committee on Children and Adolescents and its Chair between
        2010 and 2016, and leads the Centre of Expertise on Gender Dysphoria at the
        Amsterdam University Medical Centre in the Netherlands (CEGD). This is the
        institution which has led the way in the use of PBs for young people in the Netherlands;
        and is the sole source of published peer reviewed data (in respect of the treatment we
        are considering) produced to the court. She says that of the adolescents who started
        puberty suppression, only 1.9 per cent stopped the treatment and did not proceed to
        CSH.

58.     We were told that the defendant did not have any data recording the proportion of those
        on puberty blockers who progress to cross-sex hormones. We were told that in part this
        resulted from the fact that some would have progressed to adult services and would not
        be recorded by the defendant. Ms Swarbrick had carried out an analysis of a random
        sample of 312 of 1648 files of patients discharged from GIDS from 1st March 2019 to
        4th March 2020. Dr Carmichael summarised this as:

              "…based on a random sample of those referred to GIDS who had been
              discharged or had a closing summary from GIDS in 19-20 (analysis B)
              16% of patients (49 individuals) had accessed the endocrinology service
              during their time with GIDS. Of those 16%, 55% (27 individuals) were
              subsequently approved for or accessed cross-sex hormones during their
              time with GIDS. This number represents 8.7% of all the patients
              discharged from GIDS that year. We also know that of the 49 patients who
              were referred to endocrinology for GnRHa whilst at GIDS, two did not
              commence GnRHa treatment, and a further five were discharged from
              GIDS without being referred on to another gender service."

59.     We find it surprising that GIDS did not obtain full data showing the figures and the
        proportion of those on puberty blockers who remain within GIDS and move on to cross-
        sex hormones. Although neither Dr Carmichael nor Professor Butler could give the
        equivalent figures in the United Kingdom to those from the Netherlands, the language
        used in their witness statements suggests that a similarly high proportion of children
        and young people in the United Kingdom move from PBs onto CSH.

*The impact of Puberty Blockers and their reversibility*

60.     Both WPATH and the Endocrine Society in their documentation describe PBs as fully
        reversible. Professor Butler says that "*we do not know everything about the blocker and
        as far as we know it is a safe reversible treatment with a well-established history.*" Dr
        Alvi also referred to the history of the use of PBs as showing that they are fully
        reversible. However, it is important to note that apart from the Amsterdam study, the
        history of the use of PBs relied upon in this context is *from the treatment of precocious*

*puberty* which is a different condition from GD, and where PBs are used in a very different way.

61.    Dr de Vries was somewhat more nuanced in her evidence. She said:

"Puberty blocking treatment is fully reversible (see for example section 2.0 of the Endocrine Society's Clinical Practice Guidelines…). By fully reversible I mean that the administration of puberty blockers in young people has no irreversible physical consequences, for example for fertility, voice deepening or breast growth".

62.    At para 20 of her evidence she said:

"Ethical dilemmas continue to exist around … the uncertainty of apparent long-term physical consequences of puberty blocking on bone density, fertility, brain development and surgical options."

63.    The GIDS Early Intervention Young Person Information Sheet states:

"What are the possible benefits of starting on hormone blockers?

We have looked at other countries who have given this treatment **and the results** suggest that:

- Hormone blockers which block the body's natural sex hormones may improve the way you feel about yourself.

- If you decide to stop the hormone blockers early **your physical development** will return as usual in your natal gender. **As far as we are aware**, the hormone blockers will not harm your physical or psychological development.

- Hormone blockers will make you feel less worried about growing up in the wrong body and will give you more time and space to think about your gender identity.

What are the possible disadvantages and risks of the hormone blockers?

- Possible side effects from the hormone blockers are hot flushes, headache, nausea and weight gain.

- A short term effect is that your bone strength is shown not to grow as fast as it usually would whilst you are on hormone blockers. However, this will resume once your body is exposed to hormones again. That is why we have to do a bone scan every year to check the thickness of your bones. **We do not fully know how hormone blockers will affect bone strength, the development of your sexual organs, body shape or your final adult height. There**

**could be other long-term effects of hormone blockers in early puberty that we don't yet know about.**

- Hormone blockers could affect your memory, your concentration or the way you feel about your gender and how likely you are to change your mind about your gender identity.

- Hormone blockers could affect your ability to have a baby. It could take 6 to 12 months longer after stopping the hormone blockers before natal boys start making sperm again or natal girls start maturing eggs in their ovaries. However, hormone blockers do not work as a contraceptive. If you are sexually active, please ask your doctor for advice about birth control." (emphasis added)

64.     A number of aspects of this asserted reversibility are raised by the claimants. PBs stop the physical changes in the body when going through puberty. But in reliance on the evidence of Professor Levine (Clinical Professor of Psychiatry at Western Reserve University, Ohio) and Professor Hruz, the claimants assert that neurological and psychological changes occurring in puberty are less well understood than the physiological changes. Further, the degree to which neurological differences are caused by biological factors like hormones and genes are matters of debate. Professor Levine set out evidence on the degree to which young people mature through adolescence through both social and personal experiences. For young people on PBs that maturing process is stopped or delayed with potential social and psychological impacts which could be described as non-reversible.

65.     Thus, the central point made by the claimants is that although most of the physical consequences of taking PBs may be reversible if such treatment is stopped, the child or young person will have missed a period, however long, of normal biological, psychological and social experience through adolescence; and that missed development and experience, during adolescence, can never be truly be recovered or "reversed".

66.     It is to be noted that prior to June 2020, the NHS website on PBs said:

        "The effects of treatment with GnRH analogues are considered to be fully reversible, so treatment can usually be stopped at any time."

67.     In June 2020 this section was updated to read as follows:

        **"Little is known about the long-term side effects of hormone or puberty blockers in children with gender dysphoria.**

        Although the Gender Identity Development Service (GIDS) advises that is a physically reversible treatment if stopped, **it is not known what the psychological effects may be.**

> **It's also not known whether hormone blockers affect the development
> of the teenage brain or children's bones**. Side effects may also include
> hot flushes, fatigue and mood alterations." (emphasis added)

68.     A second key part of the argument about reversibility turns on the relationship between
        PBs and CSH and the degree to which commencing PBs in practice puts a young person
        on a virtually inexorable path to taking CSH. CSH are to a very significant degree not
        reversible. As is set out above at para 57 above, a very high proportion of those who
        start PBs move on to CSH and thus in statistical terms once a child or young person
        starts on PBs they are on a very clear clinical pathway to CSH.

*Evidence base to support the use of Puberty Blockers for Gender Dysphoria*

69.     The claimants submit that the treatment of PBs for GD is properly described as (i)
        experimental (ii) a treatment with a very limited evidence base, and (iii) as a highly
        controversial treatment. The claimants rely on witness statements from a number of
        undoubted experts in various relevant fields and from academic institutions in the
        United Kingdom, the USA, Sweden and Australia who refer to the controversial nature
        of the treatment and its limited evidential support.

