WO

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Janice Hennessy-Waller, et al., | No. CV-20-00335-TUC-SHR |
| Plaintiffs, | **Order re: Plaintiffs' Motion for Preliminary Injunction** |
| v. | |
| Jami Snyder, | |
| Defendant. | |

Pending before the Court is Plaintiffs D.H. and John Doe's Motion for Preliminary Injunction, asking the Court to enjoin Defendant Jami Snyder, Director of the Arizona Health Care Cost Containment System ("AHCCCS"), "from further enforcement of" a regulation that excludes gender reassignment surgery from coverage and to "order AHCCCS to cover male chest reconstruction surgery for D.H. and John." (Doc. 3 ep 2.[1]) Defendant has responded (Doc. 18) and Plaintiffs have replied (Doc. 25.) Oral argument was held on February 5, 2021. (Doc. 48.) For the reasons that follow, the Court will deny Plaintiffs' Motion.

**I.   Background**

The following facts are derived from Plaintiffs' Complaint (Doc. 1) and sworn declarations submitted in support of their Motion for Preliminary Injunction (Docs. 4, 5). Plaintiffs are minors—D.H. is seventeen and John is fifteen years old—who are enrolled

---

[1] Unless otherwise noted, "Doc." refers to documents in the CM/ECF docket online, and "ep" refers to the electronic page number.

in Arizona's Medicaid program known as AHCCCS. Plaintiffs were born as females, have been diagnosed with gender dysphoria, and have since transitioned to live as males with the recommendation and support of their healthcare providers. As part of their treatment for gender dysphoria, Plaintiffs started taking testosterone over one year ago. Since then, Plaintiffs' healthcare providers have recommended they obtain "male chest reconstruction surgery"[2]—that is, the permanent removal of their breasts—"to further alleviate [their] gender dysphoria."

> AHCCCS, however, specifically excludes the following from coverage:
>
>   a. Infertility services, reversal of surgically induced infertility (sterilization), and *gender reassignment surgeries*;
>   b. Pregnancy termination counseling services;
>   c. Pregnancy terminations, unless required by state or federal law;
>   d. Services or items furnished solely for cosmetic purposes; and
>   e. Hysterectomies unless determined medically necessary.

Ariz. Admin. Code R9-22-205(B)(4) (emphasis added).

On August 2, 2020, Plaintiffs filed their Complaint against AHCCCS Director Jami Snyder, in her official capacity, alleging AHCCCS's policy of excluding gender reassignment surgery from coverage pursuant to R9-22-205(B)(4)(a) (the "Challenged Exclusion") violates various provisions of Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396w-5 ("Medicaid Act"), Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116 ("Section 1557"), and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In their Complaint, Plaintiffs seek: (1) class certification[3]; (2) "preliminary and permanent injunctions

---

[2] Also known as "male chest contouring" or "top surgery," this procedure includes, essentially, a double mastectomy. *See Standards of Care for the Health of Transsexual, Transgender, and Gender Non-Conforming People 7th Version*, World Professional Association for Transgender Health ("WPATH"), p. 63.

[3] Plaintiffs' Motion for Class Certification (Doc. 40) remains pending and the Court will address it in a separate order.

prohibiting Defendant from any further enforcement or application of the Challenged Exclusion" and "directing Defendant and [her] agents to provide Medicaid coverage for medically necessary male chest reconstruction surgery"; and (3) declaratory judgment that the denial of coverage for male chest reconstruction surgery violates the Medicaid Act, Section 1557, and Equal Protection Clause.  (Doc. 1, ep 25-26.)

In their Motion for Preliminary Injunction ("Motion"), Plaintiffs seek to "preliminarily enjoin Defendant[] from further enforcement of the regulation and order AHCCCS to cover male chest reconstruction surgery for D.H. and John."  (Doc. 3 ep 2.)  In their proposed order, Plaintiffs request the Court order:  (1) "Defendant[] shall be immediately enjoined from further enforcement of Ariz. Admin. Code R9-22-205(B)(4)(A), on the grounds that it violates the Medicaid Act's EPSDT [Early and Periodic Screening, Diagnostic and Treatment] and Comparability Requirements, Section 1557 of the [Patient Protection and] Affordable Care Act, and the Equal Protection Clause of the United States Constitution"; and (2) the "Arizona Healthcare Cost Containment System shall provide coverage for Plaintiffs' male chest reconstruction surgeries, consistent with all other requirements of federal law."  (Doc. 3-1.)

After oral argument,[4] the parties submitted supplemental briefing as to whether Plaintiffs were required to exhaust their administrative remedies before seeking relief in court.  (Docs. 62, 64.)  The parties agree Plaintiffs are not required to exhaust their administrative remedies because they seek injunctive relief under 42 U.S.C. § 1983.  (Docs. 59, 64.)  *See Patsy v. Bd. of Regents*, 457 U.S. 496 (1982).[5]  Accordingly, this Court has jurisdiction pursuant to U.S.C. §§ 1331 and 1343(a)(3)-(4).

