1            IN THE UNITED STATES DISTRICT COURT

2                    DISTRICT OF ARIZONA

3  D.H., by and through his mother, Janice            CV-20-335-TUC-SHR
   Hennessy-Waller; and John Doe, by and
4  through his guardian and next friend, Susan
   Doe, on behalf of themselves and all others
5  similarly situated,

6            Plaintiffs,

7       vs.

8  Jami Snyder, Director of the Arizona Health
   Care Cost Containment System, in her
9  official capacity,                                 February 5, 2021
                                                        10:06 a.m.
10            Defendant.                              Tucson, Arizona
   _____

11

12

13        REPORTER'S OFFICIAL TRANSCRIPT OF PROCEEDINGS

14                    ORAL ARGUMENT

15        BEFORE THE HONORABLE SCOTT H. RASH
             UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21  Court Reporter:          Erica R. McQuillen, RDR, CRR
                             Official Court Reporter
22                           405 W. Congress Street
                             Tucson, Arizona 85701
23                           (520)205-4267

24

25       Proceedings Reported by Stenographic Court Reporter
         Transcript Prepared by Computer-Aided Transcription

```
 1                    A P P E A R A N C E S

 2   For the plaintiffs:

 3        Asaf Orr
          National Center for Lesbian Rights
 4        870 Market Street
          Suite 370
 5        San Francisco, California 94102

 6        Andrew J. Chinsky
          King & Spalding, LLP
 7        353 North Clark Street
          12th Floor
 8        Chicago, Illinois 60654

 9        Daniel Clayton Barr
          Janet Marie Howe
10        Perkins Coie, LLP
          2901 North Central Avenue
11        Suite 2000
          Phoenix, Arizona 85012

12        Catherine Anne McKee
13        National Health Law Program
          1512 East Franklin Street
14        Suite 110
          Chapel Hill, North Carolina 25714
15
          Abigail K. Coursolle
16        National Health Law Program
          3701 Wilshire Boulevard
17        Suite 750
          Los Angeles, California 90010
18
19        Also Present:  Janice Hennessy-Waller

20

21

22

23

24

25
```

```
 1                      APPEARANCES (CONTINUED)

 2   For the defendant:

 3        David T. Barton
          Kathryn H. King
 4        Burns Barton, LLP
          2201 East Camelback Road
 5        Suite 360
          Phoenix, Arizona 85016
 6
          Logan T. Johnston
 7        Johnston Law Offices, PLC
          14040 North Cave Creek Road
 8        Suite 309
          Phoenix, AZ 85022
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S

 2           THE CLERK:  In Civil Matter 20-335, Hennessy-Waller,

 3   et al., v. Snyder, on for oral argument.

 4           Counsel -- would arguing counsel please state your

 5   appearances.

 6           MR. ORR:  Good morning, Your Honor.  Asaf Orr,

 7   attorney for plaintiffs D.H. and John Doe.

 8           THE COURT:  Okay.  Counsel, I'm going to ask you to

 9   restate that.  I'm getting too much feedback on the phone

10   right now to really understand you clearly, so I'm going to

11   try to figure out how I'm going to reduce that feedback a

12   little bit.

13           So if you can restate your name, and then I may have

14   you do it again if I still can't understand.  Go ahead.

15           MR. ORR:  Sorry.  No problem, Your Honor.  Good

16   morning, Your Honor.  Asaf Orr, attorney for plaintiffs D.H.

17   and John Doe.

18           THE COURT:  No, neither me nor the court reporter

19   are getting you down, so hang on a second.  I gotta figure out

20   a way to tone this thing so that I can hear you more clearly.

21           Counsel, could you just say something again so we

22   can get a test on this again?

23           MR. ORR:  Sure.  Good morning, Your Honor.  Can you

24   hear me now?

25           THE COURT:  Okay.  I can hear.  That's a little
```

1  better.  Turn that down just a little bit more.  See if that

2  kind of ends that feedback.

3         All right.  Counsel, let's try one more time.

4         MR. ORR:  Sure.  Good morning, Your Honor.  Asaf

5  Orr, attorney for plaintiffs D.H. and John Doe.

6         THE COURT:  All right.  Thank you.

7         MR. BARTON:  Good morning, Your Honor.  David

8  Barton, attorney for the defendant.

9         THE COURT:  Okay.  And do we have anybody else on

10  the phone?

11         (Indiscernible simultaneous speaking from counsel.)

12         THE COURT:  Okay.  All right.  Let's start with the

13  plaintiffs' side.  Anybody else additional on the phone?

14         MS. HENNESSY-WALLER:  Good morning, Your Honor.

15  Janice Hennessy-Waller, mother of D.H.

16         MR. RAY:  Good morning, Your Honor.  Brent Ray of

17  King & Spalding for the plaintiffs.

18         THE COURT:  All right.

19         MR. CHINSKY:  Good morning, Your Honor.  Andrew

20  Chinsky, also King & Spalding, for the plaintiffs.

21         THE COURT:  All right.

22         MR. BARR:  And good morning -- and good morning,

23  Your Honor.  Dan Barr also -- from Perkins Coie, also with the

24  plaintiffs.

25         THE COURT:  All right.

```
 1            MS. McKEE:  Good morning.  This is Catherine McKee
 2   from the National Health Law Program, also for the plaintiffs.
 3            THE COURT:  All right.
 4            MS. COURSOLLE:  And Abigail Coursolle --
 5            MS. HOWE:  And good morning --
 6            MS. COURSOLLE:  -- also with the National Health Law
 7   Program for the plaintiffs.  Thank you.
 8            THE COURT:  Okay.  Hang on.  Can the last person who
 9   announced repeat that?  There was a little overlap.
10            MS. COURSOLLE:  Certainly, Your Honor.  This is
11   Abigail Coursolle, also with the National Health Law Program
12   for the plaintiff.
13            THE COURT:  All right.  Anybody else for the
14   plaintiffs?
15            MS. HOWE:  Yes, Your Honor.  This is Janet Howe with
16   Perkins Coie for the plaintiffs.
17            THE COURT:  Okay.  Okay.  That sounds like it
18   finishes the plaintiffs.  Anybody else there for the
19   defendants?
20            MS. KING:  Good morning, Your Honor --
21            MR. JOHNSTON:  Logan Johnston -- sorry.  Please go
22   ahead.
23            MS. KING:  I apologize.  Good morning, Your Honor.
24   This is Kathryn King with Burns Barton for defendant Jami
25   Snyder.
```

```
 1              MR. JOHNSTON:  And also, Your Honor, Logan Johnston
 2    for the defendant Snyder.
 3              THE COURT:  Okay.  Anybody else from the defendants?
 4              MR. JOHNSTON:  No, Your Honor.
 5              THE COURT:  All right.  Welcome, everybody.
 6              Let me first apologize for having to reschedule this
 7    a couple of times.  One was because the COVID virus even
 8    visits judge's households, and I was dealing with that, and
 9    after I dealt with that and tried to reschedule it, we have a
10    very tight schedule here in terms of what courtrooms we can
11    use and what phone lines and VTCs we can use, because we only
12    have so much bandwidth and availability.  So apparently I had
13    scheduled on another judge's time and whatnot, and I needed to
14    reset it.  So the Court apologizes for having to reschedule
15    this a couple of times.
16              With that, since we are on the phone and not in
17    person, you folks can't see what's going on in the courtroom,
18    I can't see what's going on on your end.  As I've indicated,
19    the phones here, usually they're pretty good, but sometimes I
20    get this feedback, and I have a difficult time hearing, so I
21    may have to interrupt counsel, and I don't mean to, but I may
22    have to if I just can't hear you and your words are getting
23    garbled.  I want to make sure I'm hearing you clearly, so I
24    may stop you and ask you to repeat something.
25              The other thing is, I do have some questions for
```

```
 1   both sides.  If I can get them in, fine.  If I can't, I won't
 2   ask them, but they may follow nicely into something that
 3   you're arguing, so I may try to catch you.  So you may pause
 4   periodically.  Maybe I can get in one of my questions.  With
 5   that, I'm going to give each side about 30 minutes to present
 6   and argue, and we will go from there.
 7            All right.  Mr. Orr, since it's your motion, you get
 8   to proceed.
 9            MR. ORR:  Thank you, Your Honor.  May it please the
10   Court, I'd like to reserve five minutes for rebuttal.
11            THE COURT:  Certainly.
12            MR. ORR:  D.H. and John Doe urgently need male chest
13   reconstruction surgery.  The psychological distress that D.H.
14   and John Doe are experiencing is debilitating, and it's
15   affecting every aspect of their lives.  As Tamar Reed, D.H.'s
16   mental health provider, predicted back in August, the delay in
17   getting male chest reconstruction surgery is starting to
18   affect D.H.'s ability to cope with the psychological distress
19   he's experiencing.  And as we informed the Court, back in
20   November of 2020, D.H. experienced such a severe panic attack
21   due to being treated as female at work that he required
22   emergency medical care and a visit to the hospital.
23            D.H. -- excuse me.  John Doe's mental health is also
24   in significant distress.  He experiences regular anxiety
25   attacks at night that keep him up for hours at a time.  He has
```

```
 1    a history of self-harm, and both his mental health provider
 2    and grandmother, who's his caretaker and guardian, are
 3    concerned that any further delay in his ability to get this
 4    medically necessary surgery will further harm his mental
 5    health.
 6             But both D.H. and John need the surgery for more
 7    than just their mental health.  For example, D.H. experiences
 8    significant physical pain from wearing the binder for long
 9    periods of time.  This also impacts his ability to focus in
10    school and has prevented him from participating in dance,
11    which was an activity that was both good for his physical
12    health, as well as providing him significant emotional relief.
13             As for John, he has to wear multiple layers of
14    clothing, even in the hot Arizona summers, which is
15    extraordinarily uncomfortable.  He also has significant social
16    anxiety out of fear that one of his peers will treat him as
17    female because of the appearance of his body.
18             Denying or delaying this care further will have
19    devastating short- and long-term consequences on their
20    physical and mental health, for example, worsening --
21    continuing worsening of their mental health and gender
22    dysphoria and other conditions.
23             Each of these harms are sufficient to be irreparable
24    on their own, let alone in combination with one another, and
25    plaintiffs are here today, Your Honor, seeking an opportunity
```

