# EXHIBIT A

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the
District of Arizona

| | |
|---|---|
| D.H. and John Doe <br> *Plaintiff* <br> v. <br> Jami Snyder, Director of AHCCCS <br> *Defendant* | ) ) ) ) ) ) ) Civil Action No. 4:20-cv-00335-SHR |

**SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION**

To: El Rio Health

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See attached Exhibit A.

| Place: BurnsBarton PLC <br> 2201 East Camelback, Ste. 360 <br> Phoenix, AZ 85016 | Date and Time: <br> 05/21/2021 9:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 05/06/2021

CLERK OF COURT

_____   OR   _____
*Signature of Clerk or Deputy Clerk*            *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Jami Snyder, Director of AHCCCS , who issues or requests this subpoena, are:
Kathryn King, BurnsBarton, 2201 E. Camelback, Ste. 360 Phoenix, AZ 85016 kate@burnsbarton.com 602-753-4500

**Notice to the person who issues or requests this subpoena**
A notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B (Rev. 12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 4:20-cv-00335-SHR

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  12/13) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# EXHIBIT A
# ITEMS TO BE PRODUCED

1. All documents or other evidence that support the assertion of Dr. Andrew Cronyn that of the transgender patients at El Rio Health Center "ranging in age from four to twenty-one" years old, "more than forty of those patients are transgender boys who receive their health insurance coverage through AHCCCS and need male chest reconstruction surgery." In providing this information, please use identifiers that will allow for further discovery related to each individual while still protecting patient privacy. (*See* Declaration of Andrew Cronyn, M.D., attached as Exhibit 1, Paragraph 10).

2. The transcript of the talk "Creating a Primary Care Medical Home for Transgender Youth," which Dr. Andrew Cronyn has given at "multiple conferences." (*See* Exhibit 1, Paragraph 12).

Case 4:20-cv-00335-SHR   Document 75-1   Filed 05/06/21   Page 6 of 12

**EXHIBIT 1**

Brent P. Ray (*pro hac vice* forthcoming)
Andrew J. Chinsky (*pro hac vice* forthcoming)
KING & SPALDING LLP
353 N. Clark Street, 12th Floor
Chicago, Illinois 60654
T: +1 312 995 6333
F: +1 312 995 6330
Email: bray@kslaw.com
       achinsky@kslaw.com

Daniel C. Barr (Bar No. 010149)
Janet M. Howe (Bar No. 034615)
PERKINS COIE LLP
2901 N. Central Avenue, Suite 2000
Phoenix, AZ 85012-2788
T: +1 602 351 8085
F: +1 602 648 7085
Email: dbarr@perkinscoie.com
       jhowe@perkinscoie.com

*Counsel for Plaintiffs and the Class*

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| D.H., by and through his mother, Janice Hennessy-Waller; and John Doe, by his guardian and next friend, Susan Doe, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> Jami Snyder, Director of the Arizona Health Care Cost Containment System, in her official capacity, <br><br> Defendant. | No. <br><br> **DECLARATION OF DR. ANDREW CRONYN IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |

I, Dr. Andrew Cronyn, hereby declare as follows:

1. I am a pediatrician based in Tucson, Arizona.

2. I am licensed to practice medicine in Arizona.

3. I specialize in providing health care to transgender and LGBTQ youth.

4. As detailed herein, I provide this declaration in support of Plaintiff D.H.'s request that AHCCCS cover D.H.'s male chest reconstruction surgery as a medically necessary procedure to treat his gender dysphoria.

5. My professional opinion of D.H. is based on my in-person assessments of his health as well as a review of prior medical records, including notes from his previous primary care doctor, Dr. Arianna Foster, who had been seeing him since 2016, and his pediatric endocrinologist, Dr. Cindy Chin, who had been seeing him since 2017.

Education and Experience

6. I have a medical degree from the Albert Einstein College of Medicine.

7. I completed my residency in pediatric medicine at Montefiore Medical Center in Bronx, New York in 2000.

8. Since completing my residency, I have worked as a pediatrician in Missouri and Arizona.

9. In November 2014, after practicing in Missouri for several years, I returned to work at El Rio Health Center in Tucson, Arizona. Shortly after my return, I started treating my first transgender patient, a child whose pediatrician refused to continue seeing him because he is transgender. I reached out to nationally recognized experts in the field to learn everything I could about providing care to transgender youth. The number of transgender patients I saw grew exponentially from there.

10. Around February 2015, I became co-leader of transgender health care within El Rio. Over the past five years, the number of transgender patients at El Rio has grown significantly and now treats approximately 250 transgender youth per year ranging in age from four to twenty-one. Of those patients, more than forty of those patients are transgender boys who receive their

health insurance coverage through AHCCCS and need male chest reconstruction surgery. El Rio has a team of pediatricians, including myself, nurses, behavioral health professionals, and pharmacists who treat transgender patients.

11. I personally treat approximately 120 transgender youth per year. I provide general pediatric care in an affirming clinical setting and—when medically indicated—prescribe treatments to alleviate their gender dysphoria. The treatments I prescribe for a patient are based on my assessment of the patient and their unique needs and medical history, in consultation with the prevailing standards of care, and cover the range of clinically indicated treatments for this population. For patients who have not yet started puberty, I have prescribed and supported them through social transition, including drafting letters to assist them in correcting their identity documents. For those who have started puberty, I have prescribed puberty-delaying medications and hormone-replacement therapy and monitored their progress on those treatments. Finally, when medically necessary, I have also referred patients for gender-confirming surgeries, such as male chest reconstruction surgery.