70.     It is not however the court's role to judge the weight to be given to various different
        experts in a judicial review.  In our view, more important is the evidence from the
        defendant and the evidence base *it* relies upon for the use of PBs. In the USA the
        treatment of GD is not an FDA approved use and as such PBs can only be used "off-
        label". That does not prevent clinicians, whether in the USA or the United Kingdom,
        from using PBs for this purpose, as long as their use falls within the clinician's
        professional expertise. Professor Butler explained that it is very common for paediatric
        medicines to be used off-label and that this factor does not render the treatment in any
        sense experimental.

71.     However, the lack of a firm evidence base for their use is evident from the very limited
        published material as to the effectiveness of the treatment, however it is measured.

72.     Paul Jenkins, Chief Executive of the defendant said:

> "…it is correct that in recent years, some clinicians [at the Trust] have
> raised their concerns about the use of GnRHa for young people presenting
> with gender dysphoria. Indeed, some have called for the Trust to alter its
> practices and have done so in a variety of ways. We are keenly aware that
> the subject of gender dysphoria raises complex issues and that many have
> strong opinions about it."

73.     The Evaluation Paper on the Early Intervention Study at GIDS, referred to in para 25
        above, gives some (albeit limited) material on the outcome of that study. It summarised
        a meeting paper presented by Dr Carmichael and Professor Viner in 2014 (but not
        published in a peer review journal) as follows:

"The reported qualitative data on early outcomes of 44 young people who received early pubertal suppression. It noted that 100% of young people stated that they wished to continue on GnRHa, that 23 (52%) reported an improvement in mood since starting the blocker but that 27% reported a decrease in mood. **Noted that there was no overall improvement in mood or psychological wellbeing using standardized psychological measures.**" (emphasis added)

74.     Ms Morris submitted it is not for this court to determine clinical disagreements between experts about the efficacy of a treatment. We agree. That is a matter for the relevant NHS and regulatory bodies to oversee and to decide. However the degree to which the treatment is experimental and has, as yet, an unknown impact, does go to the critical issue of whether a young person can have sufficient understanding of the risks and benefits to be able lawfully to consent to that treatment.

*Persistence*

75.     The claimants submit that there is good evidence that for a significant proportion of young people presenting with GD, the condition resolves itself through adolescence without treatment with PBs. Further, that PBs serve to increase the likelihood of GD, and, as such, can be positively harmful to the child or young person's long-term health. According to DSM5: "*in natal males, persistence of [gender dysphoria] has ranged from 2.2% to 30%. In natal females, persistence has ranged from 12% to 50%.*" These figures need to be treated with some caution because it may be that the cohort whose persistence was being considered in these statistics was at a lower age and with less clearly established GD than the young people being treated at GIDS.

76.     The Dutch study argued that adolescents who show established GD rarely identify as their biological sex. Professor Hruz suggested there may be two reasons for this. It may be that the clinicians made sound diagnoses of persistent GD. Alternatively, it may be that the very fact of the diagnosis and the course of treatment which affirmed that diagnosis (that is, both gender affirmative psychotherapy and the use of PBs) solidified the feeling of cross-gender identification and led the young people to commit to sex reassignment more strongly than they would have done if there had been a different diagnosis and treatment.

77.     As already indicated, it is not our role to adjudicate on the reasons for persistence or otherwise of GD. However, the nature of this issue highlights the highly complex and unusual nature of this treatment and the great difficulty there is in fully understanding its implications for the individual young person. In short, the treatment may be supporting the persistence of GD in circumstances in which it is at least possible that without that treatment, the GD would resolve itself.

*SECTION B: EVIDENCE OF THE CLAIMANTS AND OTHER INDIVIDUALS*

78.     The first claimant was born a female. In her witness statement in these proceedings she set out her experience of being prescribed PBs and then CSH. It should be noted that some of the details relating to her treatment and the information she was given (at GIDS and the first defendant) is disputed. This case is a judicial review of the GIDS policy,

not a tort action relating to the specific facts surrounding the first claimant's treatment and it is not necessary therefore to resolve any factual dispute. We simply record the first claimant's account. She describes a highly traumatic childhood. From the age of 4 or 5 she displayed gender non-conformity, associating more with male games and clothes. She felt highly alienated at secondary school and took birth control pills to stop her periods. She felt disgusted by her body and became depressed and highly anxious. From the age of 14 she began actively to question her gender identity and started to look at YouTube videos and do research on the internet about gender identity disorder and the transition process. She said: "*I thought I had finally found the answer as to why I felt so masculine, uncomfortable with my female body and why I was so much more similar to a stereotypical boy than to a stereotypical girl in physical expression and interests.*"

79.    When she was 15, the first claimant was referred to GIDS. When she was at the local Children and Adolescent Mental Health Services clinic she remembered: "*the psychiatrist attempted to talk of the gender spectrum as a way of persuading me to not pursue medical transition. I took this as a challenge to how serious I was about my feelings and what I wanted to do and it made me want to transition more. Now I wish I had listened to her.*" She was first seen at GIDS aged 16 and had a number of appointments spread out over 1 year and 9 months. She was referred to UCLH in June 2013 and after three appointments commenced PBs. She was given advice about the impact on her fertility, but her priority was to move on to testosterone. She said that at 16, she was not thinking about children and, in any event, egg storage was not available on the NHS.

80.    In April 2014 she was referred to an adult Gender Identity Clinic to discuss surgery. She "*was visualising myself becoming a tall, physically strong young man where there was virtually no difference between me and a biological boy.*" After commencing testosterone at 17, changes to her body commenced rapidly: these changes included genital changes, her voice dropping and the growth of facial and body hair. She was on testosterone for 3 years but increasingly began to doubt the process of transition:

> "27. I started to have my first serious doubts about transition. These doubts were brought on by for the first time really noticing how physically different I am to men as a biological female, despite having testosterone running through my body. There were also a lot of experiences I could not relate to when having conversations with men due to being biologically female and socialised in society as a girl. There was an unspoken "code" a lot of the time that I felt I was missing. I remember telling a close male friend at the time about these transition doubts, who responded by telling me that I was being silly and I believed him. This was reinforced by the online forums that I browsed where the consensus was that most transsexual people have doubts and that that is a normal part of transitioning, so the doubts should be ignored. I continued on, pushing the doubts in the far back of my mind and no more doubts creeped in for a while."

81.    Despite these doubts, when she was 20, she had a double mastectomy. In the year following this:

> "31. ... I started to realise that the vision I had as a teenager of becoming
> male was strictly a fantasy and that it was not possible. My biological
> make-up was still female and it showed, no matter how much testosterone
> was in my system or how much I would go to the gym. I was being
> perceived as a man by society, but it was not enough. I started to just see
> a woman with a beard, which is what I was. I felt like a fraud and I began
> to feel more lost, isolated and confused than I did when I was pre-
> transition."

82.     She described facing the reality of taking a regular dose of drugs for the rest of her life
        to maintain her male appearance; and the need to have a hysterectomy if she remained
        a man because of the atrophy of her reproductive organs if she continued to take
        testosterone.