**II.     Preliminary Injunction Standard**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'"

---

[4]The parties did not request an evidentiary hearing on the motion and, at the status conference held on December 11, 2020, the parties stated such a hearing was not necessary. (Doc. 38.)

[5]Unless otherwise noted by the Court, internal quotations and citations have been omitted when quoting and citing case law throughout this Order.

- 3 -

*Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (emphasis in original)); *see also Am. Beverage Ass'n v. City & Cnty. of S.F.*, 916 F.3d 749, 754 (9th Cir. 2019).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021, 1027 (9th Cir. 2020) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)); *see also All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).  A plaintiff must show more than a mere "possibility" of irreparable harm—he must "demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22 (emphasis in original); *see also Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (injunction will not issue if party seeking injunctive relief shows "mere possibility of some remote future injury, or a conjectural or hypothetical injury").  The Ninth Circuit Court of Appeals, employing a sliding scale analysis, has also stated:  "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1085 (9th Cir. 2013) (quoting *All. for the Wild Rockies*, 632 F.3d at 1132) (sliding-scale test "remains viable" after *Winter* though movants "must also satisfy the other *Winter* factors")).

The standard a party must meet to obtain injunctive relief depends on the type of injunction sought.  A prohibitory injunction "restrain[s] a party from taking action and effectively "freezes the positions of the parties until the court can hear the case on the merits."  *Edmo v. Idaho Dep't of Corr.*, 358 F.Supp. 3d 1103, 1122 (D. Idaho 2018) (quoting *Heckler v. Lopez*, 463 U.S. 1328, 1333 (1983)).  In contrast, a mandatory injunction is one that "orders a responsible party to take action," *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996), and therefore "'goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly disfavored.'" *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (alterations in original) (quoting

*Anderson v. United States*, 612 F.2d 1112, 1114 (9th Cir. 1979))*; see also Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (prohibitory injunction maintains status quo, whereas mandatory injunction goes well beyond maintaining status quo). "Mandatory injunctions, while subject to a higher standard than prohibitory injunctions, are permissible when 'extreme or very serious damage will result' that is not 'capable of compensation in damages,' and the merits of the case are not 'doubtful.'" *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) (quoting *Marlyn Nutraceuticals,* 571 F.3d at 879); *see also Anderson*, 612 F.2d at 1115. Therefore "[s]uch mandatory preliminary relief is subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993).

Defendant asserts the injunction sought here is a mandatory one and, therefore, is subject to higher scrutiny. (Doc. 18 ep 8.) Plaintiffs argue it is a prohibitive injunction because they seek to "enjoin Defendant from enforcing a regulation that prohibits coverage for surgeries to treat gender dysphoria, including male chest reconstruction surgery." (Doc. 25 ep 4.) At oral argument, Plaintiffs reiterated this, relying on *M.R. v. Dreyfus*, 697 F.3d 706 (9th Cir. 2012); however, this case is distinguishable. Like the instant case, plaintiffs in *M.R.* sought to enjoin the state from enforcing a state Medicaid regulation. Unlike the instant case, the regulation in *M.R.* was new and enacted to save money during an economic downturn which would have resulted in a decrease in Medicaid benefits that beneficiaries were previously receiving and were entitled to by law. Enjoining the regulation here would not result in a decrease in benefits Plaintiffs are receiving—rather, the injunction seeks to not only enjoin enforcement of the regulation but also to force AHCCCS to provide a benefit it has never before provided. That is, the plaintiffs in *M.R.* sought to *preserve* the status quo; whereas here, Plaintiffs seek to go well beyond the status quo. Additionally, the plaintiffs in *M.R.* presented far more undisputed evidence in support of their claims than the Plaintiffs have here.

At oral argument, Plaintiffs also asserted they were "seeking an opportunity to demonstrate the medical necessity of male chest reconstruction surgery and are asking the Court to enjoin enforcement of [the Challenged] [E]xclusion as to D.H. and John Doe so

they can demonstrate to [AHCCCS] that this procedure is, in fact, medically necessary for them." (OA Transcript Feb. 5, 2021 ep 9-10, 15.) This, however, is contrary to their Motion where they specifically state: "Plaintiffs move to preliminarily enjoin Defendant[] from further enforcement of the regulation and order AHCCCS to cover male chest reconstruction surgery for D.H. and John." (Doc. 3 ep 2.) Further, as noted above, Plaintiffs' proposed order would declare the Challenged Exclusion unlawful and unconstitutional and would order AHCCCS to provide coverage for the surgeries Plaintiffs seek. (Doc. 3-1.) By Plaintiffs' own argument and proposed order, they seek an injunction that not only enjoins Defendant from enforcing the law, but orders Defendant to take an affirmative action by providing coverage for a medical procedure that would be otherwise excluded, thus going well beyond the status quo. *See Meghrig*, 516 U.S. at 484; *see also Marlyn Nutraceuticals*, 571 F.3d at 879. Therefore, the injunction sought here is a mandatory one and is subject to the higher scrutiny described above. *See Heckler*, 463 U.S. at 1333-34 (injunction directing Secretary of Health and Human Services to pay benefits on an interim basis to parties who had not yet been found to be disabled was "in substance, if not in terms, a mandatory one"); *see also Katie A., ex rel. Ludin v. L.A. Cnty.*, 481 F.3d 1150, 1156 (9th Cir. 2007) (applying heightened standard for mandatory preliminary injunction where class of children enrolled in California's Medicaid program claimed state violated Medicaid Act by failing to provide certain mental health services); *Toomey v. State of Ariz., et al.*, 4:19-cv-00035-RM-LAB (Doc. 162, ep 8-9) (preliminary injunction "barring [d]efendants from enforcing the categorical exclusion of coverage for '[g]ender reassignment surgery'" is mandatory injunction because it goes beyond maintaining status quo).