1 to demonstrate the medical necessity of male chest

2 reconstruction surgery and are asking the Court to enjoin

3 enforcement of that exclusion as to D.H. and John Doe so they

4 can demonstrate to the managed care organizations that this

5 procedure is, in fact, medically necessary for them.

6        As outlined in our -- as outlined in our briefs and

7 the accompanying declarations, plaintiffs meet each of the

8 four factors for obtaining a preliminary injunction.  Before

9 getting to those four factors, however, Your Honor, I'd like

10 to first address what is the appropriate standard for this

11 Court's analysis of our motion for preliminary injunction.

12        This is a classic example of a prohibitory

13 injunction.  Plaintiffs ask for an order prohibiting a

14 Government agency from continuing its unlawful and

15 discriminatory conduct.  As the Ninth Circuit has made clear

16 in multiple cases, it doesn't matter if the prohibitory

17 injunction ultimately resulted in defendant paying money.  For

18 example, in M.R. v. Dreyfus, the Ninth Circuit upheld the

19 injunction which required the Washington State Medicaid agency

20 to pay more in benefits.

21        It also doesn't matter whether the policy is about

22 to be implemented or long-standing, which was the case, for

23 example, in Melendres v. Arpaio, where the Ninth Circuit

24 upheld an injunction of a long-standing practice.

25        The cases cited by defendant don't warrant imposing

1   the mandatory injunction standard.  Those cases involve

2   private parties along equal footing when they permitted what

3   was then the status quo --

4          THE COURT REPORTER:  I'm sorry.  Can you slow down?

5   I can't understand you.

6          THE CLERK:  Mr. Orr?  Mr. Orr?

7          MR. ORR:  Yes.

8          THE CLERK:  We're going to need you to slow down and

9   back up a bit since you're -- I think you're reading.  The

10  court reporter's having a hard time taking it down.

11         MR. ORR:  I'm sorry.  I'm not reading, but I'll make

12  sure to slow down just a little bit.

13         So I think I'll go back to discussing defendant's

14  cases.  As I indicated, the cases cited by defendant don't

15  warrant imposing the mandatory injunction standard here.

16  Those cases involve private parties who are on equal footing

17  when they created the status quo.  They also involve cases of

18  employment discrimination, cases which are -- where injunctive

19  relief is rare because of the lack of irreparable harm.  In

20  those cases, Courts can order back pay and front pay as well

21  as backdate promotion such that they can make the plaintiff

22  whole.

23         Finding otherwise, finding that the mandatory

24  injunction standard would apply, would place a thumb on the

25  scales against plaintiffs who are challenging an

```
 1   unconstitutional governmental practice because those
 2   plaintiffs don't have an opportunity to participate in the
 3   creation of the status quo.  And again, the Ninth Circuit has
 4   been clear even in cases involving the -- involving AHCCCS
 5   that the prohibitory injunction standard would need to be
 6   applied.  But even if the Court finds that it needs to apply
 7   the mandatory injunction standard, plaintiffs meet that
 8   standard as well.
 9          This is not a doubtful case.  As discussed in our
10   briefs and as I'll discuss later in this argument, plaintiffs
11   have demonstrated a likelihood of success on each of the four
12   claims that are brought forth as part of this preliminary
13   injunction, as well as the very serious nature of the harms to
14   plaintiffs.
15          In fact, one of the cases cited by defendants, Dahl
16   v. HEM Pharmaceuticals, in that case, the Ninth Circuit upheld
17   the mandatory injunction on behalf of the plaintiffs, who were
18   entitled to receive a medication as a result of participating
19   in a drug trial, and the Court found that the harm caused by
20   denying them that medication was irreparable and warranted a
21   mandatory injunction.
22          Lastly, I'll note on the preliminary injunction
23   standard that, regardless of the elements that the Court
24   applies, the elements are a balance using a sliding scale
25   approach.
```

1           Before getting to the likelihood of success on the

2    merits of each claim, however, I did also want to discuss the

3    standard of care, because that -- for the treatment of gender

4    dysphoria, because that applies to each of the four claims

5    that plaintiffs bring here.

6           Male chest reconstruction surgery is the

7    well-established consensus standard of care.  There is medical

8    literature and clinical expertise that's been demonstrated

9    that this procedure is safe and effective for the treatment of

10   gender dysphoria in adolescents and young adults, as well as

11   adults.

12          The standards of care were developed through a

13   consensus of experts in the field and have been adopted by

14   many professional associations of medical and mental health

15   providers.  Those associations include the American Medical

16   Association, the American Psychological Association, the

17   American Academy of Pediatrics and the Endocrine Society.

18          Male chest reconstruction surgery is not

19   experimental even under AHCCCS's own regulatory definition of

20   that term.  The treatment is generally and widely accepted and

21   is safe and effective for the treatment of gender dysphoria,

22   as demonstrated by the wide support that the standard of care

23   has gotten by the major medical and mental health associations

24   in the United States.  It is also supported by substantial

25   literature in the peer-reviewed journals in the United States.

 1          And the opinions of Drs. Laidlaw and Levine don't

 2   change the analysis.  As with any standards of care --

 3          THE CLERK:  Mr. Orr, could you repeat the names of

 4   the doctors, please?

 5          MR. ORR:  Sure.  Drs. Laidlaw and Levine.  Would it

 6   be helpful for the court if I spelled them?

 7          THE CLERK:  Yes.

 8          MR. ORR:  Okay.  Laidlaw is spelled L as in Larry, A

 9   as in apple, I as in ice cream, D as in David, L as in Larry,

10   A as in apple, W as in William.  And Levine is L as in Larry,

11   E as in extra, V as in Victor, I as in ice cream, N as in

12   Nancy, E as in extra.

13          THE COURT:  Mr. Orr, before you go on, as I read it,

14   the DSM-5 says the majority of adolescent cases of gender

15   dysphoria resolve on their own without surgical intervention.

16   If that's the case, then granted, there's doctors that feel

17   otherwise, and they're well-qualified, but doesn't that then

18   create some kind of disjunction between the argument you're

19   making and the argument the defendants are making such that

20   the Court probably needs to hear from the experts before I can

21   really make a ruling on this?