12. I have given lectures on health care for transgender youth on several occasions, including a talk on "Creating a Primary Care Medical Home for Transgender Youth," which I've been invited to give at multiple conferences.

Assessment of D.H.

13. I began treating D.H. for gender dysphoria in January 2020. D.H. was assigned female at birth but has identified as male for many years. When I first started treating D.H., he was already living as male and had been prescribed hormone-replacement therapy (*i.e.* testosterone).

14. I provide D.H. both primary care and specialty care. D.H.'s primary care needs include general well-child care as well as ongoing care for his existing asthma. The specialty care I provide D.H. is focused on treating his gender dysphoria and includes management of his social transition and hormone-replacement therapy.

15. D.H. reports using a binder to minimize the contour of his chest since around twelve-years old.

16. I am concerned about the consequences of his continued binding on his physical health. D.H. started developing asthma in October 2019 after a bout of bronchitis. Prior to that he had never had respiratory issues. This is quite uncommon at his age.

17. In order to be effective, a binder must sufficiently constrict the wearer's rib cage to flatten the contour of their chest. That makes it difficult for the wearer to get full, deep breaths. For D.H., his prolonged and extensive use of a binder contributed to his developing asthma, a chronic lung condition. The deterioration of his lung capacity has resulted in him feeling short of breath when he wakes up in the morning and requires him to use an inhaler when engaging in increased physical activity.

18. Physical activity, however, is an important part of a child's development. Children who don't exercise have higher rates of obesity and all the concomitant health problems. Lack of exercise also contributes to mental health conditions such as depression and anxiety, conditions that are already negatively affecting D.H.'s mental health.

19. D.H. also reports issues with back pain as a result of extended use of a binder. This is a very common complaint among my patients who wear binders regularly. Although I have many patients who complain about back pain, the pain caused by extended binder use is distinct and located in the mid-back region. D.H. currently does stretches to relieve the pain, engages in limited exercise and, when necessary, decreases binder wearing, but these steps are not sufficient to alleviate the pain and other symptoms he experiences as result of wearing the binder.

20. Not wearing the binder, however, is not an effective solution as that will have multiple negative effects on D.H.'s health. D.H. indicated that he doesn't leave his home when he is not wearing his binder. The few times he recalls attempting to go outside without a binder, his gender dysphoria causes severe anxiety, such that he must return home to get the binder and put it on before he can leave again.

DECLARATION OF ANDREW CRONYN, M.D. IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
-3-

21. Although D.H. binds less when at home to avoid wearing the binder longer than the recommended eight hours per day, he reports slouching to minimize the appearance of his chest contour.

22. His mother has also informed me that when D.H. isn't binding, he is much moodier and angrier than usual. This dates back as far as middle school, when he would miss school rather than not bind. This is consistent with the experience of other patients I treat for gender dysphoria.

23. It is my opinion that it is medically necessary for D.H. to receive chest reconstructive surgery to treat his dysphoria. D.H.'s physical health will continue to decline if he is not able to obtain this surgery immediately. For example, D.H.'s continued use of a binder will exacerbate the symptoms of his asthma, especially if D.H. gets bronchitis or a respiratory infection such as pneumonia, all of which could result in further chronic damage to his lungs.

24. In addition, without chest reconstruction surgery, his back pain will very likely worsen. D.H. currently avoids taking any medication for the pain, but that might end up changing in the future if his back pain continues to increase. Approximately fifty percent of the transgender boys treated at El Rio report back pain as a result of persistent binder wearing that is significant enough to warrant referrals to a physical therapist or an orthopedic surgeon. I am concerned that D.H. will join that group of patients if does not undergo male chest reconstruction surgery soon.

25. Although he has not yet reported skin irritation with wearing the binder, that is common complication in the transgender boys seen at El Rio, especially with extended, years-long binder use. Most skin complications associated with extended binder use are treatable, however, those conditions can have significant effects on a patient's daily life. For transgender boys, skin conditions are both physically uncomfortable and exacerbate their gender dysphoria, which can have many cascading effects, including poorer mental health, inability to focus in school, among others. Given D.H.'s binder use, especially when wearing his binder for days at time, it is highly likely that he will develop skin conditions, if he does not receive chest reconstruction surgery.

26. In my opinion, D.H. requires male chest reconstruction surgery to treat his gender dysphoria and prevent the numerous physical health consequences outlined above that will result from his continued use of a binder. Given that D.H. has been wearing a binder for about five years, which is much longer than I would recommend any patient continue binding, and it is not sufficiently alleviating his gender dysphoria, his need for male chest reconstruction surgery is urgent.

I declare under penalty of perjury pursuant to the laws of the State of Arizona that the foregoing is true and correct.

Executed this 3rd th day of August, 2020 at Tucson, Arizona.

Andrew Cronyn, M.D.

DECLARATION OF ANDREW CRONYN, M.D. IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION
-5-