83.     From January 2019 the first claimant stopped taking testosterone. She now wishes to
        identify as a woman and is seeking to change her legal sex back to that on her original
        birth certificate. She said:

> "39. ... It is only until recently that I have started to think about having
> children and if that is ever a possibility, I have to live with the fact that I
> will not be able to breastfeed my children. I still do not believe that I have
> fully processed the surgical procedure that I had to remove my breasts and
> how major it really was. I made a brash decision as a teenager, (as a lot of
> teenagers do) trying to find confidence and happiness, except now the rest
> of my life will be negatively affected. I cannot reverse any of the physical,
> mental or legal changes that I went through. Transition was a very
> temporary, superficial fix for a very complex identity issue."

84.     The defendant submits the first claimant was given the fullest possible information after
        a large number of consultations (at least 10) and that she was *Gillick* competent to make
        the decision to take PBs. Further, the defendant produced witness statements from a
        number of children and young people who are strongly supportive of the treatment they
        have received.

85.     J is a 20 year old transgender man who received PBs in 2012 at the age of 12 followed
        by CSH in 2015. He described how he felt a strong need to become a boy from an early
        age and how he was bullied at school for his behaviour. He found the onset of female
        puberty horrifying and unbearable. After a number of sessions at GIDS he was
        prescribed PBs from the age of 12.

86.     According to J he was given the fullest possible information from the clinicians at GIDS
        as to the benefits and disbenefits of the treatment. The clinicians strongly challenged
        his desire to transition and why he had chosen to express his gender identity as male.
        He was advised as to the impact on fertility if he chose to go on to CSH and surgery.
        He said: "*I made the decision to proceed with pubertal suppression without pursuing
        egg preservation. It was a difficult decision to make because I did not know whether I
        would want biological children in adulthood, but I was certain I would never want to*

*carry a child and give birth. Ultimately, I made the decision because I had a poor quality of life and without immediate treatment I did not feel I had a future at all."* He says: "*We discussed sex and I told them the idea of it disgusted me. I knew I would be unable to consider having a sexual relationship as an adult with my body so wrongly formed."* He ended his witness statement by saying that he is thankful that his pubertal development was halted as it removed the distress caused by continued development, but he wishes that the PBs were started earlier which would have prevented the need for breast surgery later.

87.    S is a 13 year old trans boy who is on the waiting list at GIDS. He was told that he would have to wait for approximately 24 months to be seen and with his parents decided to see a private provider, GenderGP, where he has been prescribed PBs. We note at this point that the GP in question was removed from the professional register and now operates from outside the United Kingdom. S in his witness statement said:

> "13. … I haven't really thought about parenthood – I have been asked about it by the gender identity specialist I have mentioned but I just have no idea what me in the future is going to think. I haven't had a romantic relationship and it's just not a thing that is really on my radar at the moment."

88.    N, an 18 year old trans woman, who was prescribed PBs when she was 17 years old said:

> "12. The treatment of hormone blockers may very well have saved my life. In the period of my life that I was prescribed them my mental health was spiralling due to my dysphoria and this impacting on my daily life, learning and social interactions. While the first injections of gonapeptyl were slow to take effect they eventually began to alleviate my dysphoria in very real ways. I had to shave less and I didn't have to fear pubertal development anymore. I had the time necessary to think about my situation and decide on further courses of action. This also helped my mental health as it gave me significantly less issues overall allowing me to focus and concentrate on aspects in my life alongside my gender identity rather than my fears of puberty and development overtaking everything else in my life."

89.    The second claimant, Mrs A, is the mother of a 15 year old girl who has ASD. The daughter has a history of mental health and behavioural problems. She "*is desperate to run away from all that made her female"* and has been referred to CAMHS (Child and Adolescent Mental Health Services). Mrs A is very concerned that her daughter would be referred to GIDS and prescribed PBs. However the daughter has not currently been referred to GIDS and having regard to the defendant's current practice, would not meet the criteria for PBs because her parents would not support that treatment. Mrs A's interest in this action is therefore largely theoretical.

## SECTION C: SUBMISSIONS

90.     The claimants' primary case is that children or young persons under the age of 18 are
        not capable of giving consent to the administration of PBs. Their secondary case is that
        the information given by the defendant and the Interested Party is misleading and
        inadequate to form the basis for informed consent to be given. In their statement of
        issues, the claimants put issue one as the adequacy of the information and issue two
        whether children and young people are capable of giving consent. In our view, the first
        issue must be whether *Gillick* competence can be achieved, and the secondary or
        alternative issue, whether the information being given is adequate. We deal with the
        arguments in that order.

91.     Mr Hyam also raised a third issue (at least in writing). This was a submission that if
        any young person under the age of 18 is prescribed PBs, their case should be referred
        to the Court of Protection. In oral argument he accepted that the Court of Protection,
        being a creature of statute, would have no jurisdiction to consider such referrals. We
        think that the substance of issue three falls within the terms of issue one.

92.     Mr Hyam stressed that the claimants were not calling into question that GD existed.
        Nor were they questioning that it could cause extreme distress or that PBs should never
        be given to people under 18 or that it was never in their best interests for it to be
        prescribed. The central issue was whether those under 18 could give informed consent.

93.     Mr Hyam submitted that a child still going through puberty is not capable of properly
        understanding the nature and effect of PBs and weighing the consequences and side
        effects properly. He pointed to the evidence of the individuals, including that put
        forward on behalf of the defendant, to show that children of this age cannot understand
        the implications of matters such as the loss of the ability to orgasm, the potential need
        to construct a neo-vagina, or the loss of fertility. He argued that the use of PBs to
        address GD does not have an adequate evidence base to support it and thus should
        properly be described as experimental treatment. There is evidence that PBs can have
        significant side effects and there is strong evidence that once a child commences on
        PBs they will progress to CSH which will cause irreversible changes to the child's body
        with lifelong medical, psychological and emotional implications for the child. He relies
        on the harm potentially caused to these vulnerable young people as evidenced by the
        witness statement of the first claimant.

94.     He submitted that the advice given to the children and young persons is misleading
        because they are told that the PBs are fully reversible when the current evidence on
        reversibility or the long term implications of the treatment is limited and unclear. He
        said further, that the reality is that PBs pave the way for CSH which do have irreversible
        impacts. Further, the information provided by GIDS fails to tell the child that there are
        no proven benefits to this treatment in either physical or psychological terms. The
        information is misleading as to the reversibility of PBs, their purpose and their benefits.

95.     In those circumstances he submitted that the court should be guided by the approach of
        the Court of Protection in its *Practice Guidance (Court of Protection: Serious Medical
        Treatment)* [2020] 1 WLR 641 which sets out those decisions relating to medical
        treatment where an application should be made to the Court of Protection.

96.     Paras 10 and 11 of that Guidance state:

"10. In any case which is not about the provision of life-sustaining treatment, but involves the serious interference with the person's rights under the ECHR, it is:

"highly probable that, in most, if not all, professionals faced with a decision whether to take that step will conclude that it is appropriate to apply to the court to facilitate a comprehensive analysis of [capacity and] best interests, with [the person] having the benefit of legal representation and independent expert advice."

This will be so even where there is agreement between all those with an interest in the person's welfare.