**III. Discussion**

    A. Likelihood of Prevailing on the Merits

Based on the record before the Court, Plaintiffs have not shown they are likely to prevail on the merits of their claims because they have not clearly shown the surgery they seek is medically necessary for them, that it is a safe and effective treatment for gender

dysphoria in adolescents, or that the Challenged Exclusion violates the Medicaid Act, Section 1557, or the Equal Protection Clause. *See Dahl*, 7 F.3d at 1403.

### 1. Medicaid's EPSDT Provision

The Medicaid Act provides medical assistance to eligible individuals[6] in participating states. Although states are not required to participate in the Medicaid program, once a state chooses to participate and accept matching federal funds, it must comply with federal Medicaid law. *See Wilder v. Va. Hosp. Ass'n*, 110 S. Ct. 2510, 2513 (1990). EPSDT services for eligible individuals under age 21 are among the mandatory categories of medical assistance a state must provide. *Katie A.*, 481 F.3d at 1154. EPSDT services are defined in § 1396(r), and include: "Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services, whether or not such services are covered under the State plan." § 1396d(r)(5). "Under § 1396d(r)(5), states must cover every type of health care or service necessary for EPSDT corrective or ameliorative purposes that is allowable under § 1396d(a). Although states have the option of not providing certain 'optional' services listed in § 1396d(a) to other populations, they must provide all of the services listed in § 1396d(a) to eligible children when such services are found to be medically necessary." *Katie A.*, 481 F.3d at 1154. Further, Arizona law incorporates § 1396d(r)(5) by reference and provides a variety of EPSDT services "are covered for a member less than 21 years of age," including: "Other necessary health care, diagnostic services, treatment, and measures required by 42 U.S.C. 1396d(r)(5)." Ariz. Admin. Code R9-22-213(a)(1–10).

Plaintiffs assert the EPSDT provisions are "extremely broad" and include the surgeries they seek, as the surgeries are necessary to "correct or ameliorate" Plaintiffs' gender dysphoria. (Doc. 3 ep 9-10.) Plaintiffs also assert there is "broad consensus within the medical community that male chest reconstruction surgery is a safe and effective treatment for gender dysphoria." (Doc. 3 ep 10.) Relying on expert declarations,

---

[6]There is no dispute Plaintiffs are eligible, enrolled members of AHCCCS.

Defendant counters "there is legitimate debate" about whether such surgery corrects or ameliorates "the underlying conditions of persons, particularly children, who seek such surgeries." (Doc. 18 ep 12.) As to Plaintiffs' specific case, Defendant points out Plaintiffs have not provided their medical records, "have not been finally assessed for suitability for surgery by the surgeon who would perform the procedures," and have not provided a declaration or opinion of any medical doctor who has treated John. (Doc. 18 ep 12-13.) Defendant further asserts Plaintiffs have not demonstrated medical necessity and argues AHCCCS is not required "to cover every service, especially services that have yet to be determined to be safe and effective." (Doc. 18 ep 13.) Lastly, Defendant notes that although EPSDT is a mandatory set of services AHCCCS must cover, it does not specifically list the services required and there is no case law recognizing gender reassignment surgery as an EPSDT requirement. (Doc. 18 ep 13.)

As Defendant notes, a state's obligation to cover health care or services necessary for EPSDT corrective or ameliorative purposes is "subject to certain limits; for example, a state need not pay for experimental medical procedures." *Katie A.*, 481 F.3d at 1154, n.10. States must also "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services to assure that payments are consistent with efficiency, economy and quality of care . . . ." 42 U.S.C. § 1396a(a)(30)(A). The Eighth Circuit explained this principle when it concluded states were not required to cover organ transplants because they were not considered safe or proven at the time: "Medicaid was not designed to fund risky, unproven procedures, but to provide the largest number of necessary medical services to the greatest number of needy people." *Ellis v. Patterson*, 859 F.2d 52, 55 (8th Cir. 1988). Defendant goes on to cite several cases from other jurisdictions that suggest the surgeries Plaintiffs seek here are "experimental," "risky," or otherwise "unproven," and, therefore asserts "it is not improper to exclude coverage for a service that continues to be the subject of legitimate debate as to its safety and efficacy." (Doc. 18 ep 13-14.)