22          MR. ORR:  No, Your Honor.  Those studies that I've

23   cited in the DSM-5 as well as in the declarations and briefs

24   filed by the defendant deal with gender dysphoria in

25   childhood, where here, what we have here, both D.H. and John

```
 1   Doe are adolescents, and there is consensus among providers,

 2   including the authors of those studies, around sort of

 3   continuation of gender dysphoria that, in adolescents, it is

 4   critical for adolescents to be able to access medically

 5   necessary treatment, including medications as well as surgery.

 6           THE COURT:  All right.  And hearken back, then, for

 7   a minute to your mandatory versus prohibitory injunction.  It

 8   seems to me we're just kind of playing semantics here because,

 9   while you may call it a prohibitory injunction, if I issue it,

10   that means that the adolescents would get the surgery;

11   correct?

12           MR. ORR:  No, Your Honor.  What would then occur is

13   that D.H. and John Doe would submit prior authorizations to

14   the managed care organizations that would then apply the

15   standard medical necessity analysis and determine whether or

16   not, again, it's medically necessary for them.  What we are

17   asking the Court to do is just enjoin AHCCCS from using that

18   exclusion as a basis for denying coverage for these two

19   plaintiffs.

20           THE COURT:  Well, that sounds to me like there's

21   administrative remedies.  Now I'm really confused, Mr. Orr.

22   You're going to have to help me out here.  Are you telling me

23   that it hasn't even been established whether it's medically

24   necessary for these two juveniles or adolescents to have the

25   surgery because, if I grant the injunction, that just then
```

 1   starts the process as to whether they can actually be reviewed

 2   or certified in whether it's medically necessary?

 3           Help me out here.

 4           MR. ORR:  Sure, Your Honor.

 5           No.  Our clients have been evaluated by their mental

 6   health providers, by their medical providers, and they've also

 7   been evaluated by Dr. Schechter, and each of those providers

 8   have stated that male chest reconstruction surgery is

 9   medically necessary for them.  All that we're saying, Your

10   Honor, is that, in order to go through the process and get

11   coverage approved, is that our clients would have to file the

12   request for prior authorization, and once that that would be

13   approved, then they would be able to get the surgery.

14           You know, as defendant indicated in the denial of

15   D.H.'s prior authorization, the only impediment is this

16   exclusion, so we fully expect that, given that both D.H. and

17   John Doe have the support of their medical and mental health

18   providers, that the managed care organizations will find that

19   it's medically necessary for our clients to undergo male chest

20   reconstruction surgery, but we want it to be clear, Your

21   Honor, that what we're asking for in terms of this Court's

22   order is to enjoin enforcement of the exclusion as to both

23   D.H. and John Doe.

24           THE COURT:  Well, if I grant -- all right.  If I

25   grant the injunction, you're saying that your clients still

 1   have to go through a process to be determined as to whether
 2   Medicaid would cover the surgery as to whether it's medically
 3   necessary.  That sounds to me like there's administrative
 4   appeals, and there should be some kind of an administrative
 5   process that hasn't occurred yet, and then I'm curious as to
 6   why we're here, because if they've still got a process by
 7   which they can appeal or seek coverage, which is what you're
 8   telling me, then I'm just not clear as to why we're here then.
 9           MR. ORR:  Your Honor, we're here because D.H. did in
10   fact seek prior authorization and was told that they would not
11   authorize the surgery because it is not covered because of the
12   exclusion; and therefore, we're here challenging the exclusion
13   because it violates both the Medicaid Act as well as Section
14   1557 and the Equal Protection Clause, and we're seeking an
15   order essentially requiring AHCCCS to consider the prior
16   authorization request without taking into account the
17   exclusion.
18           We believe, given, again, that their mental health
19   providers and medical providers are universal in this in that
20   male chest reconstruction surgery is medically necessary for
21   them, that that would then be approved.
22           THE COURT:  Well, when you say the word "universal,"
23   that's pretty all-encompassing, and I gotta tell you, although
24   I haven't had a chance to read it, but I heard about it, the
25   defendants filed a case from Britain that kind of questions

 1    that.  There is other literature out there that questions it.

 2    And I know your experts simply just, you know, wrote that off

 3    in their supplemental rebuttal that was filed with your reply.

 4         It seems a little disingenuous.  I mean, clearly

 5    there's some other avenues of thought out there that, you

 6    know, this male chest reconstruction surgery is not all the

 7    cure that it's claimed to be by others.

 8         And then your other argument, and again, maybe I'll

 9    let you just get back to it, because you'll answer my

10    questions, but is it permissible for AHCCCS to cover a

11    treatment, whether medication, surgery, et cetera, for one

12    diagnosis but deny it for the other?  I mean, isn't this

13    really about whether AHCCCS can discriminate on the basis of a

14    diagnosis instead of on, quote, the basis of sex?

15         Let me just give you an example.  If AHCCCS covers a

16    surgery for women with breast cancer and for men with breast

17    cancer, does that also mean they have to cover it for purposes

18    of treating something else?

19         MR. ORR:  Thank you, Your Honor, and just to

20    clarify, when I used the word "universal," I meant that both

21    of their mental health providers and their medical providers

22    believe that it is medically necessary for their patients.

23         You know, in responding quickly to the Court's

24    reference to Dahl v. Tavistock, you know, although we intend

25    to review it more thoroughly and provide our thoughts on that

case in particular, I actually think that that case is not relevant to a legal analysis here.  It discusses a treatment that is not at issue here.  It is -- you know, it involved those -- if I remember correctly --

THE COURT:  Well, Mr. Orr I haven't read the case. I haven't read the case, so I'm not too concerned about it at this time.  It was just that you mentioned that this is universal, and it just -- from everything I've seen, it doesn't seem like it's that universal.

And let me see if I can kind of clarify my question a little bit, and let's take it out of this context, because this context may be a little heated in terms of the political and social rhetoric.  Let's just take, do you believe that AHCCCS can deny treatment for fertility treatments?

MR. ORR:  Your Honor, I know that AHCCCS does have an exclusion for fertility treatments.  What I can say, I think hopefully this will address your question, is that if AHCCCS provides fertility treatments to treat for certain conditions and denies it to others, it must have a rational basis for distinguishing between those two groups of Medicaid recipients, and you know, a Medicaid recipient who is currently being denied infertility services does not need to demonstrate that they have an identical need for those same services as the preapproved Medicaid recipients for whom that is currently covered, and the Courts have recognized that the

1    need between two groups of people is rarely going to be

2    identical, but they need to be able to demonstrate that it's

3    comparable and that there's a comparability argument, Your

4    Honor.

5            THE COURT:  Yeah, and I gotta tell you, I'm trying

6    to wrap my ahead around that comparability argument as well.

7    I've read the briefs and whatnot.  I just gotta tell you, it's

8    not an issue I'm overly familiar with.  And I guess, taking my

9    example a little bit further, here's what my thinking was, and

10   maybe my thinking's wrong, and you can correct me if you think

11   so.  It's that, if a woman wants some fertility treatments,

12   they're denied by AHCCCS, and she goes to AHCCCS and says, I

13   want fertility treatments, I need them because my mental

14   health is suffering because I want to have children and I

15   can't do it, and AHCCCS says, no, there's a clear denial, you

16   know, it's not covered, and so she goes out, and she gets her

17   doctor and her therapist to say, you know, I'm suffering from

18   intense distress and depression because I'm unable to have

19   children, that it's medically necessary for me to have these

20   fertility treatments, you know, just because those doctors and

21   therapists say that it's medically necessary, and she makes a

22   strong case that she needs fertility treatments, can AHCCCS

23   still deny that, or under your argument, does AHCCCS have to

24   say, no, you know, that's a discriminatory provision, and

25   we're going to have to I guess now go through that process

1    that you talked about, whether -- which we go further down the

2    road?  That's where I'm kind of -- I'm unclear.

3           MR. ORR:  And Your Honor, I think those two -- well,

4    that scenario I think differs significantly from what we have

5    here.  In that case, of a woman who is seeking treatment for

6    infertility, you know, and is suffering some level of

7    psychological distress, whether that's anxiety or depression,

8    what I can say, you know, off the cuff, is that my

9    understanding is that treatment for infertility does not treat

10   depression, does not treat anxiety, whereas what we have here

11   is male chest reconstruction surgery.  It is a treatment that

12   is designed to treat gender dysphoria, and it's the standard

13   of care and is recognized as safe and effective for the

14   treatment of gender dysphoria.