11. Examples of cases which may fall into paragraph 10 above will include, but are not limited to: (a) where a medical procedure or treatment is for the primary purpose of sterilisation; (b) where a medical procedure is proposed to be performed on a person who lacks capacity to consent to it, where the procedure is for the purpose of a donation of an organ, bone marrow, stem cells, tissue or bodily fluid to another person; (c) a procedure for the covert insertion of a contraceptive device or other means of contraception; (d) where it is proposed that an experimental or innovative treatment to be carried out; (e) a case involving a significant ethical question in an untested or controversial area of medicine."

97.     The defendant and the first and second Interveners make common cause. Ms Morris argued that the care and treatment provided at GIDS fell within the terms of the Service Specification laid down by NHS England (NHSE) as required in accordance with the international frameworks of WPATH and the Endocrine Society and by the domestic regulatory frameworks of the General Medical Council and the Care Quality Commission. The NHSE is currently undertaking a review of the efficacy of treatment for GD (the Cass Review) which will report in due course, and its findings will be reflected in the Service Specification.

98.     She argued that the process at GIDS was "deeply *Montgomery* compliant" (i.e. it met the requirements for informed consent identified by the Supreme Court in *Montgomery v Lanarkshire Health Board* [2015] AC 1430) having regard to the frequent consultations, discussions and the provision of detailed, but age appropriate, information. The "vast majority" of the children referred for PBs are 15 or older she said, and the information given is varied depending on the age and maturity of the child or young person. Where the assessment is that the individual is not initially *Gillick* competent, time is taken to see if their understanding develops and competency can be achieved. The information that is given is what is salient for that individual at that age.

99.     As to those between the ages of 16-18, if the young person, the parents and the clinicians are agreed then she submitted there is no justiciable issue and the court has no jurisdiction.

100.    Mr McKendrick for the first and second Interveners argued that the child or young person did not need to understand the impact of CSH on their fertility because that did

not fall to be decided at the stage of prescribing PBs. The PBs provided the space for the person to think about further stages. In appropriate cases, a natal girl or young person's eggs could be harvested and preserved in order to preserve their fertility. The critical thing for the child was that s/he had GD and that there was no alternative physical treatment to PBs. Once the child or young person had reached the Endocrine Clinic at the Trust, there was no alternative psychological treatment available because that was a matter within the purview of GIDS and GIDS had referred the child for PBs, although ongoing psychological treatment is provided at GIDS alongside treatment with PBs. Therefore, the Trust clinicians were faced with a child in acute distress with no alternative treatment options. The purpose of the treatment was to alleviate distress and that, according to Mr McKendrick, had been achieved.

101.    When asked by the court what evidence there was that the PBs did achieve the purpose of alleviating distress, in the light of the lack of published research, Mr McKendrick pointed to the evidence of experienced endocrinologists in both Trusts who could see the real benefits of the treatment.

102.    Like Ms Morris, Mr McKendrick said the current practice was not to proceed only on parental consent. However, he did argue that if the child's consent was rendered invalid, the treatment would continue to be lawful if the parents had consented.

103.    The third Intervener is Transgender Trend Ltd., an organisation that provides evidence-based information and resources for parents and schools concerning children with GD. Ms Davies-Arai is the director of that organisation and she has filed a witness statement in these proceedings. She set out concerns about the lack of evidence as to the impacts and effectiveness of PBs and in relation to which patients it is most likely to help. Much of her evidence focused on the increase of referrals to GIDS of teenage natal girls and the cultural factors, including material on the internet and social media, which may play a part in this. She said that GIDS does not offer young people with GD a range of ways to interpret their experience, and the GIDS pathway offers a minimal challenge to the beliefs and ideas of the young person.

104.    Mr Skinner on behalf of Transgender Trend said the case was particularly important because it concerned the deliberate provision by the State of medical treatment to children and young people which may cause harm. The court should be anxious to ensure that vulnerable children, for example those with ASD, are provided with the full protection of the law.

## SECTION D: THE LAW

105.    In *Gillick v West Norfolk and Wisbech Health Authority* [1986] AC 112, the House of Lords considered the lawfulness of the Secretary of State's policy on giving contraceptive advice to children without parental consent. The House of Lords held by a majority that a doctor could lawfully give contraceptive advice and treatment to a girl aged under 16 if she had sufficient maturity and intelligence to understand that nature and implications of the proposed treatment and provided that certain conditions were satisfied.

106.    Lord Fraser at p. 169B-E said:

"It seems to me verging on the absurd to suggest that a girl or boy aged 15 could not effectively consent, for example, to have a medical examination of some trivial injury to his body or even to have a broken arm set. Of course the consent of the parents should normally be asked, but they may not be immediately available. Provided the patient, whether the boy or a girl, is capable of understanding what is proposed, and of expressing his or her own wishes, I see no good reason for holding that he or she lacks the capacity to express them validly and effectively and to authorise the medical man to make the examination or give the treatment which he advises. After all, a minor under the age of 16 can, with certain limits, enter into a contract. He or she can also sue and be sued, and can give evidence on oath. …."

Accordingly, I am not disposed to hold now, for the first time, that a girl less than 16 lacks the power to give valid consent to contraceptive advice or treatment, merely on account of her age."

107.    Lord Scarman at p. 186A-D said:

"The law relating to parent and child is concerned with the problems of the growth and maturity of the human personality. If the law should impose upon the process of "growing up" fixed limits where nature knows only a continuous process, the price would be artificiality and a lack of realism in an area where the law must be sensitive to human development and social change. If certainty be thought desirable, it is better that the rigid demarcations necessary to achieve it should be laid down by legislation after a full consideration of all the relevant factors than by the courts confined as they are by the forensic process to the evidenced adduced by the parties and to whatever may properly fall within the judicial notice of judges. Unless and until Parliament should think fit to intervene, the courts should establish a principle flexible enough to enable justice to be achieved by its application to the particular circumstances proved by the evidence placed before them."

And at p.189C-E:

"When applying these conclusions to contraceptive advice and treatment it has to be borne in mind there is much that has to be understood by a girl under the age of 16 if she is to have legal capacity to consent to such treatment. It is not enough that she should understand the nature of the advice which is being given: she must also have a sufficient maturity to understand what is involved. There are moral and family questions, especially her relationship with her parents; long-term problems associated with the emotional impact of pregnancy and its termination; and there are the risks to health of sexual intercourse at her age, risks which contraception may diminish but cannot eliminate. It follows that a doctor will have to satisfy himself that she is able to appraise these factors

> before he can safely proceed upon the basis that she has at law capacity to
> consent to contraceptive treatment. And it further follows that ordinarily
> the proper course will be for him, as the guidance lays down, first to seek
> to persuade the girl to bring her parents into consultation and, if she
> refuses, not to prescribe contraceptive treatment unless he is satisfied that
> her circumstances are such that he ought to proceed without parental
> knowledge and consent."

And p. 191C-D:

> "The truth may well be that the rights of parents and children in this
> sensitive area are better protected by the professional standards of the
> medical profession than by "a priori" legal lines of division between
> capacity and the lack of capacity to consent since any such general
> dividing line is sure to produce in some cases injustice, hardship, and
> injury to health."