The parties have submitted several declarations in support of and opposition to the

Motion. Plaintiffs have submitted declarations from: D.H.; D.H.'s mother; D.H.'s pediatrician, Dr. Cronyn; D.H.'s counselor, Tamar Reed[7]; John; John's caregiver; and John's therapist, Mischa Cohen Peck, PhD.[8] (Docs. 4, 5.) Plaintiffs have also provided declarations from two experts retained for this litigation: Dr. Aron Janssen, a child/adolescent psychiatrist, who specializes in treating children and adolescents with gender dysphoria (Doc. 5-4 ep 2; Doc. 25 ep 14-30), and Dr. Loren S. Schechter, a plastic surgeon who specializes in gender reassignment surgery and who would perform the surgeries for Plaintiffs (Doc. 5-5 ep 2-3; Doc. 25 ep 31-44). Both experts have reviewed the declarations provided by Dr. Cronyn, Reed, Dr. Peck, as well as John Doe's medical records from Dr. Veenod Chulani at the Phoenix Children's Hospital Gender Support Program.[9] (Doc. 5-4 ep 6, Doc. 5-5 ep 8.) Drs. Janssen and Schechter are members of the World Professional Association for Transgender Health ("WPATH") and rely on WPATH's "Standards of Care for the Health of Transsexual, Transgender, and Gender Non-Conforming People" ("WPATH SOC") for their opinions that the surgery Plaintiffs seek is a safe and effective procedure for treating gender dysphoria in minors such as D.H. and John. (Doc. 5 ep 22-33, 49-63.) According to Dr. Schechter: "The purpose of the WPATH SOC is to assist health providers in delivering medical care to transgender people to provide them with safe and effective treatment for gender dysphoria, in order to maximize their overall health, psychological well-being, and self-fulfillment." (Doc. 5-4 ep 4; Doc. 5-5 ep 9.)

Dr. Janssen is a contributing author to the forthcoming eighth version of the

---

[7] Reed is a Licensed Professional Counselor who specializes in working with young LGBT people. (Doc. 5-2.) D.H. was diagnosed with gender dysphoria before seeing Reed; Reed confirmed this diagnosis and her "treatment of D.H. focused on his gender dysphoria, anxiety, trauma, and oppositional [defiant] disorder." (Doc. 5-2.)

[8] Dr. Peck has a Master of Social Work and a PhD in Social Welfare, is a member of WPATH, and practices as a clinical therapist specializing in issues regarding sexuality, sexual orientation, and gender identity. (Doc. 4-2.) Dr. Peck started seeing John "to help him address the increasing psychological distress he has experienced because of his gender dysphoria. Although John was diagnosed with gender dysphoria before seeing Dr. Peck, she has confirmed this diagnosis and has also diagnosed him with post-traumatic stress disorder stemming from early life attachment trauma. (Doc. 4-2.)

[9] These records have not been disclosed to Defendant and therefore were unavailable to Defendant's experts.

WPATH SOC and has treated over 300 children and adolescents with gender dysphoria. (Doc. 5-4 ep 3-4.) Despite providing his detailed opinion that male chest reconstruction surgery is safe and effective for adolescents and that "[c]ategorically excluding coverage for male chest reconstruction surgery to treat gender dysphoria has no basis in the prevailing standards of care, peer-reviewed and medical literature," he has not opined as to whether D.H. and John themselves are suitable candidates for the surgery. (Doc. 5-4 ep 33; Doc. 25 ep 29.) Indeed, although Dr. Janssen states "[s]urgical treatment is [] medically necessary for *some* transgender youth in order to alleviate their gender dysphoria," Dr. Janssen has never met, examined, or consulted with D.H. or John to determine whether surgery is medically necessary for them. (Doc. 5-4 ep 11 (emphasis added).)

Dr. Schechter is also a contributing author of the current version of the WPATH SOC and has performed approximately 100–150 "top" surgeries on patients under the age of 21. (Doc. 5 ep 4.) Dr. Schechter has provided virtual consultations to D.H. and John but has not examined them in person or conducted a final consultation to assess skin elasticity and other concerns, due to the circumstances of the COVID-19 pandemic. (Doc. 5 ep 14-16.) Dr. Schechter has opined D.H. and John "appear[] to be [] good candidate[s] for male chest reconstruction surgery" and he is "confident" they are fully aware of the risks and benefits of the procedure, and that the surgery "is a safe, effective, and medically necessary treatment for each of them, assuming the absence of any pathology." (Doc. 5 ep 15-18.)

Defendant has also provided declarations from two experts: Dr. Michael K. Laidlaw, who is an endocrinologist, and Dr. Stephen E. Levine, a psychiatrist specializing in sexuality. (Doc. 18-1 ep 30, Doc. 18-2 ep 3-4.) Dr. Laidlaw has been retained to provide his expert opinion as to the standards of care for treating minors diagnosed with gender dysphoria and the appropriateness of D.H. and John undergoing male chest reconstruction surgery. (Doc. 18-1 ep 3-4.) According to Dr. Laidlaw, the purported "professional consensus" embodied in the WPATH SOC "exists only within the confines of [WPATH]" and there has been no high-quality study showing male chest reconstruction surgery is safe, effective, or optimal for treating minors with gender dysphoria." (Doc. 18-1 ep 12.)