15          And I think that is the critical difference, is that

16   we have on the one hand a person who's seeking coverage for

17   fertility services and is experiencing psychological distress

18   because of her inability to conceive whereas -- and so there's

19   a disconnect between what is the standard of care for the

20   treatment of the psychological distress she's experiencing

21   versus here, the surgery is recognized, is well established as

22   a safe and effective treatment for gender dysphoria.

23          THE COURT:  Well, aren't fertility treatments also

24   considered safe and effective?

25          MR. ORR:  Your Honor, I can't disagree with that.  I

1   don't know that -- but that is not the -- there may be other

2   reasons that allow Medicaid to exclude fertility services, but

3   both between the comparability requirement as well as the

4   obligation under EPSDT, certainly the Medicaid Act would

5   require AHCCCS and other Medicaid agencies to allow Medicaid

6   recipients to demonstrate medical necessity for procedures

7   like male chest reconstruction surgery.

8           THE COURT:  All right.  Let me go back, then, to

9   more your universal claim.  Who gets to decide what is safe

10  and effective treatment, or medically necessary, for that

11  matter?  I mean, I practiced for a lot of years.  I talked to

12  a lot of experts.  I can find experts just about on most

13  issues on either side of the coin.  And as a judge, I get to

14  have the benefit of having the experts both in my courtroom

15  and getting to ask them questions so I can figure out how

16  things work in a lot of respects.

17          But I guess I'm a little curious as to why your

18  experts are so adamant about their position and unwilling to

19  consider another expert's opinion.  Even though the

20  qualifications may be different, they seem equally qualified.

21          MR. ORR:  Well, I think, Your Honor, the standards

22  of care and the standards that were discussed in the

23  declarations of Drs. Janssen and Dr. Schechter track the

24  consensus standards of care which have been adopted by many

25  major mental and medical health associations in the United

 1    States and around the world.

 2            And on the other side, Drs. Laidlaw and Levine are

 3    providers for whom their regular practice does not include

 4    treatment of adolescents with gender dysphoria and that they

 5    simply disagree with that consensus, you know, and there are

 6    many situations where there is a consensus standard of care

 7    and there are providers that are kind of on the margins, some

 8    providers that believe the standards of care went too far and

 9    others that didn't, feel that it didn't go far enough.  The

10    existence of those opinions doesn't negate the fact that they

11    are still the prevailing standards of care.

12            And, you know, as we detailed further in our -- in

13    the reply declarations as well as our reply brief, we feel

14    that there are a number of other reasons why the opinions of

15    Drs. Laidlaw and Levine are not reliable, and in fact, Federal

16    Courts have repeatedly declined to rely on several opinions,

17    including those of Dr. Levine, and also Federal Courts

18    consistently recognize the standard of care that has been

19    adopted by the AMA and AAP and other organizations as the

20    prevailing standard of care.

21            So I hope that answers your question, Your Honor.

22            THE COURT:  It's helpful.  Thank you, Mr. Orr.

23    Please continue.

24            MR. ORR:  Sure.

25            With that, I'd like to move into a discussion of

```
 1 │ likelihood of success on the merits, starting with our EPSDT
 2 │ claim.  Courts interpret EPSDT to be broad and exclusive
 3 │ rather than exclusive.  EPSDT was designed to provide critical
 4 │ coverage to Medicaid recipients under age 21.  The
 5 │ congressional intent behind EPSDT is clear:  We want to
 6 │ provide coverage, greater coverage, to young people before
 7 │ their health conditions become more complex and difficult and,
 8 │ frankly, more expensive to treat as adults, and that is why
 9 │ EPSDT requires Medicaid agencies to provide coverage for
10 │ services that quote/unquote correct and ameliorate a condition
11 │ regardless of whether or not that treatment is covered for
12 │ adults.
13 │         This Court's decision in Ekloff v. Rodgers is
14 │ particularly instructive here.  In that case, children with
15 │ developmental disabilities were denied coverage for diapers to
16 │ treat incontinence.  This Court found that the diapers were
17 │ necessary to correct or ameliorate a condition, specifically,
18 │ that those diapers prevented the children from developing skin
19 │ sores, which then ultimately allowed them to avoid unnecessary
20 │ medical treatment to treat that condition, as well as the pain
21 │ associated with those skin conditions.  It also increased the
22 │ plaintiff's ability to engage in their daily life, which
23 │ included classes that helped build their social skills and
24 │ other skills they needed to live.
25 │         Just as in Ekloff, EPSDT requires coverage in male
```

chest reconstruction surgery.  A declaration provided by
plaintiffs, both by plaintiffs themselves, their treating
providers, as well as the experts, Drs. Janssen and Schechter,
prove that male chest reconstruction surgery will correct or
ameliorate gender dysphoria.  It will alleviate the gender
dysphoria as well as reduce the functional limitations that
D.H. and John Doe experience, for example, limitations on the
ability to focus in school, to participate in physical
activities, to engage in social activities with friends.  It
will eliminate physical pain that D.H. in particular
experiences as a result of the binder.  It will increase both
of their capacities to address the current medical health
issues that they're experiencing, something that Dr. Peck
specifically spoke about in her declaration, that, you know,
John Doe has come far in his mental health treatment, but his
not having access to male chest reconstruction surgery is
preventing him from progressing any further.

It will also prevent D.H. and John Doe from
developing the skin conditions that are often associated with
long-term binder use.  It also reduces the complexity of the
surgical procedure for male chest reconstruction surgery and,
relatedly, the amount of scarring.

It's also important to point out that there's also
cost savings here, that providing the surgery will then result
in AHCCCS not having to provide coverage, for example, the

1    emergency medical services that D.H. required back in

2    November.  And so, you know, it is entirely consistent with

3    the purpose of EPSDT to provide this coverage from a

4    cost-saving perspective as well.

5         The cases cited by defendant don't diminish the

6    strength of plaintiffs' EPSDT claim.  For example, the

7    defendant's cite a case from the Fifth Circuit from 1980, Rush

8    v. Parham.  In that case, the Fifth Circuit simply remanded

9    back to the District Court in order for the District Court to

10   consider or to allow the Medicaid agency to present evidence

11   that the surgical treatment that the plaintiff in that case

12   requested was experimental.  It made no conclusions about

13   whether or not the procedure itself was, in fact,

14   experimental.

15        But it's also important to note that that case was

16   decided approximately 40 years ago, and in that time, the

17   standards of care and our understanding of the necessary

18   treatments for gender dysphoria have developed significantly,

19   and there's significant support for, again, the safety and

20   efficacy of male chest reconstruction surgery in adolescents

21   and young adults.

22        THE COURT:  Well, 40 years ago, Mr. Orr, I don't

23   think gender dysphoria was even something that was even on the

24   radar, was it?

25        MR. ORR:  Your Honor, it was in the DSM -- I think

```
1   III at the time, and it was referred to as gender identity

2   disorder.  In this most recent iteration of the DSM, DSM-5,

3   the American Psychiatric Association changed it to gender

4   dysphoria to show that it's not that there's something

5   inherently psychologically problematic with being transgender

6   and really focusing on the dysphoria caused by not being able

7   to be affirmed and live consistent with your gender identity

8   in all aspects of your life.

9           THE COURT:  Right.  The older one, 40 years ago,

10  they still looked at it as some kind of a -- well, more of a

11  mental problem or something of that effect.  I mean, I agree

12  with you, times have definitely changed in 40 years, and I'm

13  not sure that that case was particularly, at this point

14  anyways, in terms of standard of care, has any real

15  significance.

16          MR. ORR:  Agreed.

17          If the Court doesn't have any further questions

18  about the EPSDT claim, I'd like to move on to the

19  comparability claim, and hopefully that will sort of provide

20  further color to our discussion earlier about that claim.

21          THE COURT:  All right.  I would like to hear about

22  the comparability, so I'm going to let you go there, and

23  you've got about three minutes, reserving five minutes for

24  your rebuttal.

25          MR. ORR:  Okay.  Thank you, Your Honor.
```

1          The comparability requirement really operates as an

2   equality principle, and it is about prohibiting Medicaid

3   agencies from arbitrarily denying a required service solely

4   because of the diagnosis, type of illness, or condition.  And

5   AHCCCS provides chest reconstructive surgery to other Medicaid

6   recipients to treat a variety of short- and long-term physical

7   and mental health needs, and, you know, the needs that male

8   chest reconstruction surgery will address for gender dysphoria

9   is comparable, again, if not identical.  The exclusion itself

10  is expressly prohibited by federal regulations even though

11  there's no legitimate reason for enforcing that exclusion.  As

12  I indicated before --

13          THE COURT REPORTER:  I'm sorry.  I can't hear him.

14          THE CLERK:  Mr. Orr?  Mr. Orr?

15          THE COURT:  Mr. Orr, Mr. Orr, I'm sorry.  My court

16  reporter here is telling me she isn't able to keep up with you

17  again, so if you could slow down just a little bit.