108.   In *R (Axon) v Secretary of State for Health (Family Planning Association Intervening)*
       [2006] QB 539 Silber J considered *Gillick* in the context of Article 8 of the Convention,
       the United Nations Convention on the Rights of the Child (UNCRC) and the increasing
       emphasis on the autonomy of the child. He held that the principles set out in *Gillick*
       continued to apply, see para 152.

109.   There are two cases dealing with children aged 16 or over who refused medical
       treatment in circumstances where clinicians considered it was clinically indicated. The
       issue in each was whether the court could nevertheless, authorise the treatment. *Re W
       (a Minor) (Medical Treatment: Court's Jurisdiction)* [1993] Fam. 64, concerned the
       case of a 16 year old girl with anorexia nervosa. The local authority applied under the
       inherent jurisdiction of the High Court to give medical treatment to W without her
       consent and against her wishes. W relied on section 8 of the Family Law Reform Act
       1969, which states:

> "Section 8 is in these terms:
>
> (1) The consent of a minor who has attained the age of 16 years to any
>     surgical, medical or dental treatment which, in the absence of consent,
>     would constitute a trespass to his person, shall be as effective as it
>     would be if he were of full age; and where a minor has by virtue of
>     this section given an effective consent to any treatment it shall not be
>     necessary to obtain any consent for it from his parent or guardian. (2)
>     In this section 'surgical, medical or dental treatment' includes any
>     procedure undertaken for the purposes of diagnosis, and this section
>     applies to any procedure which is ancillary to any treatment as it
>     applies to that treatment. (3) Nothing in this section shall be construed

> as making ineffective any consent which would have been effective if this section had not been enacted."

110.    The Court of Appeal held that section 8 did not confer on a minor an absolute right to determine whether or not she received medical treatment but protected the medical practitioner from an action in trespass. Lord Donaldson analysed *Gillick* and said that Lord Scarman would necessarily have considered that the purpose of section 8 was to provide the medical practitioners treating the child with a defence to either criminal assault or a civil claim for trespass, see pages 76G-H and 78D-F. Lord Donaldson described the effect of the section as being a *"legal flak jacket"*, whereby the 16-17 year old is conclusively proved to be *Gillick* competent but this did not mean that someone else who has parental responsibility cannot give consent for the treatment.

111.    When applying his analysis to the facts of W's case, Lord Donaldson said at p. 80G-81B:

> "I have no doubt that the wishes of a 16 or 17-year-old child or indeed of a younger child who is "Gillick competent" are of the greatest importance both legally and clinically, but I do doubt whether Thorpe J was right to conclude that W was of sufficient understanding to make an informed decision. I do not say this on the basis that I consider her approach irrational. I personally consider that religious or other beliefs which bar any medical treatment or treatment of particular kinds are irrational, but that does not make minors who hold those beliefs any the less "Gillick competent". They may well have sufficient intelligence and understanding fully to appreciate the treatment proposed and the consequences of their refusal to accept that treatment. What distinguishes W from them, and what with all respect I do not think that Thorpe J took sufficiently into account (perhaps because the point did not emerge as clearly before him as it did before us), is that it is a feature of anorexia nervosa that it is capable of destroying the ability to make an informed choice. It creates a compulsion to refuse treatment or only to accept treatment which is likely to be ineffective. This attitude is part and parcel of the disease and the more advanced the illness, the more compelling it may become. Where the wishes of the minor are themselves something which the doctors reasonably consider need to be treated in the minor's own best interests, those wishes clearly have a much reduced significance."

112.    Lord Donaldson concluded at p. 84A-B that:

> "No minor of whatever age has power by refusing consent to treatment to override a consent to treatment by someone who has parental responsibility for the minor and a fortiori a consent by the court. Nevertheless such a refusal is a very important consideration in making clinical judgments and for parents and the courts in deciding whether themselves to give consent. Its importance increases with the age and maturity of the minor."

113.    Balcombe LJ at p. 87G-H agreed with Lord Donaldson that the parents of a 16 and 17
        year old retained the right to consent to treatment even if she did not consent, and that
        the court could continue to exercise its inherent jurisdiction. Nolan LJ did not express
        a view as to whether parents could consent to treatment where the child had refused,
        but considered that the court under its inherent jurisdiction could continue to do so. He
        said, at p. 94D-E:

        "To take it a stage further, if the child's welfare is threatened by a serious
        or imminent risk that the child will suffer grave and irreversible mental or
        physical harm, then once again the court when called upon has a duty to
        intervene. It makes no difference whether the risk arises from the action
        or inaction of others, or from the action or inaction of the child. Due
        weight must be given to the child's wishes, but the court is not bound by
        them. In the present case, Thorpe J was apparently satisfied on the
        evidence before him that such a risk existed. In my judgment, he was fully
        entitled to take this view. By the time the matter came to this court, it was
        impossible to take any other view. For these reasons, I would dismiss the
        appeal save to the extent of making the necessary variation of the order of
        Thorpe J."

114.    We were taken to two cases concerning the application of *Gillick* in particularly difficult
        medical and ethical situations, which are of some assistance in the present case. In *Re
        L (Medical Treatment: Gillick Competency)* [1998] 2 F.L.R. 810 Sir Stephen Brown P.
        considered the case of a 14 year old girl with a life threatening condition involving the
        possibility of a blood transfusion. L was a Jehovah's Witness and would not consent to
        the blood transfusion. The court ordered that the medical treatment should take place
        without her consent. The expert clinician appointed by the Official Solicitor is recorded
        as giving the following evidence:

        "He makes the point that the girl's view as to having no blood transfusion
        is based on a very sincerely, strongly held religious belief which does not
        in fact lend itself in her mind to discussion. It is one that has been formed
        by her in the context of her own family experience and the Jehovah's
        Witness meetings where they all support this view. He makes the point
        that there is a distinction between a view of this kind and the constructive
        formulation of an opinion which occurs with adult experience. That has
        not happened of course in the case of this young girl."

115.    Sir Stephen Brown then concluded at p. 813:

        "It is, therefore, a limited experience of life which she has – inevitably so
        – but this is in no sense a criticism of her or of her upbringing. It is indeed
        refreshing to hear of children being brought up with the sensible
        disciplines of a well-conducted family. But it does necessarily limit her
        understanding of matters which are as grave as her own present situation.
        It may be that because of her belief she is willing to say, and to mean it, 'I
        am willing to accept death rather than to have a blood transfusion', but it
        is quite clear in this case that she has not been able to be given all the

details which it would be right and appropriate to have in mind when making such a decision.

I do not think that in this case this young girl is 'Gillick competent'. I base that upon all the evidence that I have heard. She is certainly not 'Gillick competent' in the context of all the necessary details which it would be appropriate for her to be able to form a view about."