Specifically, he challenges a study cited by Dr. Schechter for its flawed methodology and cites a different study that "questions the long-term effectiveness of gender reassignment surgery," by examining the rate of completed suicides in individuals who had undergone gender reassignment surgery. (Doc. 18-1 ep 12-13.) He also points to a 2016 final decision memo in which the Centers for Medicare & Medicaid Services ("CMS") declined to issue a National Coverage Determination on gender reassignment surgery for Medicare beneficiaries with gender dysphoria "because the clinical evidence is inconclusive for the Medicare population." (Doc. 18-1 ep 13.) *See* CTRS. FOR MEDICARE & MEDICAID, DECISION MEMO FOR GENDER DYSPHORIA AND GENDER REASSIGNMENT SURGERY (CAG-00446N) (Aug. 30, 2016), https://www.cms.gov/medicare-coverage-database/details/nca-decision-memo.aspx?NCAId=282 (last visited March 17, 2021). Although that decision does not apply to Medicaid, it is instructive that CMS found the clinical evidence is "inconclusive" for the Medicare population—which is comprised of mostly adults 65 years and older and certain disabled individuals under age 65. *See* 42 U.S.C. § 1395c. This finding suggests that if the clinical evidence is inconclusive for adults, then it is likely inconclusive for children, such as Plaintiffs. Dr. Laidlaw also opines that irreversible male chest reconstruction surgery should not be performed on D.H. or John because, in the absence of any imaging, laboratory, or other objective testing, there is no way to predict whether a minor with gender dysphoria, such as D.H. or John, will outgrow the condition. (Doc. 18-1 ep 15.) Additionally, he opines such surgery is inappropriate for minors because they are "still undergoing brain development and as such they are immature with respect to intellect, emotion, judgment, and self-control" and, therefore, "there is a significant chance that a young person may later regret removing an organ that cannot be replaced." (Doc. 18-1 ep 15.)

Dr. Levine was an early member of WPATH and Chairman of the Standards of Care Committee that developed the fifth version of the WPATH SOC.[10] (Doc. 18-2 ep 3-4.) He

---

[10]Dr. Levine was a member from 1974 to 2001 before the organization changed its name to WPATH—it had previously been known as the Harry Benjamin International Gender Dysphoria Association—and he resigned his membership in 2002 "due to [his] regretful conclusion that the organization and its recommendations had become dominated

founded and serves as co-director of the Case Western Reserve University Gender Identity Clinic, and has been retained to provide his expert opinion on the standards of care for treating adolescents with gender dysphoria. (Doc. 18-2 ep 3-4, 18.) Dr. Levine explains that "WPATH represents a self-selected subset of the mental health professions, endocrinologists, and surgeons along with its many non-professional trans members; it does not capture the clinical experiences of others." (Doc. 18-2 ep 20.) Therefore, he opines: "WPATH claims to speak for the medical profession; however, it does not welcome skepticism and therefore, deviates from the philosophical core of medical science." (Doc. 18-2 ep 20.) He further opines there are no reliable scientific data to support surgical intervention in adolescents with gender dysphoria. (Doc. 18-2 ep 27-34.) Dr. Levine also explains chest reconstruction surgery "should not be construed as a curative intervention for gender dysphoria" because it will not eliminate the incongruence of female genitalia, as most transgender males do not have genital reconstruction surgery because "[i]t is expensive, fraught with complications" and is "unable to produce the normal functions of a penis." (Doc. 18-2 ep 33-34.) Dr. Levine also points out the risks associated with transitioning, the lack of any reliable way to predict which patients' gender dysphoria will persist or desist into adulthood, and notes several studies that indicate mental health outcomes do not significantly improve for transgender individuals who undergo surgery. (Doc. 18-2 ep 34-41.)

Defendant also provided a recent opinion from the United Kingdom's High Court of Justice, which reviewed a National Health Service ("NHS") clinic's practice of prescribing puberty-suppressing medication to individuals under age 18 with gender dysphoria. (Doc. 47.) There, claimants argued that persons under age 18 are not competent to consent to such treatment and that the information being provided to such individuals was insufficient and misleading to ensure they could provide informed consent. *Bell v. Tavistock and Portman NHS Foundation Trust*, 2020 EWHC 3274 (Dec. 1, 2020). The court heard testimony from several experts (one of which is a WPATH member), and

---

by politics and ideology, rather than by scientific process, as it was years earlier." (Doc. 18-2 ep 4, 18.)

defendants argued the practice of prescribing puberty-suppressing medication to children under age 18 was "required in accordance with the international frameworks of WPATH and the Endocrine Society and by the domestic regulatory frameworks." *Id.* ¶¶ 57, 60, 97. The court nonetheless concluded: "it is right to call the treatment experimental or innovative in the sense that there are currently limited studies/evidence of the efficacy or long-term effects of the treatment." *Id.* ¶ 148. Although that case did not involve surgery and is not controlling authority, the UK decision regarding puberty-suppressing medication being experimental suggests the irreversible surgery Plaintiffs seek here is also experimental and perhaps risky, which, in turn, casts doubt on the merits of their claims. *See Hernandez*, 872 F.3d at 999; *see also Dahl*, 7 F.3d at 1403.