18          Thank you.

19          MR. ORR:  I'm sorry.  Sure, sure.

20          So as I was saying, Your Honor, AHCCCS also provides

21  chest reconstructive surgery to other Medicaid recipients to

22  treatment a variety of short- and long-term physical and

23  mental health needs, and those needs are similar to the ones

24  that would be addressed by male chest reconstruction surgery

25  here.  The surgery for D.H. and John would address D.H.'s

physical pain and would improve their overall functioning in
every aspect of their lies.

Given the amount of time I have left, I do want to
quickly address the discrimination claims.  Discrimination
against transgender people is a form of sex discrimination.
That has been clear even before Bostock but certainly since,
and Courts have treated it that way.

THE COURT:  Well, hang on.  You mentioned --
Mr. Orr, you mentioned Bostock, but Bostock by its own terms
only applies to employment discrimination.  How could this
Court expand that beyond employment discrimination when the
case itself explicitly says it's only addressing employment
discrimination?

MR. ORR:  Your Honor, Federal Courts have
interpreted sex discrimination laws as a consistent whole, and
there is a vast number of cases where Courts have interpreted
Title IX as including -- as including protections for
transgender people, as well as Section 1557 itself, and as the
Court is familiar, Section 1557 prohibits sex discrimination
by inclusion of or reference to Title IX, so these are a
consistent whole.

THE COURT:  Okay.

MR. ORR:  And the text of the exclusion itself,
"gender reassignment surgery," creates a sex-based
distinction.  The Court -- sorry.  Medicaid can't apply that

exclusion without considering sex.  The fact that AHCCCS

covers other treatments for gender dysphoria is irrelevant.

That exclusion is still sex-based, and the regulations that

defendant points to are unavailable because they've been

enjoined for violating the Administrative Procedures Act.

And lastly, Your Honor, if I have a few moments, I'd

like to quickly talk about the equal protection claim, which

is that equal protection -- discrimination based on gender

identity is entitled to intermediate scrutiny.  The cases

cited by defendants to the contrary have been overruled by

Bostock.  The exclusion, again, just like in the context of

Section 1557, is sex-based.

The difference here is that now the State bears the

burden of proof demonstrating it has an extremely persuasive

justification, and here the Medicaid agency, AHCCCS, only

proffers post hoc rationalizations, which are not permitted.

Plaintiff propounded multiple RFPs and interrogatories to ask

about the origins of the exclusion and were repeatedly told

that no records existed.

And their claims that this is based on an idea that

the surgery was experimental are belied by the regulation

itself, which just appears in a litany of other excluded

procedures, including hysterectomies and abortion care.

THE COURT:  All right.  All right.  Mr. Orr, I'm

going to have to come back to you.  I need to hear from

1   Mr. Barton a little bit.  I let you run over a little bit

2   because I'm interested in what you had to say on that, but

3   maybe you can revisit it in your rebuttal real briefly.  Okay?

4           MR. ORR:  Yes.  Thank you, Your Honor.  I appreciate

5   it.

6           THE COURT:  All right.  Mr. Barton?

7           MR. BARTON:  Thank you, Your Honor.  I'm going to

8   try and speak slowly, but if I get blustering, please just

9   stop me.

10          THE COURT:  All right.

11          MR. BARTON:  I want to begin with the notion of what

12  type of injunction is sought here.  This is not very

13  difficult.  A mandatory injunction by definition, quote,

14  requires a party to take action, and the Court need look no

15  farther than the Docket 3-1, which is the order, proposed

16  order, on the injunction.  Item Number 2, the plaintiffs ask

17  the Court to require the Arizona Health Care Cost Containment

18  System shall provide coverage for plaintiffs' male

19  reconstruction surgery consistent with all the requirements of

20  federal law.

21          No doubt they are requiring us to take action.  They

22  ask this Court to require us to provide coverage for their

23  surgery.  That is a mandatory injunction that the Courts have

24  said are particularly disfavored and not issued in doubtful

25  cases.

1        So let's talk about why this case is doubtful.

2   First of all, the plaintiffs claim that D.H. and John meet the

3   eligibility requirements for male chest reconstruction surgery

4   and the prevailing standards of care.  That's in their reply

5   at page 2.  That is critical to their claim.  They have to

6   prove that their plaintiffs meet the eligibility requirement

7   and that chest reconstruction surgery is the prevailing

8   standard of care for gender dysphoria.  Both of those items

9   are seriously in doubt, and let me explain.

10        First, we know almost nothing of consequence

11   regarding D.H. and John.  Despite repeated requests, the

12   plaintiffs have refused to turn over their medical records,

13   including with their initial disclosure, did not include any

14   medical records from the plaintiffs.  All we have is the

15   carefully selected facts their lawyers have decided to share

16   with the Court in declarations that they have provided.  We

17   would submit the decisions about the health care of Arizona's

18   children should not be made based upon one-sided,

19   one-dimensional declarations prepared by attorneys.

20        And let's talk a little bit about those declarations

21   for just a second when we consider the claim by the plaintiffs

22   that this treatment is medically necessary for D.H. and John

23   Doe.  D.H.'s claim is supported by just one actual doctor,

24   Dr. Cronyn.  He's D.H.'s pediatrician.

25        As far as his psychological care is concerned, he

submitted only a declaration from Tamar Reed.  Ms. Reed has a

master's in counseling, and she is a licensed professional

counselor.  Under Arizona law, a licensed professional

counselor can't even prescribe medication, but the plaintiffs

would have you believe that her recommendation is sufficient

to warrant this incredibly invasive and irreversible surgery

for D.H.

        John Doe doesn't even have any kind of a medical

provider supporting his application.  His application is

supported only by the declaration of Mischa Cohen Peck, a

licensed clinical social worker and therapist.  She has a

master's in social work and a Ph.D. in social welfare but no

medical degree.  She too cannot even prescribe medication, and

yet she is the only medical person who provides any support

for John Doe's claim that he's medically entitled to these

surgeries.

        They next provide two declarations from experts who

are both WPATH members, one of whom is on the WPATH board of

directors.  Dr. Janssen bases his opinions related to John Doe

and D.H. entirely upon a declaration he was supplied by legal

counsel.  That's found in his declaration at paragraph 19.

Dr. Schechter, who is on the board of directors of WPATH, is a

surgeon, but he's never met D.H. and John Doe.  He had one

video conference with them.  That's at paragraph 18 of his

declaration.

 1          This is the medical evidence that these plaintiffs

 2    claim support their contention that this treatment is

 3    medically necessary for them and is consistent with the

 4    prevailing standards of care.  I would suggest, Your Honor,

 5    that that is a huge claim to make given the limited medical

 6    information we have here.

 7          Next, the plaintiffs posit the -- they promote, they

 8    suggest, that the only standard of care is the standard of

 9    care championed by WPATH, an organization that they admit is

10    an advocacy organization, and its mission is to promote only

11    one possible treatment for individuals suffering from gender

12    dysphoria, and that is affirmation.  The culmination of

13    affirmation is gender reassignment surgery, which is what the

14    plaintiffs seek here.

15          We would point out and we have pointed out that

16    there are other treatments available for gender dysphoria, and

17    to the Court's earlier question, is the State or AHCCCS

18    required to provide all available treatments for this

19    condition, no.  The State can select between various

20    treatments, and the State provides treatments for gender

21    dysphoria, and if it decides in its logic and its analysis

22    that a treatment is not medically necessary or is not safe and

23    effective, it's well within its rights to decide that that

24    treatment is not going to be provided, and that's all we have

25    happening here.

1          As our experts have pointed out, the affirmation

2   approach to the care and treatment of gender dysphoria has not

3   been proven safe and effective in long-term studies, and it

4   could be downright dangerous in many cases.