116. *Re S (A Child) (Child Parent: Adoption Consent)* [2019] 2 Fam 177 also concerned a child under 16. In that case Cobb J considered the competence of a mother under the age of 16 to consent to her baby being placed for adoption. Cobb J held that it was appropriate and helpful in determining *Gillick* competence to read across and borrow from the relevant concepts and language in the Mental Capacity Act 2005 but cognisant of some fundamental differences, in particular that the assumption of capacity in section 1(2) of that Act did not apply and there was no requirement for any diagnostic characteristic as there is in section 2(1) of the Mental Capacity Act 2005, see paras 15,16 and 60.

117. At paras 34 to 37 Cobb J considered what test he should apply to the information that S needed to understand and then set out the information that would be relevant for the decision in question:

"34. Macur J in *LBL v RYJ and VJ* [2011] 1 FLR 1279, para 24 held that it would not be necessary for a decision-maker to be able to comprehend "all the peripheral detail" in the assessment of capacity to make the relevant decision; in a case concerning residence and the provision of education, Macur J went on to say, at para 58:

"In [the expert's] view it is unnecessary for his determination of RYJ's capacity that she should understand all the details within the statement of special educational needs. It is unnecessary that she should be able to give weight to every consideration that would otherwise be utilised in formulating a decision objectively in her 'best interests'. I agree with his interpretation of the test in section 3 which is to the effect that the person under review must comprehend and weigh the salient details relevant to the decision to be made. To hold otherwise would place greater demands upon RYJ than others of her chronological age/commensurate maturity and unchallenged capacity."

35. In the same vein, Baker J remarked in *H v A Local Authority* [2011] EWHC 1704 at [16(xi)]: "[the] courts must guard against imposing too high a test of capacity to decide issues such as residence because to do so would run the risk of discriminating against persons suffering from a mental disability."

36. Although not cited in argument, I further remind myself of the comments of Chadwick LJ in the Court of Appeal in *Masterman-Lister v Brutton & Co (Nos 1 and 2)* [2003] 1 WLR 1511, para 79: "a person should not be held unable to understand the information relevant to a

decision if he can understand the explanation of that information in broad terms and simple language…" So, says Ms Dolan, it is not necessary for S to understand all the peripheral and non-salient information in the adoption consent form in order to be declared capacitous. Nor does she even need to fully understand the legal distinctions between placement for adoption under a placement order and not under a placement order. Indeed, Ms Dolan herself relies in this regard on *In re A (Adoption: Agreement: Procedure)* [2001] 2 FLR 455, para 43 where Thorpe LJ observes that the differences between freeing and adoption are "complex in their inter-relationship and it is not to be expected that social workers should have a complete grasp of the distinction between the two, or always to signify the distinction in their discussion with the clients" (my emphasis)." If social workers are not expected to understand the complexities of the legislation (or its predecessor) or explain the distinction accurately to the parents with whom they are working asks Ms Dolan, why should a person under the age of 16 be expected to be able to grasp them in order to be able to be declared capacitous?

37. Accordingly, argues the local authority, the salient or "sufficient" information which is required to be understood by the child parent regarding extra-familial adoption is limited to the fundamental legal consequences of the same. The factors discussed at the hearing include: (i) your child will have new legal parents, and will no longer be your son or daughter in law, (ii) adoption is final, and non-reversible; (iii) during the process, other people (including social workers from the adoption agency) will be making decisions for the child, including who can see the child, and with whom the child will live; (iv) you may obtain legal advice if you wish before taking the decision; (v) the child will live with a different family forever; you will (probably) not be able to choose the adopters; (vi) you will have no right to see your child or have contact with your child; it is highly likely that direct contact with your child will cease, and any indirect contact will be limited; (vii) the child may later trace you, but contact will only be re-established if the child wants this; (viii) there are generally two stages to adoption; the child being placed with another family for adoption, and being formally adopted; (ix) for a limited period of time you may change your mind; once placed for adoption, your right to change your mind is limited, and is lost when an adoption order is made."

118.   Cobb J's conclusions were these:

"60… It follows that in order to satisfy the Gillick test in this context the child parent should be able to demonstrate "sufficient" understanding of the "salient" facts around adoption; she should understand the essential "nature and quality of the transaction" (per Munby J in *Sheffield City Council v E* [2005] Fam 326, para 19) and should not need to be concerned with the peripheral.

61. It will, however, be necessary for the competent child decision-maker to demonstrate a "full understanding" of the essential implications of adoption when exercising her decision-making, for the independent CAFCASS officer to be satisfied that the consent is valid. If consent is offered under section 19 and/or section 20 of the 2002 Act, it will be necessary for a form to be signed, even if not in the precise format of that identified by Practice Direction 5A. I accept that on an issue as significant and life-changing as adoption, there is a greater onus on ensuring that the child understands and is able to weigh the information than if the decision was of a lesser magnitude: see Baker J in *CC v KK and STCC* [2012] COPLR 627, para 69. This view is consistent with the Mental Capacity Act 2005 Code of Practice, which provides, at paragraph 4.19:

"a person might need more detailed information or access to advice, depending on the decision that needs to be made. If a decision could have serious or grave consequences, it is even more important that a person understands the information relevant to that decision.""

119.   In determining the level of understanding that the child needs to have to consent to PBs, Mr Hyam attached considerable importance to the decision of the Supreme Court in *Montgomery v Lancashire Health Board*. That case concerned an action in negligence brought by a mother on behalf of her child. The child was disabled as a result of complications during delivery and the mother argued that she should have been advised as to the possibility of delivery by elective caesarean. The central issue for present purposes was the information that the doctor needed to have given the patient in order to establish that she had given informed consent for the treatment.

120.   Lord Kerr set out the requirements placed on a doctor in providing information on risks of injury from treatment in the following terms at para 87:

"An adult person of sound mind is entitled to decide which, if any, of the available forms of treatment to undergo, and her consent must be obtained before treatment interfering with her bodily integrity is undertaken. The doctor is therefore under a duty to take reasonable care to ensure that the patient is aware of any material risks involved in any recommended treatment, and of any reasonable alternative or variant treatments. The test of materiality is whether, in the circumstances of the particular case, a reasonable person in the patient's position would be likely to attach significance to the risk, or the doctor is or should reasonably be aware that the particular patient would be likely to attach significance to it."

121.   Mr Hyam submitted that in determining whether a child is *Gillick* competent the court should consider what would a *"reasonable person in the patient's position understand",* and in asking that question, he submitted that the "reasonable person" is one with adult knowledge.

122.   Ms Morris went to the opposite extreme. She submitted that when deciding what information needs to be given to the patient and understood by them, the test is a reasonable person in that individual's position, i.e. a reasonable 12 year old (or other

age) with GD. She said that the "salient" information that needs to be provided is what that reasonable patient would attach importance to. She said that seeking consent, certainly for treatment with lifelong implications such as sterilisation will always involve some *"act of imagination"*. Many patients facing life changing treatment, such as the loss of fertility in cancer treatment or endometriosis, will not have had experience of what they are foregoing, for example, fertility. She submitted that the court ought not to be pronouncing on hypothetical cases: rather, it should or could consider the facts of one specific case as and when it arises.

123.   Mr McKendrick submitted that the correct approach in deciding what information was material was to assume a reasonable child of the individual's age.