Based on the record and, in particular, the conflicting opinions provided by well-qualified experts and the lack of any evidence showing Plaintiffs have been evaluated by a psychologist or psychiatrist, the Court finds Plaintiffs have not clearly shown the surgery is medically necessary for them or that it is safe and effective for correcting or ameliorating their gender dysphoria. *See Dahl*, 7 F.3d at 1403. Accordingly, the merits of Plaintiffs' EPSDT claim are doubtful. *See Hernandez*, 872 F.3d at 999.

### 2. Medicaid's Comparability Requirements

Under the Medicaid Act, the medical assistance made available to a qualified individual enrolled in a state plan "shall not be less in amount, duration, or scope than the medical assistance made available to any other such individual." 42 U.S.C. § 1396d(n). This provision is known as the "comparability requirement." Section 1396a(10)(A) further states the medical assistance made available must "at least" include "the care and services listed in paragraphs (1) through (5), (17), (21), (28), and (29) of section 1396d(a)," which do not expressly include gender reassignment surgery or chest reconstruction surgery, generally. *See* §§ 1396d(a)(1)–(5), (17), (21), (28), (29).

Plaintiffs argue the Challenged Exclusion violates Medicaid's comparability requirement because "AHCCCS covers the same services when necessary to treat other conditions." (Doc. 3 ep 10-11.) In other words, Plaintiffs assert the only reason AHCCCS will not cover the surgery is because it is prescribed to treat gender dysphoria, instead of

some other condition, for which the surgery would be covered. (Doc. 25 ep 7.) In support of their argument, Plaintiffs cite a recent district court decision that found Wisconsin's Medicaid policy that excluded transgender care had failed to make certain surgeries available to transgender individuals, and therefore, discriminated on the basis of diagnosis. *See Flack v. Wis. Dep't of Health Servs.*, 395 F. Supp. 3d 1001, 1019 (W.D. Wis. 2019). As explained in Section III.A.3 of this Order, *Flack* is distinguishable and not controlling.

Defendant argues the Challenged Exclusion does not violate the comparability requirement because: (1) "the exclusion applies to all transgender persons alike"; and (2) the comparability requirement "requires comparable services for individuals with comparable needs." (Doc. 18 ep 14.) Specifically, Defendant contends "the needs for relief from gender dysphoria are unique—they are not the same as the needs of a person who seeks [breast] reconstruction after a mastectomy" and this "is particularly true as to children." (*Id.*) Defendant further asserts Plaintiffs' argument "begs the question whether reconstruction following a mastectomy is based on the same needs as chest reconstruction to treat a child's gender dysphoria." (*Id.*)

Based on the record at this stage of litigation, the Court concludes Plaintiffs have not shown the facts clearly favor their position that the Challenged Exclusion violates Medicaid's comparability requirement. *See Dahl*, 7 F.3d at 1403. Not only is it disputed whether the surgery is safe and effective for minors as explained above, but Plaintiffs have not clearly shown the needs of adolescent transgender boys seeking this surgery are comparable to the needs of other patients who require such surgery, such as adult women with breast cancer—the population that most commonly requires surgical removal of their breasts, whether termed "double mastectomy" or "male chest reconstruction surgery." *See supra* note 2. Therefore, the merits of Plaintiffs' claim here are doubtful. *See Hernandez*, 872 F.3d at 999.

*3. Equal Protection Clause and Section 1557 of the Affordable Care Act*

Plaintiffs are also unlikely to succeed on the merits of their claim that the Challenged Exclusion violates the Equal Protection Clause of the Fourteenth Amendment and Section 1557 of the Patient Protection and Affordable Care Act (ACA). (Doc. 3 ep 11-15.) The

Equal Protection Clause provides: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Similarly, Section 1557 of the ACA, codified at 42 U.S.C. § 18116, provides: "an individual shall not, [on the basis of sex] . . . be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . . ."[11] To prevail on their discrimination claim, Plaintiffs must show: (1) AHCCCS is federally funded; (2) Plaintiffs were denied benefits of or otherwise discriminated against by AHCCCS on the basis of their membership in a protected class—here, on the basis of their sex; and (3) the denial of benefits or discrimination was a but-for cause of Plaintiffs' injuries. *See* 42 U.S.C. § 18116(a). The parties do not dispute AHCCCS receives federal funds, but sharply dispute the other elements of Plaintiffs' claims.