5          Before being required to abandon the rule that has

6   been in place since 1982, AHCCCS is entitled to a fair hearing

7   to determine whether reassignment surgery is the prevailing

8   standard of care for children and young adults suffering from

9   gender dysphoria.  That hearing can only happen after

10  discovery, including discovery into the class issues we've

11  raised and the merits of plaintiffs' claims.

12          THE COURT:  And Mr. Barton --

13          MR. BARTON:  Plaintiffs' argument --

14          THE COURT:  Mr. Barton, I want to jump in here

15  because you're touching on that issue that I raised with

16  Mr. Orr in that, is there some type of administrative process

17  that still needs to take place here, I mean, before this case

18  even comes here?  Because you're kind of saying, at least what

19  I hear you saying, is you're entitled to a hearing as to

20  whether -- is that hearing an administrative hearing as to

21  whether this is safe and effective, medically necessary, or is

22  it like Mr. Orr says, that, no, Judge, if you just prohibit

23  them from enforcing this clause under the regulation, then we

24  have this hearing to determine whether it's medically

25  necessary for my clients?

```
 1              MR. BARTON:  Great point, Your Honor.  There, in
 2    fact, is a medical -- a process before AHCCCS, an
 3    administrative process, that could be utilized to determine
 4    whether John Doe and D.H. qualify for this surgery, and in
 5    fact, what we have so far, at least what we know, is that D.H.
 6    applied for benefits and was denied, but he did not appeal
 7    that determination.  He did not invoke the administrative
 8    machinery to determine whether, in his particular case and in
 9    his unique circumstances, there were reasons why he should get
10    this surgery.  So it has not been determined that surgery is
11    medically necessary for him even though it could have been
12    through the AHCCCS process, the appeal, administrative appeal
13    process.
14              John Doe hasn't even applied for this benefit.  He's
15    not even sought the benefit.  So he hasn't been denied.  He
16    hasn't appealed.  He hasn't tried to prove that his
17    circumstances warrant the medical benefits he seeks.
18              THE COURT:  Okay.  Well, that --
19              MR. BARTON:  Does that answer your question?
20              THE COURT:  Well, it does in some degree.  I guess
21    it seems to me, then, is this lawsuit a bit premature?  I
22    guess I'm trying to figure out, is that discussion that we're
23    going to have, whether it's medically necessary and safe and
24    effective for these particular plaintiffs, something that the
25    Court's going to do, or that's really something that it sounds
```

1  to me like AHCCCS should rule on first, and then you come to

2  the Courts and you say, hey, Judge, we disagree with their

3  findings and how they did it or whatever conclusion you may

4  come to, if indeed you come to a conclusion that's contrary to

5  their position?

6          MR. BARTON:  We agree, Your Honor.  We believe they

7  should be given -- AHCCCS should be given the opportunity to

8  consider these unique cases and make a determination before a

9  Court compels AHCCCS to provide the relief they want.

10         THE COURT:  Isn't under the APA or even under AHCCCS

11  itself, isn't there a requirement that you exhaust your

12  administrative remedies before you file the lawsuit?

13         MR. BARTON:  It is.

14         THE COURT:  Okay.  I'm going to let you continue on,

15  but Mr. Orr, that's something I really want you to address in

16  your rebuttal.

17         Go ahead, Mr. Barton.

18         MR. BARTON:  So next, plaintiffs, you know, as

19  you've heard the plaintiffs argue with our experts.  They

20  criticize their opinions and credentials.  It's the same sort

21  of political attacks that are leveled against anyone who dares

22  to question the path promoted by WPATH.

23         But if you review the reports our experts supplied,

24  you will see in the footnotes that the opinions expressed by

25  our experts are based on sound scientific studies.  Gender

reassignment surgery is not the panacea WPATH makes it out to

be.  Indeed, the only long-term studies that have been

conducted show that individuals who have gender reassignment

surgery have a 19 percent higher rate of successful suicide

after 10 years than the general public.  At a minimum, this

Court needs to hear the evidence and examine the underlying

scientific reports before it strikes down the AHCCCS rule.

Now, in reply, the plaintiffs' specific criticisms

leveled against Dr. Levine are addressed by Dr. Janssen, and

he points to a number of studies that debate the studies

relied on by Dr. Laidlaw and Dr. Levine, but here are some key

points to take away from the Dr. Janssen reply and the reply

by Dr. Schechter.

Number one, both Dr. Schechter and Dr. Janssen admit

that male chest reconstruction surgery is not medically

appropriate until at least adolescence.  That's important

because the proposed class here is anybody under the age of

21.  Two, neither Dr. Janssen nor Dr. Schechter can point to

any long-term study showing that gender reassignment surgery

is safe and effective for adolescents.

Number three, nothing in the replies by Dr. Janssen

or Dr. Schechter rebuts the studies and evidence relied upon

by Dr. Levine and Dr. Laidlaw to show that gender dysphoria

will not persist into adulthood in 80 to 95 percent of

children if the condition is simply left untreated.

1          As the Court pointed out, even the DSM-5 points out

2   that persistence is rare.  The DSM-5 -- I want to quote it

3   exactly.  The DSM-5 says that, in natal males, persistence of

4   gender dysphoria has ranged from 2.2 percent to 30 percent.

5   In natal females, persistence has ranged from 12 percent to 50

6   percent.

7          I heard the plaintiffs today trying to argue even

8   with the DSM-5 that there can be no doubt that the scientific

9   evidence suggests that there is reason to do nothing with

10  gender dysphoric children, the group of people here at issue,

11  because the experts certainly disagree about whether it's

12  better to provide treatment or just let it play out and see

13  what happens.

14         Now, Dr. Janssen points to three studies, and I want

15  the Court to look at those studies carefully because they're

16  very interesting.  The first is the Bränström study that was

17  conducted in 2020.  This is a peer-reviewed study, and when

18  the peer-review happened on this study, the American Journal

19  of Psychiatry just this year had to issue a correction saying

20  that the study, quote, did not support a finding of improved

21  mental health post surgery.  That's critical.  This year the

22  Journal of American Psychiatry has already changed its view

23  with regard to the Bränström study.

24         The second one is the Olson-Kennedy study from 2018.

25  Take a look at the details of that study, Your Honor.  The

survey involved only 136 participants, all of whom identified
as transgender.  68 had chest reconstruction surgery; 68 did
not.  As Dr. Laidlaw points out, the study used a survey tool
that had not been scientifically validated, and it included
children as young as 13 and 14 years of age.  For these
reasons, Dr. Laidlaw called the survey flawed and unethical.

I would add that the survey was not a long-term
study.  The vast majority of respondents, 59 out of 68 of
them, were less than two years post surgery.  Only one was
five years post surgery.

They also point to the de Vries study, which is a
Dutch study from 2014.  It examined just 55 patients based on
the conclusion of the SRS patients one year after surgery.
Importantly, the mean age of the participants in that survey
was only -- was 20.7 years of age, which means that the study
has almost nothing to say about the class of adolescents and
children proposed here.

The bottom line is, the evidence -- the claim that
the plaintiffs make that this surgery is proven to be safe and
effective simply does not have the scientific support they
would like.  Take a look at Dr. Schechter's reply at paragraph
20.  He makes this bold statement under the heading,
"Peer-reviewed research indicates that male chest
reconstruction is safe and effective."  He then goes on to
say, "Here the existing literature indicates that male chest

1    reconstruction surgery is safe and effective treatment for

2    individuals with gender dysphoria, including adolescents."  I

3    was looking really hard for a footnote there.  There is none.

4    There's not a single citation to any study to back up that

5    bold claim by Dr. Schechter.

6          Now, on the other hand, we point to two studies,

7    long-term studies.  Our experts point to two of them.  They're

8    in the Laidlaw Declaration, page 35.  The Dhejne study, a

9    long-term follow-up with transsexual persons undergoing sex

10   reassignment surgery.  This study examined data from 324

11   patients who underwent gender reassignment surgery.  It

12   carefully compared the group with matching individuals in the

13   general population.  It found that, when followed out beyond

14   10 years, the gender reassignment group had 19 times the

15   complete suicide rate and nearly three times the rate of

16   all-cause mortalities than the general population.  A similar

17   study by Simonsen in 2016 out of Denmark reached similar

18   results.

19         Perhaps it's for this reason that the Centers for

20   Medicare & Medicare Services, which is the federal agency that

21   makes determinations about Medicaid eligibility, says there is

22   inconclusive evidence to support a coverage determination

23   based upon the efficacy of gender reassignment surgery.