124.   Mr Skinner pointed out that *Montgomery* concerned an adult and therefore the presumption of capacity in the Mental Capacity Act 2005 applied. That presumption is inapplicable in a case concerning *Gillick* competency where the very issue is whether the child is competent to make the decision. The decision in *Montgomery* was of limited assistance, therefore, in the present case. In determining competence, the child must have sufficient understanding of the factors that are not just relevant to him or her now but which on an objective basis ought to be given weight in the future.

125.   In our view, the following principles can be derived from the cases to which we have referred:

126.   First, the question as to whether a person under the age of 16 is *Gillick* competent to make the relevant decision will depend on the nature of the treatment proposed as well as that person's individual characteristics. The assessment is necessarily an individual one. Where the decision is significant and life changing then there is a greater onus to ensure that the child understands and is able to weigh the information, see *Re S* at para 60.

127.   Secondly, however, that does not mean that it is not possible for the court to draw some lines. The Trusts themselves accept that a 7 year old being treated with PBs for precocious puberty cannot give informed consent and his or her parents must give that consent because of the young age of the child concerned and the nature of the treatment.

128.   Thirdly, efforts should be made to allow the child or young person to achieve *Gillick* competency where that is possible. Clinicians should therefore work with the individual to help them understand the treatment proposed and its potential implications in order to help them achieve competence.

129.   Fourthly, however, that does not mean that every individual under 16 can achieve *Gillick* competence in relation to the treatment proposed. As we discuss below, where the consequences of the treatment are profound, the benefits unclear and the long-term consequences to a material degree unknown, it may be that *Gillick* competence cannot be achieved, however much information and supportive discussion is undertaken.

130.   Fifthly, in order to achieve *Gillick* competence it is important not to set the bar too high. It is not appropriate to equate the matters that a clinician needs to explain, as set out in *Montgomery*, to the matters that a child needs to understand to achieve *Gillick* competence. The consequence of Mr Hyam's approach would be significantly to raise

the bar for competence and capacity, which would be contrary both to the common law and to a child's Article 8 rights and the importance of supporting individual autonomy.

131.    We adopt the language of Chadwick LJ in *Masterman-Lister v Brutton and Co (Nos 1 and 2)* [2003] 1 WLR 151: a person should be able to "*understand an explanation of that information in broad terms and simple language*", see *Re S* at para 36. Although this was said in a case that concerned an adult's capacity, in our judgment the same approach should be applied to a case concerning *Gillick* competence. The child or young person needs to be able to demonstrate sufficient understanding of the salient facts, see *Re S* at para 60.

132.    Sixthly, we agree with Mr Skinner, that in deciding what facts are salient and what level of understanding is sufficient, it is necessary to have regard to matters which are those which objectively ought to be given weight in the future although the child might be unconcerned about them now. On the facts of this case there are some obvious examples, including the impact on fertility and on future sexual functioning.

*SECTION E: CONCLUSIONS*

133.    The principal issue before this court is in some ways a narrow one. Can a child or young person under the age of 16 achieve *Gillick* competence in respect of the decision to take PBs for GD? The legal position of 16 and 17 year olds is different, and we deal with that below.

134.    The starting point is to consider the nature of the treatment proposed. The administration of PBs to people going through puberty is a very unusual treatment for the following reasons. Firstly, there is real uncertainty over the short and long-term consequences of the treatment with very limited evidence as to its efficacy, or indeed quite what it is seeking to achieve. This means it is, in our view, properly described as experimental treatment. Secondly, there is a lack of clarity over the purpose of the treatment: in particular, whether it provides a "pause to think" in a "hormone neutral" state or is a treatment to limit the effects of puberty, and thus the need for greater surgical and chemical intervention later, as referred to in the Health Research Authority report. Thirdly, the consequences of the treatment are highly complex and potentially lifelong and life changing in the most fundamental way imaginable. The treatment goes to the heart of an individual's identity, and is thus, quite possibly, unique as a medical treatment.

135.    Furthermore, the nature and the purpose of the medical intervention must be considered. The condition being treated, GD, has no direct physical manifestation. In contrast, the treatment provided for that condition has direct physical consequences, as the medication is intended to and does prevent the physical changes that would otherwise occur within the body, in particular by stopping the biological and physical development that would otherwise take place at that age. There is also an issue as to whether GD is properly categorised as a psychological condition, as the DSM-5 appears to do, although we recognise there are those who would not wish to see the condition categorised in that way. Be that as it may, in our judgment for the reasons already identified, the clinical intervention we are concerned with here is different in kind to other treatments or clinical interventions. In other cases, medical treatment is used to remedy, or alleviate the symptoms of, a diagnosed physical or mental condition, and

the effects of that treatment are direct and usually apparent. The position in relation to puberty blockers would not seem to reflect that description.

136.   Indeed the consequences which flow from taking PBs for GD and which must be considered in the context of informed consent, fall into two (interlinking) categories. Those that are a direct result of taking the PBs themselves, and those that follow on from progression to Stage 2, that is taking cross-sex hormones. The defendant and the Trusts argue that Stage 1 and 2 are entirely separate; a child can stop taking PBs at any time and that Stage 1 is fully reversible. It is said therefore the child needs only to understand the implications of taking PBs alone to be *Gillick* competent. In our view this does not reflect the reality. The evidence shows that the vast majority of children who take PBs move on to take cross-sex hormones, that Stages 1 and 2 are two stages of one clinical pathway and once on that pathway it is extremely rare for a child to get off it.

137.   The defendant argues that PBs give the child "time to think", that is, to decide whether or not to proceed to cross-sex hormones or to revert to development in the natal sex. But the use of puberty blockers is not itself a neutral process by which time stands still for the child on PBs, whether physically or psychologically. PBs prevent the child going through puberty in the normal biological process. As a minimum it seems to us that this means that the child is not undergoing the physical and consequential psychological changes which would contribute to the understanding of a person's identity. There is an argument that for some children at least, this may confirm the child's chosen gender identity at the time they begin the use of puberty blockers and to that extent, confirm their GD and increase the likelihood of some children moving on to cross-sex hormones. Indeed, the statistical correlation between the use of puberty blockers and cross-sex hormones supports the case that it is appropriate to view PBs as a stepping stone to cross-sex hormones.

138.   It follows that to achieve *Gillick* competence the child or young person would have to understand not simply the implications of taking PBs but those of progressing to cross-sex hormones. The relevant information therefore that a child would have to understand, retain and weigh up in order to have the requisite competence in relation to PBs, would be as follows: (i) the immediate consequences of the treatment in physical and psychological terms; (ii) the fact that the vast majority of patients taking PBs go on to CSH and therefore that s/he is on a pathway to much greater medical interventions; (iii) the relationship between taking CSH and subsequent surgery, with the implications of such surgery; (iv) the fact that CSH may well lead to a loss of fertility; (v) the impact of CSH on sexual function; (vi) the impact that taking this step on this treatment pathway may have on future and life-long relationships; (vii) the unknown physical consequences of taking PBs; and (viii) the fact that the evidence base for this treatment is as yet highly uncertain.