Plaintiffs argue they were denied the benefits of and discriminated against by AHCCCS because they are transgender. (Doc. 3 ep 11-12; Doc. 25 ep 8.) To support this, Plaintiffs assert that under *Bostock v. Clayton Cnty., Ga.*, 140 S. Ct. 1731 (2020), "[d]iscrimination because a person is transgender is discrimination because of sex." (Doc. 3 ep 12.) According to Plaintiffs, the fact AHCCCS would cover the surgery "for other medically necessary reasons, such as to treat breast cancer or traumatic injury, but refuses to do so for the treatment of gender dysphoria, demonstrates the [Challenged Exclusion] on its face discriminates based on transgender status and thus on sex." (Doc. 3 ep 13; Doc. 25 ep 8.) Plaintiffs also cite several cases from other states to support their position, including *Flack*, 395 F. Supp. 3d 1001, *Boyden v. Conlin*, 341 F. Supp. 3d 979 (W.D. Wis. 2018), and *Kadel v. Folwell*, 446 F. Supp. 3d 1 (M.D.N.C. 2020).

First, Plaintiffs' reliance on *Bostock* is unpersuasive. The Supreme Court expressly limited its holding to Title VII claims involving employers who discriminated against

---

[11]Section 1557 does not expressly say "on the basis of sex," but rather references title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 et seq., which provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ."

- 15 -

employees because of their gay or transgender status when it wrote: "An employer who fires an individual merely for being gay or transgender defies the law." 140 S. Ct. at 1754. *Bostock* did not involve or purport to deal with a state Medicaid plan exclusion for surgical treatment for gender dysphoria in minors.

Second, Plaintiffs' reliance on cases from other states is also unavailing. *Boyden* is factually distinguishable, as plaintiffs there were adults who challenged Wisconsin's state-sponsored private health plan's exclusion of "[p]rocedures, services, and supplies related to surgery and sex hormones associated with gender reassignment." 341 F. Supp. 3d at 982. It did not involve Medicaid, the plaintiffs were not minors, and the exclusion challenged was significantly different than the Challenged Exclusion here. Similarly, *Kadel* is distinguishable, as it also involved a challenge to a state-sponsored private health plan's exclusion of treatment sought "in conjunction with proposed gender transformation" or "in connection with sex changes or modifications." 446 F. Supp. 3d at 7. Again, that exclusion is significantly different from the one here, and that case did not involve Medicaid or minor plaintiffs.

The most similar case Plaintiffs cite is *Flack*, 395 F. Supp. 3d 1001, in which transgender adults challenged a Wisconsin regulation that excludes from Medicaid coverage not only surgical treatment for gender dysphoria, but also "[d]rugs, including hormone therapy, associated with transsexual surgery or medically unnecessary alteration of sexual anatomy or characteristics." Wis. Admin. Code §§ DHS 107.03(23)-(24). The plaintiffs there similarly argued the regulation violated the Equal Protection Clause and § 1557 by discriminating on the basis of sex. *Flack*, 395 F. Supp. 3d at 1014, 1019-20. There, the defendants' only argument was the State of Wisconsin "could not have understood that Title IX would impose on it a new anti-discrimination requirement when this federal law passed" because "the Seventh Circuit did not hold that sexual orientation and transgender status discrimination were covered under Title VII and Title IX, respectively, until decades after the enactment of Title IX." *Id.* The court found the defendants' argument unpersuasive and granted plaintiffs' motion for summary judgment on their Equal Protection and § 1557 claims, as well as their Medicaid comparability

requirement claim. *Id.* at 1014-15, 1019, 1022. In contrast, the Challenged Exclusion here only excludes gender reassignment *surgery*—it does not exclude coverage for other treatments for gender dysphoria such as hormone therapy. Indeed, Plaintiffs have been receiving hormone therapy covered by AHCCCS for at least one year. More importantly, *Flack* involved *adult* plaintiffs—not minors such as the Plaintiffs here. *See id.* at 1010. Defendant argues that because AHCCCS covers hormone treatment and mental health counseling for the treatment of gender dysphoria, "there is no discrimination against transgender persons or the elimination of coverage for all gender transition treatment" and, therefore, "Plaintiffs have failed to establish their high burden." (Doc. 18 ep 16.) The Court is inclined to agree at this stage of the litigation, especially considering Plaintiffs have not clearly shown the surgery they seek is safe and effective for treating gender dysphoria in adolescents.

Third, although Plaintiffs would be denied coverage for the surgery due to the Challenged Exclusion, they have not clearly shown such a denial would be made on the basis of sex. As noted, AHCCCS clearly covers certain treatments for gender dysphoria. And although AHCCCS does not cover the surgery Plaintiffs seek for the purpose of treating gender dysphoria, Plaintiffs have not clearly shown AHCCCS denies coverage on the basis of sex and not on the basis of some other permissible rationale.

Finally, as explained above, *Bostock* does not apply to the ACA and, unlike the Medicaid exclusions challenged in the other cases Plaintiffs cite, the Challenged Exclusion here does not exclude coverage for all gender dysphoria treatments. To reiterate, Plaintiffs have not clearly shown the surgical treatment they seek is safe and effective for adolescents. Accordingly, the merits of Plaintiffs' Equal Protection and § 1557 claims are doubtful. *See Hernandez*, 872 F.3d at 999.