24         Your Honor, the bottom line is that these plaintiffs

25   simply cannot prove that gender reassignment surgery is safe

1  and effective for children and adolescents.

2          Finally, I would point out that the plaintiffs bring

3  this claim under two federal statutes and the Constitution.

4  Neither the Constitution nor the statute cited say anything

5  about gender reassignment surgery.  Plaintiffs are asking this

6  Court to interpret those statutes and the Constitution in a

7  way that would require the surgery, but the plain language of

8  those documents is silent.

9          And perhaps more importantly, not one of the cases

10  cited by the plaintiffs have provided the relief requested

11  here.  You can -- I've looked up every one of their cases in

12  their briefs, Your Honor, and I can say quite confidently that

13  no Court has interpreted the Medicaid Act, the Affordable Care

14  Act, or the Constitution to require a state agency to pay for

15  gender reassignment surgery for children and adolescents.  If

16  this Court were to do so, it would be the first.

17          Thank you.

18          THE COURT:  All right.  Thank you.

19          And Mr. Barton, just -- I want to follow up on --

20  that was -- you talked about the Bränström study, that there

21  was a -- you said just the last year there was a change in

22  that or they --

23          MR. BARTON:  Yes, that's the Bränström,

24  B-r-a-n-s-t-r-o-m, study cited at page 28 of the Janssen

25  reply, or paragraph 28.

 1          THE COURT:  And you said there was -- just the last

 2  year that there was some kind of amendment or clarification on

 3  that study?

 4          MR. BARTON:  Correct.  Professor or Dr. Laidlaw

 5  talks about this in his declaration in paragraph 38, that this

 6  is a study that was released initially, suggested that, you

 7  know, transgender health was improved through surgery, but

 8  after it was released, the American Journal of Psychiatry

 9  issued a correction in August of 2020 saying that the study

10  did not, in fact, support an improved mental health post

11  surgery.

12          THE COURT:  Okay.  And Mr. Barton, when we had our

13  first kind of hearing in this particular matter, and I kind of

14  discussed with the parties about whether the Court thought it

15  might be necessary to have an evidentiary hearing before I

16  actually ruled on the preliminary injunction motion, you

17  indicated that you didn't think it was necessary, but what I

18  hear you saying and what I hear Mr. Orr saying is that, you

19  know, we each have experts that --

20          (Noise interruption.)

21          THE COURT:  Whoa.  I don't know what that was, but

22  thank you for getting it under control.

23          It sounds to me like I've got a battle of the

24  experts to some degree, and then, based upon your comment,

25  that AHCCCS does have a process where it could look at these

 1   particular individuals and say, okay, in this unique

 2   situation, maybe male chest reconstruction surgery is

 3   medically necessary or safe and effective because of these

 4   unique circumstances.  Have I kind of got that right?  Is that

 5   what -- I mean, would you disagree with that?

 6          MR. BARTON:  Your Honor, I'm sorry.  You cut out

 7   there for just a second.  Let me try and understand by trying

 8   to restate your question.

 9          I think the first question was, do we believe that

10   there is a need for discovery and a full evidentiary hearing?

11   The answer to that is yes.

12          THE COURT:  Well, then why, when I kind of -- before

13   you go on, then why when I raised that issue when we first had

14   our first hearing and I asked the parties, you know, I said,

15   you know, the Court may believe that I need an evidentiary

16   hearing before I can rule on the preliminary injunction, the

17   plaintiff said, no, Judge, you don't, but you also said, no, I

18   don't.  And so I thought, well, then I'm going to dig into

19   this a little deeper.  Maybe it's not necessary.

20          But as both of you, Mr. Orr and yourself, sit here

21   and argue, it sounds like I've got a battle of the experts.

22   You've got experts that say one thing; he's got experts that

23   say another.  I've got to judge the credibility of those

24   experts and their studies and what they rely on before I can

25   really make an informed decision on this.

 1            MR. BARTON:  I guess my thought was on that, Your

 2    Honor, that I don't think they can meet the standard.  The

 3    standard requires them to prove, in essence, beyond a doubt

 4    that, for these particular plaintiffs, this is medically

 5    necessary, and for the reasons I described today, I don't

 6    think they can do that or the evidence they presented does

 7    that.

 8            When we get to the broader question -- and so I

 9    don't think they're entitled to a preliminary injunction.  I

10    think you can decide that as, you know, basically based on the

11    evidence presented, but when it comes to the broader question

12    about the second requested relief which they have, which

13    should be -- which is, should the Arizona Health Care Cost

14    Containment System be required to abandon its exclusion, that

15    certainly is going to require much more evidence and much more

16    evaluation of the evidence --

17            THE COURT:  All right.  Well, then --

18            MR. BARTON:  -- including the battle of the experts.

19            THE COURT:  All right.  And then that gets me back

20    to the other thing that you kind of brought up, which there is

21    a process that AHCCCS has in place that these particular

22    plaintiffs, given their unique situation, could apply to have

23    male chest reconstruction surgery because it might be

24    medically necessary and/or safe and effective for them.

25            Did I understand that correctly?

 1           MR. BARTON:  That is correct.

 2           THE COURT:  Okay.

 3           MR. BARTON:  And I will volunteer this, Your Honor,

 4    although I will not disclose this completely because we

 5    haven't yet reviewed the data, we're still in the process of

 6    gathering the data, but in response to plaintiffs' discovery

 7    request, we did some searches to find out, you know, what's

 8    happened with regard to transgender youth who have sought

 9    chest reconstruction surgery.  It appears, based on a

10    preliminary finding, and I need to verify this, we've had at

11    least two cases where they have been approved through AHCCCS.

12           THE COURT:  Okay.  Any further thoughts, Mr. Barton,

13    before I switch back to Mr. Orr?

14           MR. BARTON:  No, Your Honor.

15           THE COURT:  All right.  Mr. Orr, I may give you a

16    couple extra minutes because, again, you can tell by my

17    comments, I'm concerned about this exhaustion of

18    administrative remedies.  I understand that there is some

19    dispute.  I mean, you may disagree with that, but there is

20    some dispute about -- between experts about whether this

21    procedure is generally necessary and/or safe and effective,

22    but it may be necessary or safe and effective for your

23    particular plaintiffs, in which case there is a process

24    already established within AHCCCS to basically have that

25    evidentiary hearing, to have the experts testify, to, you

1    know, submit all the studies and everything else, before this

2    Court should have to hear all that, and I'd really like your

3    thoughts on that.

4            MR. ORR:  Thank you, Your Honor.

5            There's no administrative exhaustion requirement for

6    the claims that plaintiffs bring here.  What plaintiffs are

7    requesting here, Your Honor, is an order that the exclusion

8    itself violates federal law, both statutory and constitutional

9    law.  So it's not specific to the medical necessity of this

10   procedure for D.H. or John Doe.

11           And you know, as I indicated in my urging earlier,

12   our understanding is that, if the Court were to agree and

13   issue the preliminary injunction enjoining AHCCCS from

14   considering the exclusion, that then that would open up the

15   process for plaintiffs to submit a prior authorization

16   request.  The process --

17           THE COURT:  Why would that open up the process,

18   Mr. Orr?  I guess that's where I'm losing you.  I understand

19   the process is already in place.  Why do I need to make a

20   ruling to get that process in place?  According to Mr. Barton,

21   that process is in place, and I don't need to make a ruling

22   for you to pursue those avenues of remedy for your particular

23   plaintiffs.

24           MR. ORR:  Thank you, Your Honor.

25           Pursuing those remedies, Your Honor, would be

 1  futile.  There is an exclusion that would always prevent our

 2  clients from getting coverage.  Their denial of the prior

 3  authorization for D.H. said explicitly that we are denying

 4  this because of the exclusion.  It doesn't matter if it's

 5  medically necessary or not, this is excluded under our state

 6  plan and, therefore, we don't cover it.  There was no

 7  determination of medical necessity anywhere in that

 8  assessment, and Courts have consistently made clear that

 9  plaintiffs have the right under Section 1983, through the

10  Medicaid Act, and other legal remedies to challenge a Medicaid

11  agency's determination of what is or is not excluded for

12  coverage, and so there is no need to go through that

13  administrative process simply to challenge the legality of the

14  exclusion here.