139.   It will obviously be difficult for a child under 16 to understand and weigh up such information. Although a child may understand the concept of the loss of fertility for example, this is not the same as understanding how this will affect their adult life. A child's attitude to having biological children and their understanding of what this really means, is likely to change between childhood and adulthood. For many children, certainly younger children, and some as young as 10 and just entering puberty, it will not be possible to conceptualise what not being able to give birth to children (or conceive children with their own sperm) would mean in adult life. Similarly, the

meaning of sexual fulfilment, and what the implications of treatment may be for this in the future, will be impossible for many children to comprehend.

140.    Ms Morris submitted that many decisions about complex and long-lasting medical treatment will involve the patient having, to some degree, to imagine themselves into an uncertain future of which they have no experience. However, for the reasons that we have explained in para 135 above we consider the treatment in this case to be in entirely different territory from the type of medical treatment which is normally being considered.

141.    Some of the children and young people who have been treated at GIDS say in their witness statements that the thought of sex disgusted them, or they did not really think about fertility. These normal reactions do not detract from the difficulties surrounding consent and treatment with PBs. That adolescents find it difficult to contemplate or comprehend what their life will be like as adults and that they do not always consider the longer-term consequences of their actions is perhaps a statement of the obvious.

142.    These various difficulties are compounded by the particular difficulties prevalent in the cohort of children treated at GIDS. On the defendant's case, they suffer considerable psychological distress by reason of their GD and are highly vulnerable. In those circumstances, the consequences of taking PBs on their fertility for example, or on their sexual life, may be viewed as a relatively small price to pay for what may be perceived as a solution to their immediate and real psychological distress. It would not follow however that their weighing of risks and benefits when they might start taking PBs would prevail in the longer-term.

143.    The difficulty of achieving informed consent in these circumstances is further exacerbated by the lack of evidence as to the efficacy of PBs in treating GD and the long-term outcomes of taking it. We entirely accept that the fact that a treatment is experimental, or that the long-term outcomes are not yet known, does not of itself prevent informed consent being given. Otherwise no experimental treatment could ever be consented to. However, the combination here of lifelong and life changing treatment being given to children, with very limited knowledge of the degree to which it will or will not benefit them, is one that gives significant grounds for concern.

144.    We do not think that the answer to this case is simply to give the child more, and more detailed, information. The issue in our view is that in many cases, however much information the child is given as to long-term consequences, s/he will not be able to weigh up the implications of the treatment to a sufficient degree. There is no age appropriate way to explain to many of these children what losing their fertility or full sexual function may mean to them in later years.

145.    *Gillick* makes clear that any decision is treatment and person specific. However, for the reasons that we have set out above, we think that it is appropriate in this case to give clear guidance as to the application of the *Gillick* tests to the treatment and cohort of children in question. The conclusion we have reached is that it is highly unlikely that a child aged 13 or under would ever be *Gillick* competent to give consent to being treated with PBs. In respect of children aged 14 and 15, we are also very doubtful that a child of this age could understand the long-term risks and consequences of treatment in such a way as to have sufficient understanding to give consent. However, plainly the

increased maturity of the child means that there is more possibility of achieving competence at the older age.

146.    In respect of a young person aged 16 or over, the legal position is different. There is a presumption of capacity under section 8 of the Family Law Reform Act 1969. As is explained in *Re W*, that does not mean that a court cannot protect the child under its inherent jurisdiction if it considers the treatment not to be in the child's best interests. However, so long as the young person has mental capacity and the clinicians consider the treatment is in his/her best interests, then absent a possible dispute with the parents, the court generally has no role. We do not consider that the court can somehow adopt an intrusive jurisdiction in relation to one form of clinical intervention for which no clear legal basis has been established.

147.    We do however recognise that in the light of the evidence that has emerged, and the terms of this judgment, clinicians may well consider that it is not appropriate to move to treatment, such as PBs or CSH, without the involvement of the court. We consider that it would be appropriate for clinicians to involve the court in any case where there may be any doubt as to whether the long-term best interests of a 16 or 17 year old would be served by the clinical interventions at issue in this case.

148.    We express that view for these reasons. First, the clinical interventions involve significant, long-term and, in part, potentially irreversible long-term physical, and psychological consequences for young persons. The treatment involved is truly life changing, going as it does to the very heart of an individual's identity. Secondly, at present, it is right to call the treatment experimental or innovative in the sense that there are currently limited studies/evidence of the efficacy or long-term effects of the treatment.

149.    The position of the defendant and the Trusts is that they consider it would be an intrusion into the child or young person's autonomy if a decision about treatment with PBs were to be made by the court not by the patient. They are concerned about the use of NHS and court resources if these decisions have to be made by the court. We do not consider that this is the correct approach. In principle, a young person's autonomy should be protected and supported; however, it is the role of the court to protect children, and particularly a vulnerable child's best interests. The decisions in respect of PBs have lifelong and life-changing consequences for the children. Apart perhaps from life-saving treatment, there will be no more profound medical decisions for children than whether to start on this treatment pathway. In those circumstances we consider that it is appropriate that the court should determine whether it is in the child's best interests to take PBs.  There is a real benefit in the court, almost certainly with a child's guardian appointed, having oversight over the decision. In any case, under the inherent jurisdiction concerning medical treatment for those under the age of 18, there is likely to be a conflict between the support of autonomy and the protective role of the court. As we have explained above, we consider this treatment to be one where the protective role of the court is appropriate.

150.    The claimants' alternative ground is that the information provided by the defendant and the Trusts is inadequate to form the basis of informed consent. We accept that the defendant and the Trusts have in their written information, to children, young people and their parents and carers, tried hard to explain the potential consequences of PBs, including that of moving on to CSH, and to give full information. They have also

attempted to do this in an age appropriate manner. The problem is not the information given, but the ability of the children and young people, to understand and most importantly weigh up that information. The approach of the defendant appears to have been to work on the assumption that if they give enough information and discuss it sufficiently often with the children, they will be able to achieve *Gillick* competency. As we have explained above, we do not think that this assumption is correct.

## OVERALL CONCLUSION

151.   A child under 16 may only consent to the use of medication intended to suppress puberty where he or she is competent to understand the nature of the treatment. That includes an understanding of the immediate and long-term consequences of the treatment, the limited evidence available as to its efficacy or purpose, the fact that the vast majority of patients proceed to the use of cross-sex hormones, and its potential life changing consequences for a child. There will be enormous difficulties in a child under 16 understanding and weighing up this information and deciding whether to consent to the use of puberty blocking medication. It is highly unlikely that a child aged 13 or under would be competent to give consent to the administration of puberty blockers. It is doubtful that a child aged 14 or 15 could understand and weigh the long-term risks and consequences of the administration of puberty blockers.

152.   In respect of young persons aged 16 and over, the legal position is that there is a presumption that they have the ability to consent to medical treatment. Given the long-term consequences of the clinical interventions at issue in this case, and given that the treatment is as yet innovative and experimental, we recognise that clinicians may well regard these as cases where the authorisation of the court should be sought prior to commencing the clinical treatment.

153.   We have granted a declaration to reflect the terms of this judgment.