B. <u>Irreparable Harm</u>

Plaintiffs argue they will be irreparably harmed in the absence of an injunction because such harm is "presumed for violations of constitutional rights" and the continued denial of coverage for the surgery will cause them irreparable physical and emotional harm. (Doc. 3 ep 15.) Specifically, Plaintiffs assert that without immediate relief, their gender

dysphoria "will become increasingly debilitating," as both D.H. and John have histories of suicidal ideation. (Doc. 3 ep 16.) Additionally, Plaintiffs contend prolonged use of the chest binders they wear, "without which neither . . . would be able to function, can cause significant damage to the skin and tissues," which could result in additional scarring from the surgery. (*Id.*)

Defendant counters the distress experienced by Plaintiffs does not rise to the level of irreparable harm and argues "there is significant doubt whether Plaintiffs have a constitutional right to have AHCCCS pay for this surgery." (Doc. 18 ep 12.) Defendant asserts Plaintiffs have not shown irreparable harm because, according to the Diagnostic and Statistical Manual of Mental Disorders Fifth Edition ("DSM-5"), gender dysphoria does not persist into adulthood for most children and, specifically, "[i]n natal females, persistence has ranged from 12% to 50%." (Doc. 18 ep 9 (quoting DSM-5 at 455).) Defendant also asserts Plaintiffs have not demonstrated they are capable of providing informed consent, given their "other significant psychological disorders which pre-date their gender dysphoria." (Doc. 18 ep 9.) As to Plaintiff D.H.'s assertion that wearing a binder could cause irreparable harm, Defendant counters that D.H. has worn a binder for five years without developing any skin conditions or exacerbating his asthma, so irreparable harm is unlikely. (Doc. ep 10.) Defendant also asserts John's long-standing and pre-existing "chronic post-traumatic stress disorder from early life attachment trauma" "should be addressed before irreversible surgical procedures are employed," and notes that Plaintiffs have not provided a declaration from any medical doctor who is treating John. (Doc. 18 ep 10.)

As explained above, the Supreme Court's "frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." *Winter*, 555 U.S. at 22. And because Plaintiffs seek a mandatory injunction, they must demonstrate that "extreme or very serious damage will result," that such damage "is not capable of compensation in damages," and that "the merits of the case are not doubtful." *Hernandez*, 872 F.3d at 999. Although the Court agrees the deterioration of Plaintiffs' mental health could *possibly* result in extreme or very serious damage,

Plaintiffs have not met their heightened burden under the mandatory injunction standard. *See Anderson*, 612 F.2d at 1115.  Furthermore, as Judge Rosemary Márquez explained in her February 26, 2021 order denying a motion for preliminary injunction in a factually different case that involves a similar insurance policy exclusion, it is not clear "the injury complained of is [not] capable of compensation in damages," as Plaintiffs here could potentially pay for the surgeries out-of-pocket and be reimbursed by Defendant if they prevail on the merits of their claims.  *See Toomey v. State of Arizona, et al.*, No. CV-19-00035-TUC-RM, Doc. 162 (denying motion for preliminary injunction where plaintiff sought to enjoin enforcement of policy excluding coverage for gender reassignment surgery in private employer-sponsored health plan).[12]

Furthermore, the Court will deny the motion because the preliminary injunctive relief sought is identical to the ultimate relief sought in the underlying complaint.  "It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits."  *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963). Therefore, "it is not usually proper to grant the moving party the full relief to which he might be entitled if successful at the conclusion of a trial."  *Id.*  This is particularly true when the relief sought would completely change, rather than preserve, the status quo.  As explained above, the status quo here is that AHCCCS will not cover the surgeries Plaintiffs seek because of the Challenged Exclusion.  The relief sought here would not preserve the status quo, but rather would completely change it and is identical to the ultimate relief sought in Plaintiffs' Complaint.  Accordingly, the Court finds it premature to grant such relief prior to discovery and summary judgment briefing and therefore needs not address the remaining *Winter* factors.  *See Monarch*, 971 F.3d at 1032, n.10; *Toomey*, No. CV-19-00035-TUC-RM, Doc. 162; *see also Winter*, 555 U.S. at 20.

---

[12] Like the Challenged Exclusion in the instant case, the health insurance policy at issue in *Toomey* "specifically exclude[s] . . . (16) Gender reassignment surgery."  CV-19-00035-TUC-RM Doc. 86-1 ep 58-59.  Unlike the instant case, however, *Toomey* involves a private employer-sponsored health plan and the plaintiff is an adult seeking coverage for a hysterectomy—a surgery that is covered for treatment of other medical conditions.

### IV. Conclusion

For the foregoing reasons, the Court concludes Plaintiffs have not met the heightened standard for a mandatory injunction to issue. Accordingly,

**IT IS ORDERED** Plaintiff's Motion for Preliminary Injunction (Doc. 3) is **DENIED**.

Dated this 30th day of March, 2021.

Honorable Scott H. Rash
United States District Judge