15          THE COURT:  Well, I understand your argument, but it

16  sounds to me that what you really want me to do is argue on

17  this kind of higher plain, if you will, kind of almost

18  ignoring your particular defendants, or plaintiffs, excuse me.

19  I mean, they're just kind of there because they happen to be a

20  useful purpose to get to this larger argument that you wish to

21  bring regarding the, you know, whether the exclusion itself

22  violates federal law.

23          I guess I'm more interested in your particular

24  plaintiffs, and if they've got a remedy and an avenue and a

25  possibility that, without going through this whole big lawsuit

 1  and everything else, they could apply to AHCCCS and

 2  potentially get coverage, you know, why should I make a

 3  decision about the federal viability of the exclusion itself?

 4        MR. ORR:  Well, Your Honor, D.H. has tried that

 5  process and was outright denied, and John Doe couldn't go

 6  through that process because of the exclusion.  There were no

 7  competent providers from which he could seek an assessment,

 8  providers covered by AHCCCS where he could seek an assessment

 9  to seek that prior authorization.

10        So the difficulty, Your Honor, is that our clients

11  don't even really have access.  Sure, they can -- you know,

12  maybe they can find -- their pediatrician can submit a prior

13  authorization or somebody else can submit a prior

14  authorization, but they still don't have -- there's no way for

15  that authorization to be approved because of the exclusion.

16  The exclusion says, regardless of whether or not it's

17  medically necessary, that doesn't matter, we just don't cover

18  these surgeries, and they don't cover these surgeries because

19  they're transgender, and they're there to treat a condition

20  associated with being transgender.

21        THE COURT:  Okay.

22        MR. ORR:  And so the administrative process is not

23  really available to them, and that's why we came to Federal

24  Court seeking an order instructing AHCCCS to not consider that

25  exclusion when they're evaluating the medical necessity,

essentially requiring them to look at the actual medical
necessity and not just dismiss it outright because of the
exclusion.

THE COURT:  All right.  What else did you want to
address, sir?

MR. ORR:  Sure.  I have a number of points, Your
Honor.

First, and I'll try and take them sort of
chronologically through Mr. Barton's argument, regarding the
mandatory injunction, as I noted in my argument, in M.R. v.
Dreyfus, the Ninth Circuit upheld an order and injunction that
required Washington Medicaid to pay for services it did not
believe it should be required to pay for, and so I don't think
that that necessitates that this is a mandatory injunction,
and in fact, in M.R., the Ninth Circuit applied the
prohibitory injunction standard.

THE COURT:  Okay.

MR. ORR:  With regards to their refusal of medical
records, you know, this injunction is really about the legal
arguments, and in fact, you know, Drs. Laidlaw and Levine made
clear that the facts are irrelevant to them.  They do not
believe that any of these treatments for the treatment of
gender dysphoria is ever appropriate, and Dr. Laidlaw
specifically said as much in his declaration.

With regard to Mr. Barton's claim that this is

just -- these are just therapists who are not allowed to
prescribe anything, you know, this process is consistent with
the standard of care.  The standard of care requires that a
young person for whom medically -- who male chest
reconstruction surgery may be medically necessary to have to
first obtain a letter from their mental health provider
demonstrating that they are -- that they've met the
requirements, the underlying requirements, and then they have
to be evaluated by a medical provider, which, you know, could
not happen in this case, again, because of the exclusion.

        With regards to WPATH, that is an organization of
medical and mental health and other professionals that treat
and work with transgender patients.  It's not an advocacy
organization, you know, and as Dr. Janssen noted in his
declaration, that he's had patients who presented to him with
some of the symptoms or sort of precursors of gender
dysphoria, but ultimately, because they didn't have gender
dysphoria, he recommended treatments other than transition or
transition-related care for them.  So this idea that it's sort
of like a factory, everyone comes in, gets a gender dysphoria
diagnosis, and then automatically gets treatment, that is not,
in fact, accurate.

        And there are long-term studies.  The de Vries study
is a long-term cohort study involving transgender young people
that they followed from the beginning of puberty, through

surgery, and found that the mental health outcomes in that
cohort of people was identical to the general population, with
the exception that they were more likely to seek advanced
educational degrees.  So again, I would challenge
Dr. Barton or Mr. Barton's discussion on that.

With regard to the Dhejne study and the mortality
rates, you know, Drs. Laidlaw and Levine consistently cited
this study, but in fact, the study itself says that the higher
mortality rates -- there is no causal connection between
either the treatment for gender dysphoria and the higher
mortality rates.  The study was not designed to look at that
and, therefore, cannot support such conclusion.

Similar to the Bränström study, it is true that the
initial study indicated there was a causal relationship, but
the current study, the republished version, says that there's
still a positive correlation between undergoing treatments for
gender dysphoria and improvements in mental health.

THE COURT:  Well, and isn't one of your clients,
they were receiving -- AHCCCS was covering hormone therapy,
and they were doing better, the hormone therapy really helped,
they improved their mental health, and they were better?  But
I mean, your position is, is that it wasn't enough; right?

MR. ORR:  Well, Your Honor, and this was explained a
little bit further in Dr. Janssen's declaration, but what's
something that often happens is that the testosterone helps

address a portion of the gender dysphoria, but the changes

that are caused by the testosterone, namely facial hair and

the dropping voice, that in some respects also increased the

disconnect between their presentation, because here you have a

transgender guy who's got a deep voice and facial hair but

also has a female-appearing chest.

And so it's very common for testosterone treatment

to improve gender dysphoria significantly, but given that in

this case both D.H. and John started undergoing puberty

significantly before starting testosterone, that it's not

surprising that, given their -- the way that they present to

the world, that they still have gender dysphoria, and no

amount of therapy or testosterone is going to address that

because, ultimately, the chest is still the same, and that is

what is causing the persistent dysphoria.

With regards to Mr. Barton's reference to the Center

for Medicare and Medicaid Services, in fact, CMS used to have

an exclusion that's nearly identical to the one that AHCCCS is

defending here, and an internal appeals within the U.S.

Department of Health and Human Services found that that

exclusion is not reasonable and ultimately eliminated that

exclusion from Medicare services.

And so Medicare does, in fact, cover

transition-related surgeries, and it does so on a case-by-case

basis, which is exactly what our clients are seeking here, is

1   an opportunity to demonstrate that it is medically necessary

2   for them, which they cannot do because of the exclusion.

3           THE COURT:  And Mr. -- and Mr. Orr, Mr. Orr, we seem

4   to be going circular again, because you're saying, because of

5   the exclusion, they can't do the administrative remedies.

6           Is it your position that AHCCCS has no internal

7   administrative procedure for reviewing denial of coverage

8   decisions for generally excluded treatment under Arizona

9   Administrative Code R9-22-205(B)(4)?

10          That's a very specific question, and I'd like you to

11  answer it, please.

12          MR. ORR:  Sure.

13          Your Honor, my understanding is that, once a

14  Medicaid recipient files or seeks prior authorization, that

15  they will get back a response either -- or in this case a

16  denial because of the exclusion, and at that point, if they

17  choose, they can go to a state fair hearing, but that

18  exhaustion requirement, that is not an administrative remedy

19  that plaintiffs are required to exhaust prior to filing a

20  complaint in Federal Court, certainly in a case such as this,

21  when it's claiming that the exclusion itself violates federal

22  law.

23          THE COURT:  All right.  Thank you.

24          Mr. Orr, I gave you more time because I was

25  interested in your responses to the various issues that

1    Mr. Barton raised, but I think at this time I need to

2    conclude, in all fairness to both sides.

3            I'm going to take the matter under advisement.  I

4    will get you out a decision as soon as possible.

5            Thank you, folks.

6            MR. BARTON:  Thank you, Your Honor.

7            MR. ORR:  Thank you, Your Honor.

8            THE COURT:  We stand at recess.

9            (Proceedings conclude at 11:24 a.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3          I, Erica R. McQuillen, Federal Official Realtime

 4   Reporter, in and for the United States District Court for the

 5   District of Arizona, do hereby certify that, pursuant to

 6   Section 753, Title 28, United States Code, the foregoing is a

 7   true and correct transcript of the stenographically reported

 8   proceedings held in the above-entitled matter and that the

 9   transcript page format is in conformance with the regulations

10   of the Judicial Conference of the United States.

11          Dated this 9th day of February, 2021.

12

13                         s/Erica R. McQuillen
                        Erica R. McQuillen, RDR, CRR
14                      Federal Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25
```